**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| BETHEL MINISTRIES, INC., | * | |
| *Plaintiffs*, | * | |
| v. | * | No. 1:19-cv-01853-ELH |
| DR. KAREN B. SALMON, *et al*., | * | |
| *Defendants*. | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

**DEFENDANTS' MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS**

BRIAN E. FROSH
Attorney General of Maryland

SARAH W. RICE (NO. 29113)
ROBERT A. SCOTT (NO. 24613)
Assistant Attorneys General
200 Saint Paul Place
Suite 1700
Baltimore, Maryland  21202
srice@oag.state.md.us
410-576-7847
410-576-6955 (facsimile)

September 3, 2019

Attorneys for State Defendants

# TABLE OF CONTENTS

Page

INTRODUCTION ............................................................................................. 1

FACTS AS ALLEGED IN THE COMPLAINT AND STATUTORY
    BACKGROUND ...................................................................................... 3

ARGUMENT ................................................................................................... 9

I.      BETHEL HAS NOT SUFFICIENTLY ALLEGED THAT IT HAS STANDING TO
      BRING A FREE EXERCISE CLAIM. .............................................................. 9

II.    BETHEL MUST ALLEGE SPECIFIC FACTS SUFFICIENT TO SUPPORT ITS LEGAL
      CLAIMS. .............................................................................................. 10

III.   THE FIRST AMENDMENT PERMITS STATES TO PROTECT VULNERABLE
      GROUPS FROM DISCRIMINATION IN EDUCATION ....................................... 11

      A.    The BOOST Nondiscrimination Requirements Are Neutral as to
           Religion and Therefore Do Not Violate the Free Exercise or
           Establishment Clauses. ............................................................... 12

           1.    Even if Bethel had Standing to Raise a Free Exercise Claim, It
                Failed to Allege One Under Any Theory. ....................................... 12

           2.    Because the BOOST Nondiscrimination Provisions Are
                Neutral, Bethel Has Not Alleged a Violation of the
                Establishment Clause. .................................................................. 19

      B.    Bethel Has Failed to Adequately Allege Facts Sufficient to Establish
           a Violation of the Free Speech Clause Under Any Theory. ......................... 20

           1.    Requiring Bethel's Written Admissions Policy to Conform
                with the Nondiscrimination Requirement Is a Regulation of
                Conduct. ..................................................................................... 21

           2.    The BOOST Nondiscrimination Requirement Is a Permissible
                Condition on State Funding. ......................................................... 23

3.     Ensuring State Funds Do Not Support Discrimination in
       Education Is A Compelling State Interest. ...................................... 25

IV.    BETHEL HAS NO CONSTITUTIONAL CLAIM UNDER THE FOURTEENTH
       AMENDMENT ......................................................................................... 28

   A.   Bethel's Fourteenth Amendment Claims Are Barred Because It Has
        No Liberty or Property Interest in Receiving BOOST Funds. .................... 28

   B.   The BOOST Law Is Not Unconstitutionally Vague and Bethel
        Cannot Challenge Vagueness on an As-Applied Basis. .............................. 30

   C.   The State Defendants Had a Rational Basis for Bethel's Exclusion
        from the BOOST Program. ......................................................................... 32

   D.   There Is No Parental Right to Government Funding of Private
        Educational Choices. .................................................................................. 33

CONCLUSION ............................................................................................. 35

## INTRODUCTION

Defendants State Superintendent Dr. Karen B. Salmon, along with Broadening Options and Opportunities for Students Today ("BOOST") Board Chair Matthew Gallagher and BOOST Board members Marva Jo Camp, Linda Eberhart, Dr. Nancy S. Grasmick, Elizabeth Green, Beth Sandbower Harbinson, and Dr. A. Skipp Sanders (collectively "the BOOST Board"), all sued in their official capacities, move to dismiss Count I of the complaint for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and all counts for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6).

Bethel Ministries, Inc. ("Bethel") asserts six constitutional claims based in the First and Fourteenth Amendments in response to the BOOST Board's decision to disqualify Bethel from receiving BOOST student scholarship funding because Bethel's written admissions policy states that it will punish applicants based on their sexual orientation.

In Counts I and VI, Bethel alleges claims under the Free Exercise Clause and Establishment Clause. Bethel does not have standing to raise Count I because it is not an individual and the requirements for organizational standing cannot be met for a Free Exercise claim. Moreover, the BOOST nondiscrimination requirements are neutral laws of general application, and the complaint's allegations fail on their face to adequately allege any statements by BOOST that could be construed as hostile toward religion. These Counts must therefore be dismissed.

In Count II, Bethel alleges a violation of the Free Speech Clause under three different theories: that the nondiscrimination clause is an impermissible viewpoint-based regulation, a content-based regulation, and an unconstitutional condition. All three fail as a matter of law because nondiscrimination requirements do not regulate speech at all.  They are instead permissible regulation of conduct—here, Bethel's adherence to an admission policy that permits exclusion of students based on sexual orientation or gender identity. Moreover, the State's desire to limit its private school scholarship program to subsidize only schools that do not discriminate is a scope-defining element of the program and is a compelling state interest.  Maryland's interest in not granting the State's imprimatur to discriminatory educational admissions policies is achieved with minimal burden to Bethel through the BOOST regime, which allows Bethel to continue to express its position in the classroom and even elsewhere in its student handbook, as long as it refrains from adopting policies to exclude protected groups from admission.

In Counts III, IV, and V, Bethel alleges three Fourteenth Amendment claims that the Boost statute is void for vagueness, infringes on parental rights, and results in the unequal treatment of Bethel without rational basis.  As an initial matter as to Counts III and V, Bethel has not adequately alleged a property interest.  Moreover, the nondiscrimination statute gives reasonable notice about which conduct is prohibited—discriminating against people because of their sexual orientation or gender identity (as further defined in Maryland nondiscrimination law) in admissions to nonpublic schools receiving BOOST scholarship funding.  And the BOOST Board had a rational basis for its administrative decisonmaking;

Bethel's written admissions policy indicated that students would be disciplined, up to and including expulsion, on the basis of conduct inconsistent with a heterosexual status.  Other nonpublic schools, even those identified by Bethel as sharing Bethel's beliefs, did not have such admissions policies.  Last, parents have no liberty interest in a state subsidy of their private educational choices for their children.

Bethel has failed to plead facts sufficient to establish any cause of action based in the First or Fourteenth Amendments against the BOOST Board.  Bethel's complaint should therefore be dismissed in its entirety.

## FACTS AS ALLEGED IN THE COMPLAINT AND STATUTORY BACKGROUND

The BOOST Program was enacted as part of the Fiscal Year 2017 Budget legislation.  2016 Md. Laws ch. 143 at 130-35.  The purpose of the BOOST Program is to "provide[] scholarships for students who are eligible for the free or reduced-price lunch program to attend eligible nonpublic schools." *Id.* at 131.  Eligible student applicants are ranked by need, and the BOOST Advisory Board is charged with reviewing and certifying the applicants as well as setting scholarship amounts.  *Id.* at 138-9. In Fiscal Year 2017, the budget provided $5.5 million for the BOOST Program.  *Id.* at 142.

The law also set forth eligibility requirements for nonpublic schools at which the scholarships can be used, including a requirement to (1) comply with Title VI of the Civil Rights Act of 1964; (2) comply with Title 20, subtitle 6 of the State Government Article, and (3) "not discriminate in student admissions on the basis of race, color, national origin,

or sexual orientation." *Id.* at 137. In the most recent legislative session, the requirements for the upcoming BOOST Program year were amended to require participating nonpublic schools "to not discriminate in student admissions, retention, or expulsion or otherwise discriminate against any student on the basis of race, color, national origin, sexual orientation, or gender identity or expression." 2019 Md. Laws ch. 565 at 151.

The nondiscrimination requirement further specifies that nonpublic schools are not required "to adopt any rule, regulation, or policy that conflicts with its religious or moral teachings." 2016 Md. Laws ch. 143 at 137. This statement is subject to a modifying clause in the next sentence, which provides "[h]owever, all participating schools must agree that they will not discriminate . . . ." *Id.* If a participating school does not "agree that they will not discriminate in student admissions on the basis of race, color, national origin, or sexual orientation," the school is required to "reimburse MSDE all scholarship funds received under the BOOST Program and may not charge the student tuition and fees instead." *Id.*

In program years 2016 and 2017, "Bethel signed the MSDE assurance that it does not discriminate in admissions based on sexual orientation." Compl. ¶ 73. In December 2017, MSDE requested handbooks from schools participating in BOOST and Bethel complied by providing its parent-student handbook. *Id.* at ¶¶ 95-96. Bethel's handbook contains a section captioned "**ADMISSIONS POLICY.**"[1] ECF 1-4, 8. Within the

---

[1] It is proper to consider material attached to the complaint upon a motion to dismiss when the plaintiff "attaches or incorporates a document upon which his claim is based." *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 167 (4th Cir. 2016).

admissions policy, Bethel specifies, in addition to its admissions criteria, that "[p]arents must understand that continued enrollment of their child(ren) is dependent on their support of the school, its staff, and its policies." *Id.* Directly following this statement, under a heading "**Statement of Nondiscrimination**," Bethel specifies that it "admits students of any race, color, and national or ethnic origin to all the rights, privileges, programs, and activities" and that "[i]t does not discriminate on the basis of race, color, national and ethnic origin in administration of its educational policies, admissions policies . . . and other school-administered programs." *Id.* Bethel does not include sexual orientation or gender identity in its statement of nondiscrimination. *Id.* Instead, Bethel informs potential applicants that "[i]t should be noted, however, that Bethel Christian Academy supports the biblical view of marriage defined as a covenant between one man and one woman, and that God immutably bestows gender upon each person at birth as male or female to reflect His image." *Id.* Bethel goes on to caution that "faculty, staff, and student conduct is expected to align with this view," and requires faculty, staff, and students "to identify with, dress in accordance with, and use the facilities associated with their biological gender." *Id.*

Bethel enrolls students from prekindergarten through 8th grade. Compl. ¶ 36. Maryland prohibits individuals under the age of 15 years old from marrying in all circumstances, even with parental consent. Md. Code, Ann., Family Law Article, § 2-301(c) (LexisNexis 2012). No student of Bethel, therefore, could be in a same-sex marriage while enrolled at Bethel, but nevertheless, Bethel's policy requires "student

conduct" "to align with" the view that marriage is "a covenant between one man and one woman," a standard on which the student's "continued enrollment" depends.  ECF 1-4, 8.

The Maryland State Department of Education (MSDE) and the BOOST Advisory Board asked Bethel for further explanation about how Bethel reconciled its assurance that it did not discriminate based on sexual orientation with its policy language which does not include sexual orientation as a category of non-discrimination and which is juxtaposed with a policy requiring student conduct to align with a "view of marriage defined as a covenant between one man and one woman," Compl. at ¶ 102, behavior on which "continued enrollment" depends.  Bethel responded by affirming that its statement about marriage and gender identity applies when "a student *has been admitted*." ECF 1-6, 3.  Bethel recognized that it communicated its "policy regarding *student conduct*" to potential students because Bethel "believe[s] it is important that students and parents understand . . . the requirements of BCA Students." ECF 1-7.  Bethel did not and has not denied that a student could be subjected to discipline or expulsion after admission on the basis of sexual orientation status. ECF 1-6, 1-7.

The BOOST Board deliberated about whether Bethel's admissions policy met the BOOST legislation's nondiscrimination requirement in open session at its May 3, 2018 meeting.  Compl. ¶ 105.  In follow-up to questions from the BOOST Board, on May 29, 2018, Bethel sent a second letter further explaining its own interpretation of its policies. ECF 1-8.  There Bethel asserted that "[a]ny student . . . is welcome to join our school community regardless of religious beliefs, experience of same-sex attraction, sexual self-

identification, past participation in same-sex behavior, beliefs about marriage, or beliefs about sexual morality." *Id.* Bethel also emphasized that its "behavioral standards address student actions," and that "sexual behavior of any type" was impermissible under those standards. *Id.* However, Bethel did not explain why its admission policy contained a nondiscrimination statement that omitted sexual orientation as a class, or why it specifically mentioned conduct (same-sex marriage) only entered into by non-heterosexual students in the text of its admissions policy. *Id.* Unlike the policies of several schools approved for BOOST that contained general disapproval of sexual misconduct by students, ECF 1-11 (*e.g.* Grace Academy, Highland View Academy, Spencerville Academy), Bethel's admissions policy is silent as to student conduct standards regarding "sexual behavior of any type." ECF 1-4, 8. Bethel also did not explain why its statements in the letter about who was welcome to join the school were not reflected in its admissions policy. ECF 1-8.

On June 21, 2018, the BOOST Board entered into closed session and decided Bethel was ineligible for the BOOST program. Compl. ¶ 129. At the same time, it decided that Broadfording Christian Academy and Grace Academy were eligible for the BOOST program, but that Woodstream Christian Academy was not. *Id.* at ¶¶ 131-32. On August 8, 2018, the BOOST Board sent a letter to Bethel memorializing its decision and explaining that it had proceeded to examine Bethel's admission policy on the principles that (1) a bona fide offer of admission necessarily entailed that the offer not be extended with the understanding that the school would "discipline or expel a student because of the student's sexual orientation, as this would make acceptance at the school illusory"; and (2) "[a]

discipline policy that, on its face, singles out conduct or behavior based on the sexual orientation of the student for discipline or expulsion does violate the nondiscrimination clause contained in the BOOST law." ECF 1-9.  The letter further explained that discipline policies that prohibited certain conduct "without regard to sexual orientation" would not violate the nondiscrimination clause.  *Id.*  In examining Bethel's policy, the Board concluded that Bethel's requirement that students "align their conduct to the view of marriage as a covenant between one man and one woman (i.e., heterosexual)" meant that "[a] non-heterosexual student may reasonably view the policy as one that allows denial of admission or discipline or expulsion on the basis of his or her sexual orientation." *Id.*  The Board concluded that "this policy, on its face, was in conflict with the nondiscrimination clause contained in the BOOST law." *Id.*

On December 12, 2018, the Maryland State Department of Education sent Bethel an invoice for the total scholarship amounts it received for the 2016-2017 school year and the 2017-2018 school year, $102,600.  ECF 1-10.  The letter indicated that "[i]f the school can demonstrate that it is financially unable to pay this indebtedness in one lump sum, payment in installments may be arranged." *Id*.  Bethel's complaint is silent as to whether it requested payment in installments or any other accommodation or reconsideration of the BOOST Board's decision.

## ARGUMENT

### I.    BETHEL HAS NOT SUFFICIENTLY ALLEGED THAT IT HAS STANDING TO BRING A FREE EXERCISE CLAIM.

Bethel has not sufficiently alleged facts to establish a plausible claim for standing under the Free Exercise Clause. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (standing must be established "with the manner and degree of evidence required at the successive stages of the litigation"). The Free Exercise Clause's "purpose is to secure religious liberty in the individual." *School Dist. of Abington Twp., Pa. v. Schempp*, 374 U.S. 203, 223 (1963). Bethel is not an individual, but rather a "non-profit religious corporation under the laws of the State of Maryland." Compl. ¶ 21. In order for Bethel to proceed under an organizational theory of standing, it must adequately allege: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). As a threshold matter, Bethel has not alleged any injury to any of its members' right to free exercise of religion. Compl. ¶ 164 (alleging injury only as to Bethel). More fundamentally, a Free Exercise claim "is one that ordinarily requires individual participation." *Harris v. McRae*, 448 U.S. 297, 321 (1980). Organizations do not have standing to press Free Exercise

Clause claims of their members.[2]  *Id*; *accord Cornerstone Christian Sch. v. University Interscholastic League*, 563 F.3d 127, 134 (5th Cir. 2009) (school did not have standing to assert Free Exercise claim related to sports league membership).  Therefore Bethel's Free Exercise Clause claim should be dismissed for lack of jurisdiction under 12(b)(1).

## II.  BETHEL MUST ALLEGE SPECIFIC FACTS SUFFICIENT TO SUPPORT ITS LEGAL CLAIMS.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  This "plausibility" standard demands "more than a sheer possibility that a defendant has acted unlawfully."  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556).  That is, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).  In applying this standard, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation," and "[t]hreadbare recitals of the elements of a cause of action,

---

[2] *Burwell v. Hobby Lobby Stores, Inc.* is not to the contrary; there, the Supreme Court held that the Religious Freedom Restoration Act's ("RFRA's") use of the word "person" extended its scope of protection to include nonprofit corporations and closely-held for profit corporations.  *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 708 (2014).  RFRA is not applicable to the states.  *City of Boerne v. Flores*, 521 U.S. 507, 536 (1997).

supported by mere conclusory statements, do not suffice" and "are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 678–79.

## III.   THE FIRST AMENDMENT PERMITS STATES TO PROTECT VULNERABLE GROUPS FROM DISCRIMINATION IN EDUCATION.

The Supreme Court recently rejected Bethel's main contention in this lawsuit when it reaffirmed that while "religious and philosophical objections are protected, it is a general rule that such objections do not allow . . . other actors in the economy and in society to deny protected persons equal access to goods and services under a neutral and generally applicable public accommodations law." *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Com'n*, 138 S.Ct. 1719 (2018); *see also Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 572 (1995) (nondiscrimination provisions "are well within the State's usual power to enact when a legislature has reason to believe that a given group is the target of discrimination, and they do not, as a general matter, violate the First or Fourteenth Amendments").

Bethel has alleged no facts that would justify departure from this general rule. Bethel's assertions that its religious beliefs exempt it from Maryland's neutral nondiscrimination provisions are at odds with decades of jurisprudence. Such nondiscrimination requirements are common.  In its decision holding that programs like the BOOST program, which provide scholarships to students to attend private schools of their choice, did not violate the Establishment Clause, the Supreme Court expressly noted that a key element of the program was that "[p]articipating private schools must agree not

to discriminate." *Zelman v. Simmons-Harris*, 536 U.S. 639, 645 (2002).  Bethel's claim that it is somehow exempt from this neutral law of general applicability because of its religious beliefs under the First Amendment is a claim without legal foundation. "Invidious private discrimination may be characterized as a form of exercising freedom of association protected by the First Amendment, but it has never been accorded affirmative constitutional protections." *Norwood v. Harrison*, 413 U.S. 455, 470 (1973).[3]

A.     **The BOOST Nondiscrimination Requirements Are Neutral as to Religion and Therefore Do Not Violate the Free Exercise or Establishment Clauses.**

1.     **Even if Bethel had Standing to Raise a Free Exercise Claim, It Failed to Allege One Under Any Theory.**

Bethel contends that the BOOST nondiscrimination requirement, which constrains the receipt of state funding by entities that discriminate "on the basis of race, color, national origin, sexual orientation, or gender identity or expression," 2019 Md. Laws ch. 565 at 151, impermissibly infringes its right of free exercise of religion.  But there is nothing about "the right of free exercise" that "relieve[s] an individual of the obligation to comply with a valid and neutral law of general applicability." *Employment Div., Dep't of Human Res. Of Or. v. Smith,* 494 U.S. 872, 879 (1990).

Bethel has made no factual contentions that the two statutes at issue "target[] its religious beliefs or practices." *Bethel World Outreach Ministries v. Montgomery County*

---

[3] Bethel has not asserted any claim on the grounds of its right to expressive association.

*Council*, 706 F.3d 548, 556 (4th Cir. 2013). A law does not target religious beliefs or practices merely because "the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." *Smith*, 494 U.S. at 879 (quoting *United States v. Lee*, 455 U.S. 252, 263 n. 3 (1982) (STEVENS, J., concurring in judgment)). Instead, a law departs from neutrality to target religious beliefs or practices only when "the object of a law is to infringe upon or restrict practices because of their religious motivation." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 533 (1993). Bethel's logic, that (1) it has been sanctioned because it discriminates; (2) it discriminates because of its religious beliefs; and (3) therefore it is being sanctioned for its religious beliefs, is a "syllogism . . . [that] runs directly counter to the premise of *Smith*." *New Hope Family Servs., Inc. v. Poole*, No. 5:18-CV-1419, 2019 WL 2138355, at *11 (N.D.N.Y. May 16, 2019) (rejecting claim from foster care agency that requirement that it not discriminate against same-sex couples violated Free Exercise Clause). Factual allegations supporting that syllogistic reasoning therefore cannot support a Free Exercise claim.

The BOOST nondiscrimination provision is neutral as to religious beliefs. That is, "merely because" the sexual orientation and gender identity nondiscrimination clauses "'happen[] to coincide or harmonize with the tenets of some or all religions,'" does not mean the provision favors or disfavors religion. *Bob Jones Univ. v. United States*, 461 U.S. 574, 604 (1983) (quoting *McGowan v. Maryland,* 366 U.S. 420, 442 (1961)). It is true that the nondiscrimination provisions adopted by the General Assembly coincide or harmonize with the religious beliefs of those that believe non-heterosexual people and people of

varying gender identities should be accorded civil rights, and also therefore conflict with the religious beliefs of those who do not. *E.g.*, Exhibit 1, Excerpts of Testimony of Religious Leaders from Legislative Bill File for House Bill 307 (2001), and Exhibit 2 Excerpts of Testimony of Religious Leaders from Legislative Bill File for Senate Bill 212 (2014).[4]   But this coincidence is insufficient to provide the foundation for a First Amendment claim.

A comparison between the General Assembly's extension of nondiscrimination provisions to the BOOST program and the city ordinances at issue in *Hialeah* illustrates this point. The ordinances at issue in *Hialeah* were tailored in such a way that "almost the only conduct" prohibited in practical application of the ordinances was "the religious exercise of Santeria church members." *Hialeah*, 508 U.S. at 535. Here, by contrast, the statutes at issue preclude discrimination based on sexual orientation and general identity. Courts and legislatures alike have recognized that the desire to treat people differently based on sexual orientation can have religious or non-religious origins. *See, e.g.*, *Obergefell v. Hodges*, 135 S. Ct. 2584, 2602 (2015) ("Many who deem same-sex marriage to be wrong reach that conclusion based on decent and honorable religious or philosophical

---

[4] This Court is "not confined to the four corners of the complaint" and "may properly take judicial notice of matters of public record." *U.S. ex rel. Oberg v. Pennsylvania Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014). Courts may consider legislative history materials, which are "not a matter beyond the pleadings but . . . an adjunct to the [statute] which may be considered by the court as a matter of law." *Anheuser–Busch, Inc. v. Schmoke*, 63 F.3d 1305, 1312 (4th Cir. 1995), *judgment vacated on other grounds*, 517 U.S. 1206 (1996), *readopted*, 101 F.3d 325 (4th Cir. 1996).

premises"); "Interim Report of the Special Commission to Study Sexual Orientation Discrimination in Maryland" 2 December 15, 2000, available at http://mdlaw.ptfs.com/awweb/pdfopener?md=1&did=6852 ("We recognize and respect that some have objections to certain sexual orientations, whether based on personal, religious or philosophical convictions").[5]  Bethel's religious beliefs at issue here "include beliefs that there are two immutable and complementary sexes; that marriage is the consensual, lifelong, exclusive union of one man and one woman; and that sexual relations must be reserved for marriage."  Compl. ¶ 165.  But Bethel has made no factual allegation that the General Assembly enacted either version of the nondiscrimination provision with any purpose to infringe upon or restrict religious practice related to those sincere religious beliefs.  *See* Comp., ¶¶ 60-91; 150-156.  Having included no factual allegations that the General Assembly departed from neutrality in enacting the BOOST legislation, Bethel has failed to state a Free Exercise claim with regard to the statute.

The complaint also does not contain sufficient factual allegations to support a claim that the BOOST Board evinced "a clear and impermissible hostility toward the sincere religious beliefs" in the application of the nondiscrimination provision to Bethel.  *See*

---

[5] The Special Commission to Study Sexual Orientation Discrimination was created by Governor Parris Glendening in Executive Orders 01.01.2000.19 and 01.01.2000.22. When the Maryland General Assembly passed House Bill 307 in the 2001 Regular Session, the accompanying Fiscal and Policy Note specified that the "bill embodies the findings and conclusions of the special commission."  Department of Legislative Services, "Fiscal and Policy Note, Revised: HB 307," available at http://mgaleg.maryland.gov/2001rs/fnotes/bil_0007/hb0307.PDF.

*Masterpiece Cakeshop*, 138 S. Ct. at 1729.  In support of its claim, Bethel has alleged three

statements by Matthew Gallagher, Chair of the BOOST Board, "did not display appropriate

neutrality as a decision-maker."  Compl. ¶ 106.  But all three of the statements, as alleged

by Bethel, discuss only conduct that Mr. Gallagher perceived as discriminatory and do not

comment on Bethel's beliefs at all.  In the first statement, Mr. Gallagher expresses his

opinion that Bethel signed an assurance "illegally."  *Id.* at ¶ 107.  The statement did not

express any opinion as to the content of any belief that may or may not be held by Bethel,

religious or otherwise, but does express an opinion about Bethel's conduct.  The second

statement identified by Bethel was Mr. Gallagher's opinion that "he did not 'think the

burden should be on the Board'" to prove whether or not an admissions policy was

discriminatory when the policy leaves 'the door open to discriminating."  *Id.* at ¶ 108.

Again, this statement says nothing about Bethel's beliefs and is an expression of Mr.

Gallagher's opinion about the standard the Board should use.  Last, Bethel identifies a

specific discussion of Bethel's admissions policy.  Mr. Gallagher read part of Bethel's

Admission's Policy and expressed his opinion that the policy was discriminatory against

students based on their sexual orientation.  However, Mr. Gallagher stated "and here's

where it becomes problematic" *after* reading Bethel's statement of religious belief—where

the policy articulates that "students conduct is expected to align with this view." *Id.* at ¶

110.  Mr. Gallagher then explained that student conduct policy "language affords them the

opportunity to discriminate" against "a person who identifies as a different orientation from

their birth." *Id.*  Whether Mr. Gallagher "treated the sexual orientation nondiscrimination

requirement as encompassing gender identity," *id.* at ¶ 112, such treatment is no expression of hostility toward religion.[6]   Moreover, "[i]f all comment and action on religiously motivated conduct by those enforcing neutral, generally applicable laws against discrimination is construed as ill will against the religious belief itself, then *Smith* is a dead letter, and the nation's civil rights laws might be as well." *Fulton v. City of Philadelphia*, 922 F.3d 140, 159 (3d Cir. 2019).

The facts involved in the adjudicatory treatment of Mr. Phillips, the cake-baker in *Masterpiece Cakeshop*, stand in stark contrast to Mr. Gallagher's even-handed remarks. 138 S. Ct. 1729-30.   The statements the Court found to be "susceptible of different interpretations" involved a direct discussion of Mr. Phillips' beliefs, and whether he would need to compromise or give up those beliefs in order to operate in Colorado.  *Id.* at 1729 (businessman "cannot act on his religious beliefs 'if he decides to do business in the state;" businessman "needs to look at being able to compromise" in order to do business in the state).   Moreover, the Court did not rely on those statements alone; instead it also considered an actively hostile statement that the Court described as comparing "Phillips' invocation of his sincerely held religious beliefs to defenses of slavery and the Holocaust."

---

[6] If Bethel was concerned with the correctness of the Board decision, Bethel had a right under Maryland law to seek judicial review of the BOOST Board's decision under Maryland Rules, Title 7, subtitle 4, Administrative Mandamus, which provides for "judicial review of a quasi-judicial order or action of an administrative agency where review is not expressly authorized by law." Md. Rule 7-401(a).  Bethel chose not to pursue this remedy, and its attempt to elevate their administrative law claim to one of constitutional dimensions, thereby bypassing applicable appeal deadlines, should be rejected.

*Id.*  No such comparisons are alleged here.  Moreover, the Court also found the Colorado Civil Rights Commission actually engaged in disparate treatment when it found "on at least three other occasions" that "the refusal of bakers to create cakes with images that conveyed disapproval of same-sex marriage, along with religious text" was permissible.  *Id.* at 1730.

Here, however, Bethel has alleged no instance where any other school was treated more favorably because of the secular nature or content of their beliefs—in fact, Bethel's complaint asserts just the opposite.  Bethel identifies three other schools it asserts "have similar beliefs and policies on marriage and sexual conduct," Broadfording Christian Academy, Grace Academy, and Woodstream Christian Academy.  Compl. ¶ 133.  Bethel then complains that two of those schools, which allegedly hold similar beliefs but whose *admissions policies* did not expressly exclude or threaten sanction to prospective students based on their sexual orientation, *see* ECF 1-11, 2-3; 5, were permitted to continue in the program.  Compl. ¶ 131.  Woodstream Christian Academy was, according to the complaint, deemed ineligible.  Compl. ¶ 132.  Woodstream Christian Academy's policy stated that "homosexuality" in addition to other "deviant behavior of a sexual nature" would "be grounds for expulsion."  ECF 1-11, 6.  The different treatment of these four schools is justified on the face of the pleadings—those schools with discriminatory policies were excluded and those schools whose policies were expressed neutrally with respect to the covered classes were permitted to participate, regardless of their similar beliefs.  The type of Free Exercise claim at issue in *Masterpiece Cakeshop* has no application to the facts of this complaint.

The Supreme Court's recent holding that a state government may not "disqualify" religious organizations "from a public benefit solely because of their religious character," *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2021 (2017), also has no application to Bethel's factual allegations.   Here, there is no allegation in the complaint that the BOOST Board took any action based on Bethel's "religious character." In *Comer*, the Court specified that "[t]he express discrimination against religious exercise here is not the denial of a grant, but rather the refusal to allow the Church—solely because it is a church—to compete with secular organizations for a grant."   *Id.* at 2022.  Bethel's complaint fails to allege it was categorically excluded from the BOOST award approval process because it is a religiously affiliated school or even because it adheres to particular religious beliefs.  *E.g.*, Compl. ¶ 131.

> **2.     Because the BOOST Nondiscrimination Provisions Are Neutral, Bethel Has Not Alleged a Violation of the Establishment Clause.**

Bethel cannot state an Establishment Clause claim based on its bare allegations related only to the "excessive entanglement" prong of the three-part test set forth in *Lemon v. Kurtzman*, 403 U. S. 602 (1971).   Bethel's allegations that the BOOST Board "determined that Bethel's religious beliefs about marriage and biological sex constituted discrimination based on sexual orientation in student admissions," and that BOOST Board members "substituted their own interpretation of Bethel's religious beliefs" are conclusory allegations without specific factual basis, and are alleged merely "on information and belief" and are not based on "factual information that makes the inference of culpability

plausible." *Doe v. Salisbury Univ.*, 123 F. Supp. 3d 748, 768 (D. Md. 2015).  They therefore cannot form the sole basis for Bethel's claim.

Additionally, the isolation of the "excessive entanglement prong" from the *Lemon* test is incorrect.  "If the *Lemon* Court thought that its test would provide a framework for all future Establishment Clause decisions, its expectation has not been met."  *Am. Legion v. Am. Humanist Ass'n*, 139 S. Ct. 2067, 2080 (2019) (Alito, J.).  Instead, the Court applies specific precedent where available; here, *Bob Jones University* establishes that when a policy involving a government subsidy to private schools who wish to discriminate is at stake, it will be upheld if it "is founded on a neutral, secular basis."  *Bob Jones Univ.*, 461 U.S. at 604 (internal quotation omitted).  Moreover, the Supreme Court never mentioned the nondiscrimination requirement at issue in the program examined in *Zelman v. Simmons-Harris*, when it was considering whether scholarships given to students for use at sectarian schools could withstand the Establishment Clause.  536 U.S. at 645.  Bethel has failed to allege a claim for violation of the Establishment Clause.

**B.     Bethel Has Failed To Adequately Allege Facts Sufficient To Establish a Violation of the Free Speech Clause Under Any Theory.**

Bethel's First Amendment claims based on the Free Speech Clause fair no better. The BOOST nondiscrimination requirements do not regulate speech, they regulate conduct.  Bethel's failure to allege facts showing that the nondiscrimination requirements reach beyond conduct precludes any relief under the Free Speech clause.

### 1. Requiring Bethel's Written Admissions Policy to Conform With the Nondiscrimination Requirement Is a Regulation of Conduct.

"[I]t has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Expressions Hair Design v. Schneiderman*, 137 S. Ct. 1144, 1150-51 (2017) (quoting *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 62 (2006) ("*FAIR*"). When a government policy "aims at the *act* of rejecting would-be group members without reference to the reasons motivating that behavior," it is a "reasonable and viewpoint neutral" limit that does not impinge on free-speech or expressive-association rights. *Christian Legal Soc. Chapter of the Univ. of Cal. Hastings v. Martinez*, 561 U.S. 661, 696 (2010).

The BOOST nondiscrimination requirement "neither limits what [BOOST] schools may say nor requires them to say anything." *FAIR*, 547 U.S. at 60. Bethel and any other school seeking to qualify for BOOST program eligibility remain free to "express whatever views they may have," *id.*, about groups covered by the nondiscrimination provision; the program's only requirement is that Bethel alter its conduct to cease excluding those groups from attending its school by threatening potential expulsion based on a student's status.

The conduct-only nature of the BOOST nondiscrimination provisions is evident from the allegations in Bethel's complaint. First, although Bethel alleged that it stated to the BOOST Board in written correspondence that it "does not discriminate in student admissions based on sexual orientation," ¶ 104, and "forbids all admitted students from

engaging in any sexual conduct," ¶ 103, Bethel's statements are not reflected in its admissions policy. *See* ECF 1-4, 8. Second, Bethel alleges that Grace Academy and Broadfording Christian Academy "have similar beliefs and policies on marriage and sexual conduct." ¶ 133. Bethel admits that it was given examples of admissions policies that were acceptable to the BOOST Board, ¶ 141. In those examples, the BOOST Board set out how Grace Academy altered its policy to make clear that "[s]exual immorality" could be cause for expulsion and eliminated separate mention of "homosexual orientation" as the basis for expulsion. ECF 1-11. Broadfording Christian Academy similarly was granted reconsideration because "sexual immorality," with no specific reference to orientation, was the only impermissible conduct mentioned in the policy. *Id.* No school was required to alter any statement, about religion or otherwise, outside of its admissions policy.

The BOOST Board did evaluate applicant schools by examining the language of their written admissions policies, ¶ 92, after it had received written assurances of compliance, ¶ 87.[7] A policy is "[a] standard course of action that has been officially established by an organization . . . ." POLICY, Black's Law Dictionary (11th Ed. 2019). Examining written policies to investigate an organization's "standard course of action," *id.*, is an unremarkable enforcement step, and flows directly from the same principle that because legislatures may "prohibit employers from discriminating in hiring on the basis of

---

[7] Bethel has not signed a written assurance that it does not discriminate on the basis of gender identity because it has not applied for the BOOST program since the gender identity criteria was added, and does not make any assertion that it does not discriminate on the basis of gender identity in its complaint.

race," they also may "require an employer to take down a sign reading 'White Applicants Only . . . .'" *FAIR*, 547 U.S. at 62.  That a statute requires removal or alteration of words evincing a policy "hardly means that the law should be analyzed as one regulating the employer's speech rather than conduct."  *Id.*  Just as a letter declining to admit a student based on sexual orientation or gender identity would be evidence that Bethel discriminated in admissions based on sexual orientation or gender identity, an admissions policy that states students must conform their conduct to a standard incompatible with the student's status as a member of a protected class in order to gain admission is evidence that Bethel discriminated in admissions.

## 2. The BOOST Nondiscrimination Requirement Is a Permissible Condition on State Funding.

Bethel voluntarily applied to be designated eligible to receive state funding in the form of student BOOST scholarship funds.  If an applicant for a government grant program objects that a condition of the funding "may affect the recipient's exercise of its First Amendment rights," generally "its recourse is to decline the funds."  *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013) (*AOSI*).  And, "government is not required to subsidize activities that it does not wish to promote."  *Matal v. Tam*, 137 S. Ct. 1744, 1761 (2017).  "[T]he Government may allocate competitive funding according to criteria that would be impermissible were direct regulation of speech or a criminal penalty at stake."  *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 587 (1998).  It is settled precedent that even if a State has a "special interest in elevating the quality of

education in both public and private schools," it need not grant aid to schools that discriminate, because although "the Constitution may compel toleration of private discrimination in some circumstances," that Constitution does not "require[] state support for such discrimination." *Norwood v. Harrison*, 413 U.S. 455, 462-63 (1973).

The BOOST nondiscrimination provision, and the application thereof, does not fall within the narrow exception to the government's discretion when making funding decisions that the Court articulated in *AOSI*. In *AOSI*, the challenged provision "mandate[d] that the recipients of . . . funds explicitly agree with the Government's policy to oppose prostitution and sex trafficking." *AOSI*, 570 U.S. at 213. In other words, the challenged provision told "'people what they must say.'" *Id.* (quoting *FAIR*, 547 U.S. at 61). The Supreme Court's cases draw a distinction between "conditions that define" the government funding program and "those that reach outside it," finding impermissible only those conditions that reach outside the program to pose an undue burden on recipients' First Amendment expressive activity. *AOSI*, 570 U.S. at 217. But the nondiscrimination provision at issue here regulates only schools' conduct, and does not require them to say anything if their admissions policy, including in its written form, conforms to the requirement. Bethel and any other school remain free to teach, write about, speak, or take out billboards expressing any religious or other belief.

Bethel's only allegation that its expressive activity was curtailed is its conclusory statement that "the BOOST nondiscrimination requirements condition Bethel's ability to participate in the BOOST program and receive BOOST funding on Bethel changing the

language in its handbook about its religious beliefs." Compl. ¶¶ 219-222.   But that statement must be reconciled with the letter sent by the BOOST Board and incorporated into Bethel's complaint, which clearly identified only the *admissions policy* language, not any other language in its handbook, including its Statement of Faith, which contains identical language.   *Compare* ECF 1-9 *with* ECF 1-4 at 7, 8.   The BOOST Program nondiscrimination requirements are "conditions that define" the program as one that provides funds to students to attend nonpublic schools that do not discriminate on the basis of sexual orientation, and now gender identity.   These conditions leave Bethel free to express its religious beliefs in its preferred form, including on *the next page of their handbook*, as long as that speech does not amount to an actual denial of admissions, whether by outright rejection, expulsion post-admission, or deterring applications by conveying in the admissions policy that the enumerated classes are unwelcome to apply.

### 3.   Ensuring State Funds Do Not Support Discrimination in Education Is A Compelling State Interest.

As explained above, the BOOST nondiscrimination requirements are viewpoint- and content-neutral because they only regulate conduct.   Moreover, because of their focus on conduct, the requirements do not implicate the bar on unconstitutional conditions in government funding most recently set forth in *AOSI*.   Therefore, there is no basis to apply any form of scrutiny to the BOOST Board's actions.   The BOOST Board's actions nevertheless are based in long-recognized compelling state interests to prevent discrimination in education.

In 2001, Maryland revised its public accommodations, employment, state government, and housing discrimination laws to expand their ambit to prohibit discrimination against people based on their sexual orientation.  2001 Md. Laws ch. 340. In 2006, Maryland extended these requirements to commercial contracts with the State. 2006 Md. Laws ch. 283.   In 2012, Maryland's General Assembly and the people of Maryland "acted to enlarge the definition of marriage to correct what its citizens and elected representatives perceived to be an injustice that they had not earlier known or understood,"  *United States v. Windsor*, 570 U.S. 744, 764 (2013), by passing the Civil Marriage Protection Act.  2012 Md. Laws ch. 2.  "When the State used its historic and essential authority to define the marital relation in this way, its role and its power in making the decision enhanced the recognition, dignity, and protection of the class in their own community." *Windsor*, 570 U.S. at 768.  And, in 2014, the General Assembly passed the Fairness for All Marylanders Act, 2014 Md. Laws ch. 474, adding gender identity to the list of classes covered by nondiscrimination laws and extending protection to a class of transgender people that this Court has recognized as "at least a quasi-suspect classification." *M.A.B. v. Board of Educ. of Talbot Cty.*, 286 F. Supp. 3d 704, 721-22 (D. Md. 2018) (quoting *Stone v. Trump*, 280 F. Supp. 3d 747, 768 (D. Md. 2017), *appeal dismissed*, No. 17-2398, 2018 WL 2717050 (4th Cir. Feb. 2, 2018)).

When considering extending nondiscrimination laws to include "sexual orientation" and "gender identity," the General Assembly heard testimony from religious groups and leaders both for and against the statutes in question. Ex. 1, Ex. 2.  One talking point

included with the Bill File for House Bill 307, the sexual orientation legislation, specifically argued that the General Assembly "should not establish policies to allow private schools to discriminate, especially if the school receives State funding."  Exhibit 3, Excerpt of Bill File for House Bill 307 (2001).   The same document reasoned that contemplated amendments that would allow a religious or conscientious objection would "gut the bill" and allow "[a]nyone who wants to discriminate . . . to use this language as a shield."  *Id.*  In support of the Fairness for All Marylanders Act, the Maryland PTA testified that more than 3 out of 4 transgender persons "were bullied or harassed in school, 1 in 3 were assaulted at school, and 1 in 10 were sexually assaulted at school or in the local community *because of either their outward gender expression or a perception about their gender expression*."  (emphasis in original).   Exhibit 4, Ray Leone, Testimony in Support of Senate Bill 212 (2014).   The Maryland PTA further testified that 15% dropped out of school because of conflicts related to their gender expression.  *Id.*   "Stigma has 'a corrosive influence on health' and can impair a person's social relationships and self-esteem."  Amicus Curiae Brief for States of Illinois *et al.* (including Maryland), *Bostock v. Clayton County, Ga.*,  Nos. 17-1618, 17-1623, 18-107 (U.S. July 3, 2019) at 8; *see also Jaffee v. Redmond*, 518 U.S. 1, 11 (1996) ("The mental health of our citizenry, no less than its physical health, is a public good of transcendent importance.").

The State's goal of "eliminating discrimination and assuring its citizens equal access to publicly available goods and services," when "unrelated to the suppression of expression, plainly serves compelling state interests of the highest order."  *Roberts v. U.S.*

*Jaycees*, 468 U.S. 609, 624 (1984).  These interests are heightened in the educational context; "[u]nder *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), discriminatory treatment exerts a pervasive influence on the entire educational process."  *Norwood*, 413 U.S. at 469.  The impact of exclusion from an educational institution "is greater when it has the sanction of the law," because state-sanctioned exclusion from educational opportunities can impose a "sense of inferiority" that "affects the motivation of a child to learn."  *Brown v. Board of Ed. of Topeka, Shawnee Cty., Kan.*, 347 U.S. 483, 494 (1954), *supplemented sub nom. Brown v. Bd. of Educ. of Topeka, Kan.*, 349 U.S. 294 (1955).  Discrimination in admissions to educational institutions "is not barred by the Constitution, nor does it invoke any sanction of laws, but neither can it call on the Constitution for material aid from the State."  *Norwood*, 413 U.S. at 469.  The "unique evils" of discrimination transcend "the point of view such conduct may transmit," *Roberts*, 468 U.S. at 628, and the State has a compelling interest in minimizing stigmatic harms to classes it has identified have need of enhanced protection, *see Windsor*, 570 U.S. at 768.

**IV.  BETHEL HAS NO CONSTITUTIONAL CLAIM UNDER THE FOURTEENTH AMENDMENT.**

   **A.   Bethel's Fourteenth Amendment Claims Are Barred Because It Has No Liberty or Property Interest in Receiving BOOST Funds.**

Bethel has not specified any property interest related to receipt of BOOST funds from scholarship recipients to which it has a "legitimate claim of entitlement."  *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972).  BOOST scholarships are

awarded to "students who are eligible for the free or reduced-price lunch program," and who are ranked on the basis of financial need. *E.g.* 2016 Md. Laws ch. 143 at 130-35. It is then up to the student to select a BOOST-approved private educational institution to use the scholarship; such participating schools must meet testing, nondiscrimination, and reporting requirements to become eligible for funding. *Id.* The BOOST statute specified that if a school "does not comply with" the nondiscrimination requirements "it shall reimburse MSDE" for all scholarship funds received, hold any scholarship recipients harmless, and be subject to "ineligibility for participating in the BOOST program." *Id.* No process is specified in the statute; MSDE and the BOOST Board are charged with administering the grant program "in accordance with" the "guidelines" set forth in the statute. *Id.*

The BOOST Program establishes nothing like a property interest for the recipient schools—it could not; it is possible that even eligible schools never receive any funding because students do not choose them. And, "no property interest is implicated by the nonrenewal of a contract or license where there is no entitlement to the renewal." *Richardson v. Town of Eastover*, 922 F.2d 1152, 1157 (4th Cir. 1991). Here there is no entitlement granted to continued participation in the BOOST program, and therefore Bethel has failed to establish an essential element of its Fourteenth Amendment claims set forth in Counts III and V.

**B.      The BOOST Law Is Not Unconstitutionally Vague and Bethel Cannot Challenge Vagueness on an As-Applied Basis.**

Bethel's claim that the BOOST program statute is void for vagueness is incorrect for additional reasons.  As explained above, the BOOST nondiscrimination requirement does not  "'interfere[] with the right of free speech or of association,'" and therefore the "'more stringent vagueness test,'" applicable to such statutes, *Holder v. Humanitarian Law Project*, 561 U.S. 1, 19 (2010) (quoting *Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 499 (1982)), does not apply here.  Moreover, Bethel has failed to identify what part of the nondiscrimination requirement language "'fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.'" *Martin v. Lloyd*, 700 F.3d 132, 135 (4th Cir. 2012) (quoting *United States v. Williams*, 554 U.S. 285, 304 (2008)).   Bethel's unsupported assertions that the "BOOST sexual orientation nondiscrimination requirement does not define sexual orientation or discrimination" Compl. ¶ 232, and that the "State has not defined the gender identity nondiscrimination provision," *id.* at ¶ 245, is contrary to other provisions of Maryland nondiscrimination law that provide these definitions.  Md. Code, State Gov't, § 20-101(e) (LexisNexis 2014) (defining "gender identity"); (g) (defining "sexual orientation").  *See Manning v. Caldwell*

*for City of Roanoke*, 930 F.3d 264, 273 (4th Cir. 2019) (assessing a statute for vagueness requires examination of "[t]he integrated structure of the challenged scheme . . . .").

To the extent Bethel's vagueness claim is an as-applied challenge to the BOOST Board's decision in its specific case, ¶¶ 233-242, it is "is effectively 'subsumed' into the free exercise claim." *Hunt Valley Baptist Church, Inc. v. Baltimore County, Maryland*, No. CV ELH-17-804, 2017 WL 4801542, at *39 (D. Md. Oct. 24, 2017) (quoting *Doswell v. Smith*, 139 F.3d 888, at *6 (4th Cir. 1998) (table)). As for the gender identity nondiscrimination requirement, it applies to forbid admissions practices refusing admission, imposing discipline, or otherwise barring students based on their "gender-related identity, appearance, expression, or behavior of a person, regardless of the person's assigned sex at birth." State Gov't, § 20-101(e). Bethel's unsupported assertion that "[i]t is impossible to know what a person's gender identity or expression may be, or how it applies," Compl. ¶ 246, when *its own policy* requires "students to use the facilities set aside for their biological sex," *id.* at ¶ 249, and "to adhere to the dress code for the grade and biological sex," ¶ 250, is nonsensical. Insofar as Bethel is itself able to discern the "biological sex" of a student in order to enforce its policy by requiring adherence to a dress code, it must logically "know what a person's gender identity or expression may be." And there can be no doubt that "the State" *does* mean to "impose affirmative obligations on nonpublic schools" to admit and not expel students of all gender identities by requiring nonpublic schools not to discriminate against students on the basis of gender identity in admissions, retention, or expulsion. *C.f.* Compl. ¶ 247. That Bethel's admissions policy

violates the BOOST nondiscrimination statute does not make the statute vague. The BOOST nondiscrimination requirement provides "objectively discernable standards," *Manning*, 930 F.3d at 278, with respect to gender identity discrimination, and is therefore not void for vagueness.

### C.   The State Defendants Had a Rational Basis for Bethel's Exclusion from the BOOST Program.

Bethel asserts a class-of-one equal protection claim in Count V, alleging that it was treated differently than other similarly situated nonpublic sectarian schools with "similar beliefs and policies on marriage and sexual conduct." ¶ 274. Because the complaint also demonstrates that schools with like admissions policies were treated alike, Bethel fails to state a claim for violation of the Equal Protection Clause.

MSDE and the BOOST Board were granted discretion to "administer the grant program in accordance with . . . guidelines" set forth by the legislature, which included eligibility and reporting requirements for non-public schools to participate in the BOOST program. 2016 Md. Laws ch. 143 at 130-35. When "state action" involves "discretionary decisionmaking based on a vast array of subjective, individualized assessments," "treating like individuals differently is an accepted consequence of the discretion granted" and there is no available constitutional cause of action for the "arbitrary singling out of a particular" entity for different treatment. *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 603 (2008). Even if rational basis review applied, there is a rational basis that flows from Bethel's own allegations—admissions policies which a reasonable applicant could construe as

permitting rejection or expulsion based on sexual orientation or gender identity status led to exclusion from the program, whereas those schools who either never had such language or removed it were approved. *Compare* ECF 1-11, 2-3; 5 *with* ECF 1-11, 6. Even if a state actor is wrong about what its statute means or its assessment of facts applicable to a grant application, "the agency's otherwise rational decision would still pass constitutional muster." *XP Vehicles, Inc. v. Dep't of Energy*, 118 F. Supp. 3d 38, 76 (D.D.C. 2015). Bethel has not alleged facts sufficient to carry its "'heavy burden of negating every conceivable basis which might reasonably support the challenged classification.'" *Pulte Home Corp. v. Montgomery County, Maryland*, 909 F.3d 685, 695 (4th Cir. 2018) (quoting *Van der Linde Housing, Inc. v. Rivanna Solid Waste Auth.*, 507 F.3d 290, 293 (4th Cir. 2007)).

### D.   There Is No Parental Right to Government Funding of Private Educational Choices.

The Supreme Court has "held in several contexts that a legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right, and thus is not subject to strict scrutiny." *Regan v. Taxation With Representation of Washington*, 461 U.S. 540, 549 (1983). The Seventh Circuit has directly addressed the question of whether declining to provide private schools with a funded benefit, in that case transportation funding, implicated parental rights and squarely rejected that proposition. *St. Joan Antida High Sch. Inc. v. Milwaukee Pub. Sch. Dist.*, 919 F.3d 1003, 1009 (7th Cir. 2019). The Fourth Circuit has also rejected the contention that a county policy prohibiting

homeschooling parents and all other private educational entities "from using [] community centers as private educational centers" unconstitutionally restricted parents' "decisions concerning the care, custody, and control of their children." *Goulart v. Meadows*, 345 F.3d 239, 260-61 (4th Cir. 2003).  Bethel has not made any allegation that parents would not be able to "choose religious schools where their children will receive a distinctly Christian education," either by choosing a school that has qualified for receipt of BOOST scholarships or by choosing to go to a school without the benefit of a BOOST scholarship. ¶¶ 254-262.  Because parents do not have a right to a subsidy of their liberty interest, as long as their right to choose whichever school they prefer remains unimpeded there is no equal protection claim.

## CONCLUSION

Bethel's claim under the Free Exercise Clause, Count I, should be dismissed for lack of subject matter jurisdiction under Rule 12(b)(1).  Count I should additionally be dismissed and Counts II-VI should be dismissed because they fail to set forth sufficient factual allegations to support any legal cause of action under Rule 12(b)(6).

Respectfully submitted,

BRIAN E. FROSH
Attorney General of Maryland

/s/ Sarah W. Rice
_____
SARAH W. RICE (NO. 29113)
ROBERT A. SCOTT (NO. 24613)
Assistant Attorneys General
200 Saint Paul Place
Suite 1700
Baltimore, Maryland  21202
srice@oag.state.md.us
410-576-7847
410-576-6955 (facsimile)

September 3, 2019                                  Attorneys for State Defendants

## CERTIFICATE OF SERVICE

I certify that, on this 3rd day of September, 2019 the foregoing was served by CM/ECF on all registered CMF users.

/s/ Sarah W. Rice
_____
Sarah W. Rice

35