**IN THE**
**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND**

BETHEL MINISTRIES, INC.,       \*

       *Plaintiffs*,        \*

        v.         \*    No. 1:19-cv-01853-ELH

DR. KAREN B. SALMON, ET AL.,    \*

        *Defendants*.     \*

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

Bethel has not adequately alleged facts to support any claim for which relief may be granted. Bethel attempts to re-characterize an instance of enforcement of an admittedly neutral law of general application as hostility, discrimination, or targeting of Bethel because of its religious beliefs. But contradictions revealed by the allegations in its own complaint show that Bethel was treated fairly, without regard to its religious beliefs, and that the Board applied the BOOST nondiscrimination provisions to admissions policies only to ensure that the written language of those policies did not prohibit students from admission on the basis of their sexual orientation. Moreover, Bethel's opposition memorandum makes clear that it has not adequately alleged claims related to the gender identity nondiscrimination requirement because it has limited its claims to an as-applied basis (and Bethel never applied for funding under the gender identity provision) and because it has not demonstrated a property right in future BOOST funding.

## REPLY ARGUMENT

I.   **BETHEL HAS ALLEGED STANDING SUFFICIENT ONLY FOR ONE TYPE OF FREE EXERCISE CLAIM.**

Bethel has provided authority for its standing to assert only its organizational *property* interests.  *Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward County*, 450 F.3d 1295, 1304 (11th Cir. 2006); *see also Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2021 (2017) (addressing, without comment as to standing, Church's application for grant program open only to organizational nonprofits).  Insofar as Bethel has limited its Free Exercise claim to one alleging only religious hostility in the application of a neutral law of general application, it has properly limited the scope of the Free Exercise claim to one implicating Bethel's interest as an organizational property-holder.

But Bethel has not established it has standing to assert any other type of Free Exercise claim.  The Free Exercise cases Bethel cites each had an individual in addition to the church plaintiff.  *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 282 F. Supp. 2d 1236, 1240 (D.N.M. 2002); *aff'd*, 342 F.3d 1170 (10th Cir. 2003), *on reh'g en banc*, 389 F.3d 973 (10th Cir. 2004), *aff'd and remanded sub nom. Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006) (listing as plaintiffs "several church leaders and members in the United States"); *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 723 F. Supp. 1467, 1469 (S.D. Fla. 1989), *aff'd sub nom. Church of Lukumi v. City of Hialeah*, 936 F.2d 586 (11th Cir. 1991), *rev'd sub nom. Church of the*

*Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993) (listing as plaintiff Ernesto

Pichardo, "President of the Church" and who held the "religious rank of 'Italero'").  And,

when one plaintiff in a case has undisputed standing, courts generally look no further.  *See,*

*e.g.*, *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1651 (2017) ("[a]t least

one plaintiff must have standing" to assert each claim); *Horne v. Flores*, 557 U.S. 433,

446-47 (2009).

## II.   THE BOOST BOARD PROPERLY APPLIED A NEUTRAL LAW OF GENERAL APPLICATION, AND THEREFORE DID NOT BURDEN BETHEL'S RIGHT OF FREE EXERCISE.

Bethel has clarified that its Free Exercise clause claim is limited to an as-applied

challenge.  Pl's Opp'n Mem. 13, ECF No. 17.  Therefore, Bethel has limited its Free

Exercise claim only to the sexual orientation nondiscrimination provision in effect in the

2016-17 and 2017-18 years, and has not asserted a Free Exercise claim with respect to the

gender identity nondiscrimination provision that came into effect for the 2018-19 year, for

which Bethel did not apply.  Bethel has further narrowed the scope of its claim to alleged

"non-neutrality of the Board's application of the BOOST nondiscrimination requirement

to Bethel."  *Id.*  It must make this limitation because Bethel continues to contend that it

does not discriminate against potential students in admissions because of their sexual

orientation.  The elements of a specific claim of non-neutrality in a quasi-adjudicatory

setting were laid out in *Masterpiece Cakeshop*.  To the extent Bethel contends that other

Free Exercise theories apply, it is incorrect.

For example, in *Lukumi*, the Supreme Court was concerned with enforcing the Constitution's requirements of religiously neutral laws to a city ordinance, not any particular application of the ordinance. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1993) (citing *Employment Div., Dept. of Human Resources of Ore. v. Smith*, 494 U.S. 872 (1990)).   Bethel has conceded that it has not alleged the Maryland legislature targeted or acted in a non-neutral manner when passing the BOOST nondiscrimination requirements.  Pl's Opp'n Mem. 13, ECF No. 17.  *Lukumi* therefore does not apply to Bethel's claim.  Insofar as *Lukumi* could possibly be extended to "targeting religious beliefs" in the application of a law, a proposition for which Bethel cites to no authority, Pl's Opp'n Mem. 13, ECF No. 17, that particular form of the claim is subsumed in the requirements set forth in *Masterpiece Cakeshop*.  As explained in the Board's opening memorandum, ECF 16-1 at 16-18, and further below, Bethel has failed to allege any conduct by the Board analogous to the conduct of the Colorado Civil Rights Commission disapproved in *Masterpiece Cakeshop*, and has therefore failed to allege a claim for which relief can be granted.

In any event, Bethel has not pleaded any facts that would support a claim of religious targeting by the Board.  That is, none of the allegations in Bethel's complaint support a contention that Bethel's admissions policy was singled out because of its religious content rather than the policy's statement that a potential student's "continued enrollment" depends on the student's ability to "align" his "conduct" with Bethel's  view that marriage is "a

covenant between one man and one woman," and a requirement that the student "identify with, dress in accordance with, and use the facilities associated with their biological gender." ECF 1-4, 8. Bethel's admissions policy language stands in stark contradiction to written assurances given to the Board that "it does not discriminate based on sexual orientation." Pl's Opp'n Mem. 14, ECF No. 17 (citing Compl. ¶¶ 103-04, 118-19; *see also* Compl. Ex. 3 at 0070; Compl. Ex. 4 at 0072; Compl. Ex. 5 at 0074). Bethel's claim distills to its assertion that the First Amendment entitles it to complete deference on what conduct does and does not constitute "discrimination," including giving full credit to all of its assertions while simultaneously prohibiting the government program it has applied to from evaluating other sources of evidence, including its assertions made in other settings, like its own written policies.

Moreover, as Bethel pleaded, when schools with "similar beliefs and policies on marriage and sexual conduct," Compl. ¶ 133, had nondiscriminatory admissions policies, they were permitted to participate in the BOOST program. *Id.* at ¶¶ 131-32. Bethel has simply failed to allege any "[o]fficial action that targets religious conduct for distinctive treatment," *Lukumi*, 508 U.S. at 534, on the part of the BOOST Board, which neutrally applied the legislature's neutral nondiscrimination provision, in a manner that found violations of that neutral law where they existed and, where they did not, allowed full participation of religious schools with similar religious beliefs to Bethel's.

Nor do the allegations in the complaint support the type of religious hostility the Supreme Court rejected in *Trinity Lutheran*.  *Trinity Lutheran*'s holding is simply that a state government may not "disqualify" religious organizations "from a public benefit solely because of their religious character," *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2021 (2017).  The complaint does not allege, because it cannot, that Bethel was not allowed to compete for eligibility to accept student scholarship funding under the same criteria as nonreligious private schools and religious schools of other denominations.

*Masterpiece Cakeshop* also gives rise to no claim based on Bethel's factual allegations.  Although on a motion to dismiss, this Court is bound to "take the facts in the light most favorable to the plaintiff," it "need not accept legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments." *Wag More Dogs Liab. Corp. v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012) (internal quotation omitted).  That is, while the content of the remarks made by the Board must be accepted as true (and in fact are not contested; as referenced in Bethel's response the remarks, made in open meeting, were recorded), whether the remarks amounted to "religious hostility," as Bethel contends, Pl's Opp'n Mem. 16, ECF No. 17, is a legal conclusion.  In this case, that conclusion is unsupported by Bethel's factual allegations *and*, as a matter of law, the remarks of one board member are insufficient to support a claim for relief.  It is Bethel who "must nudge its claims across the line from conceivable to plausible to resist dismissal." *Cozart*, 680 F.3d at 365 (internal quotations and alterations omitted).

First, as explained in the opening memorandum, when comparing the Board's remarks to those at issue in *Masterpiece Cakeshop*, there is no evidence of the type of hostility toward religious beliefs expressed by *multiple* members of the Colorado Civil Rights Commission. *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Com'n*, 138 S.Ct. 1719, 1729-30 (2018). Here, Bethel has not pointed to a single comment made by *any* Board member that was derogatory toward the religious origin of its beliefs; it has instead only pointed to comments related to its *conduct* and the standards used to assess that conduct. Compl. ¶¶ 107-12; Pl's Opp'n Mem. 16, ECF No. 17.

Second, the Court in *Masterpiece Cakeshop* did not rest its determination of religious hostility on remarks alone. It also found the Colorado Civil Rights Commission had actually engaged in disparate treatment by treating cake-bakers' right to refuse cake-baking services differently depending on the contents and religious motivation of the cake-baker's belief. *Masterpiece Cakeshop*, 138 S.Ct. at 1730. Bethel has not alleged that the Board has *ever* engaged disparate treatment based on differing religious beliefs—in fact it has alleged the opposite; under the allegations in the Complaint, two schools with similar religious beliefs to Bethel's were permitted to continue in the program with non-discriminatory admissions policies. Compl. ¶ 131, 133; *see also* ECF 1-11, 2-3; 5.

Instead of identifying conduct by the Boost board that is analogous to the hostile conduct identified in *Masterpiece Cakeshop* (it cannot), Bethel relies on categories of comments that are nothing more than the Board's discussion of its enforcement of the

neutral, generally applicable nondiscrimination requirement, such as who has the burden of proof at each stage, whether conduct is or is not a violation of the policy, and what evidence points to violation of the policy.  The fact that "conduct springs from sincerely held and strongly felt religious beliefs does not imply that the [Board's] desire to regulate that conduct springs from antipathy to those beliefs." *Fulton v. City of Philadelphia*, 922 F.3d 140, 159 (3d Cir. 2019).  Quasi-adjudicatory bodies must be given some leeway to comment on religiously-motivated conduct when they are, as here, enforcing neutral laws of general application.  If all such comment were construed as impermissible hostility toward religion, all those who profess a religious motivation for their conduct would be able to exempt themselves from the neutral, generally applicable law.  *See id.*

Bethel's assertions that it was improper for the Board to discuss its policy related to gender expression in conjunction with its policy requiring student conduct to align with a heterosexual view of marriage are incorrect.  Courts have recognized that it is a "difficult question" to discern whether the harassment (and analogously, any discrimination) suffered by a complainant is "because of his homosexuality, his effeminacy, or both." *Prowel v. Wise Bus. Forms, Inc.*, 579 F.3d 285, 291 (3d Cir. 2009).  State agencies are at the forefront of enforcement of nondiscrimination requirements, which are largely a creature of state law.  *See Hurley v. Irish-Am. Gay, Lesbian & Bisexual Group of* Boston, 515 U.S. 557, 571-72 (1995).  Those agencies, like the Board, will be most often faced with the "difficult questions" presented by new areas of anti-discrimination legislation and

will necessarily need to assess whether or not conduct constitutes discrimination.  These difficult questions may well include whether or to what extent different forms of discrimination based on sex, sexual orientation, and gender identity overlap or do not overlap.  *See also Bostock v. Clayton County, Ga.*, Dkt. 17-1618 (U.S. 2019); *R.G. & G.R. Harris Funeral Homes Inc. v. Equal Employment Opportunity Commission*, Dkt. 18-107 (U.S. 2019) (two pending cases discussing the overlap of these categories in the context of Title VII enforcement). Room to discuss, in public, what does and does not constitute discrimination under a neutral law of general application in the process of deciding whether or not to take enforcement action is necessary if neutral laws of general application are to be enforceable against those expressing religious beliefs as explanation for their actions.

Bethel's assertions of procedural irregularity are similarly irrelevant under *Masterpiece Cakeshop*, which did not mention whether evidence of procedural irregularity could serve as a sufficient basis for a Free Exercise religious hostility claim.  Moreover, the inferences Bethel has pleaded are not reasonable ones, with respect to the regularity of the Board actions, because Bethel has made assertions inconsistent with its own factual allegations and the audio-recordings of the open meetings on which it relies elsewhere.  As a threshold matter, Bethel alleged that the Board discussed the substance of Bethel's compliance with the BOOST program criteria at two prior open meetings, Compl. ¶¶ 105-113; 120, in contrast with its later allegation that "[t]he BOOST Advisory Board did not do any deliberating about Bethel's eligibility for BOOST in any open session." *Id.* at ¶128.

Moreover, Bethel alleges both that the Board "did not give a reason for going into closed session," Compl. ¶ 123 *and* that Chair Gallagher explained that they were going into closed session to receive legal advice, Compl. ¶ 125, *see also* June 21, 2018 BOOST Advisory Board Meeting Recording Part I at 1:06:35 to 1:07:30, available at http://archives.marylandpublicschools.org/S/Audio/BOOSTMeeting%2006212018Audio 1.mp3.  The Open Meetings Act provides that a public body may go into closed session to "consult with counsel to obtain legal advice."  Md. Code, Ann., Gen. Prov. § 3-305(b)(7). There is no requirement that the Chair verbally specify the section of the Open Meetings Act under which the session will be closed.  *See* Gen. Prov. § 3-305(d)(2).  Moreover, the Chair checked to see if there was any objection and conducted the requisite vote. June 21, 2018 BOOST Advisory Board Meeting Recording Part I at 1:08:15 to 1:08:33, available at http://archives.marylandpublicschools.org/S/Audio/BOOSTMeeting%2006212018Audio 1.mp3.  And, when open session resumed, Bethel's allegation that there was no discussion before a vote was taken is unsupported by the recording, to which it repeatedly cites. Instead, the recording reveals that the Chair summarized the issues different schools presented, and entertained the opportunity for additional discussion or deliberation (after the subject had been admittedly discussed at prior meetings, Compl. ¶¶ 105-113; 120) before a vote was taken, the result of which was unanimous.  June 21, 2018 BOOST Advisory Board Meeting Recording Part II at 3:56 to 8:30, available at http://archives.marylandpublicschools.org/S/Audio/BOOSTMeeting%2006212018Audio

2.mp3.  Only Bethel's allegation that no written statement was prepared remains, an allegation Bethel made "upon information and belief."  Compl. ¶126.  That bare accusation is insufficient to push Bethel's claim of some irregularity in the consideration of its case, evidencing religious hostility, from the realm of the merely possible to state a plausible claim for relief.

### III.   THE BOOST NONDISCRIMINATION REQUIREMENTS DO NOT REQUIRE ASSESSMENT OF RELIGIOUS BELIEFS AND THEREFORE BETHEL HAS NOT ALLEGED ANY VIOLATION OF THE ESTABLISHMENT CLAUSE.

As explained in the opening memorandum, Bethel has not set forth an adequate legal claim for violation of the Establishment Clause.  Even under *Lemon*, Bethel has not explained how "given that [the Board] applies only secular criteria," about what does and does not constitute discrimination, the nondiscrimination requirements could possibly "foster an excessive government entanglement with religion."  *Liberty Univ., Inc. v. Lew*, 733 F.3d 72, 102 (4th Cir. 2013).  That is, Bethel has not explained how any of its religious beliefs were assessed in determining its eligibility for participation in the program.  The only criteria at issue here is whether or not Bethel's admissions policy discriminates on the basis of sexual orientation.  While Bethel's admissions policy may be motivated by religion, that motivation is and was (as evidenced by the discussions Bethel itself cites) irrelevant to the consideration of whether the admissions policy itself prevented or discouraged applications of prospective students based on their sexual orientation. Bethel's baseless assertion to the contrary notwithstanding, *Bob Jones University*

definitively established that the government may apply neutral laws of general application

(which again, Bethel has conceded the BOOST nondiscrimination requirements are) to

religious educational institutions without offending the Establishment Clause. *Bob Jones*

*Univ. v. United States*, 461 U.S. 574, 604 (1983).

**IV.    BETHEL HAS FAILED TO ADEQUATELY ALLEGE FACTS SUFFICIENT TO
         ESTABLISH A VIOLATION OF THE FREE SPEECH CLAUSE UNDER ANY THEORY
         FOR THE PRIMARY REASON THAT THE CONTENTS OF AN ADMISSIONS POLICY IS
         CONDUCT, NOT SPEECH.**

Bethel's assertion that its admissions policy should be construed as speech and not

conduct is similarly without foundation.  The Eighth Circuit broke no new ground with its

pronouncement that "[s]peech is not conduct just because the government says it is."

*Telescope Media Grp. v. Lucero*, No. 17-3352, 2019 WL 3979621, at *5 (8th Cir. Aug. 23,

2019).  That maxim is but the inverse of *Schneiderman*'s recent reiteration of the principle

that "it has never been deemed an abridgment of freedom of speech or press to make a

course of conduct illegal merely because the conduct was in part initiated, evidenced, or

carried out by means of language, either spoken, written, or printed." *Expressions Hair*

*Design v. Schneiderman*, 137 S. Ct. 1144, 1150-51 (2017) (quoting *Rumsfeld v. Forum for*

*Academic and Institutional Rights, Inc.*, 547 U.S. 47, 62 (2006) ("*FAIR*")).  What is

necessary is a functional assessment of the object of governmental regulation—is it speech

or conduct?  In *Lucero*, the court found that "producing a video" was expressive conduct

akin to "publishing a newspaper," moving a paintbrush, or walking in a parade, which

cannot be separated from the expressive content of the motion picture, newspaper, painting

or parade, at least with respect to the type of regulation at issue in that case.   2019 WL 3979621, at *5 (8th Cir. Aug. 23, 2019).   By contrast, Bethel has not explained how its admissions policy is expressive conduct.   Bethel cannot do so.   The policy's language is *operative*, it is evidence of a "standard course of action that has been officially established by an organization . . . ."   POLICY, Black's Law Dictionary (11th Ed. 2019); *see also Christian Legal Soc. Chapter of the Univ. of Cal. Hastings v. Martinez*, 561 U.S. 661, 696 (2010) (regulation of contents of policy is appropriate where the targeted conduct is "the *act* of rejecting would-be group members).

Bethel cannot logically distinguish the example in *FAIR* of an employer who, incidental to the prohibition on discrimination on the basis of race in employment, may also be required "to take down a sign reading 'White Applicants Only . . . .'" *FAIR*, 547 U.S. at 62.   Here it is the language of the admissions policy itself that eliminates the need for Bethel to take any additional actively discriminatory steps—if the admissions policy states that students who do not conform their conduct with a heterosexual idea of marriage or to the "identity" attendant with their biological sex will be subject to expulsion, those students will not apply.   And, therefore, Bethel (or any other school adopting a like policy for any reason) would be able to "discriminate in admissions" without actively refusing admission to a discrete individual.   In other words, Bethel's assertion that it does not discriminate based on sexual orientation *cannot* be true if the language of its admissions policy threatens expulsion to prospective students based on their sexual orientation.

Bethel itself continually asserts that it does not discriminate on the basis of admissions. *Id.* But Bethel admits that it is not challenging the BOOST Board's ability to deny eligibility for funding to schools that discriminate on the basis of sexual orientation in admissions. *Id.* It only asserts its admissions policy does not constitute such discrimination—or, in other words, the contested issue here is whether Bethel's admissions policy has the same deterrent effect as a discriminatory sign in the window; in the BOOST Board's religiously neutral evaluation of the policy, it does. Whether or not the Board is ultimately correct in that determination, it is not a regulation of speech, but rather an administrative decision about whether Bethel's conduct, as evidenced by the written language of its admissions policy, complies with the nondiscrimination requirement.

Whether a recipient of BOOST scholarship funds wishing to attend a school faces an admissions policy that requires their *de facto* exclusion on the basis of their sexual orientation is a "condition[] that defines" the BOOST funding program. *See Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 217 (2013) (*AOSI*). The BOOST Board never prescribed or proscribed any particular formulation of an admissions policy, including religious language, as long as that admissions policy did not amount to conduct excluding student applicants on the basis of sexual orientation. That condition is an appropriate exercise of the state's ability to fund only that activity that falls within the scope of a particular funding program. Here, the state provides scholarships to students only for use at schools that do not discriminate in admissions against students based on

sexual orientation.  To qualify as one of those schools, Bethel must have an admissions policy that is clear that students may be admitted regardless of their sexual orientation.

Although this Court will therefore have no occasion to apply strict scrutiny, the Board nevertheless has a compelling state interest in enforcing the BOOST nondiscrimination provisions.  Bethel's primary argument against the Board's explanation of compelling state interest is that state public schools are not subject to the same nondiscrimination in admissions requirement as those present in the BOOST program. This is incorrect.  "All individuals who are 5 years old or older and under 21 shall be admitted free of charge to the public schools of this State."  Md. Code Ann., Educ. § 7-101 (LexisNexis 2018).  There are no exceptions; all students, regardless of any status they may hold or may be attributed to them, "shall be admitted" to Maryland public schools.  This open admissions policy furthers the state's compelling interest in avoiding the "pervasive influence on the entire educational process" discriminatory treatment can assert.[1] *Norwood v. Harrison*, 413 U.S. 455, 469 (1973).

Bethel's proposal of a less restrictive alternative reveals the essential, non-constitutional, nature of their claims.  By proposing that the constitutional issue they allege

---

[1] Bethel's affirmation of the dignity of all people, Pl.'s Opp'n 20, ECF 17, is admirable.  But it does not diminish the compelling nature of the state's interest that it is shared by Bethel.  In the Board's estimation, enforcing the BOOST nondiscrimination requirements by requiring written admissions policies to convey that students are welcome regardless of sexual orientation is necessary to further its compelling interest in avoiding stigmatic harm.

could be cured if the Board did "not enforce the ban on sexual orientation discrimination beyond what the law actually authorizes," ECF 17, 27, Bethel crystallizes their claim to just this: Bethel, by reason that it has asserted a genuine religious motivation for its conduct, should be taken at its word with respect to enforcement of the state's generally applicable, neutral nondiscrimination laws.  But there is no part of the First Amendment that requires state entities, in fulfilling their enforcement obligations, to give special deferential weight to claims of compliance, in the face of contrary objective evidence, for the sole reason that religious beliefs have been invoked.  Bethel's complaint amounts to nothing more than disagreement with an administrative decision which Bethel chose not to appeal.[2]

## V.   BETHEL HAS NO CONSTITUTIONAL CLAIM UNDER THE FOURTEENTH AMENDMENT.

### A.   Bethel Has Not Established That the $102,600 Is its Money.

The BOOST statute specified that if a school "does not comply with" the nondiscrimination requirements "it shall reimburse MSDE" for all scholarship funds received, hold any scholarship recipients harmless, and be subject to "ineligibility for participating in the BOOST program."  2016 Md. Laws ch. 143 at 130-35.  "Grant moneys" are generally treated "as property of the grantors until expended in accordance with the

---

[2] While Bethel is not required to exhaust administrative remedies before pursuing a §1983 claim, it must of course set forth sufficient allegations to support such a claim, as opposed to a claim for judicial review.

terms of the grants." *In re Joliet-Will County Cmty. Action Agency*, 847 F.2d 430, 433 (7th Cir. 1988).  Insofar as Bethel was ineligible for participation in the BOOST program because it did not comply with the nondiscrimination requirement, the money it received from scholarship recipients was never expended in accordance with the term of the grant, which required Bethel to comply and to hold students harmless if it did not comply with the nondiscrimination requirement.  Bethel, in applying for BOOST program eligibility, recognized the limitation on receipt of these funds.  "Where there is no absolute entitlement, there can be no property right." *Guilford County Cmty. Action Program, Inc. v. Wilson*, 348 F. Supp. 2d 548, 563 (M.D.N.C. 2004) (no property right in receipt of block grant funding)

Importantly, Bethel's identification of the money at issue as their only basis for an asserted property right means that Bethel has asserted no claim under the Fourteenth Amendment related to the gender identity nondiscrimination requirement.  That requirement was never applied against Bethel and is not the subject of the decision requiring Bethel to return grant moneys that were not expended in conformance with the BOOST program criteria.

### B.    The BOOST Law Is Not Unconstitutionally Vague.

Bethel's vagueness claim has no legal basis.  Bethel has identified no right to establish any due process claim, including vagueness, as explained above.  And the issue here, Bethel's eligibility to receive BOOST funds, is not subject to a vagueness claim

because the void-for-vagueness doctrine "relate[s] to prohibitions, not to entitlements." *Nyeholt v. Sec'y of Veterans Affairs*, 298 F.3d 1350, 1356 (Fed. Cir. 2002) (rejecting void-for-vagueness challenge to statute defining eligibility for veterans' benefits); *accord Woodruff v. United States,* 954 F.2d 634 (11th Cir. 1992) (rejecting challenge to interpretive rule for agency in making benefit decisions).  Bethel's eligibility to receive BOOST funds does not regulate its conduct and no void-for-vagueness challenge is available.

Moreover, Bethel's memorandum reveals the dearth of authority on which Bethel can rely for its proposition that different parts of a statutory scheme setting forth the legislature's nondiscrimination requirements cannot rely on one set of definitions, even if the different parts of the scheme are set forth in different statutory provisions.[3]  *E.g.*, ECF 17, 33; *contrast Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 273 (4th Cir. 2019) (assessing a statute for vagueness requires examination of "[t]he integrated structure of the challenged scheme . . . .").  Bethel also cannot deny that its own admissions policy requires faculty, staff, and students "to identify with, dress in accordance with, and use the facilities associated with their biological gender," ECF 1-4, 8, demonstrating that Bethel understands what it means to identify with a gender.  And the term "discrimination" has a settled legal meaning.  *See, e.g.*, DISCRIMINATION, Black's Law Dictionary (11th ed. 2019)

---

[3] The BOOST nondiscrimination provisions appear in Maryland's annual set of budget bills; they are not codified.

("The effect of a law or established practice that confers privileges on a certain class or that denies privileges to a certain class because of" status as a member of that class); Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e-2(a)(1) (it is "an unlawful employment practice for an employer . . . otherwise to discriminate against any individual" on the basis of their membership in a protected class); *c.f. United States v. Daley*, 378 F. Supp. 3d 539, 550, 550 n. 6, 7 (W.D. Va. 2019) (statute is not void for vagueness when terms used have "settled legal meanings," citing to Black's Law Dictionary).  In short, a "person of ordinary intelligence" has "fair notice" of what is prohibited by both of the BOOST nondiscrimination requirements.  *Martin v. Lloyd*, 700 F.3d 132, 135 (4th Cir. 2012).  Moreover, Bethel has provided no property or other interest that would serve to ground a facial challenge to the gender identity nondiscrimination provision.  These claims must be dismissed.

### C.    The Board Had a Rational Basis for Treating Bethel Differently Than Others Sharing its Religious Beliefs.

Bethel has not alleged any disparate treatment on the basis of religion.  Bethel's complaint asserts that "Bethel, Broadfording Christian Academy, Grace Academy, and Woodstream Christian Academy have similar beliefs and policies on marriage and sexual conduct."  Compl. ¶ 133.  Allegations that four schools having similar religious beliefs were treated differently based on the actual content of their admissions policies in no way sets forth a claim for disparate treatment on the basis of religion; Bethel has not alleged that any of the four schools has a different religion or religious belief.  Strict scrutiny

therefore does not apply.  Bethel cites only to authority for the unremarkable proposition that where there are sufficient allegations of discrimination "on the basis of religion," a Fourteenth Amendment equal protection claim to which strict scrutiny applies may exist. *Jesus Christ Is the Answer Ministries, Inc. v. Baltimore County, Maryland*, 915 F.3d 256, 265 (4th Cir. 2019), *as amended* (Feb. 25, 2019).  But here, there is no allegation of discrimination on the basis of religion, and rational basis applies.  Bethel has not done anything to demonstrate there was no rational basis for treating schools with different admissions policies differently in the application of the BOOST nondiscrimination provisions.  *See Pulte Home Corp. v. Montgomery County, Maryland*, 909 F.3d 685, 695 (4th Cir. 2018).

> **D.    There Is No Parental Right to Government Funding of Private Educational Choices.**

While Bethel has repeated that parents have the fundamental right to direct their children's education, it has not substantively responded to the basic assertion that parents are not entitled to subsidy of that fundamental right.  *Regan v. Taxation With Representation of Washington*, 461 U.S. 540, 549 (1983); *Goulart v. Meadows*, 345 F.3d 239, 260-61 (4th Cir. 2003).  Parents remain free to choose private or public education, as they see fit.  There is no barrier for parents to enroll students in Bethel, they merely may not both use BOOST Scholarship funds and choose to enroll their student in Bethel.  Bethel has not set forth any allegation that the BOOST Board's action prevented any parent from choosing religious education for their children.

## CONCLUSION

Bethel's claim under the Free Exercise Clause, Count I, should be dismissed in part for lack of subject matter jurisdiction under Rule 12(b)(1).  Count I should additionally be dismissed and Counts II-VI should be dismissed because they fail to set forth sufficient factual allegations to support any legal cause of action under Rule 12(b)(6).

Respectfully submitted,

BRIAN E. FROSH
Attorney General of Maryland

/s/ Sarah W. Rice

_____
SARAH W. RICE (NO. 29113)
ROBERT A. SCOTT (NO. 24613)
Assistant Attorneys General
200 Saint Paul Place
Suite 1700
Baltimore, Maryland  21202
srice@oag.state.md.us
410-576-7847
410-576-6955 (facsimile)

October 1, 2019                         Attorneys for State Defendants

## CERTIFICATE OF SERVICE

I certify that, on this 1st day of October 1, 2019 the foregoing was served by CM/ECF on all registered CMF users.

/s/ Sarah W. Rice
_____
Sarah W. Rice