**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| BETHEL MINISTRIES, INC., | ) | |
| | ) | |
| *Plaintiff*, | ) | Case No. 1:19-cv-01853-ELH |
| | ) | |
| DR. KAREN B. SALMON, et al. | ) | |
| | ) | **Oral Argument Requested** |
| *Defendants*. | ) | |
| | ) | |
| _____ | ) | |

**Memorandum of Law Supporting Plaintiff's**
**Motion for Preliminary Injunction**

## TABLE OF CONTENTS

Table of Contents ...................................................................................................................... ii

Table of Authorities ................................................................................................................. iv

Introduction .............................................................................................................................. 1

Statement of Facts .................................................................................................................... 6

    A.   Bethel Ministries, Inc. and Bethel Christian Academy ................................................. 6

    B.   The BOOST Program ..................................................................................................... 8

    C.   Defendants enforced the BOOST Policies against Bethel based on Bethel's religious beliefs. ........................................................................................................................... 10

    D.   Bethel and its students were harmed by being kicked out of BOOST. ........................ 15

    E.   Maryland expanded the BOOST Policy to cover disciplinary actions and gender identity and expression ................................................................................................... 16

Argument ................................................................................................................................. 17

I.    Bethel is likely to succeed on the merits of its Free Exercise and Free Speech claims. ...... 17

    A.   Defendants targeted Bethel for its religious beliefs, acted out of hostility towards those beliefs, and expressly discriminated against Bethel because of its beliefs, but cannot justify their actions under strict scrutiny. .................................................................... 17

        1.   Defendants targeted Bethel for its religious beliefs, acted out of hostility towards those beliefs, and expressly discriminated against Bethel for those same beliefs. 18

          a.   Defendants targeted Bethel for its religious beliefs. ........................................... 18

          b.   Defendants acted out of hostility for Bethel's religious beliefs ........................... 22

          c.   Defendants expressly discriminated against Bethel because of its beliefs. .......... 25

        2.   Defendants' enforcement of the BOOST Policies to Bethel cannot survive the high bar of strict scrutiny. ........................................................................................27

          a.   Defendants have no compelling government interest. .......................................... 27

          b.   Defendants have not used the least restrictive means. ......................................... 29

    B.   Defendants engaged in impermissible viewpoint and content-based discrimination and placed unconstitutional conditions on a public benefit. ............................................... 30

1. Defendants impermissibly discriminated against Bethel because of Bethel's religious viewpoint............................................................................................31

2. Defendants' actions are subject to strict scrutiny as impermissible content-based discrimination. ...................................................................................................33

3. Defendants' application of the Policies also imposes unconstitutional conditions on the receipt of state benefits. ...............................................................................33

II. The remaining preliminary injunction factors weigh in Bethel's favor. .............................. 34

Conclusion ................................................................................................................................... 35

## TABLE OF AUTHORITIES

**Cases:**

*Agency for International Development v. AOSI,*
    570 U.S. 205 (2013)...........................................................................................................5, 34

*Boos v. Barry,*
    485 U.S. 312 (1988).............................................................................................................31

*Brown v. Entertainment Merchants Association,*
    564 U.S. 786 (2011).............................................................................................................27

*Burwell v. Hobby Lobby,*
    573 U.S. 682 (2014).......................................................................................................27, 29

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
    508 U.S. 520 (1993)...........................................................3-4, 17-18, 19, 20, 22, 27, 29-30

*Cincinnati v. Discovery Network, Inc.,*
    507 U.S. 410 (1993).............................................................................................................33

*Community & Labor United For Baltimore Charter Comm. (CLUB) v. Baltimore City Board Of Elections,*
    832 A.2d 804 (Md. 2003) ...............................................................................................14, 25

*Columbia Union College v. Clarke,*
    159 F.3d 151 (4th Cir. 1998) ..........................................................................................29, 32

*Contractors Association of Eastern Pennsylvania v. City of Philadelphia,*
    6 F.3d 990 (3d Cir. 1993) .....................................................................................................27

*Di Biase v. SPX Corp.,*
    872 F.3d 224 (4th Cir. 2017) ...............................................................................................17

*Elrod v. Burns,*
    427 U.S. 347 (1976).............................................................................................................34

*Giovani Carandola, Ltd. v. Bason,*
    303 F.3d 507 (4th Cir. 2002) ...........................................................................................5, 35

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,*
    546 U.S. 418 (2006)........................................................................................................27-28

*Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC,*
    565 U.S. 171 (2012).............................................................................................................21

*Iancu v. Brunetti*,
   139 S. Ct. 2294 (2019) .......................................................................................31, 32

*Jesus Christ is the Answer Ministries, Inc. v. Baltimore County, Maryland*,
   915 F.3d 256 (4th Cir. 2019) ....................................................................................4, 24

*Keyishian v. Board of Regents of University of State of N.Y.*,
   385 U.S. 589 (1967).........................................................................................................31

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission*,
   138 S. Ct. 1719 (2018) ...................................................................................4, 18, 22, 23

*Matal v. Tam*,
   137 S. Ct. 1744 (2017) .....................................................................................................31

*McDaniel v. Paty*,
   435 U.S. 618 (1978).................................................................................................19, 26

*New York Times Co. v. Sullivan*,
   376 U.S. 254 (1964).........................................................................................................31

*NIFLA v. Beccera*,
   138 S. Ct. 2361 (2018) ...............................................................................................30, 32

*Obergefell v. Hodges*,
   135 S. Ct. 2584 (2015) .....................................................................................................18

*Reaching Hearts International, Inc. v. Prince George's County*,
   584 F. Supp. 2d 766 (D. Md. 2008) ................................................................................24

*Reed v. Town of Gilbert*,
   135 S. Ct. 2218 (2015) .....................................................................................................33

*Rosenberger v. Rector & Visitors of University of Virginia*,
   515 U.S. 819 (1995).............................................................................5, 29, 31, 32, 33

*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Board*,
   502 U.S. 105 (1991).................................................................................................33, 34

*Sylvia Development Corp. v. Calvert City, Maryland*,
   48 F.3d 810 (4th Cir. 1995) ............................................................................................24

*Texas v. Johnson*,
   491 U.S. 397 (1989).........................................................................................................28

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
    137 S. Ct. 2012 (2017) ................................................................ 4, 18, 25-26, 27

*Winter v. National Resources Defense Council, Inc.*,
    555 U.S. 7 (2008) ............................................................................................17

*Witters v. Washington Department of Services for the Blind*,
    474 U.S. 481 (1986) ........................................................................................32

*Zelman v. Simmons-Harris*,
    536 U.S. 639 (2002) ........................................................................................32

**Statutes and Legislative Materials:**

2019 Md. Laws ch. 565 ............................................................................ 16-17, 21

S.B. 190 (2016) ...................................................................................................8

S.B. 191 (2016) ...................................................................................................9

Md. Code GP §  3-305 ................................................................... 13-14, 24, 25

Md. Code GP §§  3-401 ...............................................................................14, 25

Md. Code GP §§  3-402 ...............................................................................14, 25

Md. Crim. Law § 3-307 ......................................................................... 10-11, 28

**Miscellaneous:**

1 *OMCB Opinions* 53, 54 (1993) ..............................................................24-25

11 *OMCB Opinions* 38 (2017) ..................................................................24-25

*About Us*, Maryland BOOST, https://www.educationmaryland.org/ ....................27, 29

*English Language Arts Current Year Data (2018)*, Maryland Report Card,
https://msp2018.msde.maryland.gov/Graphs/#/Assessments/ElaPerformance/1EL/17/6/3/3/3/3/3/3/3/3/3/99/XXXX ...........................................................................................................29

**INTRODUCTION**

Underprivileged students are being denied access to a quality, faith-based education solely because Bethel Christian Academy holds religious beliefs disfavored by Defendants. Defendants at the Maryland State Department of Education (MSDE) and the Broadening Options and Opportunities for Students Today (BOOST) Advisory Board operate Maryland's BOOST voucher program, which provides scholarships for low-income K-12 students to attend eligible nonpublic schools. But Defendants excluded Bethel from that program because they disagree with the church-run school's religious beliefs and conduct policies.

Bethel fully complied with the BOOST program requirements that were in effect during the two years it participated in BOOST: it violated no policy and excluded no student. The school's sole "offense" is holding Christian beliefs about marriage and biological sex, communicating those beliefs in its handbook, and requiring all students to respectfully conduct themselves consistently with those beliefs. Nevertheless, in violation of BOOST's plain language and its explicit protection against requiring a school "to adopt any rule, regulation, or policy that conflicts with its religious or moral teachings," Defendants expelled Bethel from the voucher program. They now demand a $102,600 penalty. Worse, financially vulnerable students who relied on BOOST to access a quality, faith-based education were forced to leave Bethel—or are deterred from attending Bethel—because the school can no longer receive their vouchers. Bethel therefore seeks an injunction to stop the violation of its constitutional rights, to enjoin the clawback, and to be readmitted to the BOOST voucher program.

Two BOOST nondiscrimination provisions are at issue in this case: (1) the ban on sexual orientation discrimination in admissions, which was in effect when Bethel was kicked out of BOOST in 2018; and (2) the added ban on gender identity or expression discrimination in student

1

admissions, retention or expulsion, or any other circumstance, which took effect in the fall of 2019, and was applied to Bethel.  Bethel challenges both.

First, Bethel challenges Defendants' application of the BOOST sexual orientation nondiscrimination in admissions provision (the "Old Policy") because Bethel did not violate it, the Policy itself protects Bethel from being forced to adopt policies that violate its faith, and because applying the Policy to Bethel violates its constitutional rights. Bethel has not, and will not, discriminate against any student based on sexual orientation, either in admissions or beyond. All students are held to the same conduct standards: namely, that *no* student—regardless of sexual orientation, identification, or attraction—may engage in any sexual communication or conduct of any kind while at school. These requirements make sense, given that Bethel serves minor children under Maryland's age of consent.

Defendants, in disqualifying Bethel from BOOST, could not point to any applicant denied admission to Bethel based on sexual orientation (because there is none). Nor could they identify a Bethel admissions policy that explicitly excludes applicants based on sexual orientation (because there is none). Defendants ignored Bethel's repeated certifications that it does not discriminate in admissions based on sexual orientation. Defendants ignored Bethel's clear explanation of its policies, substituting their own theological interpretation of Bethel's beliefs. And Defendants ignored the plain limitation of the old BOOST policy to *admissions*, as well as the explicit safe harbor for religious policies. And now, without any wrongdoing by Bethel, Defendants demand a $102,600 penalty that is premised upon an unconstitutional application of the Old Policy.

Second, Bethel also challenges the new BOOST gender identity and expression nondiscrimination provision (the "Policy"). The Policy does not define "gender identity or expression," so it is unclear whether the terms conflict with Bethel's student conduct policies.

Bethel discriminates against no one. Its conduct policies apply equally to every student and only when at school. But Defendants claim that Bethel's student conduct requirements do violate the Policy. *See* Defs.' Mem. in Supp. of Mot. to Dismiss at 31-32. And they applied this Policy to Bethel more than a year before it was in effect. *See* Defs.' Reply in Supp. of Mot. to Dismiss at 8-9 (stating that it was proper to consider gender expression while evaluating sexual orientation). In disqualifying Bethel, Defendants pointed to Bethel's beliefs about *biological sex* as evidence that Bethel violated the ban on *sexual orientation* discrimination in admissions.

Bethel welcomes all students, regardless of whether they experience gender dysphoria. And all students are expected to comply with the same conduct requirements. At school, students must identify with, adhere to the dress code of, and use the private facilities provided for their biological sex. These conduct requirements are compelled by Bethel's deeply held religious beliefs about biological sex. Bethel makes decisions based on a student's conduct at school, not their internal self-perception. But the amended Policy forces Bethel to choose between complying with its faith-based policies or participating in BOOST. And forcing Bethel to change its beliefs and faith-based policies as a condition of participating in BOOST violates not only the Policy's safe harbor for religious policies, but also the school's constitutional rights. Thus, Bethel is entitled to an injunction to block the unconstitutional application of the Policy and to readmit Bethel to BOOST.

***Bethel has a substantial likelihood of success on the merits***. Defendants' actions violate the Free Exercise clause. A decision whose object "is to infringe upon or restrict practices because of their religious motivation" is not neutral and is subject to strict scrutiny. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993). This concern is particularly acute where the government is "targeting religious beliefs as such." *Id.* Defendants' enforcement is subject to strict scrutiny in three independent ways because it targets religious beliefs about

marriage and biological sex, *Lukumi*, 508 U.S. at 520, is based on impermissible hostility towards those beliefs, *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission*, 138 S. Ct. 1719, 1729 (2018), and expressly discriminates against Bethel because of those religious beliefs, *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2021 (2017).

Defendants excluded Bethel from BOOST based solely on the religious beliefs and conduct policies in its handbook, offered to reinstate Bethel if it removed its offensive beliefs from its handbook, and provided examples of how other schools censored their beliefs and faith-based policies to regain BOOST eligibility. In so doing, Defendants ignored BOOST's religious policy protection and its plain limitation to the admissions process. And without any evidence of discrimination or even harm, Defendants elected to retroactively demand a clawback of $102,600 in previous scholarship awards. These actions demonstrate religious targeting and express discrimination based solely on Bethel's religious beliefs and character.

Additionally, Defendant Gallagher, Chair of the BOOST Advisory Board, made several derisive remarks about Bethel's beliefs. These remarks demonstrate religious hostility that is inappropriate for a Board charged with the solemn responsibility of fair and neutral enforcement of Maryland law. Gallagher also deviated from the requirements of the Open Meetings Act, and irregularities in the decision-making process are highly probative of discriminatory motives. *Jesus Christ is the Answer Ministries, Inc. v. Baltimore Cnty., Maryland*, 915 F.3d 256, 263-64 (4th Cir. 2019), *as amended* (Feb. 25, 2019).

Defendants' actions do not stand up to strict scrutiny. They have no compelling governmental interest in overstepping the law or punishing beliefs that the law protects. Nor is there a compelling government interest in forcing Bethel to violate its faith to continue teaching BOOST students. Defendants' censorship of disfavored views undermines the State's asserted

interest in maintaining a diverse array of educational options for its most needy students. A less restrictive alternative is also readily available: allowing students to choose to attend, or not attend, whatever school promotes their values.

Similarly, Defendants' actions violate First Amendment free speech protections. They engaged in unconstitutional content- and viewpoint-based discrimination, because they targeted speech based on its message and the "particular views taken by speakers on a subject." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). Likewise, Defendants "may not place a condition on the receipt of a benefit or subsidy that infringes upon the recipient's constitutionally protected rights, even if the government has no obligation to offer the benefit in the first instance." *Agency for Int'l Dev. v. AOSI*, 570 U.S. 205, 212 (2013).

***Bethel also satisfies the remaining preliminary injunction factors***. Each school year Bethel is excluded from BOOST represents missed ministry, income, and educational opportunities—opportunities which can never be reclaimed. Nine students have been forced to leave Bethel because they can no longer use their vouchers there. One additional student is facing their last year at Bethel unless it is readmitted to BOOST. And at least 22 prospective students have been forced to turn elsewhere because of insufficient financial aid. Moreover, Bethel's educational endeavors will be severely affected if it is forced to pay the six-figure penalty, but Defendants will suffer no harm if they are denied a $102,600 windfall and forced to fairly apply the relevant law. Finally, "upholding constitutional rights surely serves the public interest." *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002). So too is ensuring that students can maintain access to a quality education of their choice. Bethel therefore seeks an injunction to stop the unconstitutional application of the BOOST nondiscrimination requirements to Bethel, to stop the $102,600 clawback, and to readmit Bethel to the BOOST voucher program.

5

STATEMENT OF FACTS

### A.  Bethel Ministries, Inc. and Bethel Christian Academy

Plaintiff Bethel Ministries, Inc. is a Pentecostal Christian church that has served the Baltimore area for nearly 100 years. Declaration of Pastor Johnny Green (Green Decl.) ¶ 2. Bethel Ministries desires to share Christ's love with others in its community, and is committed to being "a place of diversity" that serves people of all ages and from all walks of life. *Id.* ¶¶ 4–6.

To that end, Bethel Ministries serves its community by operating Bethel Christian Academy. Founded in 1984, Bethel Christian Academy is a private Christian school for preschool through 8th grade. Declaration of Principal Claire Dant (Dant Decl.) ¶ 2. Its mission is "to create an authentic Christian learning community to train students to know, love, and serve the Lord Jesus Christ, and to equip them spiritually and academically to be lights to the world." *Id.* at ¶ 3; *see also* Ex. 1 at 0010.[1] Bethel accomplishes this by producing academically equipped graduates who "demonstrate their commitment to Christ by exhibiting love toward others, strong biblical convictions, and a desire to impact the world for Him." Dant Decl. ¶ 5; *see also* Ex. 1 at 0010. In this way, Bethel is fulfilling its mission to show the love of Christ to others.

Bethel Christian Academy serves an ethnically and socioeconomically diverse student population. In the 2018–2019 academic year, Bethel enrolled 281 students in preschool through eighth grade. Dant Decl. ¶ 43. Over 85% of Bethel students are non-white, and represent approximately 40 different countries. *Id.* at ¶ 6. Admission into Bethel is competitive. It is based on a skills assessment or formal entrance exam, an evaluation of previous grades and behavior, and a pre-enrollment interview with the parents and student. *Id.* at ¶ 7; *see also* Ex. 1 at 0008.

---

[1] For the Court's convenience, Bethel has reattached to this Motion the exhibits originally filed with its Complaint as originally numbered. Exhibits 1-8 to Plaintiff's Motion for Preliminary Injunction are identical to Exhibits 1-8 to Plaintiff's Complaint. Exhibits 9-15 are new additions to the record.

Bethel does not ask about, or consider, sexual orientation or gender identity in its admissions decisions. Dant Decl. ¶¶ 8-9. Bethel also does not require that families be professing Christians in order to enroll their children in the school. *Id*. ¶ 11; *see also* Ex. 1 at 0008. Families from all walks of life are welcome. But students are expected to comply with Bethel's faith-based conduct policies while at school. Dant Decl. ¶ 12.

As a church-run school, Bethel "exists unashamedly for the purpose of reaching families with the gospel of Jesus Christ and training and equipping young people to serve Him." *Id*. ¶ 4; *see also* Ex. 1 at 0008. To that end, Bethel included a nondiscrimination statement in its Parent-Student Handbook. The 2017–2018 Handbook states, in full, that:

> Bethel Christian Academy admits students of any race, color, and national or ethnic origin to all the rights, privileges, programs, and activities generally accorded or made available to students at the school. It does not discriminate on the basis of race, color, national and ethnic origin in administration of its educational policies, admissions policies, scholarship and loan programs, and athletic and other school-administered programs.
>
> It should be noted, however, that Bethel Christian Academy supports the biblical view of marriage defined as a covenant between one man and one woman, and that God immutably bestows gender upon each person at birth as male or female to reflect His image. (Gen. 1:27, Gen. 2:23-24) Therefore, faculty, staff, and student conduct is expected to align with this view. Faculty, staff, and students are required to identify with, dress in accordance with, and use the facilities associated with their biological gender.

Ex. 1 at 0008; *see also* Dant Decl. ¶ 25. Bethel's handbooks for the 2016–2017 school year and subsequent years are substantially similar. Dant Decl. ¶ 24. Its current handbook for the 2019-2020 school year is attached as Exhibit 9. Its current statement of nondiscrimination reads:

> Bethel Christian Academy admits students of any race, color, and national or ethnic origin to all the rights, privileges, programs, and activities generally accorded or made available to students at the school. It does not discriminate on the basis of race, color, national and ethnic origin in administration of its educational policies, admissions policies, scholarship and loan programs, and athletic and other school-administered programs.

Ex. 9 at 0100. Bethel's student conduct expectations (the second paragraph of the 2017-2018 Handbook cited above) are now found in the student conduct policy portion of its 2019-2020

Handbook. Dant Decl. ¶ 12; *see also* Ex. 9 at 0126-0129. Among other expectations, Bethel requires its students—who are in preschool through 8th grade—to refrain from engaging in sexual communications or conduct of any kind. *See* Dant Decl. ¶ 13; *see also* Ex. 3 at 0070; Ex. 5 at 0074; Ex. 9 at 0128. These conduct requirements are based on Bethel's religious beliefs, and apply equally to all students, without regard to sexual orientation, sexual attraction, or sexual identification. *See* Dant Decl. ¶¶ 13-14. Bethel also requires students to identify with, dress in accordance with, and use the facilities provided for, their biological sex while at school. *See id.* at ¶ 15; *see also* Ex. 1 at 0008; Ex. 9 at 0128. These conduct requirements are also based on Bethel's religious beliefs. *See* Dant Decl. ¶ 15.

### B.  The BOOST Program

In 2016, the Maryland legislature established the BOOST Program. S.B. 190 at 128–35 (2016),  http://mgaleg.maryland.gov/2016RS/bills/sb/sb0190E.pdf (last visited Oct. 25, 2019). BOOST provides scholarship vouchers that allow eligible low-income K-12 students to attend an eligible nonpublic school of their choosing. *See* Dant Decl. ¶¶ 17, 19; *see also* Ex. 2 at 0061.

The Maryland State Department of Education (MSDE) administers the program. *See* Ex. 2 at 0061. For a school to receive BOOST vouchers, the school must participate in MSDE's Aid to Non-Public Schools Program for textbooks and computer hardware, administer student assessments, and not discriminate against students on certain grounds. *Id*. at 0061-63. For the 2016–2017 and 2017–2018 school years (the two years Bethel participated, Dant Decl. ¶ 17), the legislature required that the school:

> not discriminate in student admissions on the basis of race, color, national origin, or sexual orientation. Nothing herein shall require any school or institution to adopt any rule, regulation, or policy that conflicts with its religious or moral teachings. However, all participating schools must agree that they will not discriminate in student admissions on the basis of race, color, national origin, or sexual orientation.

Ex. 2 at 0062.[2] The legislature did not present any legislative findings or rationales for the Old Policy, nor did it define "sexual orientation" or "discriminate." *See id.* at 0061-67. Additionally, the legislature created a BOOST Advisory Board to "review and certify the ranked list of applicants and [] determine the scholarship award amounts." *See id.* at 0063. The Board also provides an annual report to the state budget committees that assess the program based on the number of scholarship recipients, the amount of the scholarships, the schools attended, and student test results. *Id.* at 0065-66. Defendant Gallagher is the Board Chair, and Defendants Camp, Eberhart, Grasmick, Green, Harbinson, and Sanders are Board members. Pl.'s Compl. at ¶¶ 24-25. Defendant Karen B. Salmon is the State Superintendent of Schools at MSDE, which administers BOOST. *Id.* at ¶ 23.

During the two years Bethel participated in BOOST, Defendants accepted Bethel's signed assurance that Bethel does not discriminate in admissions based on an applicant's sexual orientation. Bethel also met and complied with all of MSDE's other eligibility criteria for participating in BOOST. *See* Dant Decl. ¶ 19. Seventeen Bethel students received BOOST scholarships in 2016-2017, and eighteen students in 2017-2018. *See* Ex. 7 at 0079.

MSDE also runs two other scholarship programs: the Aid to Non-Public Schools Program and the Nonpublic Aging Schools Program, which provide textbooks and computers to students and funding for aging buildings. Ex. 2 at 0059. Participation in the textbooks program is a prerequisite for participating in BOOST. *Id.* at 0062. Similarly, participation in the textbooks program is a requirement for participating in the aging schools program. *See* S.B. 191 at 9-10 (2016), http://mgaleg.maryland.gov/2016RS/bills/sb/sb0191E.pdf (last visited Oct. 25, 2019).

---

[2] This sexual orientation nondiscrimination provision is also in effect for the 2019-2020 school year, although the legislature expanded it to cover additional protected classes and to prohibit additional conduct. *See* Facts Sec. E, *infra*.

Bethel participated in all three of these programs for the 2016–2017 and 2017–2018 school years. Because Bethel has been disqualified from BOOST, it is currently unable to participate in any. *See* Dant Decl. ¶¶ 35-36.

### C. Defendants enforced the BOOST Policies against Bethel based on Bethel's religious beliefs.

In a fall 2017 letter, Defendant Gallagher warned BOOST schools to review their "moral and religious position on non-discrimination, particularly on sexual orientation" and threatened that if "you sign the assurance but continue a discriminatory practice, the consequences are severe." *See* Dant Decl. ¶ 20; *see also* Ex. 10, Oct. 13, 2017, Gallagher Letter to BOOST Schools. In December 2017, the Board requested the student handbooks of BOOST schools, and Bethel complied. *See* Dant Decl. ¶¶ 21-23. The Board had not previously conducted any such investigations and, for the past two years, had accepted these schools' assurances of compliance. *See id.* ¶ 22.

On March 5, 2018, MSDE asked Bethel how its statement on marriage and biological sex was consistent with its assurance that Bethel does not discriminate in admissions based on sexual orientation. *See* Dant Decl. ¶ 26; *see also* Ex. 11, Mar. 5, 2018, MSDE Letter to Bethel at 0158-0159. Bethel responded that it "does not ask any questions about sexual orientation at all during the admissions process and is willing to enroll any student who meets and the academic criteria and whose past school conduct has not been demonstrably disruptive in a previous school." Dant Decl. ¶ 27; Ex. 3 at 0070. Bethel also explained that admitted students—who are under Maryland's age of consent—are disallowed from "engaging in sexual behavior of any type, whether heterosexual or homosexual" and reiterated that Bethel's religious beliefs on marriage and gender were compliant with the Policy. *See* Dant Decl. ¶ 28; Ex. 3. at 0069–70; Ex. 1 at 0035; *see also*

Md. Crim. Law § 3-307 (establishing criminal penalties for sexual contact with victims under 14 years, or 14-15 years old, depending on the perpetrator's age).

On May 2, 2018, Bethel submitted a statement to the BOOST Board. It reiterated that Bethel welcomes any student who meets its academic standards, regardless of sexual orientation. *See* Dant Decl. ¶ 28; Ex. 4 at 0072. It noted that BOOST explicitly prohibited Defendants from "requir[ing] any school or institution to adopt any rule, regulation, or policy that conflicts with its religious or moral teachings." *Id*. And it emphasized that "[a] statement of policy regarding *student conduct*" is irrelevant to admissions decisions. *Id*. (emphasis in original).

On May 3, 2018, the Board met and discussed Bethel's BOOST eligibility. At that meeting, Gallagher made several hostile remarks toward Bethel's religious beliefs. One Board member cautioned against pursuing a clawback because the Board had already authorized two years of scholarships before the schools were "caught up" in the Board's new investigation. Gallagher interjected, sneered, and stated, "You mean caught up with the fact that they signed an assurance illegally?" *See* May 3, 2018, BOOST advisory board meeting Video at 17:19–26 *available at* https://vimeo.com/368387715/85b45d8b3b  (last visited Oct. 25, 2019).[3]

At that same meeting, Gallagher also promoted an *ultra vires* interpretation of the Old Policy that reached beyond the law's plain text and ignored the explicit religious conscience protection. Gallagher stated that Bethel's "biblical view of marriage" and gender were

---

[3] Plaintiff hired a videographer to record the May 3, 2018, BOOST advisory board meeting, which is available here: https://vimeo.com/368387715/85b45d8b3b. That video was later transcribed, and the transcription is attached as Exhibit 12. MSDE also made available an audio recording of the May 3, 2018, BOOST advisory board meeting at this link: http://archives.marylandpublicschools.org/S/Audio/BOOSTMeeting050318.mp3 (last visited Oct. 25, 2019). Timestamps between the video and audio recording vary slightly, with the video timestamps being a few minutes later than the audio timestamps. Plaintiffs cite to the video recording throughout this Memorandum.

"problematic" because it "*affords them the opportunity* to discriminate." *See id*. at 1:18:29-1:19-
22.[4] He even suggested that Bethel's policy on biological sex violated the sexual orientation
nondiscrimination requirement. *See id.* Other Board members did as well. *See id.* 1:26:17-1:27:00.

Gallagher's position was so extreme that Green at one point asked: "At what point are we
excluding…a certain category of religious institution period—no matter what, no matter how they
try to abide by the rules…." *See id.* 1:19:45—58.[5] But Gallagher did not "think the burden [for
compliance] should be on the Board. I mean, I think, you know, you're either not discriminating
or you're leaving the door open to discriminating." *See id.* at 1:16:40-1:17:00.[6]

At the end of the meeting, the Board decided to ask Bethel for more information. MSDE
representative Monica Kearns told Bethel that Defendants would probably not determine Bethel's
eligibility before the May 21, 2018, BOOST application deadline for schools—jeopardizing
Bethel's ability to participate in BOOST the following school year. *See* Dant Decl. ¶ 29. MSDE
also informed Bethel that it would condition Bethel's participation in the textbooks aid program
on Bethel's eligibility for BOOST. *See id.* ¶ 30.

On May 25, 2018, MSDE sent Bethel a letter that asked: "1) Does your school discriminate
in student admissions on the basis of sexual orientation? 2) If your school was to discover that one

---

[4] *See also* Ex. 12, May 3, 2018, Transcript at 55:19-56:07; *see also* May 3, 2018, BOOST
advisory board meeting audio at 1:14:41-1:15:34
http://archives.marylandpublicschools.org/S/Audio/BOOSTMeeting050318.mp3 (last visited
Oct. 25, 2019).
[5] *See also* Ex. 12, May 3, 2018, Transcript at 56:13-56:15; *see also* May 3, 2018, BOOST
advisory board meeting audio at 1:16:00-1:16:17
http://archives.marylandpublicschools.org/S/Audio/BOOSTMeeting050318.mp3 (last visited
Oct. 25, 2019).
[6] *See also* Ex. 12, May 3, 2018, Transcript at 54:21-54:24; *see also* May 3, 2018, BOOST
advisory board meeting audio at 1:12:51-1:13:03
http://archives.marylandpublicschools.org/S/Audio/BOOSTMeeting050318.mp3 (last visited
Oct. 25, 2019).

of its students was in violation of the school's religious or moral teachings concerning sexual orientation, what would the school do to address it?" Dant Decl. ¶ 31; *see also* Ex. 13, May 25, 2018, MSDE Letter to Bethel at 0247. Bethel responded and attached its previous statements to MSDE. Dant Decl. ¶ 32; *see also* Ex. 5 at 0074. The school reiterated that "[a]ny student who can meet our academic standards and is likely to thrive in our structured environment is welcome to join our school community regardless of religious beliefs, experience of same-sex attraction, sexual self-identification, past participation in same-sex behavior, beliefs about marriage, or beliefs about sexual morality." *Id.* And Bethel made clear that if a student violates the conduct policy, its objective is to work with the student to bring that student back into compliance. *See id.*

On June 21, 2018, the Board considered Bethel's eligibility, but did not do so in open session. Instead, it went into closed session to discuss Bethel.[7] Gallagher failed to prepare a written statement, identify the relevant section of the Act authorizing the closed session, or limit its discussion to the receipt of legal advice as required by the Act. *See* June 21, 2018, BOOST advisory board meeting Video 2 at 3:50-6:13, *available at* https://vimeo.com/368412643/4e12ceb4b2;[8] *see*

---

[7] Plaintiff hired a videographer to record the June 21, 2018, BOOST advisory board meeting, which is available in two parts here: Video 1 at https://vimeo.com/368402663/ff91451a6c (before closed session) and here: Video 2 at https://vimeo.com/368412643/4e12ceb4b2 (after closed session). Those videos were later transcribed and are attached as Exhibit 14. MSDE also made available an audio recording of the June 21, 2018, BOOST advisory board meeting in two parts at these links:
http://archives.marylandpublicschools.org/S/Audio/BOOSTMeeting%2006212018Audio1.mp3 (before closed session) and
http://archives.marylandpublicschools.org/S/Audio/BOOSTMeeting%2006212018Audio2.mp3 (after closed session) (both links last visited Oct. 25, 2019). Timestamps between the video and audio recordings vary slightly. Plaintiff cites to the video recordings throughout this Memorandum.
[8] *See also* Ex. 14, June 21, 2018, Transcript at 53:06-54:16; *see also* June 21, 2018, BOOST meeting audio recording 2 at 3:57-6:17, *available at*
http://archives.marylandpublicschools.org/S/Audio/BOOSTMeeting%2006212018Audio2.mp3 (last visited Oct. 25, 2019).

*also* Md. Code GP § 3-305(b)(7). Open Meetings Act violations are subject to judicial review and may result in a fine or the action in question being voided. Md. Code GP §§ 3-401, 3-402; *Cmty. & Labor United For Baltimore Charter Comm. (CLUB) v. Baltimore City Bd. Of Elections*, 832 A.2d 804, 811 (Md. 2003). Underscoring this unusual step, Gallagher declared that "through 3 years that all of our meetings have been open" and that this was the first closed session for the Board in its existence. *See* June 21, 2018, BOOST advisory board meeting Video 1 at 1:07:26-1:07:36, *available at* https://vimeo.com/368402663/ff91451a6c.[9] After the closed session, the Board emerged and voted to exclude Bethel from BOOST without any explanation, justification, or deliberation in open session. *See* June 21, 2018, BOOST advisory board meeting Video 2 at 3:50-6:13, available at https://vimeo.com/368412643/4e12ceb4b2.[10]

Weeks later, Gallagher sent Bethel a letter informing Bethel that its statement on marriage and biological sex violated the Policy. Dant Decl. ¶ 33; *see also* Ex. 6 at 0076. The letter said nothing about the possibility of a clawback. That letter explained that "disciplin[ing] or expel[ling] a student because of the student's sexual orientation" violates the Policy because it "would make acceptance at the school illusory (i.e. a sham admission)." Ex. 6 at 0077. Gallagher also stated that any "discipline policy that, on its face, singles out conduct or behavior based on the sexual orientation of the student" violates the Policy, but that a discipline policy that is silent as to sexual orientation is compliant. *Id.* Gallagher ignored BOOST's religious policy protection.

---

[9] *See also* Ex. 14, June 21, 2018, BOOST meeting Transcript at 49:01-49:03; *see also* June 21, 2018, BOOST meeting audio recording  1 at 1:07:22-1:07:33, *available at* http://archives.marylandpublicschools.org/S/Audio/BOOSTMeeting%2006212018Audio1.mp3 (last visited Oct. 25, 2019).

[10] *See also* Ex. 14, June 21, 2018, BOOST meeting Transcript at 53:06-54:16; *see also* June 21, 2018, BOOST meeting audio 2 at 3:57-6:17 *available at* http://archives.marylandpublicschools.org/S/Audio/BOOSTMeeting%2006212018Audio2.mp3 (last visited Oct. 25, 2019).

**D.  Bethel and its students were harmed by being kicked out of BOOST.**

Bethel attempted to provide its own scholarships to impacted BOOST students. Dant Decl. ¶ 37. But it could not completely compensate for the loss of BOOST vouchers. *Id.* At least six Bethel students were forced to leave Bethel before the 2018–2019 school year. *Id.* ¶ 38. In the 2019-2020 school year, Bethel lost another three students due to lack of BOOST—their families could no longer stretch financially to afford Bethel. *Id.* at ¶ 40. One additional student is facing their last year at Bethel unless it is readmitted to BOOST. *Id.* at ¶ 42. And 22 prospective students have been forced to turn elsewhere because of insufficient financial aid to attend Bethel, including BOOST vouchers. *Id.* at ¶¶ 39, 41. As a result of being kicked out of BOOST, Bethel was also disqualified from the textbooks and aging schools aid programs.  *Id.* at ¶ 35. Bethel has been forced to forgo hiring teachers, backfilling positions, and updating student education equipment as a result of its inability to participate in MSDE's nonpublic school programs. *Id.* at ¶ 36.

Several months later, on December 12, 2018, MSDE sent Bethel a letter demanding repayment of $102,600 in past BOOST scholarships for the 2016–2017 and 2017–2018 school years. *Id.* at ¶ 44; Ex. 7 at 0079. The letter stated that on June 21, 2018, the Board made a "determination that the Bethel Christian Academy student handbook contained statements that violated the non-discrimination in admission requirement set forth in the BOOST law." *Id.* The letter also stated that Bethel had been in violation of the BOOST nondiscrimination provisions for the past two school years, and that it thus owed MSDE $102,600. *Id.* Pursuing the clawback was not required but the Board chose to do so regardless. *See* May 3, 2018, video at 3:24-36.[11] Failure to pay the clawback results in a referral to collections. *See id.* at 9:01-24.[12]

---

[11] *See also* Ex. 12, May 3, 2018, Transcript at 4:07-4:09; audio provided by MSDE begins after the meeting has started, so this section of the meeting is not on the MSDE recording.
[12] *See also* Ex. 12, May 3, 2018, Transcript at 8:17-8:24; *see also* May 3, 2018, BOOST advisory board meeting audio at 5:10-5:35,

On February 28, 2019, MSDE "offered" to let Bethel regain its eligibility by deleting the beliefs that MSDE found objectionable from Bethel's student handbook. Dant Decl. ¶ 45; Ex. 15, Feb. 28, 2019, MSDE Letter at 0313-0314. Defendants even sent examples of how other schools had censored their beliefs to participate in BOOST. Dant Decl. ¶ 47; *see also* Ex. 8. Though Bethel communicated with MSDE throughout the spring, it found no workable solution. Dant Decl. ¶ 46. And as MSDE informed Bethel, there was no way to appeal the Board's decision. *Id*. ¶ 34.

### E. Maryland expanded the BOOST Policy to cover disciplinary actions and gender identity and expression.

On March 26, 2019, the Maryland legislature amended the BOOST nondiscrimination requirement. The Policy expanded the regulations beyond admissions and sexual orientation. Under the amended Policy, a BOOST school may not:

> discriminate in student admissions, retention, or expulsion or otherwise discriminate against any student on the basis of race, color, national origin, sexual orientation, or gender identity or expression. Nothing herein shall require any school or institution to adopt any rule, regulation, or policy that conflicts with its religious or moral teachings.

2019 Md. Laws ch. 565 at 151. Importantly, the legislature retained the religious accommodation.

To compare the Policies, Plaintiff provides the following chart:

| 2017-2018 BOOST Policy<br>(Old Policy) | 2019-2020 BOOST Policy<br>(Amended Policy) |
|---|---|
| A nonpublic school may | A nonpublic school may |
| "not discriminate in student admissions on the basis of race, color, national origin, or sexual orientation. Nothing herein shall require any school or institution to adopt any rule, regulation, or policy that conflicts with its religious or moral teachings." | "not discriminate in student admissions, retention, or expulsion or otherwise discriminate against any student on the basis of race, color, national origin, sexual orientation, or gender identity or expression. Nothing herein shall require any school or institution to adopt any rule, regulation, or policy that conflicts with its religious or moral teachings." |
| Ex. 2, H.B. 150 at 0062 | 2019 Md. Laws ch. 565 at 151 |

---

http://archives.marylandpublicschools.org/S/Audio/BOOSTMeeting050318.mp3 (last visited Oct. 25, 2019).

The amended Policy does not define "gender identity or expression," "sexual orientation," or the phrase "otherwise discriminate." *See* 2019 Md. Laws ch. 565 at 151. Nor is it clear from the context how the Defendants intend to interpret those provisions.

**ARGUMENT**

When granting a preliminary injunction, a court considers four factors: whether the plaintiff has shown "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The plaintiff "need not establish a certainty of success, but must make a clear showing that he is likely to succeed at trial." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (internal quotations omitted). Bethel satisfies all four factors, so the Court should issue a preliminary injunction.

**I.     Bethel is likely to succeed on the merits of its Free Exercise and Free Speech claims.**

Bethel is likely to succeed on the merits of its Free Exercise and Free Speech claims.[13] Defendants have discriminated against Bethel because of its religious beliefs, so they must justify their actions under strict scrutiny. But they cannot satisfy this high bar. Similarly, the State's actions impermissibly discriminate against Bethel's beliefs based on viewpoint and content, and place unconstitutional conditions on the receipt of a public benefit by censoring religious speech and exercise that the State disfavors.

**A.  Defendants targeted Bethel for its religious beliefs, acted out of hostility towards those beliefs, and expressly discriminated against Bethel because of its beliefs, but cannot justify their actions under strict scrutiny.**

Bethel is likely to prevail on its Free Exercise claim because Defendants' enforcement of the BOOST nondiscrimination provisions is subject to strict scrutiny for religious targeting under

---

[13] Bethel does not waive other claims not raised in this Motion, but reserves the right to pursue them in later filings.

17

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993); religious hostility under *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission*, 138 S. Ct. 1719, 1729 (2018); and express discrimination under *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2021 (2017). But Defendants cannot satisfy this "most rigorous of scrutiny." *Lukumi*, 508 U.S. at 521.

> 1.  **Defendants targeted Bethel for its religious beliefs, acted out of hostility towards those beliefs, and expressly discriminated against Bethel for those same beliefs.**

Religious beliefs about marriage "are protected views and in some instances protected forms of expression." *Masterpiece Cakeshop*, 138 S. Ct. at 1727. And "the First Amendment ensures that religious organizations and persons are given proper protection as they seek to teach the principles that are so fulfilling and so central to their lives and faiths," including those about marriage and biological sex. *Obergefell v. Hodges,* 135 S. Ct. 2584, 2607 (2015). As a church-run school, Bethel unabashedly holds sincere religious beliefs about the nature of marriage and the sexes, and it complies with those beliefs as an exercise of its faith in the operation of Bethel Christian Academy. Dant. Decl. ¶¶ 2, 10.  But Defendants' application of the BOOST Policy to Bethel is subject to strict scrutiny for three independent reasons.

> a.  **Defendants targeted Bethel for its religious beliefs.**

Strict scrutiny applies because Defendants targeted Bethel for its religious beliefs. The Board did not exclude Bethel for any Policy violation; it excluded Bethel from BOOST because Defendants disapprove of Bethel's religious beliefs and conduct policies. Defendants admit that "[a] discipline policy that focuses on conduct or behavior without regard to the sexual orientation of the student does not violate the nondiscrimination clause contained in the BOOST language." Ex. 6 at 0077; *see also* Defs.' Mem. in Supp. of Mot. to Dismiss at 8. Bethel's conduct policies

focus solely on conduct and behavior, without regard to sexual orientation or gender identity. Yet Defendants disqualified Bethel anyway.

As the Supreme Court explained in *Lukumi*, "if the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral" and must satisfy strict scrutiny. 508 U.S. at 533. In *Lukumi*, city lawmakers passed multiple ordinances designed to restrict ritual animal sacrifice, while permitting other animal killings. *Id*. at 535-36. Though the discrimination was not overt on the face of the ordinance, the Supreme Court noted that the Free Exercise Clause bars even "subtle departures from neutrality" on matters of religion. *Id*. at 534. This concern is particularly acute where the government is targeting religious *beliefs*, as opposed to religious *practice*. *Id.* at 533 ("[A] law targeting religious beliefs as such is never permissible ….") (citing *McDaniel v. Paty*, 435 U.S. 618, 626 (1978)).

If it is impermissible to pass a law targeting religious beliefs (and it is), then it is equally impermissible to *apply* a law to target those same beliefs. And that is what Defendants have done. As a church-run school, Bethel is forthright with applicants and students about its religious beliefs, including those on marriage and biological sex. Bethel has not, and will not, discriminate in admissions based on sexual orientation and gender identity. *See* Dant. Decl. ¶¶ 8-9. It repeatedly made this clear to Defendants. Ex. 3 at 0070; Ex. 4 at 0072; Ex. 5 at 0074. It repeatedly explained that all students (who are below Maryland's age of consent) must refrain from "engaging in sexual behavior of any type, whether heterosexual or homosexual." Ex. 3 at 0070; Ex. 5 at 0074. And it informed the Board that it does not require students to "*agree* with the school's Statement of Faith or specific beliefs." Ex. 5 at 0074 (emphasis in original).

Yet Defendants insisted that Bethel's religious beliefs about marriage and biological sex constituted per se discrimination based on sexual orientation. *See* Ex. 6 at 0076-77; Ex. 7 at 0079-0080; Defs.' Mem. in Supp. of Mot. to Dismiss at 1, 3. Defendants stated that:

> a handbook recipient may reasonably view [Bethel's statement of beliefs], on its face, as a prohibition on students with a non-heterosexual identity because it expects all students to align their conduct to the view of marriage as a covenant between one man and one woman (i.e., heterosexual).

Ex. 6 at 0076. This was the first time Bethel learned that the Board employed a "reasonable recipient" standard.

Defendants' hypothetical is entirely speculative. But they did not seem to care how attenuated the risk of harm was, since they did not seek evidence of actual harm (there was none). Thus, "[i]t is not unreasonable to infer … that a law which visits such gratuitous restrictions on religious conduct seeks not to effectuate the stated governmental interests, but to suppress the conduct because of its religious motivation." *Lukumi*, 508 U.S. at 538 (cleaned up).

Evidence of gratuitous restrictions abound. Defendants first ignored the Old Policy's plain language, which applied only to admitting students. Then they applied the Policy to student discipline and expulsion. Ex. 6 at 0076-77. Defendants also ignored the Old Policy's plain language, which applied only to sexual orientation. They then considered gender identity, too—and admit as much. *See* Defs.' Reply in Supp. of Mot. to Dismiss at 8-9 (stating that it was proper to consider gender expression while evaluating sexual orientation); *see also* Ex. 6 at 0076 (referencing Bethel's policy on marriage and biological sex).

Defendants ultimately chose to disqualify Bethel *even though* they admitted that a discipline policy that focuses on conduct or behavior, without regard to sexual orientation—as Bethel's does—would not violate the Policy. *See* Ex. 6 at 0077. The following year, the State added new gender identity and expression requirements, terms which the Policy did not define.

While it is unclear whether the language conflicts with Bethel's faith-based requirements, Defendants say it does. *See* Defs.' Mem. in Supp. of Mot. to Dismiss at 31-32.

But Bethel's policy that students identify with, adhere to the dress code of, and use the facilities provided for their biological sex, and its policy prohibiting students from engaging in sexual communication or conduct of any kind, is protected. Nothing in the Policy "require[s] any school. . .to adopt any. . .policy that conflicts with its religious or moral teachings." 2019 Md. Laws ch. 565, at 151; *see also* Ex. 2 at 0061. Remarkably, the Board ignored those religious policy protections. *See* Ex 6. Defendants instructed Bethel to *change its policies* or be disqualified. They gerrymandered the Policy to exclude Bethel. It is of no consequence that this gerrymandering occurred in the application, rather than the creation, of the BOOST law—religious targeting by a government body is impermissible regardless of form.

Moreover, the Board offered to restore Bethel's eligibility if it "decides to revise the language in its student handbook." *See* Ex. 15 at 0313. Months later, MSDE sent examples of permissible and impermissible statements of faith from other religious schools. Setting aside the State's parsing of theology, these examples illustrate that schools who were clear about their beliefs on marriage and sexual conduct were excluded from BOOST, while schools who obscured their beliefs were readmitted—even though they still practice those beliefs. Ex. 8 at 0082–92.

The Board's zealous targeting of religious beliefs interferes with Bethel's freedom to enforce sexual conduct standards that are central to "shape its own faith and mission" as a church-run school. *Hosanna-Tabor Evangelical Lutheran Church and Sch. v. EEOC*, 565 U.S. 171, 188 (2012); *see* Ex. 1 at 0010 (Bethel's mission "is to create an authentic Christian learning community to train students to know, love, and serve the Lord Jesus Christ and to equip them spiritually and

academically to be lights to the world."). Thus, Defendants have targeted Bethel because of its religious beliefs and "must undergo the most rigorous of scrutiny." *Lukumi*, 508 U.S. at 546.

### b.  Defendants acted out of hostility for Bethel's religious beliefs.

Strict scrutiny also applies because Defendants applied the nondiscrimination Policies against Bethel out of hostility for Bethel's religious beliefs—and then passed the Amended Policy to ensure Bethel was kept out. After the Board allowed Bethel to participate in BOOST for two years, it did an about-face, departed from the plain language of the Policy, disparaged Bethel's beliefs, ignored Open Meeting Act requirements, disqualified Bethel based solely on its religious beliefs, and retroactively demanded over $100,000 based on the Board's novel interpretation of the Policy. These actions are impermissibly hostile toward religion.

The Supreme Court has made clear that if "impermissible hostility toward … sincere religious beliefs" is the motivation for a government's objection to religious conduct, that government action is unconstitutional. *Masterpiece Cakeshop,* 138 S. Ct. at 1729. The Court in *Masterpiece* noted that Colorado had "disparage[d] [the baker's] religion in at least two distinct ways: by describing it as despicable, and also by characterizing it as merely rhetorical—something insubstantial and even insincere." *Id.* In an opinion joined by seven Justices, the Court held that "[t]his sentiment is inappropriate for a Commission charged with the solemn responsibility of fair and neutral enforcement of … anti-discrimination law." *Id.* Further, the Court noted that government "cannot act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices." *Id.* at 1731.

Here, the BOOST Board passed judgment on and presupposed the illegitimacy of Bethel's religious beliefs and practices. At the May 3, 2018, BOOST Board meeting, a board member stated that Bethel and similar BOOST schools likely thought in good faith that they were complying with

the Policy for the previous two years before getting caught up in the Board's new enforcement. *See* May 3, 2018, BOOST advisory board meeting Video 17:05-17:18 *available at* https://vimeo.com/368387715/85b45d8b3b (last visited Oct. 25, 2019).[14] But rather than give these schools the benefit of the doubt, Defendant Gallagher interjected, sneering: "You mean caught up with the fact that they signed an assurance illegally?" *Id*. at 17:19–17:26.[15] Defendant Gallagher also insisted that the burden of proof was on the schools to prove that they *were not* discriminating, and to comply with a gender identity requirement that did not exist yet. *See id*. at 1:18:29-1:19-22.[16] This demonstrates religious hostility that is "inappropriate for a [Chairman] charged with the solemn responsibility of fair and neutral enforcement of [Maryland's BOOST] antidiscrimination law." *Masterpiece Cakeshop*, 138 S. Ct. at 1729.

The Board also retroactively enforced its novel interpretation of the Policy based on religious hostility. The Board allowed Bethel to participate in BOOST for two years with substantially the same Statement of Faith in its Student Handbook. Defendants then ignored the plain text of the Policy to not only disqualify Bethel in the future, but to retroactively disqualify Bethel and demand $102,600 in damages. This enforcement is also inconsistent with the Board's earlier threat to enforce the clawback against schools who signed the nondiscrimination assurance

---

[14] *See also* Ex. 12, May 3, 2018, Transcript at 15:24-16:03; *see also* May 3, 2018, BOOST advisory board meeting audio at 13:04-13:30 http://archives.marylandpublicschools.org/S/Audio/BOOSTMeeting050318.mp3 (last visited October 23, 2019).
[15] *See also* Ex. 12, May 3, 2018, Transcript at 16:04-16:05; *see also* May 3, 2018, BOOST advisory board meeting audio at 13:32-13:37 http://archives.marylandpublicschools.org/S/Audio/BOOSTMeeting050318.mp3 (last visited October 23, 2019).
[16] *See also* Ex. 12, May 3, 2018, Transcript at 55:19-56:07; *see also* May 3, 2018, BOOST advisory board meeting audio at 1:14:41-1:15:34 http://archives.marylandpublicschools.org/S/Audio/BOOSTMeeting050318.mp3 (last visited October 23, 2019).

in bad faith or were allowing discriminatory practices at their school. Ex. 10, Oct. 13, 2017, Gallgher Letter to Bethel at 0156. Bethel did neither.

Moreover, irregularities in the decision-making process are highly probative of discriminatory and hostile motives. *Jesus Christ is the Answer Ministries*, 915 F.3d at 263–64 (noting that departures from normal procedures can suggest unlawful motives). The Fourth Circuit has recognized that "the specific sequence of events leading up to the particular decision being challenged, including any significant departures from normal procedures" is probative of whether a decision-making body was motivated by discriminatory intent. *Reaching Hearts Int'l., Inc. v. Prince George's Cty.*, 584 F. Supp. 2d 766, 781 (D. Md. 2008) (citing *Sylvia Development Corp. v. Calvert Cty., Md.*, 48 F.3d 810, 819 (4th Cir. 1995). And here, Defendants' decision-making process evidenced several irregularities that are probative of hostility and discriminatory intent.

The Board went into closed session—for the first time in the Board's history—when considering Bethel's BOOST eligibility. *See* June 21, 2018, BOOST advisory board meeting Video 1 at 1:07:26-1:07:36, *available at* https://vimeo.com/368412643/4e12ceb4b2; se*e also* Defs.' Mem. in Supp. of Mot. to Dismiss at 7 ("the BOOST Board entered into closed session….").[17] Gallagher did not prepare a written closing statement, nor did he cite the relevant part of the Act authorizing the closed session or the topics to be discussed as required by the Open Meetings Act. *See* Md. Code GP § 3-305; June 21, 2018, BOOST advisory board meeting Video 2 3:50-6:13, *available at* https://vimeo.com/368412643/4e12ceb4b2.[18] Although the Act allows

---

[17] *See also* June 21, 2018, Transcript at 49:01-49:03; Audio 1 at 1:07:22-1:07:33, *available at* http://archives.marylandpublicschools.org/S/Audio/BOOSTMeeting%2006212018Audio1.mp3 (last visited October 23, 2019).
[18] *See also* June 21, 2018 Transcript at 53:06-54:16; *see also* June 21, 2018 BOOST meeting audio recording 2 at 3:57-6:17, *available at* http://archives.marylandpublicschools.org/S/Audio/BOOSTMeeting%2006212018Audio2.mp3.

the Board to receive legal advice in closed session, this narrow exemption "does not allow for closed discussion among members of the public body merely because an issue has legal ramifications." 1 *OMCB Opinions* 53, 54 (1993); 11 *OMCB Opinions* 38 (2017); *see also See* Md. Code GP § 3-305(b)(7).

The Board also may not discuss topics *other* than those listed on the closing statement. *See id.* But even though the Board voted on Bethel's eligibility in open session, it did not deliberate in open session at that meeting. This compels the conclusion that the Board deliberated in closed session about Bethel, a lack of transparency that is probative of religious hostility, as well as a violation of the Open Meetings Act. *See CLUB*, 832 A.2d at 811 (holding that City Council's Open Meeting Act violations were evidence that the Council was trying to avoid public scrutiny).[19]

And, finally, the State entrenched its exclusion of Bethel by adding gender identity and expression as protected classes after considering these categories in excluding Bethel for purported sexual orientation discrimination. *See* Defs.' Reply in Supp. of Mot. to Dismiss at 8-9 (stating that it was proper to consider gender expression while evaluating sexual orientation). In sum, the irregularities of the decision-making process as well as the statements by Gallagher as he led the Board are probative of discriminatory intent.

### c. Defendants expressly discriminated against Bethel because of its beliefs.

Finally, Defendants enforced the BOOST nondiscrimination Policy against Bethel solely because of its religious character and beliefs. Such blatant discrimination is express discrimination and must satisfy strict scrutiny. Any "policy [which] expressly discriminates against otherwise

---

[19] Open Meetings Act violations are subject to judicial review and may result in a fine or the action in question being voided. Md. Code GP §§ 3-401, 3-402; *Cmty. & Labor United For Baltimore Charter Comm. (CLUB) v. Baltimore City Bd. Of Elections*, 832 A.2d 804, 811 (Md. 2003).

eligible recipients by disqualifying them from a public benefit solely because of their religious character … imposes a penalty on the free exercise of religion that triggers the most exacting scrutiny." *Trinity Lutheran*, 137 S. Ct. at 2021.

In *Trinity Lutheran*, a religiously affiliated preschool was denied the "right to participate in a government benefit program" solely because of its "religious character." *Id.* at 2022. The Court emphasized that "[t]he express discrimination against religious exercise here is not the denial of a grant, but rather the refusal to allow the Church—solely because it is a church—to compete with secular organizations for a grant." *Id.* The Court also emphasized that the government cannot "regulate or outlaw conduct because it is religiously motivated." *Id.* at 2021. Nor may it "discriminate against 'some or all religious beliefs.'" *Id.* at 2021; *accord. McDaniel*, 435 U.S. at 626 ("The Free Exercise Clause categorically prohibits government from regulating, prohibiting, or rewarding religious beliefs as such.").

Bethel has suffered this same express discrimination. The Board has enforced the BOOST nondiscrimination Policy specifically to target disfavored religious belief—the Board has not stopped any actual Policy violations. Like the church in *Trinity Lutheran*, Bethel would be eligible for BOOST but for its religious beliefs and conduct policies. The Board made this unmistakably clear when it offered Bethel a chance to censor its religious views to regain BOOST eligibility. Ex. 15, Feb. 28, 2019, MSDE Letter to Bethel at 0313-0314; Ex. 8. And the State entrenched this reality by adding "gender identity and expression" to the amended Policy. Defendants' mandate is clear: Bethel must choose between its religious convictions or participation in BOOST. Bethel, like Trinity Lutheran, simply asks to "participate in a government benefit program without having to disavow its religious character." *Trinity Lutheran*, 137 S. Ct at 2022.

Defendants' express discrimination is even more clear in light of the BOOST religious conscience exemption, the State's purported interest in "ensuring that Maryland students have access to high-quality, affordable and diverse educational options," and its underhanded clawback demand.[20] Such blatant discrimination "must be subjected to the 'most rigorous' scrutiny." *Trinity Lutheran*, 137 S. Ct. at 2024 (quoting *Lukumi*, 508 U.S. at 546).

      **2.**    **Defendants' enforcement of the BOOST Policies to Bethel cannot survive the high bar of strict scrutiny.**

Laws subject to strict scrutiny are presumptively unconstitutional and can survive only if they "advance interests of the highest order and [are] narrowly tailored in pursuit of those interests." *Lukumi*, 508 U.S. at 546 (cleaned up). "A law that targets religious conduct … will survive strict scrutiny only in rare cases." *Id.*

      **a.**  **Defendants have no compelling government interest.**

To determine whether there is a compelling interest, courts must "scrutinize the asserted harm of granting specific exemptions to particular religious claimants." *Burwell v. Hobby Lobby*, 573 U.S. 682, 726–27 (2014) (internal quotation marks and citation omitted). Even "plausible hypotheses are not enough to satisfy strict scrutiny," *Contractors Ass'n of E. Pa. v. City of Phila.*, 6 F.3d 990, 1008 (3d Cir. 1993), and "ambiguous proof will not suffice," *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 800 (2011). Generalized speculations or assertions are not enough.

Defendants point to a generalized interest in preventing discrimination in education. *See* Defs.' Mem. in Supp. of Mot. to Dismiss at 25-28. But such "broadly formulated interests" are insufficient to carry the heavy burden under strict scrutiny. *Hobby Lobby*, 573 U.S. at 726–27. The interest must be particularized *as to Bethel*. *See Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 430–32 (2006) (strict scrutiny "requires the Government to demonstrate

---

[20] *About Us*, Maryland BOOST, https://www.educationmaryland.org/ (last visited Oct. 25, 2019).

that the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened."). Defendants cannot meet that burden. Bethel has not discriminated based on sexual orientation or gender identity, nor do its policies allow for it. Bethel prohibits bullying and harassment on any basis. Ex. 1 at 0035. It affirms the dignity and value of every person as created in God's image. *Id.* at 0009, 0034; *see also* Dant Decl. ¶ 10. And it makes decisions based on conduct, not identity. The State has no interest in interfering with Bethel's sexual conduct policies, sex-specific dress code, or facility-use policy.

Moreover, the State has no compelling interest in holding nonpublic schools to nondiscrimination standards that even Maryland public schools—which are entirely publicly funded—are not required to comply with.[21] It has no compelling interest in permitting sexual conduct by minors who are below Maryland's age of consent. *See* Md. Crim. Law § 3-307 (establishing criminal penalties for sexual contact with victims under 14 years, or 14-15 years old, depending on the age of the perpetrator). And it has no compelling interest in forcing a faith-based school to violate its faith-based policies to receive BOOST vouchers.

There is no compelling interest in sheltering the public from ideas it dislikes. *See Texas v. Johnson*, 491 U.S. 397, 414 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."). And there is no compelling interest in failing to apply the Old Policy as written and exceeding its own authority.

---

[21] Though Defendants claim that Maryland public school are required to admit all students, regardless of sexual orientation or gender identity, the point remains that there is no legal prohibition against disciplining or expelling a student for sexual orientation or gender identity. *See* Defs.' Reply in Supp. of Mot. to Dismiss at 15.

In fact, Defendants' enforcement of its Policy undermines its asserted interest in "ensuring that Maryland students have access to high-quality, affordable and diverse educational options."[22] Nor are the Board's actions consistent with the State's assertions that "education is not a one-size-fits-all endeavor and that families should be provided with the opportunity to choose the education best fit for their child."[23] *See Columbia Union Coll. v. Clarke*, 159 F.3d 151, 156 (1998) ("*Rosenberger* teaches that 'viewpoint-based restrictions are [not] proper' when the government 'expends funds to encourage a diversity of views.'").

Rather, the Board is denying numerous low-income students the opportunity to select schools with certain religious viewpoints, depriving these students of an excellent faith-based education. Without an injunction, Bethel will be unable to provide educational services to underprivileged students wanting to attend its school. This irrationally diminishes the already scarce resources available to these children.[24]

### b.  Defendants have not used the least restrictive means.

This heavy-handed censorship is especially egregious in the context of a voucher system, where students and their families choose the school. For this reason, Defendants cannot show that they have employed the least restrictive means of promoting nondiscrimination. This requirement is "exceptionally demanding" and requires the government to "show[] that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting part[y]." *Hobby Lobby*, 573 U.S. at 728. A policy fails this prong if the "interests could

---

[22] *About Us*, Maryland BOOST, https://www.educationmaryland.org/ (last visited Oct. 30, 2019).
[23] *Id.*
[24] *English Language Arts Current Year Data (2018)*, Maryland Report Card, https://msp2018.msde.maryland.gov/Graphs/#/Assessments/ElaPerformance/1EL/17/6/3/3/3/3/3/3/3/3/3/3/99/XXXX  (last visited Oct. 28, 2019) (no composite data available by grade or groups of grades, but assessments from K-8 tests show proficiency percentages between about 12–46%).

be achieved by narrower [policies] that burden[] [the right] to a far lesser degree." *Lukumi*, 508 U.S. at 546.

And here, the least restrictive alternative is already apparent: do not enforce the nondiscrimination provisions beyond what the law or Constitution authorizes. Defendants' exclusion of Bethel is dramatically overinclusive to any purported ends of stopping actual discrimination. The Board has failed to supply any evidence that anything short of full censorship of certain religious viewpoints would not protect Maryland students. Nor could it, when public schools—which are entirely publicly funded—are not even required to comply with similar nondiscrimination provisions.

Furthermore, no harm inures to a student by giving her another school to choose to attend. By contrast, shutting Bethel out of BOOST will shut the door on low-income students who wish to attend an excellent Christian school. The Board allowed Bethel and schools like it to operate under the plain meaning of the Policy for two years prior to reinventing it. It seems entirely unconcerned with the real-world effects of its censorship. Such indiscretion does not survive even intermediate scrutiny. *See NIFLA v. Beccera*, 138 S. Ct. 2361, 2376 (2018) (government flunked narrow-tailoring requirement where it "identified no evidence" to prove tailoring).

Defendants' actions do not come close to satisfying strict scrutiny. The Board has violated Bethel's Free Exercise rights. This Court should thus enjoin the Board from enforcing the clawback against Bethel and from interpreting the BOOST nondiscrimination provisions in a discriminatory manner.

### B.  Defendants engaged in impermissible viewpoint and content-based discrimination and placed unconstitutional conditions on a public benefit.

Defendants' application of its nondiscrimination Policies are unconstitutional under the Free Speech Clause of the First Amendment because the Board regulated speech based on Bethel's

religious views. Defendants' actions are also unconstitutionally content-based because they cannot justify their actions under strict scrutiny. Separately and independently, the Board placed unconstitutional conditions on Bethel's access to a state benefit.

### 1. Defendants impermissibly discriminated against Bethel because of Bethel's religious viewpoint.

Viewpoint-based regulations are an "egregious form of content discrimination" where the government targets "particular views taken by speakers on a subject." *Rosenberger*, 515 U.S. 819, 829 (1995). Courts "use the term 'viewpoint' discrimination in a broad sense," and have held "time and time again" that this factor particularly forbids any offense-based restrictions, since "[g]iving offense is a viewpoint." *Matal v. Tam*, 137 S. Ct. 1744, 1763 (2017). "The First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others." *Id.* at 1757; *see Iancu v. Brunetti*, 139 S. Ct. 2294, 2300 (2019) (government cannot discriminate between "conventional moral standards and those hostile to them; those inducing societal nods of approval and those provoking offense and condemnation").

This rule "reflects a 'profound national commitment' to the principle that 'debate on public issues should be uninhibited, robust, and wide-open.'" *Boos v. Barry*, 485 U.S. 312, 318 (1988) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). This concept applies with special force in schools. Academic freedom is "a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom." *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967).

But the Board's enforcement casts that pall of orthodoxy on schools all over Maryland. Defendants disqualified Bethel and demanded a $102,600 clawback solely because of Bethel's religious views. Had Bethel not expressed its viewpoint on traditional marriage and required its students to respect that view, it would not have been expelled. Similarly, had Bethel not expressed

its viewpoint on God's design for biological sex, and required its students to respect that view, it would not have been expelled from BOOST.

In *Columbia Union College v. Clarke*, 159 F.3d 151, 159 (4th Cir. 1998), the Fourth Circuit held that Maryland could not exclude private religious colleges from state-funded grants simply because of the colleges' religious viewpoints. "*Rosenberger* teaches that "viewpoint-based restrictions are not proper" when the government "expends funds to encourage a diversity of views." *Id.* at 156.[25] It is the same here. Maryland has excluded a religious school from a generally available public benefit program solely because of the school's religious viewpoint on marriage and biological sex. And again, the viewpoint discrimination is all the more blatant because the BOOST program was also enacted "to encourage a diversity of views." *Id.*

The Board's actions are worse than *Columbia Union.* Defendants "distinguish[] between two opposed sets of ideas: conventional moral standards and those hostile to them …." *Iancu*, 139 S. Ct. at 2300. And they are taking sides in a religious debate. The Board is coercing individuals "to be an instrument for fostering public adherence to an ideological point of view they find unacceptable." *NIFLA*, 138 S. Ct. at 2379 (Kennedy, J., concurring) (markings omitted). Skewing the voices represented in Maryland's school system is exactly the result that viewpoint-discrimination protections are designed to prevent. And for the reasons explained in the Free Exercise argument, the Board's application of its Policy does not come close to satisfying the high bar of strict scrutiny. Defendants' actions are thus unconstitutional.

---

[25] Plaintiff eventually obtained victory after the Fourth Circuit remanded and then subsequently held that the program did not violate the Establishment Clause. 254 F.3d 496 (4th Cir. 2001). The Establishment Clause concern is immaterial here because, unlike BOOST, state funds there went straight to the school instead of the student. This distinction is consistent with controlling Supreme Court precedent. *Zelman v. Simmons-Harris*, 536 U.S. 639, 652 (2002); *see Columbia Union Coll.*, 159 F.3d at 159–60 (discussing *Witters v. Wash. Dep't of Servs. for the Blind*, 474 U.S. 481 (1986)).

## 2.   Defendants' actions are subject to strict scrutiny as impermissible content-based discrimination.

"It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger.*, 515 U.S. at 828. Thus, "content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert,* 135 S. Ct. 2218, 2226 (2015). A law is content-based and subject to strict scrutiny "regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." *Id.* at 2228 (quoting *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429 (1993)). This is because content-based restrictions "raise[] the specter that the government may effectively drive certain ideas or viewpoints from the marketplace." *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991).

Here, the Board's interpretation of the Policies are content-based. The Board excluded Bethel from BOOST solely because of the religious content and policies in Bethel's handbook. And the Board makes its decisions under both Policies according "to particular speech because of the topic discussed or the idea or message expressed"—namely, marriage and biological sex—so their regulations are thus content-based and subject to strict scrutiny. *Reed*, 135 S. Ct. at 2227. For the reasons explained in the Free Exercise argument, the Board's application of its Policies does not come close to satisfying that high bar.

## 3.   Defendants' application of the Policies also imposes unconstitutional conditions on the receipt of state benefits.

A government cannot use a government funding program to silence unfunded, private speech that it finds offensive. "[T]he government may not place a condition on the receipt of a benefit or subsidy that infringes upon the recipient's constitutionally protected rights, even if the

government has no obligation to offer the benefit in the first instance." *Agency for Int'l Dev*, 570 U.S. at 212; *see Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 115 (1991) ("A statute is presumptively inconsistent with the First Amendment if it imposes a financial burden on speakers because of the content of their speech."). This is true even for a company "receiving only one percent of its budget from the Federal Government." *AOSI*, 570 U.S. at 215–16. Here, the Board is conditioning a benefit, educating BOOST students, on Bethel's relinquishment of its right to freely express itself on matters of marriage and sexuality. Maryland is thus putting unconstitutional conditions on Bethel because it disapproves of Bethel's religious beliefs and viewpoints.

## II.   The remaining preliminary injunction factors weigh in Bethel's favor.

The remaining preliminary injunction factors—irreparable harm, balance of equities, and public interest—also weigh in favor of a preliminary injunction. Defendants' application of the Policy violates Bethel's constitutional rights. And the loss of constitutional rights, "for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Irreparable harm will also continue without an injunction because Bethel will continue to lose students from low-income families. Bethel is currently unable to accept new BOOST students who desire to attend Bethel. And Bethel will continue to be unable to reach the neediest parts of the community to fulfill its mission to serve the children in its community. This is especially true since the Board's decision also disqualified Bethel from using grants from the textbooks and aging schools programs.

Bethel will also suffer irreparable harm if the clawback is enforced because it will be unable to offer the full array of educational opportunities to its students over the next few years. Bethel has already been forced to forgo hiring teachers and backfilling positions, creating burgeoning

class sizes and teacher loads, and to forgo updating student educational equipment. Dant. Decl. at ¶ 36. If the clawback is enforced, these harms will be further exacerbated.

The balance of equities likewise favors Bethel. A preliminary injunction would prevent statutory and constitutional violations, and would allow Bethel to continue providing a top-tier education to its students while this case is pending. On the other hand, Defendants will not suffer any irreparable injury. No harm will result by requiring the Board to fairly apply the relevant law, and restore the status quo so that Bethel may be readmitted to BOOST. Any parents who feel that Bethel may not be a good fit for their child or who do not wish to have their child at Bethel are free to choose any other school, including a public school. Nor will failing to obtain a $102,600 windfall from a clawback of funds that students have already used cause irreparable harm to Defendants.

Finally, "upholding constitutional rights surely serves the public interest." *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002). So too is ensuring that students can maintain access to a quality education of their choice.

### CONCLUSION

Because Bethel has demonstrated a likelihood of success on the merits of its claims, and because it has met the other requirements for a preliminary injunction, this Court should enjoin the Defendants from enforcing the clawback against Bethel and should allow Bethel to participate in BOOST program as soon as possible.

Dated this 31st day of October, 2019.      Respectfully submitted,

Christiana M. Holcomb*                     /s/ John R. Garza
Christen M. Price*                         _____
Gregory S. Baylor*                         John R. Garza
ALLIANCE DEFENDING FREEDOM                 GARZA LAW FIRM, P.A.
440 First Street NW, Suite 600             Bar No. 01921
Washington, D.C. 20001                     17 W. Jefferson Street
Telephone: (202) 393-8690                  Rockville, MD 20850
Fax: (202) 347-3622                        Telephone: (301) 340-8200
Email: CHolcomb@ADFlegal.org               Fax: (301) 761-4309
Email: CPrice@ADFlegal.org                 Email: jgarza@garzanet.com
Email: GBaylor@ADFlegal.org
                                           David A. Cortman*
                                           ALLIANCE DEFENDING FREEDOM
                                           1000 Hurricane Shoals Road, Suite D-1100
                                           Lawrenceville, GA 30043
                                           Telephone: (770) 339-0774
                                           Fax: (770) 339-6744
                                           Email: DCortman@ADFlegal.org


                     *Counsel for Plaintiffs*
                   *Appearing Pro Hac Vice*


                              36