**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| BETHEL MINISTRIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 1:19-cv-01853-ELH |
| | ) | |
| v. | ) | |
| | ) | |
| DR. KAREN B. SALMON, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**UNITED STATES' STATEMENT OF INTEREST IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

The United States of America respectfully files this Statement of Interest pursuant to 28 U.S.C. § 517, which authorizes the Attorney General "to attend to the interests of the United States in a suit pending in a court of the United States." 28 U.S.C. § 517. The United States is resolutely committed to protecting the freedoms guaranteed by the First Amendment. The First Amendment enshrines both the right to "the free exercise" of religion and "the freedom of speech" at the bedrock of the Nation's constitutional system. These freedoms lie at the heart of a free society and are the "effectual guardian of every other right." Virginia Resolutions (Dec. 21, 1798), *in* 5 THE FOUNDERS CONSTITUTION 135, 136 (Philip B. Kurland & Ralph Lerner, eds., 1987).

The United States has a particular interest in ensuring nondiscrimination in education. The United States, through the U.S. Department of Education, provides funding to the Maryland State Department of Education. The United States has an interest in ensuring that its funds are used in a manner consistent with the Constitution and federal laws. The United States also enforces Title IV of the Civil Rights Act of 1964, 42 U.S.C. § 2000c-6, which allows the Attorney General to file suit when a school board deprives children of equal protection of the

1

law, or when a public college excludes persons based on race, color, religion, sex, or national origin.  The United States also has statutory authority under Title IX of the Civil Rights Act of 1964, 42 U.S.C. § 2000h-2, to intervene in equal protection cases of general public importance.

The United States submits this Statement of Interest to address an important question involving the ability of religious schools to participate on an equal basis in publicly funded scholarship programs:  Can a school that does not discriminate on any basis forbidden by a publicly funded scholarship program nonetheless be excluded from the program simply because the government perceives the school's religious beliefs and expression as being inherently discriminatory?

## BACKGROUND

Operated by the State of Maryland, the BOOST program provides scholarships to students from low-income backgrounds to attend nonpublic schools.  ECF 19-1, 8; ECF 22, 3. From its inception in 2016, the BOOST program has prohibited schools that accept scholarship students from discriminating on the basis of race, color, national origin, or sexual orientation in admissions decisions.  ECF 19-1, 8; ECF 22, 3.  Since the fall of 2019, the BOOST program has also prohibited discrimination on the basis of "gender identity or expression," and has prohibited discrimination in "student admissions, retention, or expulsion or otherwise."  ECF 19-1, 16; ECF 22, 3.  The BOOST program's nondiscrimination requirement states, however, that it does not "require any school or institution to adopt any rule, regulation, or policy that conflicts with its religious or moral teachings."  ECF 19-1, 16; ECF 22, 3-4.

Plaintiff Bethel Ministries, Inc., is a Pentecostal Christian Church in Savage, Maryland that operates a nonpublic school, Bethel Christian Academy ("Bethel").  Bethel enrolls students from kindergarten through the eighth grade, and provides a rigorous academic program for a socioeconomically diverse student body that is 85% nonwhite.  ECF 19-1, 6.  Bethel's Mission

2

Statement states that it seeks "to create an authentic Christian learning community to train students to know, love, and serve the Lord Jesus Christ, and to equip them spiritually and academically to be lights to the world." *Id.*

In furtherance of Bethel's Mission Statement, the school's Parent-Student Handbook provides a detailed description of behavior expected of its students in order to further Bethel's values and goals. Middle school students, for example, are expected to "communicate only positive things to others," to refrain from talking about others, to speak respectfully to and about those in authority, to refrain from "[a]ny communication of a sexual nature," and to refrain from "physical contact or public displays of affection." ECF 19-5, 33-34. Children also are required to abide by a dress code based on the school's "desire[] to provide an environment in which students can focus on their schoolwork and on developing their identity in Christ," and which avoids "the styles of the surrounding culture." *Id.* at 36. Students are offered a unisex option with khaki or navy pants, and girls may choose an option with a skirt or jumper. *Id.* at 37. The school makes clear its commitment to the Biblical belief that "God immutably bestows gender upon each person at birth as male or female to reflect His image," and therefore the school requires that its students must dress, conduct themselves, and use the facilities associated with their biological sex. ECF 19-5, 7.

Bethel participated in the BOOST program in the 2016-2017 academic year, with 17 students receiving BOOST scholarships during that period. ECF 19-1, 9. In the 2017-2018 academic year, 18 Bethel students received BOOST scholarships. *Id.* Bethel has introduced a declaration, made under penalty of perjury, stating that it "does not ask about, or consider" sexual orientation, gender identity, or gender expression "in its student admission decisions." ECF 19-3, 2; *see* ECF 19-1, 7. And Bethel has represented to the Court that it "has not, and will

not, discriminate against any student based on sexual orientation, either in admissions or beyond," that "Bethel discriminates against no one," and that its "conduct policies apply equally to every student and only when at school." ECF 19-1, 2-3.

Beginning in the fall of 2017, Defendants began examining whether Bethel was in compliance with the BOOST program's prohibition on sexual-orientation discrimination in admissions decisions. In December 2017, the BOOST Board requested handbooks from every school participating in the BOOST Program, including Bethel's handbook, which Bethel furnished to the board. ECF 19-3, ¶¶ 21-23. A month later, Plaintiff alleges, Maryland's Office of the Attorney General issued a memo to Defendant Matthew Gallagher, the chair of the BOOST Advisory Board, advising the board that it could adjudicate schools to be noncompliant for their beliefs even absent allegations of actual discrimination. ECF 1 ¶¶ 97-98.

While there was no evidence that Bethel had denied admission to any student or had expelled any student based on his or her sexual orientation, ECF 19-1, 2-3, Defendants expressed concern that language in Bethel's Parent-Student Handbook might have a discriminatory effect, *id.* at 10, pointing to the statement in the Parent-Student Handbook that states: "Bethel Christian Academy supports the biblical view of marriage defined as a covenant between one man and one woman, and that God immutably bestows gender upon each person at birth as male or female to reflect His image. Therefore, faculty, staff, and student conduct is expected to align with this view. Faculty, staff, and students are required to identify with, dress in accordance with, and use the facilities associated with their biological gender." ECF 19-5, 7; ECF 22, 5. In response, Bethel stated in several letters that it did not discriminate against any students based on sexual orientation in its admissions decisions. ECF 19-1, 10-13. Bethel made clear, however, that all students, regardless of their sexual orientation or gender identity, were required both to refrain

4

from any sexual behavior at school, and to dress and use facilities according to their biological

sex. *Id.*

The BOOST board met to discuss Bethel's continued participation in the BOOST

program.  ECF 19-1, 11-12; ECF 22, 6.  After holding meetings on May 3, 2018 and June 21,

2018, Defendants informed Bethel that it was in violation of the nondiscrimination policy.  ECF

19-1, 12-14; ECF 22, 6-7.  On December 12, 2018, Defendants demanded that Bethel return

$102,600 for scholarships paid out in prior years.  ECF 19-1, 15; ECF 22, 8.

On June 24, 2019, Bethel filed suit against defendant Karen B. Salmon, State

Superintendent of Schools, as well as the Chair and six members of the BOOST Advisory Board,

alleging violation of the First Amendment's Free Speech, Free Exercise of Religion, and

Establishment Clauses, and the Fourteenth Amendment's Due Process and Equal Protection

Clauses.  ECF 1.  The Defendants filed a Motion to Dismiss for lack of standing and failure to

state a claim, ECF 16, which this Court denied on November 14, 2019.  ECF 20.  Bethel filed the

present motion for a Preliminary Injunction on October 31, 2019.  ECF 19.

## ARGUMENT

Bethel has demonstrated that it is likely to succeed on its free speech and free exercise

claims.[1]   By penalizing Bethel for its professed beliefs in the biblical view of marriage and that

God makes people male or female, and for expecting students to abide by these principles at

school, ECF 19-5, 7, Defendants have engaged in presumptively unconstitutional viewpoint

discrimination.  Although the government may prohibit discriminatory conduct, even when the

discriminatory conduct involves some ancillary speech, Defendants have introduced no evidence

---

[1] The United States does not take a position on Bethel's other claims, or on the other preliminary-injunction criteria.

of discriminatory conduct. Further, Bethel has repeatedly affirmed that it does not, and will not, discriminate based on sexual orientation or gender identity, and has squarely represented to the Court that it "discriminates against no one." ECF 19-1, 3. Supreme Court and lower court precedent make clear that penalizing Bethel for its beliefs goes beyond regulating conduct to regulating expression in violation of the Free Speech Clause, and coercing Bethel to renounce its religious character in violation of the Free Exercise Clause.

## I. DEFENDANTS HAVE VIOLATED BETHEL'S FREE SPEECH RIGHTS

Defendants have introduced no evidence that would contradict Bethel's repeated assertions that it does not discriminate against students based on their sexual orientation or gender identity; that Bethel has never denied admission to or otherwise excluded students from the school based on sexual orientation; and that Bethel will not do so in the future. Defendants instead object to Bethel's inclusion in its Parent-Student Handbook the statements that "Bethel Christian Academy supports the biblical view of marriage defined as a covenant between one man and one woman," that "God immutably bestows gender upon each person at birth as male or female to reflect His image," and that "faculty, staff, and student conduct is expected to align with this view." ECF 19-5, 7; ECF 22, 5. Defendants may disagree with these statements, but punishing Bethel for making them constitutes presumptively unconstitutional viewpoint discrimination.

### A. Defendants Have Engaged in Viewpoint Discrimination Against Speech

"It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995). The government is prohibited from imposing restrictions on or punishing speech based on "the specific motivating ideology or the opinion or perspective of the speaker."

*Id.* at 829; *see also Iancu v. Brunetti*, 139 S. Ct. 2294, 2299 (2019) ("The government may not discriminate against speech based on the ideas or opinions it conveys."); *Hardwick ex rel. Hardwick v. Heyward*, 711 F.3d 426, 443 (4th Cir. 2013); *Child Evangelism Fellowship of S.C. v. Anderson Sch. Dist. Five*, 470 F.3d 1062 (4th Cir. 2006); *Rossignol v. Voorhaar*, 316 F.3d 516, 521 (4th Cir. 2003).   Viewpoint discrimination is "presumptively unconstitutional." *Iancu,* 139 S. Ct. at 2229 (quoting *Rosenberger*, 515 U.S. at 830).

Defendants assert that they are not punishing Bethel for its viewpoint on sexuality per se, but are merely regulating discriminatory conduct, arguing that the Parent-Student Handbook's statement about marriage "is *operative*, and therefore not speech." ECF 22, 15-17 (emphasis in original).   But Bethel has repeatedly denied that it ever has excluded—and has repeatedly disclaimed any intention to exclude—any child based on sexual orientation or gender identity. Defendants cannot transform Bethel's expression into an operative act of discrimination by insisting that it is so.

To be sure, not all conduct that involves expression is speech.   Indeed, the United States enforces a variety of nondiscrimination statutes, such as Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Fair Housing Act, 2 U.S.C. § 3601 *et seq.*, which proscribe discriminatory acts that defendants may effectuate through speech.   *See, e.g.*, *Rumsfeld v. Forum for Acad. & Institutional Rights*, 547 U.S. 47, 62 (2006) ("The fact that [a law barring racial discrimination in hiring] will require an employer to take down a sign reading 'White Applicants Only' hardly means that the law should be analyzed as one regulating the employer's speech rather than conduct."); *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 208 (3d Cir. 2001) (Alito, J.) ("[A] supervisor's statement 'sleep with me or you're fired' may be proscribed not on the ground of any expressive idea that the statement communicates, but rather

because it facilitates the threat of discriminatory conduct."); *United States v. Bob Lawrence Realty, Inc.*, 313 F. Supp. 870, 872 (N.D. Ga. 1970) (Fair Housing Act provision that prohibits discussing racial change in a neighborhood to induce sales regulates conduct).  But here, Defendants' claim that they are simply enforcing a prohibition on conduct does not hold up to even cursory scrutiny.  Just as a Title VII or Fair Housing Act defendant cannot transform conduct into speech by calling it speech, Defendants cannot transform speech into conduct by calling it conduct.

The Supreme Court explained the difference between speech and conduct in *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557 (1995).  In *Hurley*, a private Veteran's Council that ran a St. Patrick's Day Parade denied permission to a group of gay, lesbian and bisexual persons of Irish descent to march in the parade carrying a banner conveying a message that "express[ed] pride in their Irish heritage as openly gay, lesbian, and bisexual individuals."  *Id.* at 561.  To support their request, the group invoked a state anti-discrimination law that prohibited "any distinction, discrimination or restriction on account of . . . sexual orientation . . . relative to the admission of any person to, or treatment in any place of public accommodation, resort or amusement."  *Id.* (citing Mass. Gen. Laws § 272:98 (1992)).

The Veteran's Council explicitly "disclaim[ed] any intent to exclude" anyone from the parade based on his or her sexual orientation, but instead argued that forcing it to allow the group to carry the banner and convey its message violated the Council's First Amendment rights.  *See id.* at 572.  The Supreme Court agreed.  *See id.* at 571-77.  The Court first held that applying the state's anti-discrimination law to prohibit the Council from excluding persons from the parade based on their sexual orientation did not violate the First Amendment.  *See id.* at 571-72.  That is

because "public accommodations law[s]" of that sort prohibit "the act of discriminating against individuals" and do not "target speech or discriminate on the basis of its content." *Id.*

The Supreme Court further held, however, that applying the state's anti-discrimination law to prohibit the Council from excluding any message with which it disagreed—even an anti-discrimination message consistent with the state's anti-discrimination law—violated the First Amendment. *See id.* at 572-77. As the Supreme Court reasoned, such an application of the anti-discrimination law would impermissibly "alter the expressive content of [the Council's] parade." *Id.* at 572-73. In other words, while the state could apply its anti-discrimination law to prohibit exclusion from the parade based on an individual's *status*, the First Amendment prevents the state from applying its anti-discrimination law to compel, or prohibit the exclusion of, a particular *message*. *See id.* at 571-73; *see also Saxe,* 240 F.3d at 206-07 (Alito, J.) ("There is of course no question that non-expressive, physically harassing *conduct* is entirely outside the ambit of the free speech clause. But there is also no question that the free speech clause protects a wide variety of speech that listeners may consider deeply offensive, including statements that impugn another's race or national origin or that denigrate religious beliefs.") (emphasis in original).

Like the Council in *Hurley*, Bethel has repeatedly "disclaim[ed] any intent to exclude," *Hurley*, 515 U.S. at 572, students based on their sexual orientation or gender identity. Bethel has simply included in its Parent-Student Handbook a forthright statement of its belief in the biblical view of marriage and its belief in the immutability of one's biological sex. Indeed, the State of Maryland expressly contemplated that religious schools would engage in this type of expression when it included a provision underscoring that no school shall be required "to adopt any rule, regulation, or policy that conflicts with its religious or moral teachings." ECF 22, 3-4.

Relying on *Hurley*, the court in *Alpha Iota Omega Christian Fraternity v. Moeser*, No. 1:04 CV 00765, 2006 WL 1286186 (M.D.N.C. May 4, 2006), addressed the speech/conduct issue that is at heart of this case.  The *Moeser* court addressed a claim that the University of North Carolina violated the First Amendment rights of a Christian student organization by requiring the organization to admit members without regard to their religion or sexual orientation, and also forbidding the group from requiring that members "conform their behavior to [its] tenets and standards of conduct."  *Id.* at *2.  The court granted a preliminary injunction in favor of the student group.  *Id.*  The university thereafter amended its policies to allow student groups to require that members ascribe to the group's beliefs and standards of conduct, but continued to forbid status-based discrimination.  *Id.* at *5.  The court then dismissed the suit.  *Id.*  Quoting *Hurley*, the court emphasized that "'[w]hile the law is free to promote all sorts of conduct in place of harmful behavior, it is not free to interfere with speech for no better reason than promoting an approved message or discouraging a disfavored one, however enlightened either purpose may strike the government.'"  *Id.* (quoting *Hurley*, 515 U.S. at 579).  As in *Moeser*, Defendants may be able to condition Bethel's funding on the school's agreement to abide by nondiscrimination policies without violating the Free Speech Clause.  But the First Amendment precludes Defendants from dictating the parameters of Bethel's beliefs and its rules of student behavior in expression of those beliefs.  *See also Doe v. Univ. of Mich.*, 721 F. Supp. 852, 863 (E.D. Mich. 1989) (although a university can have an anti-discrimination policy governing student conduct, "[w]hat the University could not do, however, was establish an anti-discrimination policy which had the effect of prohibiting certain speech because it disagreed with ideas or messages sought to be conveyed").

A recent Eighth Circuit case is particularly instructive. In *Telescope Media Group v. Lucero*, 936 F.3d 740 (8th Cir. 2019), the court ruled that a public accommodation law requiring businesses to serve all persons regardless of sexual orientation could not be invoked, consistent with the First Amendment, to require videographers to film same-sex weddings. While videographers cannot turn away prospective customers simply because they are gay or lesbian, the Constitution guarantees them "the autonomy to choose the content of [their] own message," and they thus could choose the ceremonies and celebrations for which they would produce videos. *Id.* at 758 (quoting *Hurley*, 515 U.S. at 573). Where a state seeks to "regulate speech itself as a public accommodation, it has gone too far under *Hurley* and its interest must give way to the demands of the First Amendment." *Id.*

**B**. ***Rumsfeld v. FAIR* Does Not Support the Defendants' Position**

Defendants urge that *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47 (2006) ("*FAIR*"), supports their position that they may condition funding based on Bethel's beliefs. ECF 22, 16; *see also* ECF 16-1, 21-22; ECF 18, 12-13 (Defendants' motion-to-dismiss briefs). *FAIR* counsels otherwise. In *FAIR*, the Supreme Court held that a federal law that denied federal funding to universities that provided military recruiters with less access to on-campus recruiting than other employers did not violate the Free Speech Clause. The Court stressed that while federal law required universities to provide equal access to military recruiters, the schools were free to express their opinions about the government's military policies and practices in other ways. The Court held that federal law "neither limits what law schools may say nor requires them to say anything." *Id.* at 60. "Law schools remain free under the statute to express whatever views they may have on the military's congressionally mandated employment policy, all the while retaining eligibility for federal funds." *Id.* The Court concluded that the

federal law "regulates conduct, not speech.  It affects what law schools must *do*—afford equal access to military recruiters—not what they may or may not *say*."  *Id.* (emphasis in original).

*FAIR* illustrates the propriety of the BOOST program's discriminatory-conduct ban, and the impropriety of penalizing Bethel for its beliefs.  As a condition of accepting BOOST program funding, Bethel may not discriminate against students on the basis of sexual orientation or gender identity.  But just like the law schools in *FAIR*, Bethel must "remain free . . . to express whatever views [it] may have" on the issues surrounding the nondiscrimination rule, "all the while retaining eligibility for [government] funds."  *Id.*  By predicating government funds on the nature and expression of Bethel's beliefs, Defendants violate the Free Speech Clause.[2]

## II. DEFENDANTS HAVE VIOLATED BETHEL'S FREE EXERCISE RIGHTS

### A.  Defendants Targeted Bethel Based on Its Religious Character and Expression

The Free Exercise Clause recognizes and guarantees to all Americans the "right to believe and profess whatever religious doctrine [they] desire[]." *Emp't Div. v. Smith*, 494 U.S.

---

[2] Citing *Agency for International Development v. Alliance for Open Society International*, 570 U.S. 205 (2013) ("*AOSI*"), Defendants contend that Bethel's voluntary participation in the BOOST program allows them to place substantial conditions on Bethel, including the ability to dictate Bethel's belief structure.  ECF 22, 17, 20-21; *see also* ECF 16, 23-25; ECF 18, 14-15.  Defendants are wrong.  *AOSI* explained that while the government may "selectively fund certain programs to address an issue of public concern," 570 U.S. at 217, it "may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech even if he has no entitlement to that benefit."  *Id.* at 214 (quoting *FAIR*, 547 U.S. at 59) (alteration in original); *see also Rosenberger*, 515 U.S. at 834 (government may make viewpoint-based choices when it is the speaker, but not where government "does not itself speak or subsidize transmission of a message it favors but instead expends funds to encourage a diversity of views from private speakers"); *Columbia Union Coll. v. Clarke*, 159 F.3d 151, 156 (4th Cir. 1998) (holding that Maryland infringed on college's "free speech rights by establishing a broad grant program to provide financial support for private colleges that meet basic eligibility criteria but denying funding . . . solely because of [the college's] alleged pervasively partisan religious viewpoint")

872, 877 (1990). The government may not attempt to regulate religious beliefs, compel religious

beliefs, or punish religious beliefs. *See id.* It may not discriminate against individuals or

religious organizations because of their religious beliefs or status, or for speaking on religious

topics or sharing their religious beliefs. *See id.*; *see also Masterpiece Cakeshop Ltd. v. Colo.

Civil Rights Comm'n*, 138 S. Ct. 1719, 1731-32 (2018); *Church of the Lukumi Babalu Aye, Inc.

v. City of Hialeah*, 508 U.S. 520, 531 (1993); *Widmar v. Vincent*, 454 U.S. 263, 269 (1981).

      The Supreme Court held two years ago that the State of Missouri, in its implementation

of a law providing playground-resurfacing grants for nonprofits serving children, had violated

the Free Exercise Clause when it excluded a church preschool from the grant program based on

the school's religious character. *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct.

2012 (2017). The Court reiterated its holding in *Lukumi* that "[t]he Free Exercise Clause

'protect[s] religious observers against unequal treatment' and subjects to the strictest scrutiny

laws that target the religious for 'special disabilities' based on their 'religious status.'" *Id.* at

2019 (quoting *Lukumi*, 508 U.S. at 533). The Court thus held that the State's "policy expressly

discriminates against otherwise eligible recipients by disqualifying them from a public benefit

solely because of their religious character," and thus constituted a "penalty on the free exercise

of religion that triggers the most exacting scrutiny." *Id.* at 2021. The Court held that

government could not "require[ ] Trinity Lutheran to renounce its religious character in order to

participate in an otherwise generally available public benefit program, for which it is fully

qualified." *Id.* at 2024.

      Like the church preschool in *Trinity Lutheran*, Bethel is "otherwise eligible" and "fully

qualified" to participate in the BOOST program. It meets all of the program's other eligibility

requirements, and has represented to the Court that it does not, and will not, discriminate on the

basis of sexual orientation or gender identity.  Also like the church preschool in *Trinity Lutheran*, Bethel is being penalized for refusing to disavow its "religious character."  It has been removed from the BOOST program, and has been billed for more than $100,000 in scholarships for which it has already provided services to children, because it refused to revise its statements of its beliefs and its expectations for students in the Parent-Student Handbook.  Defendants' conduct triggers strict-scrutiny review under the Free Exercise Clause.

Other courts considering similar challenges, both before and after *Trinity Lutheran*, have reached similar conclusions about governmental efforts to penalize religious organizations that hold religious views that are unpopular with the State.  *See, e.g.*, *Jesus Christ is the Answer Ministries v. Baltimore*, 915 F.3d 256 (4th Cir. 2019) (denial of zoning approval for church— allegedly because of "community opposition to the Church's religious denomination"—could establish a free exercise claim); *Ward v. Polite*, 667 F.3d 727 (6th Cir. 2012) (state university's failure to apply anti-discrimination policy "in an even-handed, much less a faith-neutral, manner" to counseling student who objecting to providing counseling about same-sex relationships created triable free exercise claim); *Business Leaders in Christ v. Univ. of Iowa*, 360 F. Supp. 3d 885 (S.D. Iowa 2019) (university had made "value judgment" in deregistering Christian student group for requiring leaders to ascribe to and abide by group's beliefs on sex and marriage, triggering strict scrutiny under the Free Exercise Clause); *Country Mill Farms, LLC v. City of East Lansing*, 280 F. Supp. 3d 1029, 1050 (W.D. Mich. 2017) (farmer excluded from city farmer's market for his policy of not renting farm for same-sex weddings pleaded valid free exercise claim that city targeted him based on his "religiously-motivated conduct").

Defendants' actions in barring Bethel from the BOOST program based on its religious beliefs and practices as set forth in the Parent-Student Handbook may only stand if they can meet

"the 'most rigorous' scrutiny," *Trinity Lutheran*, 137 S. Ct. at 2024 (quoting *Lukumi*, 508 U.S. at 546), and if they are supported by "a state interest 'of the highest order.'" *Id.* (quoting *McDaniel v. Paty*, 435 U.S. 618, 628 (1978)).

### B.  Defendants Have Not Shown an Interest "of the Highest Order" for Barring Bethel from the BOOST Program and Seeking Reimbursement for Past Scholarships

Defendants cannot show that they have an interest "of the highest order," *Trinity Lutheran*, 137 S. Ct. at 2024, for barring Bethel from the BOOST program, much less for demanding it to return scholarship money for services Bethel has already provided to students. Although Defendants argue that they satisfy strict scrutiny, ECF 22, 21-23, they concede, as they must, that "[s]chools that do not discriminate may express all the viewpoints that they wish." *Id.* at 23.  Defendants have no legitimate interest in forcing Bethel to change its statement of beliefs, including a belief that the Supreme Court has recognized "long has been held—and continues to be held—in good faith by reasonable and sincere people" and that is often "based on decent and honorable religious or philosophical premises," or in pressuring Bethel to renounce its religious character.  *Obergefell v. Hodges*, 135 S. Ct. 2585, 2594, 2602 (2015); *see id.* at 2607 (emphasizing First Amendment protections for religious objectors); *Masterpiece*, 138 S. Ct. at 1727 (same).  Controlling authorities simply do not allow Defendants the power to deny children scholarships due to the beliefs and policies set forth in Bethel's Parent-Student Handbook. *See Masterpiece*, 138 S. Ct. at 1732.

## CONCLUSION

For the foregoing reasons, the Court should hold that Bethel has demonstrated a likelihood of success on the merits of its free speech and free exercise claims for purposes of its Motion for a Preliminary Injunction.

Dated:  November 26, 2019

Respectfully submitted,

REED D. RUBINSTEIN
Principal Deputy General Counsel

ERIC S. DREIBAND
Assistant Attorney General

RIDDHI DASGUPTA
CHRISTINE PRATT
Attorney Advisors
U.S. Department of Education
400 Maryland Avenue S.W.
Washington, D.C. 20202
Phone: (202) 401-6000

ELLIOTT M. DAVIS
Acting Principal Deputy Assistant Attorney
General

/s/ Eric W. Treene
ERIC W. TREENE
Special Counsel
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC  20530
Phone: (202) 514-2228
Email: Eric.Treene@usdoj.gov

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY, that this 26th day of November, 2019, the foregoing United States' Statement of Interest was electronically filed with the Clerk of Court using the CM-ECF system.

/s/ Eric W. Treene
Eric W. Treene