IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

BETHEL MINISTRIES, INC.,     *

    *Plaintiff*,     *

    v.     *    No. 1:19-cv-01853-ELH

DR. KAREN B. SALMON, et al.,     *

    *Defendants*.     *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**PROPOSED RESPONSE TO THE UNITED STATES'
STATEMENT OF INTEREST**

**INTRODUCTION**

The United States' main contentions proceed from a misapprehension of the record in this case. That is, the United States recognizes "the propriety of the BOOST program's discriminatory-conduct ban," but decries the Board's actions as penalizing Bethel for its beliefs. ECF 24, 12. However, this stance stems from the United States' mistaken understanding that the BOOST Board was attempting to "forc[e] Bethel to change its statement of beliefs," *Id.* at 15, a contention wholly unsupported by the record and contrary to fact. The Board made a limited objection to a limited piece of operative language within Bethel's Admissions Policy, the portion of the Parent-Student handbook applicants would review in deciding whether they met the criteria for entry to Bethel. The Board did not examine other portions of the Parent-Student handbook where Bethel set forth its beliefs.

None of the United States' legal contentions withstand a proper examination of the record. The Board properly enforced the BOOST program's discriminatory-conduct ban

because Bethel's conduct in maintaining its Admissions Policy effectively communicated to prospective applicants that, depending on the applicant's sexual orientation or gender identity status, the applicant could be at increased risk of expulsion. In the same way a sign in a window effectively stops a store manager from having to make discriminatory hiring decisions, Bethel's Admissions Policy, with its discriminatory language, removed the need for Bethel to "ask about, or consider" a student's sexual orientation or gender identity, *see* ECF 24, 3 (quoting ECF 19-3, 2). The necessary implication of the United States' position in this case is that, as long as religious beliefs are invoked, discriminatory signs in windows may remain in place, unless a state agency charged with enforcement can locate the prospective applicant who walked by the store front. Because the United States' arguments are not consistent with the facts, they should not be accorded any weight in deciding the motion for preliminary injunction, where Bethel bears the burden to clearly establish likelihood of success on the merits.

## BACKGROUND

Contrary to the United States' assertion, ECF 24, 15, the Board *never* asked or required Bethel to change its statement of beliefs. In fact, Bethel's self-identified "Statement of Faith" appeared on the very next page from its admissions policy and contained a very similar statement relating to marriage and gender identity: "We believe that God created mankind in His image, male and female (Gen. 1:27, Gen. 5:2) and, according to His word, marriage is a sacred union between one man and one woman (Gen. 2:18-24; 1 Corinthians 7:1-5; Mark 10:6-9; Romans 1:24-27) condemning a homosexual lifestyle (Romans 1:24-26, 1 Timothy 1:10)." ECF 1-4, 8. The Board noted no objection

2

to this language or any part of the Parent-Student Handbook or statement of Bethel outside for the Admissions Policy. ECF 19-10. No suggestion was made that any specific language was required to replace the Admissions Policy language identified as discriminatory by the Board. Instead, the Board offered general principles of decision, including noting that "[a] discipline policy that focuses on conduct or behavior without regard to the sexual orientation of the student does not violate the nondiscrimination clause." *Id.* The Board also provided examples of language that was acceptable *even in the context* of an Admissions Policy, including statements related to religious beliefs and statements generally related to the condemnation of sexual behavior that did not specifically mention sexual orientation. ECF 19-12.

In response to the Board's articulation of its decisional principles, Bethel chose not to not present any change in its Admissions Policy for the Board's consideration. Bethel did not offer to include any of the explanations given in its correspondence with the Board in its Admissions Policy. Bethel also did not offer the frank disavowal of discrimination in admissions present in the Dant affidavit, 19-3, ¶¶ 8, 9; Bethel's Admissions Policy contained a list of classes against which it would not discriminate, but did not list sexual orientation among those classes or contain any other statement of non-discrimination in admissions based on sexual orientation.

As for the relevance of the Dant affidavit, on which the United States relies for the proposition that Bethel did not discriminate in admissions on the basis of sexual orientation in the 2017-2018 school year, ECF 24, 3, was signed October 25, 2019. This affidavit was not before the Board when it made the decision at issue in this case in 2018 and the

3

statements it contains are phrased in the present tense with no temporal modifiers. Moreover, Bethel, on its own initiative, has modified its handbook substantially since the Board's decision, *compare* ECF 19-13, 8 *with* ECF 19-5, 8. The 2019-2020 Handbook language has never been considered by the Board.[1]

As explained more fully below, all of the United States' legal arguments hinge on these misinterpretations of the record. This Court should therefore consider the United States' acknowledgement that the BOOST nondiscrimination requirement's conduct ban is proper, but disregard the legal arguments which hinge on a misconception that the Board assessed more than the operative Admissions Policy language.

## ARGUMENT

### I. THE BOARD DID NOT COMPEL OR PROHIBIT SPEECH, CAREFULLY LIMITING ITS ENFORCEMENT TO CONDUCT.

In crafting principles to enforce the nondiscrimination requirement, the Board "neither limited what [participating] schools may say nor required them to say anything." *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 60 (2006)

---

[1] The 2019-2020 Parent-Student Handbook continues to state that it is Bethel's behavioral "expectation that BCA students identify with . . . their biological gender," and that Bethel "reserves the right to decide whether misbehavior is serious enough to warrant suspension or expulsion even for a first offense." ECF 19-13, 36. Ms. Dant's declaration and the new handbook, each given full credit, state that 1) Bethel will admit students without regard to gender identity; but 2) if a Bethel student does not "identify with . . . their biological gender," that student is subject to the possibility of immediate expulsion. Ms. Dant has not provided any explanation of how this policy does not discriminate against students based on the students' gender identity, as prohibited by the current version of the nondiscrimination law. This disconnect is relevant in considering the request for preliminary injunction because the Board has had no opportunity to consider whether the current handbook meets the current BOOST nondiscrimination requirement.

4

("*FAIR*"). The United States, without pointing to what it views as expressive in Bethel's Admissions Policy, has described the Policy as "Bethel's expression." ECF 24, 7. It appears to characterize the policy as expressive not because of any feature of the policy, but because Bethel has "has repeatedly denied that it ever has excluded—and has repeatedly disclaimed any intention to exclude—any child based on sexual orientation or gender identity." *Id.* But these statements of Bethel's, not contained in the Admissions Policy, have nothing to do with whether the Admissions Policy language itself is an operative act of discrimination.

As the United States admits, some language discriminates by its utterance. ECF 24 7-8. The Admissions Policy is just such language, as is illustrated by answering a simple question: what did Bethel mean to express in crafting its admissions policy? Bethel, along with schools everywhere when they sit down to write their admissions policy, meant to express what criteria students must fulfill to be granted admission to their program. The statement of those criteria is itself operative, and, when the criteria states that an individual will be refused admission or subject to expulsion based on status-linked conduct, it is a discriminatory act effected through speech.

The United States' discussion of *Hurley* illustrates the logical error it makes in its flat denial of the operative nature of the Admissions Policy. The United States characterizes *Hurley* as holding that "applying the state's anti-discrimination law to prohibit the Council from excluding any message with which it disagreed . . . violated the First Amendment." ECF 24, 9. That statement itself is fair, but excluding a message is not excluding a person, as the *Hurley* Court made clear. As described by the Court, the Council

5

wished to prevent a group formed "to celebrate its members' identity as openly gay, lesbian, and bisexual descendants of the Irish immigrants" from "carrying its own banner" in the Council's parade. *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 570, 572 (1995). In this case, by contrast, the Board has said nothing about Bethel's ability to limit the messages expressed by its students at school. The correct analogy between this case and *Hurley* would be the state's enforcement related to a statement in *the application to be in the parade*. But the Supreme Court expressly noted that *Hurley* did not involve "any dispute about the participation of openly gay, lesbian, or bisexual individuals in various units admitted to the parade." *Id.* at 572. And the Supreme Court gave no particularly special evidentiary weight to the Council's "disclaim[er of] any intent to exclude homosexuals as such," *id.* at 572; there was no contrary evidence that the parade application or the Council's policies contained language discouraging or forbidding non-heterosexual parade-float applicants.

Bethel has not proposed to host a parade, create a video, or engage in any other expressive conduct. It wrote an Admissions Policy as part of a larger Parent-Student handbook. That Admissions Policy works just like a sign in a window. It lets the world know who is and who is not invited to apply to Bethel. It expresses no message beyond the content of the Policy. It is on this basis that this case is also entirely distinct from *Lucero*, which deals with the exact opposite issue—where conduct, containing no speech, is nevertheless expressive. There, the court was concerned with the question of whether the videos wedding videographers make are expressive communication. It held yes, both because (1) "[t]he Supreme Court long ago recognized that 'expression by means of motion

6

pictures'" is expressive content under the First Amendment, *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 750–51 (8th Cir. 2019) (quoting *Joseph Burstyn*, 343 U.S. at 502); and (2) the creation of the videos in question required editorial control and judgment over what to include, in what order to include it, and what elements should be set to music. *Lucero*, 936 F.3d at 751.

There is no long tradition of the Supreme Court recognizing policies governing membership as expressive conduct equivalent to speech; in contrast, such policies are regarded as conduct subject to regulation. In *Christian Legal Society Chapter of the University of California, Hastings College of the Law v. Martinez*, the Court held that Hastings, a public law school, engaged in "reasonable and viewpoint neutral" regulation when it rejected the Christian Legal Society's application to be an official student group because its "*bylaws* . . . barred students based on religion and sexual orientation." 561 U.S. 661, 697, 672 (2010) (emphasis added). The Court did not require evidence that a student had actually been rejected under those bylaws, but nevertheless held that Hastings' nondiscrimination policy "aims at the *act* of rejecting would-be group members without reference to the reasons motivating that behavior," and was therefore no infringement of the Christian Legal Society's First Amendment rights. *Id.* at 697.[2]

---

[2] This holding by the Supreme Court casts the United States' reliance on an unpublished decision of the District Court of North Carolina, *Alpha Iota Omega Christian Fraternity v. Moeser*, No. 1:04 CV 00765, 2006 WL 1286186 (M.D.N.C. May 4, 2006), in a bizarre light. The United States has not explained how that court's reasoning could retain even persuasive authority after the Supreme Court's decision in *Martinez*, when the two cases reached opposite results when considering whether a nondiscrimination requirement for membership can constitute viewpoint discrimination. ECF 24, 10. Similarly, *Doe v. Univ. of Michigan*, 721 F. Supp. 852 (E.D. Mich. 1989), is inapposite because it dealt with

7

Similarly, the Supreme Court has recognized that speech that is only incidental to conduct, like an Admissions Policy's statement *of the admissions policy*, is not protected by the First Amendment. *Rumsfeld v. Forum for Academic and Institutional Rights, Inc. ("FAIR")*, 547 U.S. 47, 62 (2006). In *FAIR*, the Court rejected the law schools' contention that compelled statements of fact, like "The U.S. Army recruiter will meet interested students in Room 123 at 11 a.m.," were compelled speech. *Id.* at 62. The Court reasoned that such statements were "plainly incidental to the . . . regulation of conduct" at issue in that case, and that "it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Id.* Bethel's Admissions Policy is even more analogous to the Court's example of discriminatory sign in the window than was the law schools' example of scheduling announcements. The Admissions Policy serves the exact function of a discriminatory sign—it explains to the public who is not welcome to apply.

Further, whether the Board may "dictat[e] the parameters of Bethel's beliefs and its rules of student behavior in expression of those beliefs," ECF 24, 10, is simply not at issue in this case. The Board never sought to look behind the Admissions Policy to examine the

---

a harassment policy that sought to directly regulate student speech and supported, for example, the discipline of a student for "reading an allegedly homophobic limerick during a scheduled class public-speaking exercise." *Id.* at 865. There is no contention in this case that the Board sought to examine, let alone prohibit, any speech by Bethel outside of its operative policies related to admissions and student discipline that could lead to expulsion, which are directly tied to whether or not Bethel engages in discrimination in admissions.

8

content or viewpoint of Bethel's teachings. Instead, the Board examined one statement, that was made within the Admissions Policy, and "concluded that a handbook recipient may reasonably view this statement, on its face, as a prohibition on students with a non-heterosexual identity . . . [and] the policy as one that allows denial of admission or discipline or expulsion on the basis of his or her sexual orientation." ECF 19-10. The Board's conclusion that Bethel's statement that student "conduct" was expected to align with the "view" that marriage is a covenant between "one man and one woman" and that students are "required to identify with . . . their biological gender," *id.*, constituted status discrimination is well-supported by the Supreme Court's treatment of status and conduct. The Court's "decisions have declined to distinguish between status and conduct in this context" of sexual orientation discrimination. *Martinez*, 561 U.S. at 689 (citing *Lawrence v. Texas,* 539 U.S. 558, 575 (2003); *id.,* at 583 (O'Connor, J., concurring in judgment)). Moreover, federal law supports the proposition that sexual orientation discrimination is often carried out through discrimination based on conformance with gender-marker stereotypes. *E.g. Prowel v. Wise Bus. Forms, Inc.*, 579 F.3d 285, 291 (3d Cir. 2009) (explaining the difficulty in discerning whether discrimination is because of "homosexuality," "effeminacy," or "both").

The United States appears to be taking the position that even when a policy discriminates on its face, deference must be given to denials of discriminatory conduct, if they are made by people who refer to their religious beliefs as motivation for the discriminatory policy. ECF 24, 6, 7. But there is no reason to believe that such an approach could ever be adequate for enforcement of a nondiscrimination requirement, and the United

9

States has provided no citation to any source endorsing or requiring this type of evidentiary limitation.

The record in this very case contradicts any assertion that such reliance is adequate; the Board began with this approach. In the beginning of the BOOST program, the Board accepted the sworn statements of all applicant schools that they did not discriminate on the basis of sexual orientation. *E.g.*, ECF 1, Compl. ¶ 73. However, after a complaint was made, the Board found it necessary to examine whether schools had signed those statements in direct contrast to the operative language in their handbooks. ECF 22-1, ¶ 7. They had. A cursory examination of the example language MSDE prepared indicates that schools, *who had each signed an assurance* that they did not discriminate on the basis of sexual identity in admissions, had written policies like the following: (1) "the school reserves the right . . . to refuse admission of an applicant or discontinue enrollment of a student . . . [for] living in, condoning, or practicing homosexual lifestyle or alternative gender identity;" (2) the school "reserves the right to refuse admission of an applicant or discontinue enrollment of a student . . . [for] homosexual orientation;" and (3) the school "does not admit or retain individuals who engage in . . . homosexual conduct." ECF 19-12, 2-6. Therefore, the United States' intimation that reliance on sworn statements from the subject schools could substitute for evidentiary examination of operative policies is contradicted by the record.

The record reflects that the Board properly limited its examination of Bethel's speech to only that speech incidental to its conduct relevant to the nondiscrimination requirement—the Admissions Policy. Bethel's written policy indicated to the Board that

10

Bethel discriminated in admissions based on sexual orientation, and Bethel declined to amend the policy in any way to reflect statements it made to the Board about its practice that conflicted with the written policy. Potential applicants to Bethel would never see the explanations Bethel. Those applicants made the decision to apply or not apply for the 2017-2018 school year based on Bethel's Admissions Policy as written. Because that policy contained no statement of nondiscrimination related to sexual orientation status *and* indicated that applicants would be subject to expulsion and discipline based on status-linked conduct, the Board properly found Bethel's policy noncompliant.

II. **THE UNITED STATES DOES NOT ESTABLISH THAT THE BOARD TREATED BETHEL DIFFERENTLY BASED ON BETHEL'S RELIGIOUS BELIEFS, AND SUPPLIES NO OTHER BASIS FOR A FREE EXERCISE CLAUSE VIOLATION.**

The record reflects that the BOOST program allows participation by private schools regardless of affiliation or non-affiliation with religion. ECF 22-1, 5-14. Moreover, disapproval of non-heterosexual orientation, same-sex marriage, and gender identity that does not conform to the gender identity assigned at birth are beliefs held by some secular and some religious people and is not inherently religious. *Obergefell v. Hodges*, 135 S. Ct. 2584, 2602 (2015) (sincerely held beliefs about marriage may stem from "religious or philosophical" views). Conversely, many religious people deeply hold religiously-motivated beliefs in nondiscrimination based on sexual orientation and gender identity. *E.g.* ECF 16-2 (collecting legislative history on the topic). Neither the United States nor Bethel has supplied any evidence (the burden for proponents of a preliminary injunction) that the BOOST Board treated religious institutions holding that belief differently from nonreligious institutions, or that any distinction was made between the different religious

11

institutions before the Board that all hold that belief. In fact, the currently operative pleading in this case reflects Bethel's acknowledgement that schools with beliefs similar to its own were permitted to carry on in the program. ECF 1, Compl. ¶¶ 131-133. Moreover, one of those schools Bethel self-identifies as holding similar beliefs, Broadfording Christian Academy, did not change its handbook language before being permitted to participate in BOOST. ECF 19-12, 5. There is ample evidence that the Board examined each school based on the neutral criteria it established for compliance with the nondiscrimination requirement.

Given the record, claims like those recognized in *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012 (2017) and *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Com'n*, 138 S.Ct. 1719 (2018) are inapposite. In particular, Bethel was not prevented from participating in the BOOST program "solely because of their religious character." *Trinity Lutheran*, 137 S. Ct. at 2021. Bethel, along with any secular school that applied to the BOOST program, was merely required to meet the basic requirements of the program, which include adherence to the nondiscrimination provision. Bethel was not excluded from BOOST because "it refused to revise its statements of its beliefs and its expectations for students in the Parent-Student Handbook." ECF 24, 14. As explained above, Bethel was never asked to revise its statements of its beliefs even in the Parent-Student Handbook. Instead, Bethel refused to alter its Admissions Policy, in any way of its own choosing, to clarify to the average reader that it did not discriminate in admissions against applicants based on sexual orientation.

12

Bethel and the United States "can point to no specific evidence demonstrating that the [Board] acted other than out of a sincere commitment to equality and non-discrimination," *Fulton v. City of Philadelphia*, 922 F.3d 140, 159 (3d Cir. 2019), and therefore have not demonstrated any likelihood of success on the merits of their Free Exercise claims. The remainder of the United States' arguments on this point are addressed fully in the Board's prior briefing on the preliminary injunction at ECF 22, 13-23.

## CONCLUSION

Bethel is not likely to succeed on the merits of its claims at trial and the motion for preliminary injunction should be denied.

Respectfully submitted,

BRIAN E. FROSH
Attorney General of Maryland

/s/ Sarah W. Rice

_____
SARAH W. RICE (NO. 29113)
ROBERT A. SCOTT (NO. 24613)
ASSISTANT ATTORNEYS GENERAL
Assistant Attorneys General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
srice@oag.state.md.us
410-576-7847
(410) 576-6955 (facsimile)

December 18, 2019         Attorneys for State Defendants

## CERTIFICATE OF SERVICE

I certify that, on this 18th day of December, 2019 the foregoing was served by CM/ECF on all registered CMF users.

/s/ Sarah W. Rice

_____

Sarah W. Rice