**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |
|---|---|
| BETHEL MINISTRIES, INC., | * |
| Plaintiff, | * |
| v. | *     Civil Case No.: SAG-19-01853 |
| DR. KAREN B. SALMON, *et al.*, | * |
| Defendants. | * |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

Bethel Ministries, Inc., ("Plaintiff") sued Maryland State Superintendent Dr. Karen B. Salmon ("Superintendent Salmon") and all seven members of the advisory board for the Broadening Options and Opportunities for Students Today ("BOOST") program (collectively, "Defendants"), alleging violation of its constitutional rights (the "Motion"). Plaintiff also filed a Motion for a preliminary injunction, ECF 19, along with a supporting memorandum of law, ECF 19-1. Defendants filed an opposition, ECF 22, and Bethel filed a reply, ECF 25. The United States of America filed a statement of interest and supporting memorandum, ECF 24, and Bethel filed a response, ECF 35. Additionally, the parties and the United States of America participated in a hearing on the Motion on January 9, 2020. I have considered the Motion, and the related filings by the parties and the United States of America. For the reasons set forth below, the Motion, ECF 19, is denied.

## I. FACTUAL BACKGROUND

### A. Bethel Christian Academy

Bethel Ministries, Inc., is a Pentecostal Christian Church located in Savage, Maryland. ECF 1 ¶ 26. As part of the Church's mission, it operates Bethel Christian Academy (collectively with Plaintiff, "Bethel"), a private school for students in preschool through eighth grade.[1] *Id.* ¶ 28. Bethel is "unabashedly Christian," and outwardly shares its Christian beliefs with prospective school applicants. ECF 19-1 at 18.

In 2017, Bethel summarized its religious beliefs and related practices in its Parent/Student Handbook. The handbook contained a "statement of nondiscrimination" on its "Admissions Policy" page, which states, in relevant part, that Bethel "does not discriminate on the basis of race, color, national and ethnic origin in administration of its educational policies, admissions policies, scholarship and loan programs, and athletic and other school-administered programs." ECF 1-4 at 7. Bethel did not include sexual orientation or gender identity in its statement of nondiscrimination. *See id.* In the next paragraph, the "Admissions Policy" said,

> It should be noted, however, that Bethel Christian Academy supports the biblical view of marriage defined as a covenant between one man and one woman, and that God immutably bestows gender upon each person at birth as male or female to reflect his image … faculty, staff, and student conduct is expected to align with this view.

*Id.*

Admissions at Bethel is a competitive process, based on a formal entrance exam, an evaluation of previous grades, and a pre-enrollment interview. ECF 1 ¶ 41. Bethel contends that it does not consider sexual orientation in its admissions process. According to Bethel, once students are admitted, the school's policies apply equally, regardless of a student's sexual orientation or sexual attraction. *See* ECF 1 ¶ 54. For example, the student conduct policy prohibits any communication of a sexual nature, and any harassment, physical contact, or public displays of affection. *See* ECF 1 ¶ 52–53.

---

[1] For purposes of this Motion, Bethel Ministries, Inc. and Bethel Christian Academy are jointly referred to as "Bethel."

In its current handbook, for the 2019-2020 school year, Bethel made several relevant changes. Primarily, the statement about Bethel's biblical view of marriage is no longer in the "student admissions" section. *Compare* ECF 19-13 at 7 (2019-2020 "Admissions Policy" page), *with* ECF 1-4 at 7 (2017-2018 "Admissions Policy" page). However, sexual orientation and gender identity remain omitted from the Statement of Nondiscrimination in the 2019-2020 handbook. ECF 19-13 at 7.

B. BOOST Program

Maryland's legislature established the BOOST program in 2016, and has re-authorized its funding in each subsequent fiscal year. ECF 1 ¶ 60–61. The program is administered jointly by the Maryland State Department of Education ("MSDE") and a seven-person BOOST advisory board (the "Advisory Board"). *Id.* ¶ 63. BOOST provides scholarships for students to attend nonpublic schools in Maryland. *Id.* ¶ 62. However, only students that are eligible for the free or reduced-price lunch program may receive the scholarships. *Id.* Additionally, the scholarships can only be used at schools that meet certain eligibility requirements. First, to be eligible for BOOST, schools must participate in a second program operated by MSDE, known as Aid to Non-Public Schools (the "Aid Program"). ECF 19-1 at 8. The Aid Program provides nonpublic schools with textbooks and computer hardware. ECF 19-6 at 0059.[2] Second, to participate in BOOST, schools must sign an assurance stating that they "will not discriminate in student admissions on the basis of race, color, national origin, or sexual orientation." ECF 1-5 at 4. The nondiscrimination requirement specifies that schools are not required "to adopt any rule, regulation, or policy that conflicts with its religious or moral teachings." ECF 1 ¶ 68. Bethel signed the assurance, and

---

[2] MSDE operates a third program called the "Nonpublic Aging Schools Program," which provides funding to renovate aging buildings. Participation in the Aid Program is also a prerequisite for the Aging Schools Program. Bethel participated in all three programs for the 2016-2017 and 2017-2018 school years. ECF 19-1 at 10.

started participating in BOOST during the program's inaugural year. *Id.* ¶ 72–73. Ultimately, seventeen Bethel students received BOOST scholarships for the 2016-2017 academic year, and the number increased to eighteen students for the 2017-2018 academic year. *Id.* ¶ 75–76.

In the fall of 2017, MSDE began investigating BOOST schools to verify their compliance with the nondiscrimination requirement. ECF 1 ¶ 92. The Advisory Board received a complaint from the Maryland Parent Teacher Association ("MPTA") on October 11, 2017, suggesting that written policies in the handbook of a different school, Trinity Lutheran Christian School ("Trinity"), signaled a practice of discrimination in admissions. *See* Affidavit of Donna Gunning, ECF 22-1, Attachment B. Two days later, the Advisory Board sent a letter to all BOOST-eligible schools, reminding them of the assurances that the schools had signed, and asking them to "review [their] school's moral and religious position on non-discrimination, particularly on sexual orientation." ECF 19-14. The letter was sent to schools of various religious and non-religious affiliations. *See* ECF 22-1 ¶ 6 (referring to the list of schools to which the letter was sent).

C. Enforcement of Nondiscrimination Provision

A couple of months later, in December, 2017, MSDE specifically requested that BOOST schools submit their respective student handbooks for review. Declaration of Principal Claire Dant, ECF 19-3 ¶ 21. Bethel complied by sending its Parent/Student handbook for the 2017-2018 academic year. ECF 1 ¶ 95–96. Throughout the first half of 2018, Bethel corresponded with MSDE about its handbook and its related admissions practices. For example, on March 5, 2018, MSDE asked Bethel how its handbook was consistent with the school's assurance that it does not discriminate in admissions, based on an applicant's sexual orientation. *Id.* ¶ 102, ECF 19-15. Bethel responded with a letter, on March 13, 2018, explaining that the school does not consider sexual orientation in admissions, and that all students at its K-8 school are forbidden from engaging

in any sexual conduct.  ECF 1 ¶ 103, ECF 19-7.  Bethel has reiterated to MSDE and to the Advisory Board that it complies with BOOST's nondiscrimination provision.  *See, e.g.*, ECF 19-8 (explaining in statement that Bethel's statement on marriage and biological sex is consistent with BOOST's nondiscrimination requirement).

The Advisory Board met on May 3, 2018, to discuss Bethel's eligibility for BOOST.  ECF 19-16 (transcript of meeting).  At this meeting, Board Member Matthew Gallagher ("Defendant Gallagher") commented on Bethel's eligibility. Bethel and the Defendants disagree vehemently about the nature of these comments, and whether Defendant Gallagher's statements had anything to do with Bethel's religious beliefs.  *Compare* ECF 22 at 19, *with* ECF 19-1 at 23.  In response to another Board member, Defendant Gallagher stated, "You mean caught up with the fact that they signed an assurance illegally?"[3]  ECF 22 at 19.[4]  *See id.* Defendant Gallagher also referred to language on Bethel's "Admissions Policy" page as "problematic," and stated that certain language "affords them the opportunity to discriminate." ECF 19-1 at 11–12.  Defendant Gallagher elaborated, adding that the handbook "becomes problematic" when it states that "faculty, staff, and student conduct is expected to align with this view." [5]  On May 25, 2018, Assistant State Superintendent Monica Kearns ("Assistant Superintendent Kearns") wrote to Bethel's Principal, Claire Dant ("Principal Dant"), with additional questions.  In the section immediately preceding her questions, Assistant Superintendent Kearns explained that, since "[t]he law prohibits discrimination in student admissions," "it can be argued that it is problematic if a school admits a

---

[3]   May 3, 2018 BOOST Advisory Board Meeting Video, at 17:19-17:26, available at https://vimeo.com/368387715/85b45d8b3b.

[4] Defendants and Bethel disagree about whether this statement referred to Bethel at all. The Court has not yet made a factual finding on this issue.

[5] *See supra* n.3 at 1:18:28 – 1:19:25.

student and then summarily expels the student based on sexual orientation." ECF 19-17. In response, Bethel stated that any student who can meet its academic standards is welcome to join the community, regardless of religious beliefs, same-sex attraction, beliefs about marriage, or beliefs about sexual morality. ECF 19-9.

On June 21, 2018, the Advisory Board met again, to consider Bethel's eligibility for BOOST. ECF 19-18 (transcript of meeting). The Advisory Board members voted to enter closed session for this meeting, in order to receive legal advice from the Maryland Attorney General's Office. *Id.* at 0296–98.[6] Following the closed session, the Advisory Board members returned to open session, deliberated further, and ultimately voted to exclude Bethel from BOOST. *See id.* at 0301–02. On the same day, they voted to deem Broadfording Christian Academy and Grace Academy eligible for BOOST. *Id.* at 0299–300. According to Bethel, those two schools share Bethel's beliefs and policies on marriage and sexual conduct. ECF 1 ¶ 133. On December 12, 2018, MSDE sent a letter (1) notifying Bethel that it was disqualified from BOOST for the 2018-2019 and 2019-2020 academic years, and (2) seeking repayment of $102,600 for the years Bethel had participated in the program. *Id.* ¶ 136–37, ECF 19-11. Due to this disqualification, and the resulting lack of funding, at least six students were forced to leave Bethel in the 2018-2019 academic year, and three additional students left during the 2019-2020 academic year. ECF 19-3 ¶ 38, 40.

In 2019, the General Assembly expanded BOOST's nondiscrimination requirement beyond a school's admissions decisions, and expressly included gender identity/expression as a protected class. ECF 22 at 22. The new requirement mandates that schools will not "discriminate in student admissions, retention, or expulsion or otherwise discriminate against any student on the

---

[6]    June   21,   2018   BOOST   Advisory   Board   Meeting,   at   1:07:30   –   1:09:09,   available   at https://vimeo.com/368402663/ff91451a6c.

basis of race, color, national origin, sexual orientation, or gender identity or expression." 2019 Md. Laws Ch. 565 at 151. Bethel has not applied for BOOST since the new requirement took effect. All funding for the 2019-2020 BOOST cycle has been disbursed in full. ECF 22 at 26.

    D. <u>Procedural History</u>

Bethel filed its Complaint in the present action on June 24, 2019, alleging six counts against Superintendent Salmon and the seven members of the Advisory Board — all in their official capacities. ECF 1. Specifically, pursuant to 42 U.S.C. § 1983, Bethel alleged six violations of the United States Constitution: the Free Exercise Clause of the First Amendment (Count I), the Free Speech Clause of the First Amendment (Count II), the Due Process Clause of the Fourteenth Amendment for vagueness (Count III), the Due Process Clause of the Fourteenth Amendment for interference with parental rights (Count IV), the Equal Protection Clause of the Fourteenth Amendment (Count V), and the Establishment Clause of the First Amendment (Count VI). *Id.* This Court denied Defendants' Motion to Dismiss, ECF 16, in an Order dated November 14, 2019. ECF 20, 21. Bethel filed a Motion for Preliminary Injunction on October 31, 2019. ECF 19.

## II.    LEGAL STANDARD

A preliminary injunction is warranted when the movant demonstrates four factors: (1) that the movant is likely to succeed on the merits, (2) that the movant will face irreparable harm in the absence of preliminary relief, (3) that the balance of equities favors preliminary relief, and (4) that injunctive relief is in the public interest. *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)); *Wilson v. Williams*, 2019 WL 4942102, at *1 (D.S.C. Oct. 8, 2019). The movant must establish all four elements in order to prevail. *Pashby v. Delia*, 709 F.3d 307, 320–21 (4th Cir. 2013).

A preliminary injunction affords "'an extraordinary and drastic remedy' prior to trial." *Ultimate Outdoor Movies, LLC v. FunFlicks, LLC*, 2019 WL 2642838, at *6 (D. Md. June 27, 2019) (quoting *Munaf v. Green*, 553 U.S. 674, 689–90 (2008)); *see also MicroStrategy, Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (stating preliminary injunctive relief is an "extraordinary remed[y] involving the exercise of far-reaching power [that is] to be granted only sparingly and in limited circumstances") (citation omitted). Since preliminary injunctions are intended to preserve the status quo during the pendency of litigation, injunctions that "alter rather than preserve the status quo" are disfavored. *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 216 n.8 (4th Cir. 2019). Courts should grant such "mandatory" preliminary injunctions only when "the applicant's right to relief [is] indisputably clear." *Id.*

## III. ANALYSIS

Although Bethel's Complaint includes six counts, the school moves for a preliminary injunction on only two counts: violations of the Free Exercise Clause and the Free Speech Clause of the First Amendment.

### A. Mandatory Nature of Requested Preliminary Injunction

At the outset, the Court notes that Bethel has not asked the Court to maintain the "status quo" during the pendency of litigation. *League of Women Voters of N.C.*, 769 F.3d at 236. Instead, in its Motion, Bethel requested that the Court "enjoin the Defendants, Defendants' officers, agents, employees, and all other persons acting in concert with them, from enforcing their nondiscrimination requirement." ECF 19 at 2. This request asks for the Court (1) to nullify Defendants' determination about Bethel's eligibility from June, 2018, (2) to enjoin Defendants from enforcing any version of the legislation's nondiscrimination requirement in the future, and (3) to order Defendants to reinstate Bethel into BOOST. Courts have consistently noted that

"mandatory" injunctions are especially drastic remedies that are generally disfavored. *Taylor v. Freeman*, 34 F.3d 266, 270 n.2 (4th Cir. 1994) ("Mandatory preliminary injunctive relief in any circumstance is disfavored and warranted only in the most extraordinary circumstances."). Furthermore, the extraordinary nature of the preliminary injunction sought in this action is primarily a result of Bethel's delay in seeking preliminary injunctive relief.[7] Had Bethel sought to enjoin enforcement of the nondiscrimination provision in 2017 or 2018, a preliminary injunction could have merely prevented Defendants from *removing* Bethel from BOOST, during the pendency of the litigation. Presently, preliminary injunctive relief would require this Court not only to circumvent the Advisory Board's annual review process for BOOST applications, but also, by extension, to enjoin enforcement of the 2019 nondiscrimination provision (or some future version), which has never been applied to Bethel.[8]

**B. Irreparable Harm**

Issuing a preliminary injunction "based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a 'clear showing' that the plaintiff is entitled to relief." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (quoting *Winter*, 555 U.S. at 22). Bethel contends that the school continues to suffer significant harm as a result of its 2018 exclusion from BOOST. Principal Dant, in an affidavit, recounted how Bethel's enrollment numbers have dwindled, which she attributes to the loss of BOOST funding. ECF 19-3. For example, according to Principal Dant, the loss of BOOST vouchers caused Bethel to lose six students during the 2018-2019 school year, three students during the 2019-2020 school year, and numerous prospective students in both years. *Id.*

---

[7] Bethel's delay is detailed in the "Irreparable Harm" section, which follows.

[8] Bethel did not address the "mandatory" nature of its requested relief.

at 6. In response, Defendants contend that there can be no imminent harm because "there is no guarantee that the BOOST program will be funded next year." ECF 22 at 1. Thus, "it is not certain or imminent that the nondiscrimination requirement will ever again be applied" to Bethel. *Id.*

Defendants characterize their irreparable harm argument partially as a challenge to Bethel's standing to seek injunctive relief. Since Maryland's General Assembly has not yet appropriated funds for the 2020-2021 cycle of BOOST, the argument goes, it cannot be imminent that Bethel will be excluded from that cycle based on noncompliance with the nondiscrimination provision. However, at a minimum, Defendants' clawback request for $102,600 from Bethel confers Article III standing.[9] Further, based on the history of BOOST, and the current status of the 2020-2021 cycle, Defendants' argument appears disingenuous. Operating each year's BOOST program involves review of materials from two sets of applicants: students and schools. For the 2019-2020 cycle, applications from schools were due in December, 2018, while applications from students were due in April, 2019. ECF 22 at 11. Since the General Assembly did not pass Maryland's appropriations bill until the spring of 2019, consequently, MSDE asked schools to submit applications before the program was formally re-authorized.

Defendants identified comments from one Maryland legislator suggesting that BOOST may not be renewed for 2020-2021. ECF 22-2 at 6.[10] Moreover, at the hearing, counsel for Defendants made the Court aware that Maryland's elected officials are currently entertaining proposals for a major overhaul of education spending in the state. Even so, it would be entirely speculative to dismiss Bethel's claims, based solely on Defendants' representations about possible

---

[9] Plaintiffs must establish standing "for each form of relief that is sought." *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017). If Bethel were to prevail, then as part of its injunctive relief, this Court would also enjoin Defendants from seeking to clawback the $102,600 scholarship amount. *See South Carolina v. United States*, 907 F.3d 742, 762 (4th Cir. 2018) ("[A] determination of appropriate injunctive relief requires an exercise of the trial court's broad discretion").

[10] Ironically, the legislator suggested that the outcome of this lawsuit may cause BOOST not to be re-authorized.

changes to the education budget. Since BOOST's inception in 2016, Maryland has not only re-authorized the program, but has increased funding in each subsequent year. And although BOOST technically has not been re-authorized for the 2020-2021 academic year, annual renewal is not unusual for government programs. Defendants themselves anticipated BOOST's longevity when they expelled Bethel for two years, before the 2019-2020 program had been officially funded. ECF 19-11 (Dec. 12, 2018 letter, disqualifying Bethel for 2018-2019 and 2019-2020 BOOST program). Indeed, the BOOST website currently says that "2020-2021 Applications [are] available soon."[11] ECF 40. While Defendants suggested that funding for the 2020-2021 cycle of BOOST might be less certain than in past years, it is not sufficiently "hypothetical," for purposes of Article III standing, that Bethel will be excluded from BOOST for the next academic year.

Although uncertainty about BOOST's 2020-2021 cycle has not undermined Bethel's Article III standing, the current status of the program does, nonetheless, pose issues for Bethel's assertions of irreparable harm. Namely, Bethel has not made a clear showing that a preliminary injunction would remedy its alleged irreparable harm. *See Faulkner v. Jones*, 10 F.3d 226, 235–36 (4th Cir. 1993) ("[A]ny inquiry into the irreparable harm resulting from the denial of interim relief *must* necessarily *begin* with an analysis of the degree to which that particular relief remedies the alleged injuries.") (emphasis in original). For instance, in its briefing, Bethel requested that the Court "enjoin the Defendants … from enforcing their nondiscrimination requirement." ECF 19 at 2. Since Bethel has explicitly limited its suit to an as-applied challenge, *e.g.* ECF 1 ¶ 164, it is presumably seeking for the Court to enjoin Defendants from enforcing the 2017 version of the

---

[11] Maryland State Dept. of Education website, http://marylandpublicschools.org/pages/boost/index.aspx, (last accessed January 16, 2020).

nondiscrimination requirement.[12]   However, the 2017 nondiscrimination requirement, which resulted in Bethel's expulsion from BOOST, is no longer operative. Maryland amended BOOST's eligibility requirements for the 2019-2020 academic year.  Whereas Bethel signed an assurance in 2016 and 2017, stating that it would not discriminate in student *admissions*, schools must now agree that they will not discriminate in "student admissions, retention, expulsion, or otherwise discriminate," 2019 Md. Laws Ch. 565 at 151.  Furthermore, Bethel's assurance stated that it would not discriminate in student admissions on the basis of race, color, national origin, and sexual orientation.  But, in 2019, Maryland further expanded the nondiscrimination requirement to include "gender identity or expression."  *Id.*  Bethel has not demonstrated that it would satisfy BOOST's current requirements, even if the Court were to nullify Defendants' determination from June, 2018, regarding Bethel's eligibility under the original 2017 qualifications.[13]

This does not end the inquiry, though, because Bethel's preferred injunctive relief has evolved throughout this litigation. At the hearing, counsel for Bethel explained that the school requests for this Court not only to enjoin enforcement of the nondiscrimination requirement, but also to reinstate Bethel into BOOST.  Even if the requested remedy is styled in this way, Bethel has not adequately linked its proposed preliminary injunction to the harm it asserts. In elucidating its irreparable harm, Bethel states that, as a result of its removal from BOOST, the school has been "forced to forgo hiring teachers and backfilling positions," and will "continue to lose students from

---

[12] Bethel contends that Defendants applied the 2019 version of the nondiscrimination requirement because Defendants considered whether Bethel's admissions policy discriminated on the basis of gender identity and gender expression. *See* ECF 19-1 at 20. At most, Defendants applied an overly broad reading of the 2017 nondiscrimination requirement, which conflated "sexual orientation" with "gender identity," and "gender expression," and viewed prospective expulsion as part of "admissions." Had Defendants been applying the yet-nonexistent 2019 provision, they likely would have cited the catch-all "otherwise discriminates" category while considering Bethel's eligibility. Thus, the Court does not have a valid basis to enjoin enforcement of the 2019 version, which has never been applied to Bethel.

[13] Also, Bethel conceded that it likely remains ineligible for BOOST, because it did not participate in the Aid Program during the 2018-2019 school year. ECF 40.

low-income families." ECF 19-1 at 34–35. Even if true, a preliminary injunction would not alleviate this harm, because all funds for the 2019-2020 cycle have already been disbursed. ECF 22 at 26. At the hearing, counsel for Bethel suggested that students currently using BOOST scholarships at other schools might transfer to Bethel during the current school year, if Bethel is placed back in the program. But Bethel has offered no evidence to show that students routinely, or even sporadically, transfer BOOST funds mid-year in this manner. On the present record, it is speculative to assume that any students would move their scholarships to Bethel, in the middle of an academic year, as soon as Bethel is deemed BOOST-eligible. Regardless of how the requested preliminary injunction is construed, Bethel has not shown that a preliminary injunction would alleviate its alleged irreparable harm. *See Marietta Memorial Hosp. v. W.V. Health Care Authority*, 2016 WL 7363052, at *8 (S.D. W. Va. Dec. 19, 2016) ("If the requested relief does not alleviate the alleged injuries, then refusal to grant that relief could not cause irreparable harm.").

Finally, the lack of irreparable harm is further illustrated by Bethel's delay in seeking preliminary injunctive relief. Bethel contends that it is suffering harm in the form of the government's attempt to "clawback" $102,600, the amount awarded in scholarships for the 2016-2017 and 2017-2018 school years. ECF 19-1 at 34. However, Bethel offers no reasons why Defendants' attempts to collect this money will cause it *imminent* harm. *See Scotts Co. v. United Industries Corp.*, 315 F.3d 264, 283 (4th Cir. 2002) (explaining that the irreparable harm must be "actual and imminent"). Even though Defendants first sought repayment of the scholarship total in December, 2018, Bethel waited until June, 2019 to file suit, ECF 1, and waited another four months to seek a preliminary injunction, ECF 19. Bethel has provided no information suggesting that the government is actively trying to, or would be able to, collect this amount until the present litigation has concluded. For instance, at the hearing, both parties agreed that the clawback amount

has not even been sent to collections. And even if Defendants did successfully collect the funds, courts are wary of finding irreparable harm where monetary damages can be easily calculated. *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 552 (4th Cir. 1994), *abrogated on other grounds by Winter*, 555 U.S. 7 (2008) ("Generally, irreparable injury is suffered when monetary damages are difficult to ascertain or are inadequate.").

Bethel's delay also undermines the imminent nature of other harm it alleges, in terms of the decreased enrollment and other deleterious effects on the school.[14]  ECF 19-1 at 15 ("Bethel has been forced to forego hiring teachers, backfilling positions, and updating student education equipment.").  Bethel has been aware that it would be deemed ineligible for BOOST since June, 2018, at the latest.  Yet the school waited approximately 16 months to seek preliminary injunctive relief.  In fact, Bethel failed to seek preliminary injunctive relief, with respect to enforcement of the nondiscrimination requirement, during the entirety of the 2018-2019 academic year, and prior to the start of the 2019-2020 academic year.  Its lack of haste casts doubt on the necessity of such extraordinary relief.  *See, e.g.*, *W. Star Hosp. Auth. v. City of Richmond, Va.*, Civil No. 18-cv-647-JAG, 2019 WL 3752962, at *2 n.2 (E.D. Va. Aug. 8, 2019); *Ultimate Outdoor Movies, LLC v. FunFlicks, LLC*, Civil No. SAG-18-2315, 2019 WL 2642838, at *7 (D. Md. June 27, 2019).

Accordingly, since Bethel has not met its burden to establish irreparable harm, its Motion fails on this basis alone.  Nonetheless, on the present record, Bethel also fails to satisfy the remaining preliminary injunction factors.

---

[14] Certainly, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).  As explained in the next section, however, Bethel has not yet shown that Defendants infringed on its First Amendment rights. *See WV Ass'n of Club Owners and Fraternal Srvs., Inc. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009) ("[I]n the context of an alleged violation of First Amendment rights, a plaintiff's claimed irreparable harm is 'inseparably linked' to the likelihood of success on the merits of plaintiff's First Amendment claim.") (citation omitted).

## C. Likelihood of Success on the Merits

To obtain a preliminary injunction, Bethel bears the burden to show that it is likely to succeed on its Free Exercise claim or its Freedom of Speech claim. *See, e.g.*, *Stinnie v. Holcomb*, 355 F. Supp. 3d 514, 527 (W.D. Va. 2018) ("[A]ll that is necessary for preliminary injunctive relief is establishing the likelihood of success on at least one of their claims."). Bethel's likelihood of success depends primarily on whether the Court would subject Defendants' enforcement of the nondiscrimination provision to strict scrutiny. At this point in the proceedings, the Court does not have a justifiable evidentiary basis to apply strict scrutiny, and thus, Bethel has not demonstrated a likelihood of success. Even so, the Court's current assessment of Bethel's likelihood of success "in no way suggests that some or all of the Plaintiff['s claims] will not ultimately prevail in this case." *Vollette v. Watson*, 2012 WL 3026360, at *17 (E.D. Va. July 24, 2012) ("[T]he findings of fact and conclusions of law made by a court in ruling on a preliminary injunction are not binding at trial on the merits.") (quoting *AttorneyFirst, LLC v. Ascension Entm't, Inc.*, 144 F. App'x 283, 287–88 (4th Cir. 2005)).

### 1. Free Exercise Claim

The Free Exercise Clause of the First Amendment, which has been applied to the states through the Fourteenth Amendment, provides that "Congress shall make no law … prohibiting the free exercise" of religion. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993). Bethel argues that it is likely to prevail on its Free Exercise claim because Defendants' enforcement of the nondiscrimination requirement cannot survive strict scrutiny. Bethel contends that Defendants' enforcement is subject to strict scrutiny for three independent reasons, each premised on a Supreme Court case: religious targeting under *Lukumi*, religious hostility under *Masterpiece Cakeshop v. Colorado Civil Rights Comm'n*, 138 S. Ct. 1719 (2018),

and express discrimination under *Trinity Lutheran Church of Columbia v. Comer*, 137 S. Ct. 2012 (2017). ECF 19-1 at 17–18. A review of these cases, however, illustrates that Bethel has not presently met its burden to show that Defendants targeted, were hostile to, or expressly discriminated against the school because of its religious beliefs.

Religious Targeting

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. at 531, is instructive for evaluation of a Free Exercise claim. That case concerned claims of religious discrimination by a Florida Church, practicing the Santeria religion. The church leased land in Hialeah, Florida in 1987, with plans to construct a house of worship. *Id.* at 525–26. However, plans for the church were met with immediate community opposition, because the Santeria faith openly practiced animal sacrifice. *Id.* In fact, the City Council adopted several resolutions to codify residents' concerns about religious animal sacrifice. *Id.* at 526–27. One ordinance stated that the Council had "determined that the sacrificing of animals within the city limits is contrary to the public health, safety, welfare and morals of the community." *Id.* at 528. On appeal, the Court elaborated on the importance of "neutrality," explaining that "a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Id.* at 531. However, "if the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral." *Id.* at 533.

With those principles in mind, the Court found several indications that the objective of the City Council's ordinances was to target the Santeria faith. First, the text of the ordinances evinced a desire to target Santeria, since the Council's resolutions explicitly referenced concerns from city residents about the religion's practices. *Id.* at 535. Second, the "effect" of the law was to target

Santeria, given that the ordinances were underinclusive in terms of which animal killings were prohibited. *Id.* at 536 ("The net result of the gerrymander is that few if any killings of animals are prohibited other than Santeria sacrifice… killings that are no more necessary or humane in almost all other circumstances are unpunished."). Third, during the Council's deliberative process, members openly disparaged the Santeria faith. For example, one Councilman said that devotees of the church "are in violation of everything this country stands for," and the Council president specifically asked, "What can we do to prevent the Church from opening?" *Id.* at 541. Accordingly, the Court invalidated the ordinances as contrary to First Amendment principles.

Bethel has not established that it was targeted by Defendants in any similar manner. Indeed, the origins of the respective government actions are fairly distinct. In *Lukumi*, the City Council took action directly in response to the church's attempt to establish its presence in Hialeah, Florida. Here, by contrast, enforcement of the nondiscrimination provision, and the concomitant review of school handbooks, was not prompted by Bethel specifically. Rather, the MPTA wrote to the Advisory Board with concerns that a different school was discriminating in its student admissions. *See* Affidavit of Donna Gunning, ECF 22-1, Attachment B (referring to Trinity's "open discrimination policy disguised as a Biblical Lifestyle Requirement to refuse admission of an applicant… based on [] sexual orientation"). Following the letter from the MPTA, the Board wrote to all BOOST-eligible schools, including schools with no religious affiliation, asking them to "review [their] school's moral and religious position on non-discrimination, particularly on sexual orientation." ECF 19-14 at 1. Two months later, in December, 2017, the Board directed the schools to provide their respective student handbooks. ECF 19-3 at 3. After discovery, Bethel may be able to demonstrate that Defendants nonetheless targeted its school because of its religious

beliefs.[15]  On the present record, however, Bethel has not met its burden to make the requisite showing.

<u>Religious Hostility</u>

In *Masterpiece Cakeshop*, the Court found that an adjudicatory body's "clear and impermissible hostility" toward religious beliefs violated the Free Exercise Clause.  138 S. Ct. at 1729.  When the owner of a Colorado bakery ("Phillips") refused to create a cake for a same-sex couple's wedding celebration, the couple filed a discrimination claim with the state.  *Id.* at 1724–25.  Colorado's public accommodations law had established an administrative system for the investigation and resolution of discrimination claims.  *Id.* at 1725.  The state's Civil Rights Commission ultimately found that the anti-discrimination law was a valid and neutral law of general applicability, and, thus, that applying it to the bakery owner did not violate the Free Exercise Clause.  *Id.* at 1726.  Furthermore, the Commission ordered the owner to cease and desist from discriminating against same-sex couples by refusing to sell wedding cakes and other products to them.  *Id.*  After affirmance in the Colorado Court of Appeals, Phillips sought review of his Free Exercise and Free Speech claims in the Supreme Court.

At the outset, the Justices recognized the inherent tension between "recognition that gay persons and gay couples cannot be treated as social outcasts or as inferior in dignity," with "religious and philosophical objections to gay marriage."  *Id.* at 1727.  While Colorado, like other states, has the autonomy to enact neutral laws of general applicability in efforts to eradicate discrimination from the public sphere, Phillips's views were not given "neutral and respectful consideration" in the state's forum.  *See id.* at 1729.  In concluding that the Commission expressed hostility toward Phillips's religious views, the Court emphasized two aspects of the Commission's

---

[15] For instance, it is not clear how many handbooks the Advisory Board actually reviewed, and whether all or a disproportionate number were from schools with a religious identity.

adjudication. First, in public hearings, members of the body made openly derisive comments about his religious beliefs. *See id.* at 1729–30. Second, the Court found unjustifiable disparities between how the Commission handled Phillips' case, and how it handled other, similar cases. *Id.* at 1730. Considering these two parts of the Court's decision, Bethel has not proven that Defendants displayed any comparable level of religious hostility.

To illustrate hostility, Bethel points to comments made by Defendant Gallagher at meetings of the Advisory Board. Primarily, Defendant Gallagher implied that Bethel "signed [the] assurance illegally," and characterized some of Bethel's views as "problematic" because they "afford[] them the opportunity to discriminate." ECF 19-1 at 10–11. Properly analyzing these statements requires a factfinder to make credibility assessments. While Bethel argues that these remarks were "hostile" toward Bethel's religious beliefs, *id.* at 11, Defendants contend that the remarks either did not implicate Bethel at all, or had nothing to do with the school's religious beliefs in particular, ECF 22 at 19. Importantly, in *Masterpiece Cakeshop*, the Court found that comments made by commissioners in an initial meeting were "susceptible of different interpretations." 138 S. Ct. at 1729 (commissioner stating Phillips can believe "what he wants to believe," but cannot act on his beliefs "if he decides to do business in the state"). However, "in view of the comments that followed" in a subsequent meeting, it became more likely that the commissioners were indeed hostile toward Phillips's religious views. *See id.* (commissioner comparing Phillips' beliefs to slavery and to the Holocaust). Here, Bethel has identified remarks that "standing alone… are susceptible of different interpretations." *See id.* But unlike in *Masterpiece Cakeshop*, Bethel has not provided evidence of subsequent conduct that would justify characterizing Defendant Gallagher's statements as connoting hostility toward Bethel's religious views.

The *Masterpiece Cakeshop* Court found that "another indication of hostility is the difference in treatment between Phillips' case and the cases of other bakers who objected to a requested cake." *Id.* at 1730.  For instance, while the Commission accepted that other bakers were willing to sell certain products to same-sex couples, it would not grant Phillips the same consideration.  *Id.*  Here, it is undisputed that two schools sharing Bethel's religious views on marriage, Grace Academy and Broadfording Christian Academy, were deemed eligible for BOOST on the same day that Bethel was deemed ineligible.  *E.g.* ECF 17 at 9.  Since discovery has not started, the parties have not developed a factual record to enable this Court to discern how Defendants enforced the nondiscrimination requirement with other schools, and with respect to Grace Academy and Broadfording Academy in particular.  If, for example, Defendants accepted the representations made by these schools that they did not discriminate in admissions, it might suggest hostility toward Bethel's views, because Defendants remained skeptical of Bethel's similar assertions.  At this stage of the proceedings, however, Bethel has not met its burden to show that Defendants treated Bethel differently than other, similarly situated schools.

Express Discrimination

In *Trinity Lutheran Church v. Comer*, 137 S. Ct. 2012 (2017), a religiously-affiliated daycare center alleged that the state of Missouri discriminated against it in violation of the Free Exercise Clause.  Missouri's Department of Natural Resources operated a program, in which it would reimburse qualifying nonprofit organizations that purchased playground surfaces made from recycled tires.  *Id.* at 2017.  The initiative, known as the "Scrap Tire program," awarded grants on a competitive basis, based on criteria such as the level of poverty in the area surrounding the applicant, and the applicant's plan to promote recycling.  *Id.*  Although Trinity Lutheran applied, and scored near the top 10% of applicants, Missouri's Department had an express policy

of denying grants to any applicant owned or controlled by a church. *Id.* at 2018. After its denial, Trinity Lutheran sought declaratory and injunctive relief, to prohibit the Department from discriminating against the Church in future grant applications. *Id.*

Because the Department refused to allow Trinity Lutheran to compete with secular organizations for a grant "solely because it is a church," the Court subjected the government's decision to strict scrutiny. *See id.* at 2022. And though the government attempted to justify denying Trinity Lutheran with concerns about violating the Establishment Clause, the Justices found that its policy went "too far" by "expressly denying a qualified religious entity a public benefit solely because of its religious character." *Id.* at 2024.

Here, Bethel has not proven express discrimination on the part of Defendants. Unlike the government in *Trinity Lutheran*, Defendants did not have an express policy of denying funding to schools with religious ties. Defendants permitted Bethel to participate in BOOST for two years, including the program's inaugural year, despite the school's "unabashedly" Christian identity. Indeed, aside from its "Admissions Policy," Bethel has not shown that Defendants scrutinized any of the religious material on its website, in its handbook, or elsewhere. Moreover, after Bethel turned over its handbook at the Advisory Board's behest, Defendants did not automatically expel Bethel from BOOST. MSDE and the Advisory Board not only corresponded with Bethel over a period of more than six months, but also convened several separate meetings to consider Bethel's eligibility to remain in BOOST. Although Defendants ultimately banished Bethel from the program, Bethel has not proven, with the present record, that the decision was made "solely" based on its religious identity. *See* ECF 19-1 at 4. Accordingly, *Trinity Lutheran* does not provide a viable basis for the Court to apply strict scrutiny.

<u>Summary of Free Exercise Claim</u>

Bethel has not yet established that strict scrutiny should apply to Defendants' enforcement of the nondiscrimination provision. Thus, it has not met its burden to show likely success on the merits of its Free Exercise claim.

**2. Freedom of Speech Claim**

The Free Speech Clause of the First Amendment, applied to states through the Fourteenth Amendment, provides that "Congress shall make no law … abridging the freedom of speech." *Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019) (quoting U.S. Const. amend. I.). The First Amendment "protects speech along a spectrum, so that '[l]aws that impinge upon speech receive different levels of judicial scrutiny depending on the type of regulation and the justifications and purposes underlying it." *Id.* Bethel contends that enforcement of the nondiscrimination provision was unconstitutional because (1) Defendants regulated content in Bethel's handbook, (2) Defendants regulated this content based on Bethel's religious viewpoint, and (3) Defendants leveraged the BOOST voucher to silence Bethel's speech. ECF 19-1 at 30–35. At this stage of the litigation, Bethel has not demonstrated a likelihood of success on the merits of its claim that Defendants regulated Bethel's speech.

<u>Content Discrimination</u>

"At the one end of the spectrum, 'regulations that discriminate against speech based on its content are presumptively invalid' and are usually subject to strict scrutiny." *Id.* (citation omitted). Importantly, the Supreme Court has distinguished regulation of *speech* from regulation of *conduct*. *See, e.g.*, *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 62 (2006) ("[I]t has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means

of language, either spoken, written, or printed."). *Rumsfeld* involved efforts by an association of law schools and law faculties ("FAIR") to exclude military recruiters from their campuses, because of the policy adopted by Congress with respect to gay and lesbian individuals in the military. *Id.* at 52. Congress attempted to thwart the law schools' efforts by adopting the "Solomon Amendment," which denied certain government funding to institutions that prevented military recruiters from visiting campus. *See id.* FAIR sought a preliminary injunction to enjoin enforcement of the Solomon Amendment because, in its view, the legislation violated the law schools' Freedom of Speech rights. *Id.* at 53. On appeal, the Court found that the Solomon Amendment regulated conduct rather than speech. According to the majority, the Solomon Amendment "affects what law schools must *do*—afford equal access to military recruiters—not what they may or may not *say*." *Id.* at 60.

Critically, in enforcing the Amendment, Congress did technically infringe upon some speech, *e.g.*, compelling law schools to send e-mails, and to post notices about recruitment events. *Id.* at 61–62. However, the Court found that this compelled speech was "plainly incidental" to the regulation of conduct, *id.*, and elaborated with a useful analogy:

> Congress, for example, can prohibit employers from discriminating in hiring on the basis of race. The fact that this will require an employer to take down a sign reading "White Applicants Only" hardly means that the law should be analyzed as one regulating the employer's speech rather than conduct.

*Id.*

Courts have recognized that "drawing the line between speech and conduct can be difficult." *Nat'l Institute of Family and Life Advocates v. Becerra*, 138 S.Ct. 2361, 2373 (2018); *see also Otto v. City of Boca Raton, Fl.*, 353 F. Supp. 3d 1237, 1249 (S.D. Fl. 2019) ("The difference between speech and conduct is not always easy to discern and the distinction is frequently criticized."). In this case, certain factual development must occur before the Court can

ascertain whether Defendants' enforcement of BOOST's nondiscrimination provision involved regulation of Bethel's speech or its conduct. *See Columbia Union College v. Clarke*, 159 F.3d 151, 168 (4th Cir. 1998) ("Particularly when deciding difficult constitutional questions dependent on intensely factual determinations… a court must assure itself that it has before it a full and complete factual record."). For instance, the Court needs more information about the origins of Defendants' investigation into school handbooks. In a letter dated October 11, 2017, the MPTA referenced problematic language in the handbook of Trinity, a different school. *See* ECF 36-1. Given Trinity's "open discrimination policy," the MPTA recommended not only that the Advisory Board should review handbooks from BOOST schools, but also that schools should make particular changes to the language in their handbooks. *Id.* However, the record does not indicate how Defendants initiated the investigation into Trinity's handbook, nor how Defendants addressed the MPTA's recommendation about requiring schools to make changes to their handbooks, which clearly focused on the schools' speech.

Furthermore, it is unclear at this time whether the language on Bethel's "Admissions Policy" page evidenced an accompanying admissions practice, or whether Defendants took any steps, beyond consideration of Bethel's handbook, to verify Bethel's compliance with the nondiscrimination requirement. The discovery process should reveal facts about, *inter alia*, (1) whether, and to what extent, language in Bethel's handbook was illustrative of its admissions conduct, and (2) whether Defendants drew similar inferences about admissions conduct from handbook language supplied by nonreligious schools, or investigated actual admissions conduct by schools that agreed to change their handbook language in accordance with Defendants' wishes. These facts will assist the Court in assessing whether Defendants reasonably believed that Bethel

indeed discriminated in student admissions, or if their decision was based on the religious speech in Bethel's handbook.

Accordingly, Bethel has not yet met its burden to establish that "the Board excluded Bethel from BOOST solely because of the *religious content* and policies in Bethel's handbook." ECF 19-1 at 33 (emphasis added).

<u>Viewpoint Discrimination</u>

For similar reasons, the Court cannot conclude at this time that Defendants engaged in viewpoint discrimination. Viewpoint discrimination is an "egregious form of content discrimination" that is presumptively unconstitutional. *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829–30 (1995). In *Rosenberger*, the University of Virginia declined to fund expenses incurred by Wide Awake Productions, a Christian student group. The University had a system in which registered student organizations were entitled to apply to have their expenses reimbursed from a "student activities fund." *Id.* at 824. However, guidelines for the fund dictated that religious activities were not eligible for funding. *See id.* This restriction implicated Wide Awake Productions because, although it was a registered student organization, the group's mission was to publish materials promoting a Christian viewpoint. *Id.* at 825–26 (stating the group was created "[t]o publish a magazine of philosophical and religious expression" and to "foster[] an atmosphere of sensitivity to and tolerance of Christian viewpoints."). Accordingly, when the group applied for reimbursement of printing costs associated with its newspaper, the request was denied as an ineligible "religious activity." *Id.* at 827. The United States Court of Appeals for the Fourth Circuit (the "Fourth Circuit") found that the funding guidelines discriminated on the basis of content, but concluded that the discrimination was justified by a compelling interest in maintaining strict separation between church and state. *Id.* at 828.

On appeal, the Supreme Court found that the University guidelines discriminated on the basis of viewpoint because "the University does not exclude religion as a subject matter but selects for disfavored treatment those student journalistic efforts with religious editorial viewpoints." *Id.* at 831. The "prohibited perspective" regarding Christianity resulted in denial for a group that otherwise would have been approved for funding. *See id.* Thus, the Court held that the guidelines, both on their face and as applied, denied the petitioners' free speech rights under the First Amendment. *Id.* at 837.

*Columbia Union College v. Clarke*, 159 F.3d 151 (4th Cir. 1998), presents an example of regulation of speech in the context of government funding. That case concerned the Sellinger program, which provided grants to qualifying private colleges. *Id.* at 154. The Maryland Higher Education Commission denied funding to Columbia Union on the grounds that the college "lacked institutional autonomy from the Seventh Day Adventist Church." *See id.* Columbia Union requested reconsideration and, after a second denial, it filed suit, alleging multiple statutory and constitutional violations. *Id.* at 155. Invoking *Rosenberger*, the Fourth Circuit found:

> The Sellinger program similarly infringed on Columbia Union's free speech rights by establishing a broad grant program to provide financial support for private colleges that meet basic eligibility criteria but denying funding to Columbia Union solely because of its alleged pervasively partisan religious viewpoint.

*Id.* at 156.

*Rosenberger* and *Columbia Union College* highlight an important difference in this case. Whereas the University in *Rosenberger*, and the state of Maryland in *Columbia Union College*, admitted that they denied funding because of the religious viewpoints expressed by the regulated entities, here, Defendants have provided evidence that viewpoint was immaterial in their enforcement of the nondiscrimination mandate. For example, as noted above, Defendants allowed

Bethel to participate in BOOST for two years. Bethel has not argued that Defendants were unaware of its religious affiliation when they granted BOOST funds in 2016 and 2017.

Even so, Defendants' contentions are not dispositive. Bethel could ultimately prove that Defendants did in fact consider the school's religious viewpoint by, for instance, showing that nonreligious schools were treated differently with respect to enforcement of the nondiscrimination provision. Thus far, the parties have not developed a factual record to show, *inter alia*, (1) how many handbooks Defendants actually reviewed, (2) how many schools were flagged for follow-up correspondence, and (3) the breakdown of religious versus nonreligious schools for each of these groups. *See, e.g.*, ECF 39 (stating that "[A]ll schools but one *submitted* handbooks for review"). Moreover, both parties agree that, in the course of their investigation, Defendants identified several other schools, in addition to Bethel, that were potentially violating the nondiscrimination mandate. However, neither party has provided the Court with the correspondence between Defendants and these other schools. In one letter, Defendants offered examples of how other schools had altered their language to qualify for BOOST. ECF 19-12. But to assess whether Defendants made their ultimate determination as a result of Bethel's religious viewpoint, the Court needs a more comprehensive record, detailing all of the language Defendants took issue with (and whether the language was primarily religious in nature), and elucidating the process that other schools took in amending their handbooks to satisfy Defendants' concerns.

Bethel has not met its burden to show that Defendants discriminated on the basis of speech. The Court would not apply strict scrutiny at this point, and Bethel has not argued that Defendants' enforcement would fail rational basis review.[16]

---

[16] Further, Bethel does not argue that its conduct was "expressive." Thus, case law discussing regulation of expressive conduct is inapposite. *See, e.g.*, *Iota XI Chapter of Sigma Chi Fraternity v. George Mason Univ.*, 993 F.2d 386 (4th Cir. 1993).

<u>Conditions on Receipt of State Funds</u>

A statute, or its enforcement, is presumptively inconsistent with the First Amendment if a financial burden is imposed on speakers because of the content of their speech. *See Simon & Shuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 115 (1991). As detailed in the preceding sections, Bethel has not met its burden to show that it was disqualified from BOOST because of the content of its speech.

### D. Balance of Equities and Public Interest

Finally, even if Bethel had demonstrated the factors above, "a preliminary injunction does not follow as a matter of course from a plaintiff's showing of a likelihood of success on the merits." *Benisek v. Lamone*, 138 S. Ct. 1942, 1943–44 (2018). Rather, Bethel has not met its burden to establish the remaining preliminary injunction factors, which courts often consider together. *See Int'l Refugee Assistance Project v. Trump*, 857 F.3d 554, 602 (4th Cir. 2017), *as amended* (June 15, 2017), *vacated and remanded on other grounds sub nom.*, *Trump v. Int'l Refugee Assistance*, 138 S. Ct. 353 (2017) ("As the district court did, we consider the balance of the equities and the public interest factors together."). In *Benisek*, the Court specifically considered "reasonable diligence" as part of the assessment of these equitable factors. 138 S. Ct. at 1944. Although the delay in this case is not as lengthy as in *Benisek*, Bethel's lack of diligence has nonetheless caused any preliminary injunctive relief to be significantly more disruptive.

As detailed above, Bethel failed to seek a preliminary injunction during the entire 2018-2019 school year, and prior to the 2019-2020 school year. Thus, the BOOST program has continued without Bethel's participation, and all funding for the current cycle has been disbursed. At the hearing, Bethel elaborated on its requested relief, clarifying that it wants this Court to not only enjoin enforcement of the nondiscrimination requirement, but also to reinstate Bethel into

BOOST unilaterally. Granting this relief would require this Court to circumvent the Advisory Board's process for making eligibility determinations, as instituted by Maryland's Governor and General Assembly. For example, unilaterally reinstating Bethel into BOOST would likely render Bethel the only school — out of more than 200 BOOST-eligible schools — to which the 2019 version of the nondiscrimination requirement has not been applied. In fact, since Bethel has not applied for BOOST over the past two cycles, it is not clear that the school would satisfy the program's other, unrelated eligibility requirements. *See* ECF 19-6 at 0061–62 (listing eligibility requirements for BOOST schools);[17] *see also* ECF 26 ¶ 74 (Defendants' answer denying allegation in Bethel's Complaint that "Bethel met and complied with all of MSDE's eligibility requirements to participate in the BOOST scholarship program during the 2016-2017 and 2017-2018 academic years").

While all funds have been disbursed for the 2019-2020 cycle, Bethel contends that relief from this Court would enable BOOST students, immediately, to leave their current schools and use their vouchers at Bethel. This Court is sympathetic to Bethel's contentions that students have been unable to attend the school without BOOST funding. However, neither party has proffered any evidence suggesting that transfers of this nature occur routinely, or even infrequently. But assuming *arguendo* that students would transfer their vouchers to Bethel during the current 2019-2020 academic year, then granting relief could lead to a peculiar result. In particular, Bethel could receive BOOST funds for the present school year, and later be deemed ineligible by the Advisory Board, based on requirements in either the 2019-2020 budget bill or in new legislation. This

---

[17] For example, the 2017-2018 legislation required that schools "administer assessments to all students in accordance with federal and State law." The 2019-2020 legislation bolstered the assessment requirement, and specified that schools must provide English/language arts, mathematics, and science exams for certain grades. 2019 Md. laws ch. 565. Since Bethel did not apply for BOOST in 2019, the Advisory Board has not verified that Bethel offers assessments in accordance with Maryland's requirements.

potential abnormality highlights the extraordinary nature of Bethel's request, specifically that this Court completely bypass the process that Maryland has developed for evaluation of applications to BOOST.

## IV.    CONCLUSION

For the reasons set forth above, Bethel's Motion for a preliminary injunction, ECF 19, is denied.  A separate Order follows.


<u>Dated:</u> January 21, 2020                                    /s/
                                                    Stephanie A. Gallagher
                                                    United States District Judge