# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

BETHEL MINISTRIES, INC.,                 *

                *Plaintiffs*,                 *

        v.                                 *     No. 1:19-cv-01853-SAG

DR. KAREN B. SALMON, *et al.*,           *

             *Defendants*.                 *

   *    *    *    *    *    *    *    *    *    *    *    *

## DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

BRIAN E. FROSH
Attorney General of Maryland

/s/ Ann M. Sheridan
_____
ROBERT A. SCOTT (NO. 24613)
ANN M. SHERIDAN (NO. 11137)
JUSTIN E. FINE (NO. 18731)
Assistant Attorneys General
200 St. Paul Place
Baltimore, Maryland 21202
asheridan@oag.state.md.us
410-576-6441
410-576-6955 (facsimile)

June 25, 2021                    Attorneys for State Defendants

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

STATEMENT OF UNDISPUTED FACTS ........................................................ 3

    Maryland's Nondiscrimination Laws ...................................................... 3

    Maryland's BOOST School Voucher Program ......................................... 5

    Discovery that a BOOST-Participating School Has Discriminatory
    Admission Policy Leads to Handbook Review for All BOOST-
    Participating Schools ................................................................................ 6

    MSDE and the Board Discover that Bethel's Written Policy is
    Discriminatory ......................................................................................... 8

    Board Disqualifies Bethel from Further Participation in BOOST
    and Seeks Reimbursement of BOOST Funds ........................................ 10

    Board Gives Bethel Another Chance to Correct Its Discriminatory Policy .......... 12

    Maryland Seeks Reimbursement of BOOST Funds ............................... 13

    Maryland Expands Nondiscrimination Requirement to Expressly
    Include Gender Identity and Expression; Bethel Remains in Violation
    of Requirements ..................................................................................... 14

ARGUMENT ........................................................................................................... 15

I.    LEGAL STANDARD ....................................................................................... 15

II.   THE FIRST AMENDMENT PERMITS STATES TO PROTECT VULNERABLE
    GROUPS FROM DISCRIMINATION IN EDUCATION ...................................... 16

    A.    The Undisputed Facts Do Not Support Bethel's Free Exercise Claim. ...... 18

    B.    The Undisputed Facts Do Not Demonstrate a Violation of the
         Establishment Clause ................................................................... 23

    C.    The Undisputed Facts Do Not Demonstrate a Violation of the Free

Speech Clause Under Any Theory ............................................................ 25

    1.    Requiring Bethel's Written Admissions Policy to Conform with the Nondiscrimination Requirement Is a Regulation of Conduct .................................................................................. 26

    2.    The BOOST Nondiscrimination Requirement Is a Permissible Condition on State Funding. ......................................... 28

    3.    Ensuring State Funds Do Not Support Discrimination in Education Is a Compelling State Interest. ........................................ 31

III.    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON BETHEL'S THIRD CAUSE OF ACTION BECAUSE ITS VOID-FOR-VAGUENESS THEORY FAILS AS A MATTER OF LAW ................................................................................ 32

IV.    THERE IS NO PARENTAL RIGHT TO GOVERNMENT FUNDING OF PRIVATE EDUCATIONAL CHOICES .......................................................... 38

V.    THE STATE DEFENDANTS HAD A RATIONAL BASIS FOR BETHEL'S EXCLUSION FROM THE BOOST PROGRAM ............................................. 39

CONCLUSION ............................................................................................. 40

Defendants submit this memorandum of law in support of their motion for summary judgment and state as follows:

## INTRODUCTION

This case involves Maryland's refusal to subsidize education at a nonpublic school that maintains discriminatory educational admissions policies and thereby grant imprimatur to such policies. Maryland can and does limit distribution of its discretionary educational funds to nonpublic schools that do not discriminate against vulnerable classes of people. Defendants are the Superintendent of the Maryland State Department of Education ("MSDE") and members of a voluntary Board that administers a private school voucher program called Broadening Options and Opportunities for Students Today ("BOOST"). The Maryland General Assembly funds the BOOST program annually through a budget bill that sets forth requirements for participating schools, including that schools not discriminate in admissions on the basis of sexual orientation.

Plaintiff Bethel Ministries, Inc. ("Bethel") operates a private Christian school, Bethel Christian Academy, that applied for and received approval to accept BOOST scholarship funds for some of its students in 2016 and 2017. As a condition of its participation in the BOOST program, Bethel signed an assurance that it would not discriminate in admissions on the basis of sexual orientation.

MSDE discovered in 2018 that Bethel and a handful of other schools had discriminatory policies, and it referred those schools to the Board for a decision on eligibility. Ultimately, the Board determined that Bethel's admissions policy discriminated

on the basis of sexual orientation and disqualified Bethel from participation in BOOST.  In compliance with the terms of the enacted funding bill, the State also sought a refund of scholarship funds that had been paid to Bethel for the 2016-17 and 2017-18 school years. In response, Bethel filed this lawsuit asserting six constitutional claims based in the First and Fourteenth Amendments.

Fundamentally, Bethel complains that it, like numerous other schools of varied religious backgrounds, was assessed for compliance with a generally applicable, religiously neutral nondiscrimination requirement.  The undisputed facts demonstrate that the BOOST Board acted without a clear and impermissible hostility toward Bethel's religious beliefs in the application of the nondiscrimination provision.  Bethel, but not all schools sharing similar religious beliefs, was found to be in violation of the nondiscrimination requirement.  Bethel seeks to evade this straightforward application of a neutral law by claiming that it was targeted because its discriminatory conduct resulted from its sincerely held religious beliefs.  Bethel's First Amendment claims fail because the State's actions are a regulation of conduct that is not specifically tied to religion or religious beliefs.  That type of regulation of conduct under a neutral law has been upheld by the courts for decades in a variety of contexts, including when private educational institutions sought to benefit from public programs such as tax exemptions, despite carrying out segregationist policies.

Bethel's claims asserted under the Fourteenth Amendment also fail.  Bethel has no property interest in participation in a school voucher program like BOOST, and the BOOST nondiscrimination requirements are not void for vagueness.  The BOOST

nondiscrimination requirements do not interfere with parental rights and do not violate the Equal Protection Clause.  Accordingly, defendants are entitled to judgment as a matter of law.

## STATEMENT OF UNDISPUTED FACTS

### Maryland's Nondiscrimination Laws

Maryland has a 20-year history of protecting its citizens from discrimination based on sexual orientation.  In 2001, Maryland expanded its laws governing public accommodations, employment, state government, and housing discrimination to prohibit discrimination against people based on their sexual orientation.  2001 Md. Laws ch. 340. In 2006, Maryland extended these requirements to commercial contracts with the State. 2006 Md. Laws ch. 283.  In 2012, Maryland's General Assembly and the people of Maryland "acted to enlarge the definition of marriage to correct what its citizens and elected representatives perceived to be an injustice that they had not earlier known or understood," *United States v. Windsor*, 570 U.S. 744, 764 (2013), by passing the Civil Marriage Protection Act.  2012 Md. Laws ch. 2.  And, in 2014, the General Assembly passed the Fairness for All Marylanders Act, 2014 Md. Laws ch. 474, adding gender identity to the list of classes covered by nondiscrimination laws and extending protection to a class of transgender people that this Court has recognized as "at least a quasi-suspect classification."  *M.A.B. v. Board of Educ. of Talbot County*, 286 F. Supp. 3d 704, 721-22 (D. Md. 2018) (quoting *Stone v. Trump*, 280 F. Supp. 3d 747, 768 (D. Md. 2017), *appeal dismissed*, No. 17-2398, 2018 WL 2717050 (4th Cir. Feb. 2, 2018)).

3

When considering extending nondiscrimination laws to include "sexual orientation" and "gender identity," the General Assembly heard testimony from religious groups and leaders both for and against the statutes in question. Exhibit 3, Excerpts from Maryland General Assembly Bill File for House Bill 307 (2001).[1]  A document included in the Bill File for House Bill 307, the sexual orientation legislation, specifically stated that the General Assembly "should not establish policies to allow private schools to discriminate, especially if the school receives State funding." Ex. 3 at 12.  The same document reasoned that contemplated amendments that would allow a religious or conscientious objection would "gut the bill" and allow "[a]nyone who wants to discriminate . . . to use this language as a shield."  *Id.* at 13. In support of the Fairness for All Marylanders Act, the Maryland Parent Teacher Association ("PTA") testified that more than three out of four transgender persons "were bullied or harassed in school, 1 in 3 were assaulted at school, and 1 in 10 were sexually assaulted at school or in the local community *because of either their outward gender expression or a perception about their gender expression*."  Exhibit 4, Excerpts from Maryland General Assembly Bill File for Senate Bill 212 (2014), at 10 (emphasis in original).  The Maryland PTA further testified that 15 percent dropped out of school because of conflicts related to their gender expression.  *Id.*

---

[1] The numbering for the exhibits to this memorandum begins at 3 so that the exhibit numbering coincides with the ECF numbering.

**Maryland's BOOST School Voucher Program**

In 2016, the Maryland General Assembly enacted a $5.5 million school voucher program dubbed "BOOST" to provide financial aid to help children of low-income families attend private schools. 2016 Md. Laws ch. 143 at 130-35; 142. The BOOST program is administered by MSDE and is overseen by a seven-member advisory board of volunteers ("BOOST Board" or BOOST Advisory Board"). *Id*. at 132-33. Eligible student applicants are ranked by need, and the BOOST Advisory Board is charged with reviewing and certifying the applicants as well as setting scholarship amounts. *Id.*

The law also set forth eligibility requirements for nonpublic schools at which the scholarships can be used, including a requirement to (1) comply with Title VI of the Civil Rights Act of 1964; (2) comply with Title 20, subtitle 6 of the State Government Article, and (3) "not discriminate in student admissions on the basis of race, color, national origin, or sexual orientation." *Id.* at 137. The nondiscrimination requirement further specifies that nonpublic schools are not required "to adopt any rule, regulation, or policy that conflicts with its religious or moral teachings." 2016 Md. Laws ch. 143 at 137. This statement is subject to a modifying clause in the next sentence, which provides "[h]owever, all participating schools must agree that they will not discriminate . . . ." *Id.* If a participating school does not "agree that they will not discriminate in student admissions on the basis of race, color, national origin, or sexual orientation," the school is required to "reimburse MSDE all scholarship funds received under the BOOST Program and may not charge the student tuition and fees instead." *Id.*

Bethel, the plaintiff in this case, operates a private school called Bethel Christian Academy.  Compl. ¶¶ 1-2.  In 2016, Bethel applied to participate in the BOOST voucher program.  In so doing, Bethel signed written assurances to the State that it did not discriminate in student admissions based on sexual orientation.  Compl. ¶ 73; Exhibit 5, Declaration of Claire Dant, ¶ 19; Exhibit 6, BOOST Assurance for 2017-18 School Year; Exhibit 7, Excerpts from 30(b)(6) Deposition of Bethel (Deposition of Claire Dant), at 80:12-81:2.

### Discovery that a BOOST-Participating School Has Discriminatory Admission Policy Leads to Handbook Review for All BOOST-Participating Schools

In October, 2017, the BOOST Board received a complaint from the Maryland PTA that Trinity Lutheran Christian School, a private school participating in the BOOST program, maintained a discriminatory admissions policy that allowed it to deny admission or discontinue enrollment of a student based on the sexual orientation of the student's parents.  Exhibit 8, Letter from Maryland PTA, dated October 11, 2017; Exhibit 9, Affidavit of Donna Gunning, ¶ 7.   Upon inquiry, MSDE and the Board learned that Trinity's written policy provided that it reserved the right "to refuse admission of an applicant or to discontinue enrollment of a student" whose "conduct, inside or outside the school, is counter to or in opposition to the Biblical lifestyle the school teaches . . . includ[ing]  . . . living in, condoning, or practicing homosexual lifestyle or alternative gender identity."  Exhibit 10, Excerpt from Trinity Lutheran Christian School Handbook. Furthermore, it expressly "reserve[d] the right, within its sole discretion, to refuse admission of an applicant or to discontinue enrollment of a student of a same sex marriage

or relationship."  Ex. 10.  As a result, the BOOST Board declared Trinity ineligible for BOOST and required that Trinity pay back to the State the BOOST scholarship funds it received.  Exhibit 11, Letter from Matthew Gallagher to Pastor John Austin, dated October 13, 2017; Exhibit 12, Letter from Donna Gunning to Pastor John Austin, dated February 28, 2019.

Concerned that other BOOST schools might have similar discriminatory policies, the BOOST Board sent letters to all BOOST-participating schools requesting that they examine their written policies for compliance with the nondiscrimination requirement and the assurances that they signed.  Exhibit 13, Letter from Matthew Gallagher to BOOST-eligible schools, dated October 13, 2017.  The letter went to all BOOST-eligible schools at the time regardless of their religious or non-religious affiliations.  Ex. 9 ¶ 6; *id.* at Attachment A.  In addition, in December 2017, MSDE requested copies of school admission policies from all BOOST schools, including Bethel, to make sure that the schools' policies complied with the nondiscrimination provisions in the BOOST law.  Exhibit 14, Letter from Matthew Gallagher to BOOST schools, dated December 19, 2019; Compl. ¶¶ 94-95.

MSDE staff conducted the initial review of school admission policies.  Exhibit 15, Declaration of James Klarman, ¶¶ 10-11.  In reviewing the policies, MSDE staff applied the same standards to all of the schools, regardless of religious or non-religious affiliation.  Ex. 15 ¶ 12.  Schools were not singled out or treated differently based on their religious beliefs.  Ex. 15 ¶ 13.  Rather, MSDE looked carefully at the language of each school's admissions policy to determine whether the policies were discriminatory.  Ex. 15 ¶ 14.

**MSDE and the Board Discover that Bethel's Written Policy is Discriminatory**

Upon review, MSDE staff discovered that the admissions policies of the vast majority of schools did not have discriminatory language. Ex. 15 ¶ 15. Other schools, however, including Bethel, had admissions policies that appeared to be inconsistent with the BOOST law's nondiscrimination requirements. Ex. 15 ¶ 16. Notably, Bethel's admissions policy, set forth in its 2017-2018 Parent/Student Handbook, stated that it did not discriminate based on "race, color, national and ethnic origin," but was silent as to whether the school discriminated based on sexual orientation. Exhibit 16, Excerpt of Bethel 2017-2018 Parent/Student Handbook at 3. Further, Bethel's policy stated that in order to remain enrolled at the school, students were required to "align" their "conduct" with Bethel's "view" that defined marriage "as a covenant between one man and one woman" and that students are expected to identify with their biological gender. Ex. 16 at 3. Specifically, the handbook stated:

**ADMISSIONS POLICY**

\*       \*       \*

**Statement of Nondiscrimination**

Bethel Christian Academy admits students of any race, color, and national or ethnic origin to all the rights, privileges, programs, and activities generally accorded or made available to students at the school. It does not discriminate on the basis of race, color, national and ethnic origin in administration of its educational policies, admissions policies, scholarship and loan programs, and athletic and other school-administered programs.

8

> *It should be noted, however, that Bethel Christian Academy supports the biblical view of marriage defined as a covenant between one man and one woman, and that God immutably bestows gender upon each person at birth as male or female to reflect His image.* (Gen. 1:27, Gen. 2:23-24)   *Therefore,* faculty, staff, and *student conduct is expected to align with this view.* Faculty, staff, *and students are required to identify with, dress in accordance with, and use the facilities associated with their biological gender*.

Ex. 16 at 3 (emphasis added).

Bethel further specified that "[p]arents must understand that continued enrollment of their child(ren) is dependent on their support of the school, its staff, and its policies." Ex. 16 at 3.  By letter dated March 5, 2018, MSDE and the BOOST Board asked Bethel for an explanation of how Bethel reconciled its assurance that it did not discriminate based on sexual orientation with its admissions policy language.  Exhibit 17, Letter from Monica Kearns to Claire Dant, dated March 5, 2018.  Bethel responded by letter dated March 13, 2018.  Exhibit 18, Letter from Claire Dant to Monica Kearns, dated March 13, 2018.  Significantly, Bethel did not deny that a student could be expelled from the school after admission on the basis of sexual orientation.  Ex. 18.  Bethel further asserted that its policy requiring student conduct to "align with" the view that marriage should be limited to heterosexual couples was irrelevant to whether it discriminated in admissions.  Ex. 18.  MSDE staff referred the Bethel matter to the BOOST Board for a determination.[2]  Ex. 15 ¶ 18.

---

[2] In addition to Bethel, MSDE staff also referred several other schools with discriminatory language to the BOOST Board for a decision.  Exhibit 19, Declaration of Matthew Gallagher, ¶¶ 12-13.

**Board Disqualifies Bethel from Further Participation in BOOST and Seeks Reimbursement of BOOST Funds**

On May 3, 2018, the BOOST Board deliberated for more than an hour in open session about whether Bethel's admissions policy met the BOOST nondiscrimination requirement.  May 3, 2018 BOOST Advisory Board Meeting Video 43:00 to 1:57:00, available at https://vimeo.com/368387715/85b45d8b3b.  Bethel was invited to present to the Board but did not attend.[3]  *Id.* at 1:30-2:15; 43:00 to 1:57:00; Ex. 7 at 95:12-22.

After the May 3, 2018 meeting, the BOOST Board requested additional information from Bethel.  Exhibit 20, Letter from Monica Kearns to Claire Dant, dated May 25, 2018.  In response, Bethel sent a second letter on May 29, 2018, claiming that "[a]ny student . . . is welcome to join our school community regardless of religious beliefs, experience of same-sex attraction, sexual self-identification, past participation in same-sex behavior, beliefs about marriage, or beliefs about sexual morality."  Exhibit 21, Letter from Claire Dant to Monica Kearns and BOOST Board, dated May 29, 2018.  Significantly, however, Bethel failed to explain why its statements in the letter about who was welcome to join the school were not reflected in its admissions policy.  Ex. 21.  Bethel also failed to explain why its admissions policy contained a nondiscrimination statement that omitted sexual orientation as a class, or why its admissions policy conditioned continued enrollment on the requirement that student conduct "align" with Bethel's view that marriage is defined as

---

[3] During the same meeting, the Board considered whether the State should attempt to "clawback" money from schools already found to be in noncompliance with the BOOST nondiscrimination requirement, which at the time did not include Bethel.  *Id.* at 03:00 to 4:00.

a covenant between one man and one woman.  Ex. 21.  While Bethel rejected the contention that it would summarily expel a student based on sexual orientation, it did not deny that "student actions," which were undefined in the letter, could result in expulsion if the student could not be brought "into compliance with behavioral expectations."  Ex. 21.

On June 21, 2018, the BOOST Board entered into closed session to receive legal advice, returned to open session, and voted unanimously to find Bethel was ineligible for the BOOST program.  June 21, 2018 BOOST Advisory Board Meeting Recording Part I at 1:06:35 to 1:07:30, 1:08:15 to 1:08:33, available at http://archives.marylandpublicschools.org/S/Audio/BOOSTMeeting%2006212018Audio 1.mp3; June 21, 2018 BOOST Advisory Board Meeting Recording Part II at 3:56 to 8:30, available at http://archives.marylandpublicschools.org/ S/Audio/BOOSTMeeting%2006212018Audio2.mp3.

On August 8, 2018, the BOOST Board sent a letter to Bethel memorializing its decision and explaining that it had examined Bethel's admission policy on the principles that (1) a bona fide offer of admission necessarily entailed that the offer not be extended with the understanding that the school would "discipline or expel a student because of the student's sexual orientation, as this would make acceptance at the school illusory"; and (2) "[a] discipline policy that, on its face, singles out conduct or behavior based on the sexual orientation of the student for discipline or expulsion does violate the nondiscrimination clause contained in the BOOST law."  Exhibit 22, Letter dated August 8, 2018.  The letter further explained that the Board concluded that Bethel's requirement that students "align their conduct to the view of marriage as a covenant between one man and one woman (i.e.,

11

heterosexual)" meant that "[a] non-heterosexual student may reasonably view the policy as one that allows denial of admission or discipline or expulsion on the basis of his or her sexual orientation." Ex. 22. Therefore, the Board concluded that "this policy, on its face, was in conflict with the nondiscrimination clause contained in the BOOST law." Ex. 22.

Bethel was not the only private school that was declared ineligible for the BOOST program in 2018 based on discriminatory language in its admissions policy. A total of 10 schools originally were declared ineligible on this basis. Exhibit 23, School Status – BOOST Program Discriminatory Practices Review Summary. Among the schools that were declared ineligible was Celebration Christian Academy, which had language in its admissions policy that was strikingly similar to Bethel, including the statements that student conduct was required to "align" with the school's view that marriage is "a covenant between one man and one woman." Exhibit 24, Letter from Matthew Gallagher to Robin Davis, dated March 16, 2018.

**Board Gives Bethel Another Chance to Correct Its Discriminatory Policy**

To maximize participation in BOOST, MSDE and the BOOST Board bent over backwards to be flexible and accommodating to schools with discriminatory language in their policies. Ex. 19 ¶¶ 17-18. The Board restored eligibility to six of the ten schools that were initially declared ineligible after those six schools removed the discriminatory language from their admissions policies. Ex. 19 ¶ 18; Ex. 23. In February, 2019, MSDE advised Bethel in writing that the Board had restored eligibility to several schools that removed discriminatory language from their admissions policies and invited Bethel to consider doing the same. Exhibit 25, Letter from Donna Gunning to Claire Dant, dated

February 28, 2019; Ex. 7 at 107:7-20.  In response, Bethel requested examples of revised

policies from other schools that had regained BOOST eligibility, and MSDE provided

several such examples. Exhibit 26, Email thread between Donna Gunning and Claire Dant,

dated May 24, 2019.   Despite this, Bethel refused to change its discriminatory admissions

policy, and remained ineligible.  Ex. 7 at 107:12-20.

### Maryland Seeks Reimbursement of BOOST Funds

Pursuant to the BOOST law, schools declared ineligible based on discriminatory

admissions policies were required to "reimburse MSDE all scholarship funds received

under the BOOST Program and may not charge the student tuition and fees instead."  2016

Md. Laws ch. 143 at 137.  Accordingly, on December 12, 2018, MSDE sent Bethel an

invoice for the total scholarship amounts it received for the 2016-2017 school year and the

2017-2018 school year, $102,600.  Exhibit 27, Letter from Donna Gunning to Claire Dant,

dated December 12, 2018.  To minimize the financial hardship on Bethel, the letter stated

that "[i]f the school can demonstrate that it is financially unable to pay this indebtedness in

one lump sum, payment in installments may be arranged."  Ex. 27.  Bethel was not the only

school that was required to pay back BOOST funds.  Other schools that were declared

ineligible due to discriminatory policies were similarly required to pay back BOOST funds,

including those that later revised their policies and regained eligibility for BOOST.  Exhibit

28, BOOST Advisory Board Summary Decisions of February 5, 2019; Ex. 23.

**Maryland Expands Nondiscrimination Requirement to Expressly Include Gender Identity and Expression; Bethel Remains in Violation of Requirements**

In 2019, after Bethel was declared ineligible for BOOST, the Maryland General Assembly expanded BOOST's nondiscrimination requirements, mandating participating schools to agree to not discriminate not only in student admissions but also in "retention[] or expulsion." 2019 Md. Laws ch. 565 at 151. In addition, the General Assembly required that schools agree not to discriminate against any student on the basis of "gender identity or expression." *Id*. After this change in the law, in January 2020, several months after this lawsuit was filed, Bethel re-applied for BOOST and related programs even though it knew that its policies on gender identity were in clear conflict with the new BOOST law.[4] Exhibit 29, Email and letter from Donna Gunning to Claire Dant, dated April 24, 2020; Ex. 7 at 112, 117-19.

Bethel's Parent/Student Handbook in effect at that time stated:

> ***Any conduct*** that is in violation of the school's Statement of Faith will be considered ***grounds for disciplinary action,*** including the expectation that ***BCA students identify with, dress in accordance with, and use the facilities associated with their biological gender.***

---

[4] The revised law also included a requirement that nonpublic schools applying for the Aid To Non-Public Schools program, which is also referred to as the "Textbook and Technology" program, submit their handbooks to MSDE for review to ensure compliance with program requirements. 2019 Md. Laws ch. 565 at 146-7. To qualify for the BOOST program, the school must first qualify for the Textbook and Technology program. 2019 Md. Laws ch. 565 at 149-50. The new nondiscrimination requirements appear in both the Textbook and BOOST sections of the law, but because the law now provides that MSDE will conduct the handbook review as part of the qualification process for the Textbook program, the BOOST Board no longer plays a role in determining compliance with the nondiscrimination requirements. *Id*. at 146-52.

Exhibit 30, Excerpt from Bethel Christian Academy 2019-20 Handbook, at 7 (emphasis in original).   Punishment for failing to abide by Bethel's requirement regarding gender identity and expression extends to off-campus conduct and can include "suspension or expulsion even for a first offense."   Ex. 30 at 7-8.   Despite this plainly discriminatory language, Bethel's principal, Claire Dant, signed assurances as part of Bethel's 2020 application for the Textbook and Technology program, that falsely stated that Bethel "does not discriminate in student admissions, retention, or expulsion or otherwise discriminate against any student on the basis of race, color, national origin, sexual orientation, or gender identity or expression."   Exhibit 31, Program Assurance signed by Claire Dant, dated January 17, 2020; Ex. 7 at 118:12-119:18.   Bethel's 2020 application was denied because it was not timely and its policies called for punishing students, including expulsion, based on gender identity and expression.  Ex. 29; Ex. 7, at 112:1-9, 117:12-21.

## ARGUMENT

### I.   LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, a district court "shall grant summary judgment" if the record, including the pleadings, affidavits, and depositions, "shows that there is no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Rule 56 mandates the entry of summary judgment where, after adequate time for discovery, the non-moving party fails to come forth with proof sufficient to establish an essential element of his claim upon which he will bear the burden of proof at trial.  *Feldman v. Law Enf't Assocs. Corp.*, 752 F.3d

339, 348 (4th Cir. 2014);  *Cray Commc'ns, Inc. v. Novatel Sys. Inc.*, 33 F.3d 390, 393 (4th Cir. 1994).

In order to survive a properly supported motion for summary judgment, the non-moving party must present evidence from which a reasonable fact finder could return a verdict in his favor.  *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984). The mere existence of some disputed fact does not require denial of the motion.  *Thompson Everett, Inc. v. National Cable Advert, L.P.*, 57 F.3d 1317, 1322 (4th Cir. 1995).  Rather, the disputed facts must be material to an issue necessary for resolution of the case and the quality and quantity of the evidence offered to create a question of fact must be adequate to support a verdict.  *Id.*; *FDIC v. Cashion*, 720 F.3d 169, 180 (4th Cir. 2013).

## II.   THE FIRST AMENDMENT PERMITS STATES TO PROTECT VULNERABLE GROUPS FROM DISCRIMINATION IN EDUCATION.

Shortly before Bethel filed this lawsuit, the Supreme Court reaffirmed that while "religious and philosophical objections are protected, it is a general rule that such objections do not allow . . . other actors in the economy and in society to deny protected persons equal access to goods and services under a neutral and generally applicable public accommodations law."  *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 138 S. Ct. 1719, 1727 (2018); *see also Hurley v. Irish-American Gay, Lesbian and Bisexual Grp. of Bos.*, 515 U.S. 557, 572 (1995) (nondiscrimination provisions "are well within the State's usual power to enact when a legislature has reason to believe that a given group is the target of discrimination, and they do not, as a general matter, violate the First or Fourteenth Amendments").

The undisputed facts do not justify departure from this rule. Bethel's assertions that its religious beliefs exempt it from Maryland's neutral nondiscrimination provisions are at odds with decades of jurisprudence.[5] Such nondiscrimination requirements are common. In its decision holding that programs like BOOST, which provide scholarships to students to attend private schools of their choice, did not violate the Establishment Clause, the Supreme Court expressly noted that a key element of the program was that "[p]articipating private schools must agree not to discriminate." *Zelman v. Simmons-Harris*, 536 U.S. 639, 645 (2002); *see also Norwood v. Harrison*, 413 U.S. 455, 470 (1973) (observing that "[i]nvidious private discrimination," even if characterized as conduct protected by the First Amendment, "has never been accorded affirmative constitutional protections"). Bethel's claim that it is somehow exempt under the First Amendment from this neutral law of general applicability because of its religious beliefs is a claim without legal foundation.

---

[5] The Supreme Court recently declined to revisit the analytical construct provided in *Masterpiece Cakeshop* and its progenitor, *Employment Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872 (1990), because it found that the City of Philadelphia had burdened the religious exercise of Catholic Charities Services ("CCS") "through policies that do not meet the requirement of being neutral and generally applicable." *Fulton v. City of Philadelphia*, ___ S. Ct. ___, 2021 WL 2459253 (June 17, 2021) at *4. In *Fulton*, the City had refused to contract with CCS for placement of foster children on the ground that CCS violated the City's nondiscrimination requirements when it would not certify same-sex married couples as foster parents. But the City's policy permitted the Commissioner of the Department of Human Services, in his/her sole discretion, to grant exceptions to the requirement that placement agencies not discriminate on the basis of sexual orientation. *Id.* at *5-6. Applying dicta in *Smith*, the Court held that, in light of a system for discretionary exceptions, the City could not refuse to extend the exception to cases of religious hardship without compelling reason. *Id.* at *6. No such exception is at play in this case, so the reasoning in *Fulton* does not apply.

Similarly, its claim that its discriminatory admissions policy constitutes speech protected by the Free Speech Clause also is without merit.

### A.   The Undisputed Facts Do Not Support Bethel's Free Exercise Claim.

Bethel's First Cause of Action asserts a claim under the Free Exercise Clause of the First Amendment.   Compl. ¶¶ 163-196.   Significantly, Bethel has conceded that the BOOST nondiscrimination requirement is a neutral law of general applicability that does not target Bethel for its religious beliefs.   ECF 17, at 19-20; *see Smith,* 494 U.S. at 879 (reasserting that there is nothing about "the right of free exercise" that "relieve[s] an individual of the obligation to comply with a valid and neutral law of general applicability").   Bethel nevertheless asserts that the BOOST Board applied this neutral provision "in a way evidencing religious targeting."   ECF 17, at 20.   To prevail on this theory, Bethel must demonstrate that the BOOST Board evinced "a clear and impermissible hostility toward . . . sincere religious beliefs" in the application of the nondiscrimination provision to Bethel.  *See Masterpiece Cakeshop*, 138 S. Ct. at 1729.   There is no evidence to support such a claim.

The facts involved in the Colorado Civil Rights Commission's adjudicatory treatment of Mr. Phillips, the cake-baker in *Masterpiece Cakeshop*, stand in stark contrast to the undisputed facts in this case.  138 S. Ct. 1729-30.  As an initial matter, *Masterpiece Cakeshop* involved the Colorado Civil Rights Commission's sanction of a baker for refusing to bake a custom wedding cake for a same sex couple, against his sincerely held religious beliefs, at a time such weddings were not legally recognized by the State of

Colorado. *Id.* at 1723-24. By contrast, this case involves Maryland's refusal to subsidize education at a school that maintains discriminatory educational admissions policies and thereby grant imprimatur to such policies.

In *Masterpiece Cakeshop*, multiple state actors made statements disparaging Mr. Phillips' beliefs. *Id.* at 1729-30. Although some of the statements the Court found to be "susceptible of different interpretations," *id.* at 1729 (businessman "cannot act on his religious beliefs 'if he decides to do business in the state'"; businessman "'needs to look at being able to compromise'" in order to do business in the state), other statements were actively hostile, comparing "Phillips' invocation of his sincerely held religious beliefs to defenses of slavery and the Holocaust," *id.* In this case, by contrast, Bethel has identified no statements made by any defendant that was derogatory toward the religious origin of its beliefs.

Bethel identifies three alleged statements by Matthew Gallagher, Chair of the BOOST Board, that Bethel contends demonstrate Mr. Gallagher "did not display appropriate neutrality as a decision-maker." Compl. ¶ 106. None of those statements demonstrate any hostility towards Bethel's religious beliefs; all three statements discuss only conduct that Mr. Gallagher perceived as discriminatory and do not comment on Bethel's beliefs at all. In the first statement, Mr. Gallagher expresses his opinion that Bethel signed an assurance "illegally." *Id.* at ¶ 107. The statement did not express any opinion as to the content of any belief that may or may not be held by Bethel, religious or otherwise, but did express an opinion about Bethel's conduct.

The second statement identified by Bethel was Mr. Gallagher's opinion that "he did not 'think the burden should be on the Board'" to prove whether or not an admissions policy was discriminatory. *Id.* at ¶ 108. Again, this statement said nothing about Bethel's beliefs and was an expression of Mr. Gallagher's opinion about the standard the Board should use to determine whether Bethel's policy complied with the nondiscrimination requirement.

Last, Bethel identifies a specific discussion of Bethel's admissions policy. Mr. Gallagher read part of Bethel's admissions policy and expressed his opinion that it was discriminatory against students based on their sexual orientation. After reading Bethel's statement of religious belief, Mr. Gallagher stated, "and here's where it becomes problematic," where the policy articulates that "students conduct is expected to align with this view." *Id.* at ¶ 110. Mr. Gallagher then explained that the policy "language affords them the opportunity to discriminate" against "a person who identifies as a different orientation from their birth." *Id.* Even accepting those allegations as true, Mr. Gallagher never characterized the religious basis of the policy as problematic. What was problematic was the discriminatory effect of the policy.

Bethel's contention that Mr. Gallagher's treatment of "the sexual orientation nondiscrimination requirement as encompassing gender identity," *id.* at ¶ 112, is evidence of hostility toward religion is incorrect. Courts have recognized that it is a "difficult question" to discern whether the harassment (and analogously, any discrimination) suffered by a complainant is "because of his homosexuality, his effeminacy, or both." *Prowel v. Wise Bus. Forms, Inc.*, 579 F.3d 285, 291 (3d Cir. 2009). State agencies are at

the forefront of enforcement of nondiscrimination requirements, which are largely a creature of state law. *See Hurley*, 515 U.S. at 571-72. Those agencies, like the Board, will be most often faced with the "difficult questions" presented by new areas of anti-discrimination legislation including whether or to what extent different forms of discrimination based on sex, sexual orientation, and gender identity overlap or do not overlap. Indeed, the Supreme Court recently held that sex discrimination as used in Title VII of the Civil Rights Act of 1964 includes discrimination based on sexual orientation and gender identity. *Bostock v. Clayton County*, 140 S. Ct. 1731, 1754 (2020).

Moreover, evidence of hostile treatment in *Masterpiece Cakeshop* was not limited to disparaging comments. Instead, the Court also found the Colorado Civil Rights Commission actually engaged in disparate treatment when it found "on at least three other occasions" that "the refusal of bakers to create cakes with images that conveyed disapproval of same-sex marriage, along with religious text" was permissible. *Masterpiece Cakeshop*, 138 S. Ct. at 1730.

Here, however, there is no evidence of any instance where another school was treated more favorably because of the secular nature or content of their beliefs. Although the initial discriminatory policy brought to the Board's attention involved a Christian school, MSDE reviewed the written policies of *all* schools, regardless of religious affiliation. Ex. 15 ¶ 10; Exhibit 32, Excerpts of Deposition of Monica Kearns at 40:15-41:12. During her deposition, Monica Kearns, the MSDE administrator under whose purview the BOOST program fell during the relevant time period, explained:

21

> [T]he big moment for me and my team was we, and I felt very strongly
> about this because there was a—there was a discussion about [the
> Trinity] handbook and [Trinity] school, but we can't consider this in
> isolation.  If this is being used to determine whether a school is eligible
> to participate, again, we have to treat all the schools the same. . . . [W]e
> need to look at all school handbooks. . . . [T]he big thing was handbook
> review across the board, everybody.

Ex. 32 at 40:15-41:12.   And, upon engaging in that review, MSDE applied the same standard to all of the schools' policies, regardless of the religious or non-religious affiliation of the school.  Ex. 15 ¶¶ 12-13.

In fact, Bethel's own complaint refutes the notion that it was treated differently than other schools based on its religious beliefs.  Bethel identifies three other schools it asserts "have similar beliefs and policies on marriage and sexual conduct," Broadfording Christian Academy, Grace Academy, and Woodstream Christian Academy.  Compl. ¶ 133.  Bethel then complains that two of those schools, which allegedly hold similar beliefs but whose *admissions policies* did not expressly exclude or threaten sanction to prospective students based on their sexual orientation, *see* ECF 1-11, 2-3, 5, were permitted to continue in the program.  Compl. ¶ 131.  Woodstream Christian Academy was, according to the complaint, deemed ineligible.  Compl. ¶ 132.  Woodstream Christian Academy's policy stated that "homosexuality" in addition to other "deviant behavior of a sexual nature" would "be grounds for expulsion."  ECF 1-11, 6.  The different treatment of these four schools is justified on the face of the pleadings—those schools with discriminatory policies were excluded, those schools whose policies were expressed neutrally with respect to the covered classes were permitted to participate, regardless of their similar beliefs.  The type

of Free Exercise claim at issue in *Masterpiece Cakeshop* has no application to the facts in this case.

The Supreme Court's holding that a state government may not "disqualify[]" religious organizations "from a public benefit solely because of their religious character," *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2021 (2017), also has no application to Bethel's claims. Here, there is no evidence that the BOOST Board took any action based on Bethel's "religious character." In *Comer*, the Court specified that "[t]he express discrimination against religious exercise here is not the denial of a grant, but rather the refusal to allow the Church—solely because it is a church—to compete with secular organizations for a grant." *Id.* at 2022. The undisputed facts do not demonstrate that Bethel was categorically excluded from the BOOST award approval process because it is a religiously affiliated school or even because it adheres to particular religious beliefs. Indeed, the undisputed facts demonstrate just the opposite.

The undisputed facts are completely devoid of the type of clear and impermissible hostility or express religious targeting that could constitute a violation of the Free Exercise Clause. Therefore, defendants are entitled to summary judgment on the First Cause of Action in the Complaint.

### B.    The Undisputed Facts Do Not Demonstrate a Violation of the Establishment Clause.

Defendants are entitled to summary judgment on Bethel's Sixth Cause of Action because the undisputed facts do not demonstrate a violation of the Establishment Clause. Nearly 20 years ago, the Supreme Court rejected an Establishment Clause challenge to the

23

type of private school voucher program embodied in BOOST. *Zelman*, 536 U.S. at 662-663.  The BOOST program, similar to the one upheld in *Zelman*, provides scholarship funds "to participating families on neutral terms, with no reference to religion." *Id.* at 653. The financial aid to qualifying students "'is allocated on the basis of neutral, secular criteria that neither favor nor disfavor religion, and is made available to both religious and secular beneficiaries on a nondiscriminatory basis.'" *Id.* at 653-54 (quoting *Agostini v. Felton*, 521 U.S. 203, 231 (1997)).

Notwithstanding this settled precedent, Bethel asserts that the defendants' enforcement of the BOOST law's nondiscrimination requirement violates the "excessive entanglement" prong of the three-part Establishment Clause test set forth in *Lemon v. Kurtzman*, 403 U. S. 602 (1971).  ECF 17 at 28.  To the contrary, the facts demonstrate that MSDE and the BOOST Board made no inquiry as to the sincerity of Bethel's, or any other school's, religious beliefs.  Ex. 15 ¶ 14.  They did not challenge whether Genesis 1:27 or Genesis 2:23-24 meant what Bethel said it meant or otherwise take issue with Bethel's interpretation of biblical scriptures.  Ex. 15 ¶ 14; *see United States v. Lee*, 455 U.S. 252, 257 (1982) (observing that "'[c]ourts are not arbiters of scriptural interpretation'" (citation omitted)).  They evaluated no curriculum or teacher performance.  Instead, they conducted an across-the-board review of all BOOST schools' policies to determine whether they were discriminatory.  Ex. 15 ¶¶ 10-15.  That the discriminatory policies may have been expressed in religious terms does not mean that review of those policies created an excessive entanglement between church and state.

24

Additionally, Bethel's isolation of the "excessive entanglement prong" from the *Lemon* test is incorrect.   "If the *Lemon* Court thought that its test would provide a framework for all future Establishment Clause decisions, its expectation has not been met." *American Legion v. American Humanist Ass'n*, 139 S. Ct. 2067, 2080 (2019) (Alito, J.). Instead, the Court applies specific precedent where available; here, *Bob Jones University* establishes that when a policy involving a government subsidy to private schools who wish to discriminate is at stake, it will be upheld if it "is founded on a neutral, secular basis." 461 U.S. at 604 (internal citation and quotation marks omitted).   Moreover, the Supreme Court never mentioned the nondiscrimination requirement at issue in the program examined in *Zelman* when it was considering whether scholarships given to students for use at sectarian schools could withstand the Establishment Clause.   536 U.S. at 645. Bethel's claim for violation of the Establishment Clause fails as a matter of law.   The defendants are entitled to summary judgment on Bethel's Sixth Cause of Action.

### C.   The Undisputed Facts Do Not Demonstrate a Violation of the Free Speech Clause Under Any Theory.

Bethel's First Amendment claims based on the Free Speech Clause and asserted in the Second Cause of Action fair no better.   The BOOST nondiscrimination requirements do not regulate speech, they regulate conduct.   Bethel's failure to demonstrate that the nondiscrimination requirements reach beyond conduct precludes any relief under the Free Speech Clause.

### 1. Requiring Bethel's Written Admissions Policy to Conform with the Nondiscrimination Requirement Is a Regulation of Conduct.

"'[I]t has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed.'" *Expressions Hair Design v. Schneiderman*, 137 S. Ct. 1144, 11551 (2017) (quoting *Rumsfeld v. Forum for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 62 (2006) [hereinafter "*FAIR*"]. When a government policy "aims at the *act* of rejecting would-be group members without reference to the reasons motivating that behavior," it is a "reasonable and viewpoint neutral" limit that does not impinge on free-speech or expressive-association rights. *Christian Legal Soc'y Chapter of the Univ. of Cal. Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 696-67 (2010).

The undisputed facts demonstrate that MSDE and the BOOST Board sought to avoid public funding of schools that discriminate in admissions. MSDE and the BOOST Board did not proscribe speech, but rather conduct:  discrimination in admissions. Discrimination in admissions is treating applicants who possess a disfavored orientation (homosexual) less favorably than similarly situated applicants who possess the favored orientation (heterosexual). *See Bostock*, 140 S. Ct. at 1740 (observing that discrimination today means roughly what it meant in 1964—disparate treatment). Discrimination can occur ad hoc or, as here, through discriminatory policies.

The fact that policies are expressed in words does not transform them into protected speech. A policy is "[a] standard course of action that has been officially established by

26

an organization . . . ."  Policy, Black's Law Dictionary (11th Ed. 2019).  Examining written

policies to investigate an organization's "standard course of action," *id.*, is a routine

enforcement step, and flows directly from the same principle that because legislatures may

"prohibit employers from discriminating in hiring on the basis of race," they also may

"require an employer to take down a sign reading 'White Applicants Only' . . . ." *FAIR*,

547 U.S. at 62.  That a statute requires removal or alteration of words evincing a policy

"hardly means that the law should be analyzed as one regulating . . . speech rather than

conduct."  *Id.*  An admissions policy that states students must conform their conduct to a

standard incompatible with the student's status as a member of a protected class in order

to gain admission *is* discrimination in admissions.

Defendants' focus on written policies was appropriate here given the genesis of the

complaint brought to the State's attention.  In response to a report that a participating school

had a written admissions policy that violated the BOOST law nondiscrimination

requirement, MSDE and the BOOST Board engaged in good faith efforts to determine

whether any other participating school maintained discriminatory policies.  Upon review,

the Board determined that Bethel's written admissions policy discriminated on the basis of

sexual orientation.  That determination was reasonable because the policy, on its face,

disfavored homosexual applicants.   Despite signing assurances that it would not

discriminate on the basis of sexual orientation, the nondiscrimination provision in Bethel's

admissions policy excluded sexual orientation.  Ex. 16 at 3.  And directly following the

nondiscrimination requirements, the admissions policy admonished: "It should be noted,

however, that Bethel Christian Academy supports the biblical view of marriage defined

as a covenant between one man and one woman, and that God immutably bestows gender upon each person at birth as male or female to reflect His image." Ex. 16 at 3. Although Bethel is a Kindergarten through 8th grade school, whose students cannot marry legally in Maryland, the admissions policy went on to state that "student conduct is expected to align with this view." Ex. 16 at 3. A reasonable interpretation of this provision is that it disfavored homosexual applicants and, in any event, the Board's determination, even if incorrect, does not give rise to a First Amendment violation.[6]

The Board's enforcement of the BOOST nondiscrimination requirement "neither limits what [BOOST] schools may say nor requires them to say anything." *FAIR*, 547 U.S. at 60. Bethel and any other school seeking to qualify for BOOST program eligibility remain free to "express whatever views they may have," *id.*, about groups covered by the nondiscrimination provision; the program's only requirement is that Bethel alter its conduct to cease excluding those groups from attending its school.

## 2. The BOOST Nondiscrimination Requirement Is a Permissible Condition on State Funding.

Bethel voluntarily applied to be designated eligible to receive state funding in the form of student BOOST scholarship funds. If an applicant for a government grant program

---

[6] If that interpretation was not reasonable, Bethel had a right under Maryland law to seek judicial review of the BOOST Board's decision under Maryland Rules, Title 7, subtitle 4, Administrative Mandamus, which provides for "judicial review of a quasi-judicial order or action of an administrative agency where review is not expressly authorized by law." Md. Rule 7-401(a). Bethel chose not to pursue this remedy, and its attempt to elevate their administrative law claim to one of constitutional dimensions, thereby bypassing applicable appeal deadlines, should be rejected.

objects that a condition of the funding "may affect the recipient's exercise of its First Amendment rights," generally "its recourse is to decline the funds." *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013) (*AOSI*). And, "government is not required to subsidize activities that it does not wish to promote." *Matal v. Tam*, 137 S. Ct. 1744, 1761 (2017). "[T]he Government may allocate competitive funding according to criteria that would be impermissible were direct regulation of speech or a criminal penalty at stake." *National Endowment for the Arts v. Finley*, 524 U.S. 569, 587-88 (1998). It is settled that even if a State has a "special interest in elevating the quality of education in both public and private schools," it need not grant aid to schools that discriminate, because although "the Constitution may compel toleration of private discrimination in some circumstances," it does not "require[] state support for such discrimination." *Norwood v. Harrison*, 413 U.S. 455, 463 (1973).

The condition upon funding that Bethel challenges in this case is that it refrain from a discriminatory admissions practice, not that it adopt any particular belief or message. Consequently, the BOOST nondiscrimination provision, and the application thereof, does not fall within the narrow exception to the government's discretion when making funding decisions that the Court articulated in *AOSI*. In *AOSI*, the challenged provision "mandate[d] that the recipients of . . . funds explicitly agree with the Government's policy to oppose prostitution and sex trafficking." *AOSI*, 570 U.S. at 213. In other words, the challenged provision told "'people what they must say.'" *Id.* (quoting *FAIR*, 547 U.S. at 61). The Supreme Court's cases draw a distinction between "conditions that define" the government funding program and "those that reach outside it," finding impermissible only

those conditions that reach outside the program to pose an undue burden on recipients' First Amendment expressive activity. *AOSI*, 570 U.S. at 217. But the nondiscrimination provision at issue here regulates only schools' conduct, and does not require them to say anything if their admissions policy, including in its written form, conforms to the requirement. Neither MSDE nor the BOOST Board have any interest in whether Bethel or any other school teaches, writes about, speaks, or takes out billboards expressing any religious or other belief.

Bethel's only allegation that its expressive activity was curtailed is its conclusory statement that "the BOOST nondiscrimination requirements condition Bethel's ability to participate in the BOOST program and receive BOOST funding on Bethel changing the language in its handbook about its religious beliefs." Compl. ¶¶ 219-222. But that statement must be reconciled with the letter sent by the BOOST Board and incorporated into Bethel's complaint, which clearly identified only the *admissions policy* language, not any other language in its handbook, including its Statement of Faith, which contains identical language. *Compare* ECF 1-9 *with* ECF 1-4 at 7, 8. The BOOST Program nondiscrimination requirements are "conditions that define" the program as one that provides funds to students to attend nonpublic schools that do not discriminate on the basis of sexual orientation, and now gender identity. These conditions leave Bethel free to express its religious beliefs in its preferred form, including on *the next page of their handbook*, as long as that speech does not amount to an actual denial of admissions, whether by outright rejection, expulsion post-admission, or deterring applications by conveying in the admissions policy that the enumerated classes are unwelcome to apply.

30

### 3. Ensuring State Funds Do Not Support Discrimination in Education Is a Compelling State Interest.

As explained above, the BOOST nondiscrimination requirements are viewpoint- and content-neutral because they only regulate conduct. Moreover, because of their focus on conduct, the requirements do not implicate the bar on unconstitutional conditions in government funding most recently set forth in *AOSI*. Therefore, there is no basis to apply any form of scrutiny more stringent than rational basis to the BOOST Board's actions. The BOOST Board's actions nevertheless are based in long-recognized compelling state interests to prevent discrimination in education.

The exclusion of persons based on particular traits such as sexual orientation "impose[s] stigma and injury of the kind prohibited by our basic charter." *Obergefell v. Hodges*, 576 U.S. 644, 671 (2015). "Stigma has 'a corrosive influence on health' and can impair a person's social relationships and self-esteem." Amicus Curiae Brief for States of Illinois *et al.* (including Maryland), *Bostock v. Clayton County*, Nos. 17-1618, 17-1623, 18-107 (U.S. July 3, 2019) at 8 (citation omitted); *see also Jaffee v. Redmond*, 518 U.S. 1, 11 (1996) ("The mental health of our citizenry, no less than its physical health, is a public good of transcendent importance.").

The State's goal of "eliminating discrimination and assuring its citizens equal access to publicly available goods and services," when "unrelated to the suppression of expression, plainly serves compelling state interests of the highest order." *Roberts v. United States Jaycees*, 468 U.S. 609, 624 (1984). These interests are heightened in the educational context; "[u]nder *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686,

98 L.Ed. 873 (1954), discriminatory treatment exerts a pervasive influence on the entire educational process." *Norwood*, 413 U.S. at 469.   The impact of exclusion from an educational institution "is greater when it has the sanction of the law," because state-sanctioned exclusion from educational opportunities can impose a "sense of inferiority" that "affects the motivation of a child to learn." *Brown v. Board of Educ.*, 347 U.S. 483, 494 (1954), *supplemented sub nom. Brown v. Board of Educ.*, 349 U.S. 294 (1955). Discrimination in admissions to nonpublic educational institutions "is not barred by the Constitution, nor does it invoke any sanction of laws, but neither can it call on the Constitution for material aid from the State." *Norwood*, 413 U.S. at 469.   The "unique evils" of discrimination transcend "the point of view such conduct may transmit," *Roberts*, 468 U.S. at 628, and the State has a compelling interest in minimizing stigmatic harms to classes it has identified have need of enhanced protection, *see Windsor*, 570 U.S. at 768; *cf. Fulton*, at *9 (recognizing that equal treatment of foster parents and foster children is a "weighty" interest because "'[o]ur society has come to the recognition that gay persons and gay couples cannot be treated as social outcasts or as inferior in dignity and worth,'" but that City's creation of exceptions undermined its contention that denial of exception for religious reasons furthered a compelling interest (quoting *Masterpiece Cakeshop*, 138 S. Ct. at 1727)).

## III.   DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON BETHEL'S THIRD CAUSE OF ACTION BECAUSE ITS VOID-FOR-VAGUENESS THEORY FAILS AS A MATTER OF LAW.

Bethel's Third Cause of Action asserts that the State violated its rights under the Fourteenth Amendment when the BOOST Board disqualified Bethel based on "vague,

subjective, and malleable standards that differed from the program budget language." Compl. ¶ 241. That claim fails as a matter of law for a number of reasons.

First, Bethel does not have "legitimate claim of entitlement" to BOOST scholarships for purposes of the Fourteenth Amendment. *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972). BOOST scholarships are awarded to "*students* who are eligible for the free or reduced-price lunch program," and who are ranked on the basis of financial need. 2016 Md. Laws ch. 143 at 130-35 (emphasis added). Those students then decide which nonpublic school to attend, and those schools in turn must meet testing, nondiscrimination, and reporting requirements to become BOOST eligible. *Id.* Here, Bethel's mere "unilateral expectation" that it is entitled to receive these students' scholarships is insufficient under the Fourteenth Amendment. *Roth*, 408 U.S. at 577. And, "no property interest is implicated by the nonrenewal of a contract or license where there is no entitlement to the renewal." *Richardson v. Town of Eastover*, 922 F.2d 1152, 1157 (4th Cir. 1991). BOOST contains no automatic renewal provisions; thus, there is no guarantee or entitlement to it.

Second, any Fourteenth Amendment claim Bethel asserts is "effectively 'subsumed'" into Bethel's more specific claims under the First Amendment. *Hunt Valley Baptist Church, Inc. v. Baltimore County*, No. CV ELH-17-804, 2017 WL 4801542, at *39 (D. Md. Oct. 24, 2017). (quoting *Doswell v. Smith*, 139 F.3d 888, at *6 (4th Cir. 1998) (table)). The First Amendment, not the Fourteenth, contains rights about freedom of religion and speech, which are the primary subject of Bethel's allegations.

Finally, the void-for-vagueness doctrine does not fit the facts of this case. The Supreme Court "has steadfastly applied the void for vagueness doctrine *only* to statutes or regulations that purport to *define the lawfulness of conduct or speech*." *Nyeholt v. Secretary*, 298 F.3d 1350, 1356 (Fed. Cir. 2002) (emphasis added) (rejecting void-for-vagueness challenge to statute defining eligibility for veterans' benefits); *see also Singhal v. Lee,* No. 1:12CV708, 2016 WL 1305294, at *1 (E.D. Va. Mar. 28, 2016) (rejecting void-for-vagueness challenge to U.S. patent statute); *Woodruff v. United States,* 954 F.2d 634 (11th Cir. 1992) (rejecting challenge to interpretive rule for agency in making benefit decisions). Put another way, the void-for-vagueness doctrine "relate[s] to prohibitions." *Nyeholt*, 298 F.3d at 1356. But BOOST is not a prohibition. As explained in argument section II.C.1 above, the law does not regulate speech, and the law does not prohibit conduct because no school is required "to adopt any rule, regulation, or policy that conflicts with its religious or moral teachings." 2016 Md. Laws ch. 143 at 130-35.

Moreover, Bethel's contention that the sexual-orientation and gender-identity nondiscrimination provisions in the BOOST law are vague is not supported by an examination of the BOOST law text. ECF No. 1, ¶¶ 232, 245. A statute is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Martin v. Lloyd*, 700 F.3d 132, 135 (4th Cir. 2012) (citations and internal quotation marks omitted). But the Court should seek "an interpretation which supports the constitutionality of legislation." *United States v. Nat'l Diary Prods. Corp.*, 372 U.S. 29, 32 (1963). Words in a challenged statute "must be read in their context and

with a view to their place in the overall statutory scheme." *Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 273 (4th Cir. 2019) (citation and internal quotation marks omitted).

The BOOST law provides "fair notice" about its nondiscrimination provisions. Although Bethel complains that the BOOST law does not define sexual orientation or gender identity, the State Government Article already defines these terms. *See* Md. Code, State Gov't, § 20-101(e) (LexisNexis 2014) (defining "gender identity"); (g) (defining "sexual orientation").

Bethel also feigns that the BOOST law does not define "discrimination," but that term has an established legal meaning. *See, e.g.*, "Discrimination," *Black's Law Dictionary* (11th ed. 2019) ("The effect of a law or established practice that confers privileges on a certain class or that denies privileges to a certain class because of" status as a member of that class); *see also United States v. Daley*, 378 F. Supp. 3d 539, 550, 550 n. 6, 7 (W.D. Va. 2019) (stating that statute is not void for vagueness when terms used have "settled legal meanings," citing to Black's Law Dictionary). Further, the BOOST nondiscrimination provisions incorporate by reference Title VI of the Civil Rights Act of 1964, as amended. *See* 42 U.S.C. § 2000d (defining discrimination to mean that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance"). Even if Bethel quibbles with these definitions, the case law recognizes that words in a statute cannot possibly be as precise as "mathematical symbols." *Boyce Motor Lines v. United States*, 342 U.S. 337, 340 (1952). This is because

"most statutes must deal with untold and unforeseen variations in factual situations," *id.*, and therefore only a "reasonable degree of certainty can be demanded" from the language of a statute, *id.*, especially a non-criminal statute like BOOST. *Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 498-98 (1982).

And looking beyond the statutory text, the facts establish that Bethel sufficiently understood the meaning of the BOOST nondiscrimination requirements.  Bethel was "aware that in order to participate in the BOOST program that they had to agree that [it] would not discriminate against students in admissions based on . . . sexual orientation." Ex. 7 at 80:12-17.  Bethel was also aware when it re-applied to the BOOST program that the BOOST law prohibited gender-identity discrimination.  Ex. 7 at 111:14-22.

Additionally, Bethel cannot persuasively argue that the BOOST law did not provide "fair notice" about its nondiscrimination provisions because it signed two written assurances—once before the Board removed it from BOOST and once after—stating that it does not discriminate on the basis of sexual orientation or gender identity.  Specifically, in 2017, and as a precondition to participate in BOOST, Bethel signed a written assurance declaring that it "does not discriminate in student admissions on the basis of . . . *sexual orientation.* Nothing herein shall require any school or institution to adopt any rule, regulation, or policy that conflicts with its religious or moral teachings. However, all participating schools must agree that they will not discriminate in student admissions on the basis of race . . . *sexual orientation*."  Ex. 6 at 2 (emphasis added); Ex. 7 at 84:3-20. Then in 2020, Bethel again signed an assurance stating that it "does not discriminate in student admissions, retention, or expulsion or otherwise discriminate against any student

on the basis of . . . *sexual orientation, or gender identity or expression*." Ex. 31 at 2 (emphasis added). Bethel did not equivocate or qualify its assurances that it does not discriminate; it never contended it did not understand the meaning of the terms in the written assurance or the BOOST law.

Bethel also cannot cogently argue that the terms sexual orientation and gender identity are incomprehensible because it incorporated its beliefs about these very same concepts into its student handbooks. Regarding sexual orientation, Bethel admonished prospective students in the nondiscrimination provisions of its admissions policy that Bethel "supports the biblical view of marriage defined as a covenant between one man and one woman." Ex. 16, at 3. And for gender identity or expression, Bethel declares in its admissions policy that "God immutably bestows gender upon each person at birth as male or female to reflect His image." *Id.* Further, the admissions policy requires "[f]aculty, staff, and students . . . to identify with, dress in accordance with, and use the facilities associated with their biological gender." Ex. 16 at 3. In another example of Bethel's understanding of sexual orientation and gender identity, the "Statement of Faith" section of the handbook states, "We believe that God created mankind in His image, male and female (Gen. 1:27, Gen. 5:2) and, according to His word, marriage is a sacred union between one man and one woman . . . condemning a homosexual lifestyle." Ex. 16 at 4.

In short, Bethel demonstrated that it knew what the terms "sexual orientation" and "gender identity" meant in the BOOST law because it emphasized its own beliefs about these concepts in its student handbooks. Consequently, Bethel had "fair notice" about the BOOST nondiscrimination requirements, and the defendants are entitled to summary

judgment over Bethel's claim that BOOST is unconstitutionally vague under the Fourteenth Amendment.

## IV.   THERE IS NO PARENTAL RIGHT TO GOVERNMENT FUNDING OF PRIVATE EDUCATIONAL CHOICES.

The defendants are entitled to summary judgment regarding Bethel's Fourth Cause of Action alleging a violation of the parental right to direct a child's education.  The Supreme Court has "held in several contexts that a legislature's decision *not* to subsidize the exercise of a fundamental right *does not* infringe the right, and thus is not subject to strict scrutiny." *Regan v. Taxation With Representation of Washington*, 461 U.S. 540, 549 (1983) (emphasis added).  The Seventh Circuit considered nonpublic school funding and the parental right to educate a child.  *St. Joan Antida High Sch. Inc. v. Milwaukee Pub. Sch. Dist.*, 919 F.3d 1003, 1008-09 (7th Cir. 2019).  That court of appeals decided that a public-school district's decision not to fund some transportation costs for nonpublic religious schools did not implicate a parental right to educate.  *Id.*  The Fourth Circuit has also rejected the contention that a county policy prohibiting homeschooling parents and all other private educational entities "from using [] community centers as private educational centers" unconstitutionally restricted parents' "decisions concerning the care, custody, and control of their children." *Goulart v. Meadows*, 345 F.3d 239, 260-61 (4th Cir. 2003).

Bethel in this case has not produced any evidence that the defendants attempted to "forc[e]" Bethel's students "into public schooling."  *St. Joan*, 919 F.3d at 1008 (citation and internal quotation marks omitted).  To the contrary, after reviewing approximately 176 handbooks of schools that participated in BOOST participating during the 2016-2017

school year, the defendants determined that only ten religious nonpublic schools did not comply with the BOOST nondiscrimination requirements, and the defendants later re-admitted six of these schools after they revised their student handbooks.  Ex. 19 ¶ 18; Ex. 33 at 8-9.

Because parents do not have a constitutional right to receive government subsidies for their children's nonpublic school education, the Court should grant summary judgment to the defendants regarding Bethel's Fourth Cause of Action.

## V.   THE STATE DEFENDANTS HAD A RATIONAL BASIS FOR BETHEL'S EXCLUSION FROM THE BOOST PROGRAM.

Finally, the defendants are entitled to summary judgment on Bethel's Fifth Cause of Action.  In that count, Bethel asserts a class-of-one equal protection claim alleging that it was treated differently than other similarly situated nonpublic sectarian schools with "similar beliefs and policies on marriage and sexual conduct."  Compl. ¶ 274.  Because the undisputed facts demonstrate that schools with like admissions policies were treated alike, defendants are entitled to judgment as a matter of law on this claim.

The undisputed facts demonstrate that the State had a rational basis for treating Bethel differently from other schools with similar beliefs or policies.  Upon receiving a report that Trinity Lutheran Chistian School maintained a written policy that discriminated on the basis of sexual orientation in violation of the BOOST law and the assurances the school had signed, MSDE conducted a review of written policies of all BOOST-participating schools to determine whether any other schools had discriminatory policies.  Ex. 15 ¶¶ 9-10; Ex. 19 ¶¶ 10-11.  In conducting this review, MSDE applied the same

standards to all of the schools' policies, regardless of religious or non-religious affiliation of the school.  Ex. 15 ¶ 12.  After conducting the review, MSDE staff identified a group of schools that had policy language that was potentially discriminatory and presented those schools to the Board for decision.  Ex. 19 ¶ 12.  After carefully reviewing the schools' policies, the Board determined that a number of schools, including Bethel, had discriminatory policies. Ex. 19 ¶¶ 13-14.  The Board gave those schools, including Bethel, the opportunity to revise their policies to bring them into compliance.  Ex. 19 ¶¶ 18-19.  Those schools that took advantage of that opportunity had their eligibility restored.  Ex. 19 ¶ 18.  Bethel declined to change its policies and, therefore, did not have its eligibility restored. Ex. 19 ¶ 19.

These facts demonstrate a rational basis for the Board's treatment of Bethel.  Even if the Board was wrong about what the BOOST law means or its assessment of facts applicable to Bethel's eligibility, "the agency's otherwise rational decision would still pass constitutional muster."  *XP Vehicles, Inc. v. Department of Energy*, 118 F. Supp. 3d 38, 76 (D.D.C. 2015).

## CONCLUSION

The defendants are entitled to summary judgment because the undisputed material facts do not support Bethel's claims under any of the theories it asserts in its complaint.

Respectfully submitted,

BRIAN E. FROSH
Attorney General of Maryland

40

/s/ Ann M. Sheridan
_____
ROBERT A. SCOTT (No. 24613)
ANN M. SHERIDAN (No. 11137)
JUSTIN E. FINE (No. 18731)
Assistant Attorneys General
200 St. Paul Place
Baltimore, Maryland 21202
asheridan@oag.state.md.us
410-576-6441
410-576-6955 (facsimile)

June 25, 2021                      Attorneys for Defendants