**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION**

BETHEL MINISTRIES, INC.,     )
       )
       )
       *Plaintiff,*     )
       )  Case No. 1:19-cv-01853-SAG
DR. KAREN B. SALMON, et al.     )
       )
       )
       *Defendants.*     )
—————————————————  )

**PLAINTIFF'S MEMORANDUM IN SUPPORT
OF CROSS-MOTION FOR SUMMARY JUDGMENT
AND RESPONSE IN OPPOSITION
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Table of Authorities ............................................................................................ iv

Introduction .......................................................................................................... 1

Statement of facts ................................................................................................ 2

Legal Standard ................................................................................................... 18

Argument ........................................................................................................... 18

    I.  Defendants violated Bethel's Free Exercise rights ....................................... 18

        A.    Defendants failed to act neutrally in enforcing the BOOST law. ....... 19

            1.    Defendants unconstitutionally targeted Christian schools and their beliefs ................................................................................. 20

            2.    Defendants showed impermissible hostility to Christian schools and their beliefs. .................................................................. 22

            3.    Defendants excluded Bethel because of its religious status. ........... 25

        B.    The BOOST nondiscrimination provision is not generally applicable. ........................................................................................ 26

        C.    Defendants' actions interfere with Bethel's internal affairs and religious autonomy. ..................................................................... 28

    II.  Defendants violated Bethel's Free Speech Rights. ...................................... 29

        A.    Defendants engaged in content-based discrimination. ....................... 30

        B.    Defendants engaged viewpoint-based in discrimination. ................... 30

        C.    Defendants imposed an unconstitutional condition on Bethel's receipt of BOOST funds. .............................................................. 31

    III. The BOOST Nondiscrimination Requirement Is Unconstitutionally Vague, Violating Bethel's Due Process Rights ................................................. 34

    IV. Defendants Violated Parents' Fourteenth Amendment Due Process Rights. .................................................................................................... 36

    V.  Defendants Violated Bethel's Right to Equal Protection of Laws ............... 37

    VI. Defendants religious favoritism violates the Establishment Clause .......... 39

    VII.    Defendants' Enforcement Fails Strict Scrutiny ...................................... 40

A.   Defendants have no compelling interest in excluding Bethel from BOOST............................................................................................ 40

B.   Defendants have not pursued their stated interest in the least restrictive means........................................................................... 41

Conclusion..................................................................................................... 42

Certificate of Service.................................................................................... 43

## TABLE OF AUTHORITIES

**Cases**

*Agency for International Development v. Alliance for Open Society International, Inc.,*
570 U.S. 205 (2013) ................................................................................. 31

*Americans for Prosperity Foundation v. Bonta,*
No. 19-251, 2021 WL 2690268 (U.S. July 1, 2021) ................................. 29

*Andy's Ice Cream, Inc. v. City of Salisbury,*
724 A.2d 717 (Md. Spec. App. 1999) ....................................................... 14

*Axson-Flynn v. Johnson,*
356 F.3d 1277 (10th Cir. 2004) ............................................................... 27

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) ................................................................................. 18

*Child Evangelism Fellowship of Maryland, Inc. v. Montgomery County Public Schools,*
457 F.3d 376 (4th Cir. 2006) ............................................................. 38, 39

*Christian Legal Society Chapter of the Univ. of California, Hastings College of the Law v. Martinez,*
561 U.S. 661 (2010) ............................................................................ 32, 33

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,*
508 U.S. 520 (1993) .......................................................................... passim

*City of Cleburne, Texas v. Cleburne Living Center,*
473 U.S. 432 (1985) ............................................................................ 37, 38

*Connally v. General Construction Co.,*
269 U.S. 385 (1926) ................................................................................. 34

*EEOC v. Roman Catholic Diocese of Raleigh, North Carolina,*
213 F.3d 795 (4th Cir. 2000) ................................................................... 28

*Employment Division, Department of Human Resources of Oregon v. Smith,*
494 U.S. 872 (1990) ............................................................................ 19, 26

*Espinoza v. Montana Department of Revenue,*
140 S. Ct. 2246 (2020) ..................................................................... passim

*Everson v. Board of Education of Ewing,*
330 U.S. 1 (1947) ..................................................................................... 25

*Fulton v. City of Philadelphia, Pennsylvania,*
141 S. Ct. 1868 (2021) ..................................................................... passim

*Gillette v. United States,*
401 U.S. 437 (1971) ................................................................................. 20

*Gonzales v. O Centro Espírita Beneficente União do Vegetal,*
   546 U.S. 418 (2006) ................................................................................ 40

*Grayned v. City of Rockford,*
   408 U.S. 104 (1972) ................................................................................ 34

*Hosanna–Tabor Evangelical Lutheran Church and School v. EEOC,*
   565 U.S. 171 (2012) ................................................................................ 28

*Jesus Christ is the Answer Ministries, Inc. v. Baltimore County, Maryland,*
   915 F.3d 256 (4th Cir. 2019) .................................................................. 14

*Larson v. Valente,*
   456 U.S. 228 (1982) ................................................................................ 39

*Legal Services Corp. v. Velazquez,*
   531 U.S. 533 (2001) ................................................................................ 33

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission,*
   138 S. Ct. 1719 (2018) ................................................................... passim

*National Association for Advancement of Colored People v. Button,*
   371 U.S. 415 (1963) ................................................................................ 29

*National Institute of Family & Life Advocates v. Becerra,*
   138 S. Ct. 2361 (2018) ..................................................................... 29, 30

*Obergefell v. Hodges,*
   576 U.S. 644 (2015) ....................................................... 2, 22, 23, 40

*Pierce v. Society of Sisters,*
   268 U.S. 510 (1925) ................................................................................ 37

*Plyler v. Doe,*
   457 U.S. 202 (1982) ................................................................................ 37

*Reed v. Town of Gilbert,*
   576 U.S. 155 (2015) ................................................................................ 30

*Roller v. Gunn,*
   107 F.3d 227 (4th Cir.1997) .................................................................. 38

*Roman Catholic Diocese of Brooklyn v. Cuomo,*
   141 S. Ct. 63 (2020) ........................................................................ passim

*Rosenberger v. Rector & Visitors of Univ. of Virginia,*
   515 U.S. 819 (1995) ..................................................................... 30, 31, 32

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*
   547 U.S. 47 (2006) ......................................................................... 33, 34

*Simon & Schuster, Inc. v. Members of New York State Crime Victims Board,*
   502 U.S. 105 (1991) ................................................................................ 32

*St. Joan Antida High School Inc. v. Milwaukee Public School District,*
  919 F.3d 1003 (7th Cir. 2019) ................................................................... 37

*Thomas v. Review Board of Indiana Employment Security Division,*
  450 U.S. 707 (1981) ...................................................................... 19, 21

*Trinity Lutheran Church of Columbia, Inc. v. Comer,*
  137 S. Ct. 2012 (2017) ............................................................. 19, 28, 40

*Turner Broadcasting Systems, Inc. v. FCC,*
  512 U.S. 622 (1994) ...................................................................... 30, 31

*Village of Willowbrook v. Olech,*
  528 U.S. 562 (2000) ............................................................................. 38

*Washington State Grange v. Washington State Republican Party,*
  552 U.S. 442 (2008) ............................................................................. 33

*Wisconsin v. Yoder,*
  406 U.S. 205 (1972) ...................................................................... 36, 37

*Wooley v. Maynard,*
  430 U.S. 705 (1977) ...................................................................... 29, 30

**Statutes**

42 U.S.C. § 2000d ...................................................................... 11, 27

MD GEN PROVIS §  3-301 ...................................................................... 14

**Other Authorities**

Fed. R. Civ. P. 56(a) ............................................................................. 18

## INTRODUCTION

Bethel Christian Academy serves underprivileged students. More than 90% of the school's student population are racial and ethnic minorities, whose families (many first and second-generation Americans) come from dozens of different nations. These students are precisely the children BOOST was created to help. But Defendants have shut the door on them for one reason: Bethel holds religious beliefs disfavored by Defendants.

Bethel included its beliefs about marriage and human sexuality in its handbook. As a result, Defendants kicked them out of the state's aid programs. But Bethel was not alone. State officials expelled other Christian schools too. In fact, they only kicked out Christian schools—and that's no coincidence. State officials rifled through the handbooks of private schools, one-by-one, individually targeting their language for approval or disapproval. Defendants looked for specific "triggers" that warranted extra scrutiny, including phrases like "biblical values," "Christian principles," "Christian parenting," "traditional family marriage," "Christ-centered environment" or even bare citations to Bible verses. And when Defendants found these or similar "triggers," they scrutinized the schools' handbooks further. Jewish, Muslim, or secular schools did not receive similar scrutiny. That's more targeting.

Defendants put the targeted schools to a choice: either "fix" or remove handbook language that Defendants did not like or be removed from the program. Most schools capitulated. But when Bethel declined to "fix" their religious beliefs, Defendants kicked them out of the program and demanded they return all funds spent educating their disadvantaged children. That's compelled speech.

Defendants' unconstitutional behavior caused severe, tangible harms. When Defendants kicked Bethel out of the BOOST scholarship program in August 2018, students who planned to use their scholarships at Bethel in the coming weeks had to find new schools—away from their friends and teachers at Bethel. Defendants'

actions harmed Bethel's reputation and Bethel's enrollment suffered. The loss of BOOST funds limited the financial assistance Bethel could offer other students. And Bethel was forced to forego replacing teachers and updating equipment. To make matters worse, Defendants demand that Bethel repay more than $100,000 in already-spent scholarship money.

All of this occurred under the guise of eliminating sexual orientation discrimination. But Defendants admit that they have never received complaints, allegations, or evidence of discrimination by Bethel or any school. And the BOOST law explicitly states that schools need not adopt policies that conflict with their religious or moral beliefs. However, because Bethel's handbook states the Christian school's unremarkable, "decent and honorable religious" beliefs that marriage is the union of a man and woman, *see Obergefell v. Hodges*, 576 U.S. 644, 672 (2015), and that people are created in the image and likeness of God as male or female, Defendants refused to believe Bethel's truthful assertions that they welcome all academically qualified children to their school. Defendants' conduct violates Bethel's rights under the First and Fourteenth Amendments to the United States Constitution. It also harms the parents who wish to have their children educated at Bethel. Bethel is entitled to summary judgment on its claims.[1]

## STATEMENT OF FACTS

### a. Bethel Christian Academy.

Bethel Ministries, Inc., an Assemblies of God church, operates a pre-kindergarten through eighth grade school, Bethel Christian Academy, as an exercise of its faith. Dant Decl. at ¶ 2. The school provides an excellent education to a diverse and underserved population, with many of the school's students eligible for the federal free and reduced school lunch program. Dant Decl. at ¶¶ 11–16.

---

[1] As explained below, Bethel is entitled to summary judgment on each of its claims. But if the Court finds for Bethel on any claim, it need not reach remaining claims.

Some parents choose Bethel because they share the school's religious beliefs and want their children to receive a religious formation; others choose Bethel for its excellent academics and rigorous curriculum. Dant Decl. at¶¶ 6, 8. But regardless of the reason, the school welcomes all academically qualified students, even if they do not share Bethel's religious beliefs. Ex. 1, Dant Depo. 68:12–15. Prospective students must simply pass the entrance exam. Dant Decl. at ¶ 10. Bethel has never refused admission to a prospective student or disciplined any student on the basis of sexual orientation, gender identity, or gender expression. Dant Decl. at ¶ 30. In fact, Bethel does not inquire into the sexual orientation of prospective students or their families. Dant Decl. at ¶ 29. It's irrelevant. Bethel therefore cannot say whether any current Bethel students or parents identify as LGBTQ. But those families certainly have been a part of the Bethel community. Ex. 2, Wecker Depo. at 93:6–9; 93:14–20, 96:20–97:2 (noting that the fact that one Bethel graduate was parented by two moms "wasn't a secret" and explaining that "We just love people, all people.").

Once admitted, students are expected to follow the school's policies and rules. Because Bethel is an elementary school and it considers romantic relationships inappropriate for children, students may not engage in public displays of affection and the school expects the children to keep their hands to themselves. Ex. 1, Dant Depo. 73:21–74:2, 76:10–12, 76:17–18; Ex. 3, Pl.'s Interrog. Ans. 7. And students must follow the school's dress code and wear the uniform items appropriate to their biological sex. Dant Decl. at ¶¶ 35, 36. All students, regardless of their sexual orientation, gender identity, or gender expression are expected to follow the school's policies. Dant Decl. at ¶ 31. And all students, regardless of their sexual orientation, gender identity, or gender expression, are welcome. Ex. 1, Dant Depo. 60:19–20, 121:10–11, 122:22–123:3.

### b.  The BOOST Program.

The BOOST law also created an advisory board appointed by the governor and legislative leaders. MSDE launched the program by simultaneously inviting families and schools to participate. Ex. 5, Kearns Depo. 23:3–12. Families filled out applications and selected their preferred schools from a list generated by MSDE officials. Ex. 5, Kearns Depo. 24:8–25:4. The list included schools that participated in the textbook procurement program. Ex. 6, Klarman Depo. 19:11–17. For schools, participating in the textbooks program is "the gateway" to participating in BOOST. *Id.* at 17:7–10. So once a student chose a school, MSDE notified the school and encouraged it to participate in BOOST. Ex. 5, Kearns Depo. 22:25–23:8, 24:10–18. If the school declined, the students had to choose a different school or forfeit their BOOST scholarship award. Ex. 64.

BOOST included a non-discrimination requirement in student admissions on the basis of race, color, national origin, or sexual orientation. *See* Ex. 4 (FY 2018 Budget Bill); Ex. 7 (annual BOOST law nondiscrimination language). The law also included a religious liberty provision stating "[n]othing herein shall require any school or institution to adopt any rule, regulation, or policy that conflicts with its religious or moral teachings." Exs. 4, 7. The BOOST law did not require schools to add affirmative language to their handbooks stating that they do not discriminate. *Id.* Harbison Depo. at 63:10; Kearns Depo. 67:11. Eberhart 55:9.

The BOOST Board chair acknowledged that the budget bill's "non-discrimination provisions are in conflict with the religious freedom provisions." *See* Ex. 8 (Gallagher email calling the BOOST law "an area ripe for legal challenge."). Monica Kearns, who supervised the employees making judgment calls on handbooks, also described the statute's language as "vague," and "pretty difficult to reconcile certain pieces even within itself." Ex. 5, Kearns Depo. at 21:6–10, 86:15–17.

Copying the textbooks programs, MSDE staff required schools' administrators to sign assurances verifying they did not discriminate and met the program's other

requirements. Ex. 5, Kearns Depo. 41:17–42:5; Ex. 9, Eberhart Depo. 19:8–12. Schools were not initially required to have handbooks or to adopt particular nondiscrimination language to participate. Ex. 5, Kearns Depo. 67:7–11; Ex. 9, Eberhart Depo. 55:4–9. In fact, neither the law nor the BOOST Board have ever adopted a policy that schools' handbooks must affirmatively state they do not discriminate on protected bases. Ex. 7; Ex. 10, Harbinson Depo. at 63:6–10; Ex. 5, Kearns Depo. 67:7–11; Ex. 9, Eberhart Depo. 55:4–9, 57:14–58:1.

Bethel's students are those the BOOST program was created to help. And because Bethel met the requirements, it signed the assurance and began accepting BOOST students. In the 2016–17 school year, 18 BOOST students chose Bethel and 22 students chose to attend Bethel in 2017–18. Dant Decl. at ¶ 20.

### c. The Maryland PTA lodges its complaint.

The BOOST Board and MSDE have never received any report or complaint that any BOOST-participating school discriminated against a student because of their sexual orientation. Ex. 11, Defs.' Admis. No. 10; Ex. 12.[2] In the fall of 2017, however, the Maryland PTA's Vice President for Legislation, Marla Posey-Moss, lodged a complaint with the MSDE against Trinity Lutheran School in Joppa, Maryland. Posey-Moss's communication alleged that Trinity Lutheran had a discriminatory admissions policy. Ex. 14; *see also* Ex. 14. Interestingly, the Maryland PTA lobbies against programs like BOOST. The 2016 Maryland PTA legislative agenda, which prominently features Posey-Moss, explained that the "Maryland PTA opposes using public funds to support private and religiously-based schools via appropriations, vouchers, scholarships, or tax credits." Ex. 15.

---

[2] Defendants also admit that they have not received complaints or allegations that a BOOST school ever discriminated against a student on the basis of either gender identity or expression. Ex. 11, Defs.' Admis. Nos. 17, 18.

Trinity Lutheran's handbook explained that "the school reserve[d] the right, within its sole discretion, to refuse admission of an applicant or to discontinue enrollment of student" for homosexuality based on the school's biblical lifestyle requirement. Ex. 16. The BOOST Board decided to remove Trinity Lutheran School from the program due to this handbook language during an October 11, 2017, meeting. Ex. 17; Ex. 18.

### d. Defendants launch an inquisition into school handbooks.

After the BOOST Board meeting, Textbook Program Coordinator Jamie Klarman and BOOST Program Coordinator Felicia Wise concluded that "if there's one, there may be more" schools with handbook language similar to Trinity. Ex. 6, Klarman Depo. 24:15–19, 25:3–5. Without direction from superiors, and without any guiding standards or policies, they searched the internet for other BOOST schools' handbooks and reviewed them. Ex. 6, Klarman Depo. 26:1–12, 28:14–16; Ex. 19, Wise Depo. 34:1–8. When they found handbook or website language that they deemed problematic, they notified Kearns. Ex. 19, Wise Depo. 31:11–16.

Wise and Klarman began a review of the school handbooks in late 2017. Ex. 20. MSDE staff pulled handbooks off school websites without notifying them. Ex. 6, Klarman Depo. 28:15–18; Ex. 20. For those schools that did not post handbooks online, Defendants sent out a letter requesting a copy. Ex. 21. For schools without handbooks, MSDE requested they provide a written copy of the schools' admissions policies. Ex. 21.

### e. Defendants' handbook review targets Christian schools.

Wise and Klarman performed an initial review of the handbooks, splitting the list alphabetically. Ex. 5, Kearns Depo 34:20–35:4, 46:14–19; Ex. 19, Wise Depo. 28:12–13, 36:18–21. Because they were business services staff, Kearns did not believe it was fair that she and her subordinates were saddled with the responsibility of making school eligibility determinations. Ex. 5, Kearns Depo. 47:5, 47:14–48:8. Yet

these MSDE staffers were the final decision-makers for the vast majority of BOOST schools, as no school received further scrutiny unless flagged by these individuals. Ex. 22, Gallagher Depo. 161:4–15; Ex. 9, Eberhart Depo. at 45:10–17; Ex. 6, Klarman Depo. 65:18–66:1.

Wise, Klarman and Kearns were given no guidance on how to conduct their handbook reviews. Ex. 6, Klarman Depo. 48:8–19; Ex. 19, Wise Depo. 33:12–18. So they focused on certain sections in the handbooks, and searched for language similar to Trinity Lutheran's. Ex. 5, Kearns Depo. 50:19–25; Ex. 19, Wise Depo 34:1–8. MSDE staff reviewed digital copies of handbooks and used the "find" function along with key terms. Ex. 5, Kearns Depo. 50:19–25, 51:24 ("Yup, control F"). As Wise explained, some of these terms acted as "triggers" that warranted further scrutiny. Ex. 19, Wise Depo. 15:2, 38:13–39:10. Incredibly, the staff members' "triggering" terms included phrases like "Christian principles," "biblical values," "Christ-centered approach" "Christ-centered environment" "traditional family marriage," or even citations to Bible verses. Ex. 23; Ex. 19, Wise Depo. 38:17, 39:2–10, 98:17–20; Ex. 6, Klarman Depo. 56:17–19, 57:7–9, 59:7, 85:20–21.

 Of the approximately 180 participating BOOST schools, only about 20 schools' handbooks were flagged for further scrutiny—all of them Christian schools. Ex. 11, Defs.' Admis. No. 2. *See* Ex. 24; Ex. 20; Ex. 19, Wise Depo. 45:12–17. No Jewish, Muslim, or secular private schools were included. Ex. 11, Defs.' Admis. Nos. 5, 6, 7; Ex. 19, Wise Depo. 48:1–4. And even though the BOOST law only prohibited discrimination in admissions, MSDE staff flagged handbooks of Christian schools that included student conduct expectations regarding sexual activity. Ex. 6, Klarman Depo. 65:6-10. If MSDE staff did not flag a handbook, it was never reviewed by the Attorney General's office or the BOOST Board and the schools were allowed to participate. Ex. 5, Kearns Depo. 64:2–4; Ex. 9, Eberhart Depo. 45:10–17; Ex. 6,

Klarman Depo. 65:18–66:1; Ex. 19, Wise Depo. 26:10–11. MSDE never investigated practices outside of handbook language. Ex. 5, Kearns Depo. 112:20–24.

### f. MSDE officials seek help on "questionable" handbooks.

Wise and Klarman provided Kearns with copies of handbook language they deemed "problematic," and only forwarded those flagged handbooks to her. Ex. 19, Wise Depo. 31:11–16, 37:11–18; Ex. 6, Klarman Depo. 65:18–66:1. And sometimes Wise and Klarman would disagree about whether a school's handbook language was problematic. Ex. 6, Klarman Depo. 48:16–19.

Kearns then collected portions of the problematic handbooks and sent them to the Attorney General's office for review. Ex. 5, Kearns Depo 47:14–19, 54:21–55:2. *See* Ex. 25. If the Attorney General's office deemed the handbooks compliant, the process ended, and the school was allowed to participate in BOOST. *See* Ex. 26; Ex. 26. If the Attorney General's office deemed a handbook noncompliant or questionable, Defendants asked for follow-up information and ultimately referred the handbook to the BOOST Board. Ex. 22, Gallagher Depo. 76:1–8.

The BOOST Board never reviewed entire handbooks but were only given handbook snippets by MSDE staff. Ex. 11, Defs.' Admis. No. 4; Ex. 27, Green Depo. 17:17–18; Ex. 10, Harbinson Depo. at 68:2–12; Ex. 25. And the BOOST Board only reviewed the handbook portions referred to them by MSDE. Ex. 27, Green Depo. 17:19–18:3; Ex. 5, Kearns Depo. 64:2–4; Ex. 28, Sanders Depo. 37:1–5, 37:12–16, 47:14–15.

After the MSDE staff performed their handbook review of all BOOST schools, the Attorney General's office produced a legal guidance memorandum to Chairman Gallagher and Monica Kearns. Ex. 5, Kearns Depo 88:4–5. *See* Ex. 29. The January 9, 2018, memorandum responded to MSDE's questions about whether particular school handbooks violated the BOOST law. Ex. 5, Kearns Depo 86:7–19. And based on the samples provided by MSDE staff, the Attorney General's office grouped schools

into three categories. *Id.* at 86:23–87:6. The first two categories included schools that the Attorney General's office deemed "facially discriminatory." Ex. 29 at 2. Those schools either explicitly reserved the right to discriminate based on sexual orientation (Category 1) or reserved the right to refuse admission based on "sexual misconduct" (Category 2). *Id.* The third category included schools whose handbooks "do not mention sexual orientation," but that "require students and parents to adhere to religious principles." *Id.* MSDE staff placed Bethel's handbook in Category 3. Ex. 19, Wise Depo. 42:16–20, 95:3–16; Ex. 30; Ex. 31. According to the Memo, Category 3 schools only needed to sign the assurances to comply with the BOOST law. Ex. 29 at 2.

### g. MSDE's letters to schools demonstrate hostility toward and targeting of Christian schools.

Monica Kearns sent letters to the BOOST schools whose handbooks were flagged to obtain more information. Ex. 23; Ex. 5, Kearns Depo. 70:25–71:1 ("the letters show what—how we carried on."). All of the schools were Christian schools. Ex. 11. Defs.' Admis. No. 2; Ex. 23. The letters included scanned portions of the schools' handbooks that MSDE found "problematic," with highlights identifying specific language at issue. Ex. 23; Ex. 6, Klarman Depo 48:20–49:11, 56:2–9, 93:20–94:2; Ex. 19, Wise Depo. 54:4–21, 56:6–9, 61:3–10. Kearns asked the schools to explain how their handbooks were consistent with the signed assurances. Ex. 23.

The language Defendants highlighted in the letters shows religious targeting and hostility. Defendants scrutinized Christian school handbooks that mentioned biblical morality generally, even though sexuality was not specifically addressed. *See* Ex. 23 at 5 (Letter to Cathedral Christian Academy identifying as problematic "We will provide our child with the educational and spiritual support he/she requires by exemplifying Christian parenting, and the sharing of Scripture and prayer with him/her, and support/encourage the school's efforts to teach and cultivate Biblical

9

values and lifestyles."); Ex. 23 at 7–8 (Letter to Elvaton Christian Academy highlighting "We believe that the entire Bible, all 66 books of the combined Old and New Testaments are verbally inspired by God and are inerrant in the original writings. . ." and ". . . we also believe that God has given the parents and the home the responsibility to bring up their children in the nurture and admonition of the Lord (Eph. 6:4; Prov. 22:6).").

Defendants also scrutinized schools that included the phrase "Christian principles" in their handbooks. Ex. 23 at 15 (Letter to St. Joseph's Regional Catholic School flagging "Students seeking admission to Catholic schools for reasons that violate Christian principles will not be admitted"); Ex. 23 at 17 (Letter to St. Louis School highlighting similar language); Ex. 23 at 19 (Letter to St. Margaret School questioning "The school reserves the right to deny attendance to anyone whose behavior is contrary to the teachings and ideals of the school[.]").

But that wasn't all. Defendants scrutinized Christian schools for mentioning their teachings on sexuality in contexts that did not discuss homosexuality. *See* Ex. 23 at 1 ("engaging in sexual activity inconsistent with Scriptural teaching"). And they questioned Christian schools whose handbooks prohibited sexual harassment and other improper sexual conduct. *See* Ex. 23 at 13.

### h. Defendants advise some schools to "fix" their handbooks.

MSDE staff sent the January 2018 legal guidance memorandum to some (but not all) BOOST schools which included Defendants' interpretation of the BOOST law and to "fix" their handbook language. Ex. 6, Klarman Depo 151:3–5; Ex. 19, Wise Depo. 48:21–49:6, 89:4–21. *See* Exs. 32, 33. *See also* Ex. 31; Ex. 5, Kearns Depo 95:4–25, 108:10–17, 109:5–8. They needed permission from the Office of the Attorney General before they shared it. Ex. 5, Kearns Depo at 92:2–3. But they never provided Bethel a copy. Dant Decl. at ¶ 39. Several BOOST schools though did "fix" their handbook language by eliminating or changing the portions Defendants deemed

10

problematic. Ex. 19, Wise Depo. 48:21–49:6, 51:6–9; Ex. 5, Kearns Depo 56:22–23. *See* Ex. 25 (examples of handbook changes).

### i. Defendants scrutinize Bethel's religious beliefs on marriage and human sexuality.

The Bible inspires every aspect of Bethel's program and the school handbook reflects this by providing the scriptural bases for policies and procedures. *See* Ex. 34; Dant Decl. at ¶ 5. Bethel's handbook includes its beliefs on marriage and human sexuality and, "because [they] accept students from anywhere and have open enrollment," Bethel thought it was "a good thing" to provide "clarity regarding who we are and what we expect." Ex. 1, Dant Depo. 69:9–11.

MSDE flagged Bethel's handbook because it includes the school's biblical marriage statement, its religious belief that people are created male and female in the image and likeness of God, and citations to the book of Genesis that provided the religious basis for its beliefs. Ex. 19, Wise Depo. 56:21–57:8; Ex. 5, Kearns Depo. 67:5–6 ("this is talking about a covenant between one man and one woman."); Ex. 1, Dant Depo. at 69:3–14; *see* Ex. 23 at 3; *see also* Ex. 34 at 7.

Defendants' March 5, 2018, letter to Bethel asked it to "explain how your handbook statement reconciles with the assurance the school signed regarding non-discrimination in admissions." Ex. 23 at 4. The letter highlighted Bethel's religious beliefs about marriage and sexuality. *Id.* at 3. But the letter did not highlight Bethel's statement of nondiscrimination, which, as it has for decades, listed Title VI's protected classes. *Id; see also* 42 U.S.C. § 2000d; Ex. 1, Dant Depo. at 59:19–60:1. MSDE staff were aware that schools' handbooks might only list the Title VI classes and that "the omission of those words related to the new law was acceptable in the handbook." Ex. 6, Klarman Depo. 103:20–104:14.

11

### j.   Bethel explains its policies to Defendants.

On March 13, 2018, Bethel responded that its policies only applied to the conduct of enrolled students, not any prospective students. Ex. 35. And Bethel made clear that its students, all in elementary school, are "expected to comply with behavior expectations . . . including [not] engaging in sexual behavior of any type, whether heterosexual or homosexual." Ex. 35.[3]

In April 2018, only 3 of the 20 Christian schools scrutinized by Defendants remained undecided, including Bethel. Ex. 26; Ex. 36 at 2. The other schools had either been deemed in violation of the program or cleared by the Attorney General's office. Exs. 24, 27. On May 1, 2018, the Attorney General's office updated their legal guidance memo and sent it to Kearns and the BOOST Board. Ex. 37. Although they were previously allowed to share the Attorney General's guidance with BOOST schools, MSDE staff were told not to share the updated memo. *See* Ex. 37. Ex. 19, Wise Depo. 110:4-112:10.

At its May 3, 2018, meeting, the Board's chair, Matthew Gallagher, described Bethel's and other schools' policies as discriminatory and stated that the schools signed their assurances illegally. Ex. 38, May 3 Meeting Transcript; *See* 2018.05.03 BOOST        Advisory        Meeting        Video,        available        at https://vimeo.com/368387715/85b45d8b3b (last visited July 9, 2021). Another board member considered recusing herself because of her opposition to another "very conservative" school's policies, but did not do so. Ex. 39, Camp Depo. at 69:4–7, 67:15–18. Ultimately, the BOOST Board determined that it wanted more information from Bethel and other schools before proceeding to vote. Ex. 36.

On May 25, 2018, Kearns told Bethel that the BOOST Board was dissatisfied with the school's March 13 response, and asked two questions: "1) Does your school

---

[3] At the time Bethel was expelled, the BOOST nondiscrimination provision did not include gender identity or gender expression.

discriminate in student admissions on the basis of sexual orientation?" Ex. 40. And
"2) If your school was to discover that one of its students was in violation of the
school's religious or moral teachings concerning sexual orientation, what would the
school do to address it?" *Id.* As to the first, Bethel explained that "[a]ny student who
can meet our academic standards and is likely to thrive in our structured
environment is welcome to join our school community regardless of religious beliefs,
experience of same-sex attraction, sexual self-identification, past participation in
same-sex behavior, beliefs about marriage, or beliefs about sexual morality." Ex. 41.
As to the second, Bethel stated it does <u>not</u> expel a student based on sexual orientation.
Instead, all students, heterosexual and homosexual alike, are expected to not
"engag[e] in sexual behavior of any type." Ex. 41. Remember, Bethel is an elementary
school. And Bethel also explained that when students violate the school's rules, it
hopes to restore and reconcile them with the school community, an approach Bethel
believes is mandated by the Bible. Ex. 41.[4]

### k. The BOOST Board determines Bethel's fate.

On June 4, 2018, the Supreme Court held in *Masterpiece Cakeshop, Ltd. v.
Colorado Civil Rights Commission*, that members of the Colorado Civil Rights
Commission violated the Free Exercise clause when—in the course of enforcing a
state nondiscrimination law—they displayed hostility toward Jack Phillips' Christian
beliefs about marriage and sexuality. 138 S. Ct. 1719, 1720 (2018). Later that day,
the BOOST Board met, but decided that they needed to look at the school's handbook
again. Ex. 27, Green Depo. 23:8–10.

On June 18, 2018, the Attorney General's office provided the Board with a new
legal memorandum. Three days later, the Board met again, "received new legal advice

---

[4] Discovery has demonstrated, for example, that no Bethel students have been
expelled for any reason since Bethel participated in BOOST. Ex. 3, Pl.'s Interrog.
Ans. No. 3.

and determined that Bethel Christian and Woodstream are ineligible." Ex. 36 at 2; Ex. 42. The decision came without debate and after the Board emerged from an unprecedented, 30-minute closed session. Ex 43; Ex. 43 at 49:22–54:16. The board deliberated Bethel's fate during the closed session.[5] Ex. 10, Harbinson Depo. 111:14–16.

Defendants notified Bethel of its decision to remove them from BOOST in an August 8, 2018, letter. Ex. 44. The letter stated that Bethel's religious beliefs that "marriage [is] a covenant between one man and one woman" and that "God immutably bestows gender upon each person at birth as male or female to reflect his image" along with Bethel's student conduct expectations conflicted with the law. *Id.* Defendants' letter did not say their handbook was discriminatory because their nondiscrimination statement did not enumerate "sexual orientation" as a protected class. *Id.*

### l. Defendants claw back spent scholarship funds.

The BOOST Board never awards all of its appropriated scholarship funding. Unused funds roll-over to the next year, but Defendants nonetheless pursued a "clawback" of the $102,600 in scholarship money Bethel received. Ex. 27, Green Depo. 52:20–21; Ex. 45. Later, BOOST Program Executive Director Donna Gunning informed Bethel that it could potentially regain eligibility if it, like other schools, changed its handbook language. Ex. 46. In response, Bethel requested examples of

---

[5] This deliberation was in violation of the Maryland Open Meetings Act, which mandates that all actions of a public body occur in open meeting, unless otherwise excepted. MD GEN PROVIS § 3-301. The Open Meetings Act confers a right to observe deliberative process and decision-making by public bodies at open meetings—this applies "to all deliberations preceding the actual act that ratifies or effectuates the public body's intent." *Andy's Ice Cream, Inc. v. City of Salisbury*, 724 A.2d 717 (Md. Spec. App. 1999), *cert. denied* 727 A.2d 382 (Md. 1999). Irregularities in the decision-making process are highly probative of discriminatory motives. *Jesus Christ is the Answer Ministries, Inc. v. Balt. Cty., Md.*, 915 F.3d 256, 263–64 (4th Cir. 2019) (as amended)

handbook changes schools made to regain eligibility. Ex. 21 at 3. Gunning provided an updated copy of examples. *Id.* at 1; Ex. 25. But Bethel declined the State's offer to hide their religious beliefs in exchange for re-entry into the program.

### m. Defendants' discrimination harms Bethel.

Defendants harmed Bethel when they expelled it from the programs. Most significantly, Bethel's expulsion harmed the children who attended the school. Nine BOOST students were forced to leave Bethel because the school lost BOOST funding. Dant Decl. at ¶ 21. Bethel provides a significant amount of aid to families in need to minimize the amount they have to pay out of pocket. Ex. 2, Wecker Depo. 114:11–13. Losing BOOST shrunk Bethel's scholarship pool, which meant the school could not provide aid to other students. *Id.* at 114:14–16, 115:10–13. Additionally, prospective students could not afford to attend Bethel without BOOST funds. Dant Decl. at ¶ 23. Since Bethel lost BOOST, its enrollment has declined from 329 students in 2017–18 to 251 in 2019–20. *See* October 25, 2019 Dant Declaration, ECF 19-3 at 43.

Defendants' discrimination also harmed Bethel in other ways. First, Defendants demand Bethel repay $102,600 in scholarship funds. Bethel also could not fill vacant teaching positions or update the school's equipment or facilities. Dant Decl. at ¶ 24. And Defendants falsely branded Bethel as discriminatory in the news media. *See* Ex. 47 (Gallagher email summarizing discussions with Baltimore Sun Reporter); *see also* Ex. 48 ("Looks like you have been working behind the scenes to get this editorial printed. Says everything that is needed to be said. Thanks"). Dant Decl. at ¶ 25.

### n. Gender identity and gender expression classes are added to BOOST's nondiscrimination requirement.

Maryland added gender identity and gender expression to the nondiscrimination requirements beginning in the 2018–19 school year, but the BOOST law did not define these terms and the Defendants themselves are unable to

15

define them. Ex. 7; Ex. 27, Green Depo. 28:20–29:5; *see e.g.* Ex. 49, Grasmick Depo. 44:18–45:12 (conflating sexual orientation with gender identity); Ex. 27, Green Depo. 43:21–44:10 (does not understand line between identity and expression). *See also* Ex. 38, May 3 Meeting Transcript (BOOST members and MSDE attorney confused). In Fiscal Year 2019–20, Maryland expanded the nondiscrimination requirement from only admissions to include "retention, expulsion, or otherwise discriminate." Ex. 7; Ex. 27, Green Depo. 29:6–10.

MSDE's representative (the MSDE official who administers the programs) cannot define either "gender identity" or "gender expression"—and has not given the issue "much thought." Ex. 50, Gunning Depo. 40:11-17, 43:1–11. Nor can she explain how schools would discriminate on those bases. *Id.* at 40:19–41:4. She never received any guidance explaining how to enforce the gender identity or gender expression nondiscrimination requirements. *Id.* at 42:7–13. And she explained that the MSDE has no policy on whether schools' enforcement of their sex-specific uniform requirements would violate those requirements. *Id.* at 41:18–42:6. She does not know whether the gender identity and expression nondiscrimination requirements mean that schools cannot require their students to follow sex-specific dress codes or use restroom facilities appropriate to their sex. *Id.* at 118:4–16, 120:18–121:8. Instead, she explained that her staff "use their professional judgment." *Id.* at 35:6–12, 97:17–19; Ex. 51 (notice of 30(b)(6) deposition).

And BOOST schools have been confused about what the law requires, with many asking for clarification. *See* Ex. 52 at 3; Ex. 53 at 39. But despite these requests, Defendants have never provided any guidance. Ex. 50, Gunning Depo. 58:7–21, 57:11–13 (MSDE never responds to schools' requests for explanation).

**o. Defendants continue to exclude Bethel from the programs.**

Since Defendants expelled Bethel from their programs, the process to participate has changed. Handbooks—now required—are initially reviewed for

16

compliance by Klarman. Ex. 50, Gunning Depo. 21:5–17. Klarman makes eligibility decisions for most schools, despite having received no training on how to conduct his review. Ex. 6, Klarman Depo. 122:8–13; Ex. 50, Gunning Depo. 34:17–20. Further, MSDE has no written process on how to deal with "questionable" handbooks. Ex. 6, Klarman Depo. 123:2–4. Instead, most handbooks do not receive any scrutiny if Klarman is satisfied with his review. Ex. 50, Gunning Depo. 21:18–20, 22:7–10. But Bethel had no such luck. Bethel reapplied for Defendants' programs but was denied because its handbook included the "same language that was of concern" before. Ex. 54 at 4; Ex. 6, Klarman Depo. 119:18–120:4.

Klarman then forwarded Bethel's handbook to the now-defunct Compliance Monitoring Group, which reviewed Bethel's handbook and suggested that "Bethel Christian Academy appears to be in conflict" with multiple program requirements.[6] Ex. 50, Gunning Depo. 22:8–11, 24:14–21, 70:6–11; Ex. 55. They identified Bethel's religious beliefs about marriage and human sexuality—including their scriptural bases—as "statements of concern." Ex. 55; Ex. 50, Gunning Depo. 70:16–71:3. When asked why MSDE flagged Bethel's scripture references, MSDE's corporate representative explained "whoever reviewed this felt that it was questionable . . . they had concerns about the potential discriminatory nature of the language and they felt it needed further review." Ex. 50, Gunning Depo. 71:4–14.

MSDE notified Bethel on April 24, 2020, that its reapplication for the programs was denied because "the Attorney General's Office [ ] found the language to be discriminatory" on the basis of gender identity and expression. Ex. 50, Gunning Depo 25:1–3, 39:18–40:17; Ex. 6, Klarman Depo. 122:19–123:1, 133:1–13, 136:17–20; *see also* Ex. 56. Bethel has not revised language in its handbook that Defendants deemed problematic since MSDE deemed its handbook noncompliant. Dant Decl. at ¶ 28.

---

[6] MSDE recently disbanded the Compliance Monitoring Group, which enforced program requirements. Ex. 50, Gunning Depo. 19:18–20:13.

### p. Defendants do not apply same scrutiny to non-Christian schools.

Defendants did not review all school handbooks the same way. For example, the Talmudical Academy is a Jewish day school in Baltimore. Ex. 57. Like "the vast majority" of Jewish day schools, the Talmudical Academy is limited to one sex. Ex. 27, Green Depo. 91:18–21. Its conduct policy and behavior standards prohibit "abuse", which includes "sodomy, unnatural or perverted sexual practices." Ex. 57. Yet unlike the Christian schools that expressed their own beliefs on sexual morality or prohibited sexual misconduct, the Talmudical Academy's policies were not flagged for further scrutiny and they have participated in the program for multiple years. *See* Ex. 58 at 26 (2017–2018 BOOST Scholarship Award Summary listing Talmudical Academy's awards); Ex. 59 at 28 (2018–2019 BOOST Scholarship Award Summary listing Talmudical Academy's awards).

## LEGAL STANDARD

Bethel is entitled to summary judgment because there are no material facts in dispute. As such, Bethel is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Bauer v. Lynch*, 812 F.3d 340, 347 (4th Cir. 2016).

## ARGUMENT

Bethel raises free exercise, free speech, due process, equal protection, and Establishment Clause claims. Although Bethel should prevail as a matter of law on each of its claims, success on one is enough to grant it the requested relief.

## I.   Defendants violated Bethel's Free Exercise rights

"The Free Exercise Clause protects against laws that penalize religious activity by denying any person an equal share of the rights, benefits, and privileges enjoyed by other citizens." *Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246, 2255 (2020) (quotation omitted). "A person may not be compelled to choose between the exercise of a First Amendment right and participation in an otherwise available public

program." *Thomas v. Review Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 716 (1981); "[D]isqualifying otherwise eligible recipients from a public benefit 'solely because of their religious character' imposes 'a penalty on the free exercise of religion that triggers the most exacting scrutiny.'" *Espinoza*, 140 S. Ct. at 2255 (quoting *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2021 (2017)).

Here, Bethel's Free Exercise rights have been violated for at least three reasons. First, Defendants failed to neutrally enforce the law. Second, the BOOST law is not generally applicable. And third, Defendants' enforcement unconstitutionally intrudes on Bethel Ministries' internal affairs. Their actions fail to satisfy strict scrutiny.[7]

### A. Defendants failed to act neutrally in enforcing the BOOST law.

The government violates the Free Exercise clause when it fails to meet "the minimum requirement of neutrality to religion." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 66 (2020) (quotation omitted); *Fulton v. City of Phila., Pa.*, 141 S. Ct. 1868, 1875 (2021) ("principles of neutrality and general applicability still constrain the government in its capacity as manager."). "[U]pon even slight suspicion that proposals for state intervention stem from animosity to religion or distrust of its practices, all officials must pause to remember their own high duty to the Constitution and to the rights it secures." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 547 (1993).

The government can fail to act neutrally by targeting religious activity, showing hostility toward religious practice or beliefs, or by discriminating based on

---

[7] Strict scrutiny also applies because Defendants have violated Bethel's hybrid rights of Free Exercise, Free Speech, and parental rights. The Supreme Court has "held that the First Amendment bars application of a neutral, generally applicable law to religiously motivated action" that involves "the Free Exercise Clause in conjunction with other constitutional protections, such as freedom of speech." *Emp. Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 881 (1990).

religious status. *See Lukumi*, 508 U.S. at 533; *Masterpiece*, 138 S. Ct. 1719; *Espinoza*, 140 S. Ct. 2246. Defendants violated Bethel's Free Exercise in all three ways.

### 1. Defendants unconstitutionally targeted Christian schools and their beliefs.

"Official action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality." *Lukumi*, 508 U.S. at 534. "The Free Exercise Clause protects against governmental hostility which is masked, as well as overt." *Id*. It "'forbids subtle departures from neutrality.'" *Id*. (quoting *Gillette v. United States*, 401 U.S. 437, 452 (1971)). The State "may not devise mechanisms, overt or disguised, designed to persecute or oppress a religion or its practices." *Id*. at 547. "The Court must survey meticulously the circumstances of governmental categories to eliminate, as it were, religious gerrymanders." *Id*. (quotation omitted).

Defendants unconstitutionally targeted Christian schools. When they conducted their handbook review, Defendants searched for "triggers"—terms that subjected participating schools to heightened scrutiny. Those "triggers" were limited to terms that implicated Christian schools—"Christian principles," "biblical values," "Christ-centered environment," "Christ-centered approach." Ex. 23; Ex. 19, Wise Depo. at 38:17, 39:2-10, 98:20; Ex. 6, Klarman Depo. 56:17–19, 57:7–9, 59:7, 85:20–21. Defendants used the language from one Christian school as a template to find "similar" language in other handbooks.

Defendants also treated mentions of Christian moral teaching as a "dog whistle" for discrimination. This shows Defendants' "distrust" of Christian schools' "religion [and] its practices." *Lukumi*, 508 U.S. at 547. Searching for terms particular to religion, generally, or Christianity, specifically, is not a neutral application of the law. Defendants never searched for "secular values" or "Torah values" or "Quaran Principles," although similar phrases appear in other schools' handbooks. *See, e.g.,*

Ex. 61 (handbook includes no nondiscrimination statement and mentions "Torah values" in student discipline section). While these words invited no scrutiny in the context of Jewish, Muslim, or secular schools, they were hair triggers when MSDE staff reviewed Christian schools' handbooks. And this course of conduct explains why every school that Defendants scrutinized and expelled was a Christian school. Ex. 11, Defs.' Admis. Nos. 1, 2, 5, 6, 7.

"[T]he protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or prohibits conduct because it is undertaken for religious reasons." *Lukumi*, 508 U.S. at 532. In *Lukumi*, the City of Hialeah similarly targeted the Santeria religion's practice of animal sacrifice, passing an ordinance that banned certain, but not all, animal killings. 508 U.S. at 535-46. Slaughtering animals was only banned in the ritual sacrifice context—in other words, it was the religious motivation that drove the government enforcement, and that violated the Free Exercise clause. *Id*. "[R]eligious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Thomas*, 450 U.S. at 714.

The religious motivation for Bethel's conduct policy is the reason Defendants kicked them out of the program. Consider that Bethel's conduct policy prohibits all romantic relationships because Bethel's students are elementary children and the school does not believe that those relationships are appropriate for their ages. Ex. 1, Dant Depo. 73:21–74:5. So no student may engage in public displays of affection and students are expected to keep their hands to themselves. *Id*. at 76:10–18; Ex. 2, Wecker Depo. 98:4–5; Ex. 34 at 34. These rules apply to everyone, regardless of sexual

orientation, and even heterosexual students have been disciplined for violating these rules in the past. Ex. 3, Pl.'s Interrog. Ans. 7.[8]

Other schools have similar policies prohibiting public displays of affection and sexual contact. Ex. 65, Krieger Schechter Day School Handbook. Yet MSDE did not flag that policy for further review. What's the difference? The only difference is that Bethel's policy is also inspired by its religious belief that all sexual intimacy should occur in marriage between a man and a woman. Ex 23 at 3. That's it. "Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton*, 141 S. Ct. at 1877 (citing *Masterpiece*, 138 S. Ct. at 1730–32). Defendants cannot allow a "no sexual conduct" policy to stand at one school and simultaneously disallow Bethel's "no sexual conduct" policy just because it does not like the religious reason inspiring Bethel's policy.

### 2. Defendants showed impermissible hostility to Christian schools and their beliefs.

"[R]eligious and philosophical objections to gay marriage are protected views and in some instances protected forms of expression." *Masterpiece*, 138 S. Ct. at 1727. "The First Amendment ensures that religious organizations and persons are given proper protection as they seek to teach the principles that are so fulfilling and so central to their lives and faiths." *Obergefell*, 576 U.S. at 679–80. When the government demonstrates hostility toward these religious beliefs, in word or deed, it violates the Free Exercise Clause's neutrality requirement. *Masterpiece*, 138 S. Ct. 1729–31. "The Free Exercise Clause bars even 'subtle departures from neutrality' on matters of religion." *Masterpiece*, 138 S. Ct. at 1731 (quoting *Lukumi*, 508 U.S. at

---

[8] Defendants acknowledge that "discriminate" means disparate treatment, See Defs.' Brief at 26, but under their theory Bethel would have to treat some children differently than others. Bethel's conduct expectations apply to all students, regardless of their sexual orientation, gender identity, or gender expression. Dant Decl. at ¶ 31.

534). Defendants' "disparity in treatment" of schools shows their hostility toward Christian schools' religious beliefs about marriage and sexuality. *Masterpiece*, 138 S. Ct. at 1730–31.

MSDE staff only flagged Christian schools' handbooks for further scrutiny. Ex. 11, Defs.' Admis. No. 2. They did not flag a single Jewish, Muslim, or secular private school for further scrutiny, but instead accepted those schools' assurances and allowed them to participate in BOOST. *Id.*, Defs.' Admis. Nos. 5, 6, 7. Defendants adopted an attitude of deference for non-Christian schools while they used a hair trigger methodology for Christian schools—especially those that included their teachings about human sexuality.

Defendants' conflation of Bethel's religious beliefs with discrimination highlights their hostility to those beliefs. Bethel's handbook never mentions homosexuality or sexual orientation. *See generally* Ex. 34. It does, however, mention Bethel's religious views that people are created as either male or female, in the image and likeness of God, and that marriage is a covenant between one man and one woman. *Id.* at 7. These beliefs are "decent and honorable." *Obergefell*, 576 U.S. at 672.

Defendants also use the specter of racism to construe Bethel's marriage statement as discriminatory. Defs.' Brief at 27. But saying marriage is a covenant between a man and a woman is a far cry from saying "no homosexual students will be admitted" or "gay children need not apply." *See* Defs.' Brief at 27. The conflation of religious beliefs that have been sincerely held for millennia, *Obergefell*, 576 U.S. at 657, with actual discrimination makes Defendants' hostility clear. "[L]umping those who hold traditional beliefs about marriage together with racial bigots is insulting to those who retain such beliefs." *Fulton*, 141 S. Ct. at 1925 (Alito, J., concurring); *see also Masterpiece*, 138 S. Ct. at 1729 (describing Christian's sincerely held religious beliefs about marriage as an excuse for bigotry disparages those beliefs). And it's

particularly insulting for a school overwhelmingly made up of racial and ethnic minorities. Dant Decl. at ¶ 13.

Defendants' dishonesty in interpreting Bethel's handbook also highlights their hostility. Not only did they fail to consider that Bethel is an elementary school where marriage is not applicable to underage children, they stated Bethel's marriage statement was discriminatory. Ex. 10, Harbinson Depo. 62:7–12; Ex. 1, Dant Depo. at 68:20–22; Ex. 22, Gallagher Depo. 98:3–12 ("specifically the first half of the sentence that comes before it, 'The biblical view of marriage is defined as a covenant between one man and one woman'") Ex. 49, Grasmick Depo. 40:19–41:6 (handbooks mentioning "covenants" suspect, Bethel's marriage statement of concern); Ex. 39, Camp Depo. 80:11–13 (identifying problem as language about "marital or non-marital something"); Ex. 28, Sanders Depo. 50:6–51:2 (identifying marriage provision as problem); Ex. 10, Harbinson Depo. 60:7–13, 64:16–65:3 (marriage statement was the reason for expulsion); Ex. 10, Eberhart 62:2–63:2 (same).

And Defendants' disdain for Bethel's religious beliefs is no secret. The BOOST chair called Bethel's handbook language "extraordinarily problematic and leaves the door wide open to discrimination" after sneering that Bethel "signed an assurance illegally."[9] Ex. 38 at 57:12–14, 16:4–5. *See also* Ex. 60 (in response to Catholic Church declining to bless same-sex unions, Gallagher retweeted "Offering prayers and condolences to all my LGBTQ friends and colleagues who get pummeled by the church Catholic on a daily basis . . . . It will be set right."). And while board member Green reassured her colleagues that the Jewish day schools' (her constituents) conduct policies really focused on conduct, not orientation, Sanders and Eberhart doubted that Christian schools would enforce their policies equally to opposite-sex and same-sex behavior. Ex. 38 at 51:5–12 53:5–16. *See also* Ex. 27, Green Depo. 11:20–12:15;

---

[9] A video of the Board's discussion is available here. *See* https://vimeo.com/368387715/85b45d8b3b (last visited July 9, 2021).

Ex. 28, Sanders Depo. 20:8–12. Further, the Board considered how Bethel would "respon[d] to a transgender application," even though the law only covered sexual orientation at the time. Ex. 38 at 58:6–25; Ex. 7 (BOOST law requirements). It's no wonder, then, that the Board decided Bethel's fate during an unprecedented, closed session. Ex. 38 at 49:22–54:16; Ex. 10, Harbinson Depo. 111:14–16.[10]

### 3. Defendants excluded Bethel because of its religious status.

"Disqualifying otherwise eligible recipients from a public benefit solely because of their religious character imposes a penalty on the free exercise of religion that triggers the most exacting scrutiny." *Espinoza*, 140 S. Ct. at 2255 (cleaned up). "[A] State 'cannot exclude individual Catholics, Lutherans, Mohammedans, Baptists, Jews, Methodists, Non-believers, Presbyterians, or the members of any other faith, because of their faith, or lack of it, from receiving the benefits of public welfare legislation.'" *Id.* at 2255 (quoting *Everson v. Bd. of Ed. of Ewing*, 330 U.S. 1, 16 (1947)).

Bethel's religious status led Defendants to scrutinize its religious beliefs and ultimately expel it from the program. Government officials examined school handbooks and searched for phrases that would only apply to religious schools, particularly Christian schools. Ex. 23; Ex. 19, Wise Depo. at 38:17, 39:2–10, 98:20; Ex. 6, Klarman Depo. 56:17–19, 57:7–9, 59:7, 85:20–21. If Bethel had been a secular private school, or even a Jewish or Muslim school, MSDE staff would not have subjected it to heightened scrutiny. Ex. 11, Defs.' Admis. Nos. 5, 6, 7.

---

[10] It's noteworthy that the Supreme Court handed down its *Masterpiece Cakeshop* decision before the June 4, 2018, BOOST meeting. This explains why the BOOST board engaged in curiously little public discussion of Bethel and other schools before voting to kick them out at their June 21, 2018, meeting. Ex. 27, Green Depo. 23:8–10 (board had to reconsider handbooks in light of *Masterpiece*).

**B. The BOOST nondiscrimination provision is not generally applicable.**

"A law is not generally applicable if it 'invite[s]' the government to consider the particular reasons for a person's conduct by providing 'a mechanism for individualized exemptions.'" *Fulton*, 141 S. Ct. at 1877 (quoting *Smith*, 494 U.S. at 884). "[W]here the State has in place a system of individual exemptions, it may not refuse to extend that system to cases of 'religious hardship' without compelling reason." *Id*. (quoting *Smith*, 494 U.S. at 884). The BOOST law is not a neutral law of general applicability.

In *Fulton*, the City of Philadelphia asserted that its nondiscrimination policy categorically prohibited Catholic Social Services from declining a referral of a child or individual based on its beliefs about marriage. But the relevant contract allowed exceptions at the city's "sole discretion." *Fulton*, 141 S. Ct. at 1878. This created "a system of individual exemptions," making the policy not generally applicable. *Id*. And it did not matter if the city had ever granted an individualized exemption; the Court held that the existence of a "formal mechanism for granting exceptions" alone destroyed general applicability. *Id*. at 1879.

The BOOST law's religious freedom exemption language provides Defendants with the capacity to make exceptions based on a school's religious or moral beliefs. *See* Ex. 4 ("Nothing herein shall require any school or institution to adopt any rule, regulation, or policy that conflicts with its religious or moral teachings."). The presence of exceptions, written or not, demonstrates that the law is not generally applicable, even if no exceptions have ever been granted. *See Fulton*, 141 S. Ct. at 1878–79.

And here, many exemptions have been granted as Defendants retained some schools with the same beliefs as Bethel. *See, e.g.*, Ex. 61 (no nondiscrimination provision, prohibits sexual conduct). In Bethel's case Defendants rely on the fact that Bethel's nondiscrimination statement only includes the categories listed in Title VI

26

as evidence that the school's policy is discriminatory. Defs.' Brief at 27 ("Despite signing assurances that it would not discriminate on the basis of sexual orientation, the nondiscrimination provision in Bethel's admissions policy excluded sexual orientation."). But this argument is a *post hoc* justification for their religious discrimination and wasn't applied to other schools.

For example, sworn testimony acknowledged that listing the BOOST law's categories was not required and that many schools would only include Title VI language. Ex. 6, Klarman Depo. 104:3–11; *see also* 42 U.S.C. § 2000d ("No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."). Further, Some BOOST schools did not have handbooks. Ex. 9, Eberhart Depo. 66:7–8. And even now some BOOST schools do not have nondiscrimination statements. *See* Ex. 61. Defendants only apply these standards to Bethel because it expresses its views on marriage and sexuality and not on schools that do not share their beliefs. That means the standards are not generally applicable.

Lastly, Defendants' method of enforcement employs a system of individualized assessments—with government employees weighing each school's handbook language individually. *Lukumi*, 508 U.S. at 537. When MSDE staff initially reviewed handbooks, they were given no guidance to follow. Ex. 6, Klarman Depo. 48:16–19; Ex. 19, Wise Depo. 33:12–18. This led to MSDE staff making "ad hoc discretionary decisions" on whether religious schools had discriminatory policies or not. *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1299 (10th Cir. 2004). Most handbooks do not receive any additional scrutiny if they satisfy a single MSDE staff member. Ex. 50, Gunning Depo. 21:18–20, 22:7–10. And even today, MSDE staff have not been provided training to perform handbook reviews. *Id.* at 34:17–20. MSDE's corporate representative testified that MSDE staff "use their professional judgment" in making

27

compliance determinations for the law's gender identity and expression provisions. *Id.* at 35:6–12.

### C. Defendants' actions interfere with Bethel's internal affairs and religious autonomy.

While courts often evaluate free exercise claims under *Smith*'s general rule, it does not always apply. As the Supreme Court has explained, not every "application of a valid and neutral law of general applicability is necessarily constitutional under the Free Exercise Clause." *Trinity Lutheran*, 137 S. Ct. at 2021 n.2. In fact, the Court declined to apply *Smith* where a case "concerns government interference with an internal church decision that affects the faith and mission of the church itself," even though "that case concerned government regulation of physical acts." *Hosanna–Tabor Evangelical Lutheran Church and Sch. v. EEOC*, 565 U.S. 171, 190 (2012). That's because the Free Exercise Clause provides "constitutionally compelled limitation on civil authority" that "ensures that no branch of secular government trespasses on the most spiritually intimate grounds of a religious community's existence." *EEOC v. Roman Cath. Diocese of Raleigh, N.C.*, 213 F.3d 795, 800 (4th Cir. 2000) (declining to apply *Smith*). For "religious freedom encompasses the power of religious bodies to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Id.* (cleaned up). And "religious education and formation of students is the very reason for the existence of most private religious schools," including Bethel. *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2055 (2020).

To be clear—Bethel has always complied with the BOOST law's requirements: it has never discriminated against a student in admissions (or otherwise). Ex. 11, Defs.' RFA Nos. 19, 20, 21. And Bethel welcomes any academically qualified student who wants to attend the school and is willing to follow its policies. Dant Decl. at ¶ 7, 31. Yet the First Amendment guards against government interference into internal

church affairs—and Defendants cannot scrutinize a church-run school's religiously inspired conduct policy in order to deprive them of the rights, programs, and benefits they are entitled to.

Bethel Ministries, Inc.—the church plaintiff here—runs its school as an exercise of its faith. Dant Decl. at ¶ 2. The school provides an opportunity for Bethel Ministries to be a Gospel witness to its students and their community. Dant Decl. at ¶ 3. And its mission is to create an authentic Christian learning community to teach kids to know, love, and serve the Lord Jesus Christ and to equip them spiritually and academically to lights to this world. Ex. 34 at 9. Defendants cannot force a church-run school to abandon its religious beliefs and conduct expectations in their own internal documents in order to participate in a public benefit. Defendants cannot drive Bethel out of the public square simply because they disagree with the religious beliefs at the foundation of Bethel's conduct policy. Such interference offends the First Amendment.

## II.    Defendants violated Bethel's Free Speech Rights.

"The First Amendment. . . prohibits laws that abridge the freedom of speech." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371 (2018) ("*NIFLA*"). It protects speech "without regard to the race, creed, or political or religious affiliation of the members of the group which invokes its shield, or to the truth, popularity, or social utility of the ideas and beliefs which are offered." *Nat'l Ass'n for Advancement of Colored People v. Button*, 371 U.S. 415, 444–45 (1963). "When it comes to a person's beliefs . . . broad and sweeping state inquiries into these protected areas discourage citizens from exercising rights protected by the Constitution." *Ams. for Prosperity Found. v. Bonta*, No. 19-251, 2021 WL 2690268, at *8 (U.S. July 1, 2021) (cleaned up). The First Amendment protects both the right to speak freely or to "refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). "A system which

secures the right to proselytize religious, political, and ideological causes must also guarantee the concomitant right to decline to foster such concepts." *Id*.

Defendants violated Bethel's Free Speech rights in numerous ways. First, they have employed an illegal, content-based restriction on Bethel's religious speech in its student handbook. Second, they have engaged in viewpoint-based discrimination. And third, Defendants punished Bethel's speech by imposing an unconstitutional condition on the receipt of a public benefit.

## A. Defendants engaged in content-based discrimination.

Courts "distinguish between content-based and content-neutral regulations of speech." *NIFLA*, 138 S. Ct. at 2371. "Content-based regulations 'target speech based on its communicative content.'" *NIFLA*, 138 S. Ct. at 2371 quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed*, 576 U.S. at 163. Content-based laws "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 155. "This stringent standard reflects the fundamental principle that governments have no power to restrict expression because of its message, its ideas, its subject matter, or its content." *NIFLA*, 138 S. Ct. at 2371 (quotations omitted).

Here Defendants specifically sought to eliminate language in handbooks that expressed religious beliefs about marriage. MSDE targeted schools for having marriage statements, statements about sexuality, and statements about Christian morality. *See* Ex. 23 (flagged handbook language); Ex. 19, Wise Depo 38:8–39:10.

## B. Defendants engaged viewpoint-based in discrimination.

"Discrimination against speech because of its message is presumed to be unconstitutional." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 828 (1995) (citing *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641–643 (1994)

("*TBS*")). "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Rosenberger*, 515 U.S. at 829. "Viewpoint discrimination is . . . an egregious form of content discrimination." *Id*. "The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Id*.

Defendants sought to silence schools that expressed certain opinions on sexual morality or marriage. Ex. 23 (highlighting "problematic" language). *See* Ex. 25 (schools remove references to sexual immorality from their handbooks to stay in BOOST program). And for Defendants, a particular Christian perspective on sexuality and marriage was verboten—that's why "Biblical values" "Christian principles," "traditional family marriage," "Christ-centered environment," and "Christ-centered approach" acted as hair "triggers" for enforcement. Ex. 23; Ex. 19, Wise Depo. at 38:17, 39:2–10, 98:20; Ex. 6, Klarman Depo. 56:17–19, 57:7–9, 59:7, 85:20–21. And the BOOST Board members admit that Bethel's marriage statement was the basis for its expulsion from the program. *See supra* at 24.

### C. Defendants imposed an unconstitutional condition on Bethel's receipt of BOOST funds.

It's "a basic First Amendment principle that freedom of speech prohibits the government from telling people what they must say." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 213 (2013) ("*AOSI*") (quotation omitted). "At the heart of the First Amendment lies the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence." *TBS*, 512 U.S. at 641. "The Government may not deny a benefit to a person on a basis that infringes his constitutionally protected freedom of speech even if he has no entitlement to that benefit." *AOSI*, 570 U.S. at 214 (cleaned up).

Defendants violated Bethel's free speech rights by imposing an unconstitutional condition on the receipt of BOOST scholarship funds. Christian schools had to give up their right to express their religious beliefs in their school handbooks in order to participate in a state program. Ex. 19, Wise Depo. 48:21–49:6, 51:6–9; Ex. 5, Kearns Depo. 56:22–23; *see* Ex. 25 (examples of handbook changes). But "the government offends the First Amendment when it imposes financial burdens on certain speakers based on the content of their expression." *Rosenberger*, 515 U.S. at 828–29 (citing *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 115 (1991)). Defendants cannot make Bethel choose between its religious speech or public benefits.

### D. Defendants do not seek to regulate Bethel's conduct.

Defendants try to dodge the inconvenient fact that Bethel does not discriminate by relying on two cases for the proposition that government enforcement of nondiscrimination laws does not violate Free Speech rights. But both cases are inapplicable because Bethel is not seeking an exemption from a neutral law as this law is not neutral. Bethel welcomes all academically qualified children, regardless of their religion, sexual orientation, gender identity, or expression. Dant Decl. at ¶ 7. Bethel is seeking relief from Defendants' non-neutral application of the law—their punishment of Bethel's religious speech in its handbook. Defendants are not attempting to regulate Bethel's conduct—they admit that they have received no complaints or allegations that Bethel (or any other BOOST school) has ever discriminated. Ex. 11, Defs.' Admis. Nos. 10, 17, 18, 19, 20, 21. Rather, they punished Bethel for its speech—specifically its speech about marriage.

Defendants rely heavily on *Christian Legal Soc. Chapter of the Univ. of California, Hastings Coll. of the L. v. Martinez*, but it is inapplicable here. 561 U.S. 661, 672 (2010) (*CLS*). *CLS* involved a law school's all-comers policy for student organizations in a school-created limited public forum. *Id*. Here, the BOOST program

is a public benefit program where the beneficiaries are families who choose where to use their benefit. *Cf. Espinoza*, 140 S. Ct. 2246 (government cannot restrict scholarships because beneficiaries choose religious schools); *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 547 (2001) (government cannot restrict indigent beneficiaries' use of legal services benefit). Second, in *CLS*, the appellant student organization sought an exemption from the law school's all-comers policy to limit membership to Christians and required officers to agree to the group's statement of faith. *CLS*, 561 U.S. at 672. But here Bethel *has* an all-comers policy—it welcomes all academically qualified candidates and, like every other school in the BOOST program, it requires all of its students to follow the same rules. Bethel's conduct expectations are common to other BOOST schools and just plain common sense because, as Defendants acknowledge, Bethel's "students cannot marry legally in Maryland." Def's brief at 28.

And in this case, Defendants' enforcement of their policy is not neutral toward Bethel's religion or its speech. Indeed, Bethel's marriage statement in its handbook is the sole reason it's been expelled from the program. *See, e.g.*, Ex. 23.

Second, *Rumsfeld v. Forum for Academic & Institutional Rights, Inc. (FAIR)*, is inapplicable here as well. 547 U.S. 47 (2006). Defendants rely on *FAIR* to argue that equal access laws aimed at conduct do not unconstitutionally compel speech. Defs.' Brief 26–27. But *FAIR* upheld a law forcing law schools to open their empty rooms to recruiters and to send occasional logistical emails. 547 U.S. at 61–62. The Court held the law in FAIR didn't compel access to anything "inherently expressive." 547 U.S. at 64. *But see Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 457 n.10 (2008) (declining to apply *FAIR* because "[f]acilitation of speech" is different from laws forcing someone to speak); *Masterpiece Cakeshop*, 138 S. Ct. at 1744-45 (Thomas, J., concurring) (same).

Bethel's expression of its faith and religious beliefs in its handbook goes to the very reason why the school exists. *Our Lady of Guadalupe Sch.*, 140 S. Ct. at 2055 ("religious education and formation of students is the very reason for the existence of most private religious schools."). Unlike the recruiting emails in *FAIR*, the speech Defendants infringed on was "inherently expressive." *FAIR,* 547 U.S. at 64. And, at bottom, Defendants rely on *FAIR* to make an unfair and despicable comparison between Bethel's religious beliefs about marriage and segregationist hiring discrimination. This Court should reject it for the insult it is. *Fulton*, 141 S. Ct. at 1925 (Alito, J., concurring).

## III. The BOOST Nondiscrimination Requirement Is Unconstitutionally Vague, Violating Bethel's Due Process Rights.

"A statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law." *Connally v. Gen. Construction Co.*, 269 U.S. 385, 391 (1926). And here, the Fourteenth Amendment prohibits Defendants from enforcing laws based on vague standards. *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972).Although BOOST schools are required to not discriminate in student admissions based on sexual orientation, that requirement is not defined. Nor are the terms "gender identity" or "gender expression." MSDE's corporate representative, who oversees the textbooks and BOOST programs, cannot define those terms and admits that she has not given the issue "much thought." Ex. 50, Gunning Depo. 40:11–16, 42:19–43:11. *See also* Ex. 5, Kearns Depo. 116:8–11 (Board wondered whether gender identity was same as sexual orientation).  She also can't explain how schools would discriminate on those bases. Ex. 50, Gunning Depo. 40:18–41:4. To make matters worse, MSDE has no policy on whether schools' enforcement of uniform requirements would violate gender identity or gender expression requirements. *Id.* at 41:18–42:13. And MSDE doesn't know

whether schools can require their students to follow sex-specific dress codes or to use restroom facilities consistent with their biological sex. *Id.* at 118:4–121:8. Instead, due to the absence of clarity, Defendants' staff "use their professional judgment" when making a determination. *Id.* at 35:6–12.

And when you compare the religious liberty provision contained in the law to these nondiscrimination provisions, confusion reigns supreme. Ex. 7. The BOOST Board chair acknowledged that concern, and Kearns, who supervised the handbook reviewing process, described the statute's language as "vague" and "pretty difficult to reconcile certain pieces even within itself." *See* Ex. 8; Ex. 5. The only clarity is that if untrained government officials think you have discriminatory religious beliefs, you're out. Ex. 50, Gunning Depo. 71:11–14. And if they think a school's handbook—which was not created or required for this program—show that (in the government officials' view) the school's beliefs are bigoted, they will make you pay already-spent scholarship money back. Ex. 45.

The lack of guidance has also led to arbitrary enforcement. A number of BOOST-participating religious schools are single-sex. Their handbooks do not mention gender identity or expression. *See* Ex. 62 (Bais HaMedrash & Mesivta of Baltimore is an all-boys high school reserving right to deny admission or remove student due to failure to live in accordance with Orthodox Judaism; its nondiscrimination statement omits sexual orientation and gender identity and expression); Ex. 57 (Talmudical Academy of Baltimore's conduct policy does not have a nondiscrimination statement, but it condemns "sodomy, unnatural or perverted sexual practices" as incompatible with the school's education goals. No other handbook was found); Ex. 61 at 14 (Yeshiva of Greater Washington has separate boys and girls divisions, each division has its own dress and uniform code, its admissions

policies only mention Title VI categories.[11] The boys' division handbook includes as a breaches of student conduct: "Any behavior, in or out of school, which may cause a chillul HaShem, or that may bring discredit to the school and the Torah values it represents"). All those schools participate in the programs. See Exs. 58, 59. Yet Defendants have not flagged any of them for further inquiry into how they comply with the BOOST law. *See* Ex. 63 (Klarman explaining that Bethel's "handbook is the only problematic one this year"). Ex. 11, Defs.' Admis. No. 5. These examples show the Defendants arbitrary enforcement of their policy and unequal treatment in the programs, but Bethel does not believe the government should be scrutinizing the religious beliefs and policies of any school.

Defendants' enforcement of the law has also chilled speech. Religious schools have changed their handbooks to continue to participate in the program. Ex. 19, Wise Depo. 48:21–49:6, 51:6–9; Ex. 5, Kearns Depo. 56:22–23; *see* also Ex. 25 (examples of handbook changes). And schools to this day do not know how to comply with the gender identity and gender expression provisions in the nondiscrimination law. *See* Ex. 52 at 3 (school administrator asking the MSDE and other BOOST schools how to comply); Ex. 50, Gunning Depo. 58:7–21, 57:11–13.

## IV. Defendants Violated Parents' Fourteenth Amendment Due Process Rights.

The United States Supreme Court has recognized that the "enduring American tradition" protects parents' right to "direct 'the religious upbringing' of their children." *Espinoza*, 140 S. Ct. at 2255, 2261 (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 213–214 (1972)). And here, "parents exercise that right by sending their children

---

[11] The Yeshiva School's nondiscrimination policies are found at their website. http://www.yeshiva.edu/BOYSDIVISION/Admissions/tabid/109/Default.aspx

to religious schools, a choice protected by the Constitution." *Id.* at 2261 (citing *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534–535 (1925)).[12]

When Defendants kicked Bethel out of the program, they deprived parents of a choice for a Christian education. Dant Decl. at ¶¶ 18, 21, 23. Some parents send their children to Bethel because the school shares their religious, spiritual, and moral beliefs. Dant Decl. at ¶ 6. The parents want to pass these values down to their children and want to do so by sending their children to Bethel. Dant Decl. at ¶ 6. By expelling Bethel from the program, Defendants deprived parents of that choice without due process.

BOOST scholarships belong to the students who receive them. Schools receive BOOST funds when children choose to attend a particular school. Ex. 8, Gallagher Depo. 170:15–19 (explaining the BOOST scholarship is portable). By depriving parents and families of the choice to go to a religious school that shares their religious beliefs, including their religious beliefs about marriage, Defendants violate those parents' rights. *See Yoder*, 406 U.S. 205 (invalidating compulsory school-attendance laws as applied to Amish parents who refused on religious grounds to send their children to school).

## V. Defendants Violated Bethel's Right to Equal Protection of Laws.

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (citing *Plyler v. Doe*, 457 U.S. 202, 216 (1982)). "The general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *Id.* at 440. But "the general rule

---

[12] Bethel may raise these rights. *See Pierce*, 268 U.S. 510; *see also St. Joan Antida High Sch. Inc. v. Milwaukee Pub. Sch. Dist.*, 919 F.3d 1003, 1007 (7th Cir. 2019).

gives way" when laws classify by suspect classes, including religion. *Id.*; *see also Roller v. Gunn*, 107 F.3d 227, 233 (4th Cir.1997) (religion is a suspect classification).

Defendants violated Bethel's equal protection rights in two main ways. First, Defendants treated Bethel worse than other religious schools with similar religious beliefs. The only distinction was that Bethel published its religious beliefs in its handbook. *See supra* at 20–25. A BOOST Board member even wondered aloud, "is the intent to—at what point are we excluding a certain category of religious institution, period, no matter what, no matter how they try to abide by the rules because we're projecting certain things?" Ex. 38 at 56:13–16.

And Defendants' mistreatment of Bethel is bolstered by the fact that while they provided legal guidance and advice on compliance to some Christian schools, they never shared it with Bethel. Ex. 6, Klarman Depo 152:14–17; Ex. 19, Wise Depo. 89:4–16. *See* Exs. 32, 33. *See also* Ex. 31. Ex. 5, Kearns Depo 95:10–20, 106:9–15, 109:5–8. Worse still, MSDE staff were specifically instructed not to share a similar memo that pertained to Bethel and other Category 3 schools. *See* Ex. 37; Ex. 19, Wise Depo. 110:5–111:21. Either of these memos would have helped Bethel navigate compliance with Defendants' enforcement of the law.

Second, Defendants deprived Bethel of the equal protection of the laws by creating a system of ad hoc enforcements that gave government officials unbridled discretion. *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) (equal protection claim can be brought by plaintiff alleging it has been treated differently from others). "The Supreme Court has long held that the government violates the First Amendment when it gives a public official unbounded discretion to decide which speakers may access a traditional public forum." *Child Evangelism Fellowship of MD, Inc. v. Montgomery Cty. Pub. Schs.*, 457 F.3d 376, 386 (4th Cir. 2006). "[T]here is broad agreement that, even in limited public and nonpublic forums, investing governmental officials with boundless discretion over access to the forum violates the

First Amendment." *Id*. That's because "the dangers posed by unbridled discretion—particularly the ability to hide unconstitutional viewpoint discrimination—are just as present in other forums." *Id*.

Here, the program's enforcement was uneven. MSDE officials without training, who rely on their "professional judgment," made ad hoc decisions granting eligibility for most schools, while singling out schools like Bethel for harsher scrutiny. Ex. 50, Gunning Depo. 35:6–12. *See also id*. at 71:4–14 (explaining that citations to Bible verses in Bethel's handbook were flagged because, "whoever reviewed this felt that it was questionable. . .they had concerns about the potential discriminatory nature of the language and they felt it needed further review.).

Defendants claim that Bethel's handbook is deficient because it does not explicitly list the classes identified by the BOOST law, specifically sexual orientation. Defs.' Brief at 27. But the law does not require schools to adopt particular language in their handbook. Ex. 7 (BOOST legal requirements). And Klarman testified that MSDE staff were aware that the handbooks they reviewed would only list the Title VI classes and that "the omission of those words related to the new law was acceptable in the handbook." Ex. 6, Klarman Depo. 103:20–104:14. As explained above, Defendants do not hold all BOOST schools to that standard. And they violate Bethel's rights when they single it out for worse treatment than other schools.

## VI.  Defendants' religious favoritism violates the Establishment Clause.

The Establishment Clause of the First Amendment "forbids an official purpose to disapprove of a particular religion or of religion in general." *Lukumi*, 508 U.S. at 532. When a law treats some religious denominations more favorably than others, it violates the Establishment Clause. *Larson v. Valente*, 456 U.S. 228 (1982).

As explained above, here government officials treated Christian schools less favorably than their Jewish, Muslim, or secular peers. Ex. 11, Defs.' Admis. Nos. 2, 5, 6, 7. Defendants subjected Christian schools to harsher treatment than others. And

because Defendants scrutinized handbooks in a manner that only implicated the Christian schools, Jewish Muslim, and secular schools faced no such burden. And even among Christian schools, the government treated schools that shared their religious beliefs worse than those who kept their beliefs to themselves. Ex. 25. These disparities, revealing the government's religious favoritism, violates the Establishment Clause.

## VII. Defendants' Enforcement Fails Strict Scrutiny.

Because Defendants violated Bethel's Constitutional rights, "they must satisfy strict scrutiny, and this means that [their actions] must be narrowly tailored to serve a compelling state interest." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. at 67 (quotation omitted). *See also Reed*, 576 U.S. at 155. And their actions cannot survive that burden because Defendants have no compelling interest in excluding Bethel from the programs and they failed to pursue their goal in the least restrictive means.

### A. Defendants have no compelling interest in excluding Bethel from BOOST.

Only a "state interest of the highest order" can justify Defendants' discriminatory application of the law. *Trinity Lutheran*, 137 S. Ct. at 2024. Because strict scrutiny applies, this Court must reject Defendants' argument that they have a general interest in enforcing the BOOST nondiscrimination provision. As *Fulton* explains, strict scrutiny demands "a more precise analysis." 141 S. Ct. at 1881. This Court must "'scrutinize[] the asserted harm of granting specific exemptions to particular religious claimants,'" not "rely on 'broadly formulated'" governmental interests. *Id.* (quoting *Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418, 431 (2006)). Therefore, the question before the court "is not whether [Maryland] has a compelling interest in enforcing its non-discrimination policies

generally, but whether it has such an interest in denying an exception" from that requirement to Bethel specifically. *Fulton*, 141 S. Ct. at 1881.

Defendants have no compelling interest in putting Bethel to a choice between expressing its religious beliefs about marriage and receiving a public benefit. Defendants admit that they have never received a complaint or allegation that any BOOST student has been discriminated against—in admissions or otherwise. Ex. 11, Defs.' Admis. Nos. 10, 17, 18. And Defendants admit they have never received a complaint or allegation of discrimination against Bethel. *Id.,* Defs.' Admis. Nos. 19, 20, 21. Contrary to Defendants' claims, Bethel does not discriminate in admissions or any other basis. Bethel welcomes any student who passes the schools' entrance exam. Dant Decl. at 7. And once admitted, Bethel treats all children the same and expects that they all comply with the school's conduct requirements. Dant Decl. at 31.[13]

Additionally, if Defendants really had an interest in eliminating the non-existent discrimination in Maryland's programs, they would pursue that interest in all instances—but they do not. They target Christian schools and do nothing besides handbook reviews. Ex. 5, Kearns Depo. 112:20–24.; Ex. 50 Gunning Depo at 52:14–18. Defendants' uneven enforcement undermines their alleged interest.

### B. Defendants have not pursued their stated interest in the least restrictive means.

"[S]o long as the government can achieve its interests in a manner that does not burden religion, it must do so." *Fulton*, 141 S. Ct. at 1881. Defendants have not pursued their stated interest in the least restrictive means or a means narrowly tailored to fit their purpose. Defendants took the vast majority of BOOST schools at their word, relying on the signed assurances stating that they did not discriminate on the basis of sexual orientation. Bethel has not discriminated, and no complaints

---

[13] Defendants argue that Bethel's statement on marriage discriminates against children on the basis of sexual orientation. But, at least at Bethel, no children should be engaging in sexual conduct.

have been lodged against it or others participating in the program. *see* Ex. 11, Defs'
Admis. Nos. 10, 17, 18, 19, 20, 21. Considering that absence, Defendants could
similarly rely on Bethel's assurance.

## CONCLUSION

For these reasons, Bethel is entitled to judgment as a matter of law. Bethel
respectfully requests that the Court deny Defendants' motion, grant this motion, and
provide Bethel with the declaratory and injunctive relief requested in its complaint.
Bethel further asks for any other remedies the Court sees fit.


Respectfully submitted this 9th day of July, 2021.

By: /s/ *John R. Garza*

John R. Garza (No. 01921)
Garza Law Firm, P.A.
17 W. Jefferson Street
Rockville, Maryland 20850
Telephone: (301) 340-8200
Fax: (301) 761-4309
Email: JGarza@garzanet.com

Paul Daniel Schmitt*
Alliance Defending Freedom
440 First Street NW, Suite 600
Washington, D.C. 20001
Telephone: (480) 444-0020
Fax: (480) 444-0028
Email: PSchmitt@ADFlegal.org

David A. Cortman*
Alliance Defending Freedom
1000 Hurricane Shoals Road
Suite D-1100
Lawrenceville, Georgia 30043
Telephone: (770) 339-0774
Fax: (770) 339-6744
Email: DCortman@ADFlegal.org

Ryan J. Tucker*
Alliance Defending Freedom
15100 N 90th Street
Scottsdale, AZ 85260
Telephone: (480) 444-0020
Fax: (480) 444-0028
Email: RTucker@ADFlegal.org


*Attorneys for Plaintiff*
*\*Admitted Pro Hac Vice*

**CERTIFICATE OF SERVICE**

I certify that, on this 9th day of July, 2021, the foregoing was served in compliance with the Federal Rules of Civil Procedure to the following:

Robert A. Scott
Ann Sheridan
Justin E. Fine
Assistant Attorneys General
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
rscott@aog.state.md.us
asheridan@oag.state.md.us
jfine@oag.state.md.us

/s/ Paul Daniel Schmitt
Paul Daniel Schmitt
*Attorney for Plaintiff*