IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

BETHEL MINISTRIES, INC.,    *

      *Plaintiffs*,    *

      v.

      *    No. 1:19-cv-01853-SAG

MOHAMMED CHOUDHURY,[1]    *
*et al.*,

      *Defendants*.    *

      *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**DEFENDANTS' OPPOSITION
TO PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT AND
REPLY MEMORANDUM IN FURTHER SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

BRIAN E. FROSH
Attorney General of Maryland

/s/ Robert A. Scott

_____
ROBERT A. SCOTT (NO. 24613)
ANN M. SHERIDAN (NO. 11137)
JUSTIN E. FINE (NO. 18731)
Assistant Attorneys General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
rscott@oag.state.md.us
(410) 576-7055
(410) 576-6955 (facsimile)

July 23, 2021        Attorneys for Defendants

---

[1] Effective July 1, 2021, Mr. Mohammed Choudhury succeeded Dr. Karen Salmon as the Maryland State Superintendent of Schools.  Under Federal Rule of Civil Procedure 25(d), a public officer's successor is automatically substituted as a party.

# TABLE OF CONTENTS

Page

ARGUMENT.................................................................................................................... 2

I.  THE UNDISPUTED FACTS DEMONSTRATE THAT THE DEFENDANTS'
    ENFORCEMENT OF THE BOOST NONDISCRIMINATION REQUIREMENT DID
    NOT VIOLATE ANY RIGHTS ARISING UNDER THE FIRST AMENDMENT
    RELIGION CLAUSES.................................................................................................. 2

    A.  There is No Evidence that the Defendants Targeted or Showed
        Hostility Towards Christian Schools and Their Beliefs or Excluded
        Bethel Because of Its Religious Status........................................................... 2

    B.  The BOOST Nondiscrimination Provision Is Generally Applicable............ 8

    C.  The Defendants Never Interfered With Bethel's Internal Affairs and
        Religious Autonomy..................................................................................... 11

II. THE UNDISPUTED FACTS DEMONSTRATE THAT THE DEFENDANTS'
    ENFORCEMENT OF THE BOOST NONDISCRIMINATION REQUIREMENT  DID
    NOT VIOLATE BETHEL'S FREE SPEECH RIGHTS. ....................................... 13

    A.  There is No Evidence that the Defendants Engaged in Content-Based
        or Viewpoint-Based Discrimination............................................................ 13

    B.  There is No Evidence that the Defendants Imposed an
        Unconstitutional Condition on Bethel's Receipt of BOOST Funds. .......... 14

III. NEITHER THE TEXT OF THE BOOST NONDISCRIMINATION REQUIREMENT
     NOR THE DEFENDANTS' ENFORCEMENT OF THE REQUIREMENT VIOLATED
     ANY RIGHTS ARISING UNDER THE FOURTEENTH AMENDMENT............................ 15

    A.  The Void-for-Vagueness Doctrine Does Not Provide a Basis for
        Bethel to Prevail in This Case .................................................................... 15

    B.  Defendants' Enforcement of the Nondiscrimination Requirement Did
        Not Violate Parents' Fourteenth Amendment Due Process Rights. .......... 18

    C.  Defendants' Enforcement of the Nondiscrimination Requirement Did
        Not Violate Bethel's Right to Equal Protection of Laws. ........................... 19

IV.  STRICT SCRUTINY DOES NOT APPLY IN THIS CASE, BUT IF IT DID, DEFENDANTS' ENFORCEMENT OF THE BOOST NONDISCRIMINATION REQUIREMENT SATISFIES STRICT SCRUTINY ......................................................... 23

CONCLUSION ............................................................................................................. 24

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

BETHEL MINISTRIES, INC.,

          *Plaintiffs*,

     v.

                            No. 1:19-cv-01853-SAG

MOHAMMED CHOUDHURY,
*et al.*,

          *Defendants*.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

**DEFENDANTS' OPPOSITION
TO PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT AND
REPLY MEMORANDUM IN FURTHER SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

Upon first blush, the conflicting narratives set forth in the parties' cross-motions for summary judgment might lead one to believe genuine disputes of material fact preclude granting summary judgment to either party. But a close examination of Bethel's exhibits reveals that they do not support Bethel's narrative, and that Bethel is urging the Court to draw inferences that are not reasonable. Bethel's factual contortions are an acknowledgement that *Masterpiece Cakeshop*[2] provides the proper framework for analyzing this case. Therefore, Bethel cannot prevail unless it can show religious targeting and hostility. Because there is no evidence of such, defendants are entitled to judgment as a matter of law.

---

[2] *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 138 S. Ct. 1719 (2018).

## ARGUMENT

I.  **THE UNDISPUTED FACTS DEMONSTRATE THAT THE DEFENDANTS' ENFORCEMENT OF THE BOOST NONDISCRIMINATION REQUIREMENT DID NOT VIOLATE ANY RIGHTS ARISING UNDER THE FIRST AMENDMENT RELIGION CLAUSES.**

   A.  **There is No Evidence that the Defendants Targeted or Showed Hostility Towards Christian Schools and Their Beliefs or Excluded Bethel Because of Its Religious Status.**

Bethel's claim that the defendants targeted Christian schools is belied by Exhibit 58 to its memorandum. ECF 80-61. That document is a scholarship award summary for the 2017-2018 school year that includes an appendix of 138 BOOST-participating schools.[3] *Id.* at 7, 14-17. An examination of that list reveals that no non-religious schools, two Muslim schools, nine Jewish schools, and 127 Christian schools participated in BOOST during that time period.[4] *Id.* at 14-17. Given that the vast majority of schools that participated in BOOST were Christian schools, Bethel's contention that Bethel was excluded because of its religious views, ECF 80-1 at 25, simply is not tenable.

Similarly groundless is the contention that the BOOST program administrators were hostile towards Christian beliefs and targeted Christian schools for discrimination. That

---

[3] The report indicates that MSDE requested data from 158 BOOST schools and received responses from 138. ECF 80-61 at 7.

[4] The Court can take judicial notice of this fact. *See* Fed. R. Evid. 201(b) (permitting court to "judicially notice a fact that is not subject to reasonable dispute" because it is "generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"). With few exceptions, the religious affiliation of the schools is evident from their names. The affiliation of the handful of schools with names that do not indicate religious affiliation is easily ascertainable. *See* https://www.privateschoolreview.com/center-for-creative-learning-profile; https://hva-edu.com/; https://www.littleflowerschool.org/.

assertion defies logic and common sense in light of the fact that more than 90 percent of the schools that benefitted from the program were Christian schools like Bethel.

Given that the vast majority of BOOST-participating schools were Christian, no nefarious inferences can be drawn from the fact that the handbooks MSDE staff flagged for further review were from Christian schools. Of 176 schools participating in the 2016-2017 school year, handbooks for 22 schools were found to have questionable language. ECF 75-23 at 2. Of the 22 schools selected for further review, three opted out of the program, nine were found to be eligible after further review, and ten were found to be ineligible. *Id.* Of the ten ineligible schools, six were re-admitted to the program after revising their handbook language, and four, including Bethel, remained ineligible. *Id.* These numbers do not support a claim of targeting, hostility, or disparate treatment.

Similarly, the method MSDE used to conduct the handbook review does not support a claim of targeting, hostility, or disparate treatment. First of all, the MSDE staff reviewed handbooks of *all* BOOST schools, not just Christian schools. ECF 80-8 at 41-42. And what they found were schools that expressed their discriminatory policies in religious terms. The very first discrimination example brought to the State's attention, the Trinity Lutheran handbook, illustrates this point. ECF 80-19 at 2. In its handbook, Trinity "reserve[d] the right . . . to refuse admission of an applicant" whose conduct, inside or outside school, "is counter to or in opposition to the Biblical lifestyle the school teaches." *Id.* The handbook explained that such conduct "includes . . . living in, condoning, or practicing homosexual lifestyle or alternative gender identity," and cited biblical verses in support of its policy. *Id.*

3

Monica Kearns explained that she and her team noticed a pattern after they had reviewed many handbooks:

> [I]f you look at enough of them, what you'll notice is things where in — perhaps in the admissions section or another one section of the handbook it will just say biblical values, or something like that. . . .  [I]n one part of the handbook it may just say biblical values and another part of the handbook it will say biblical values and then it will list out what those biblical values are. And those biblical values often would say explicitly, you know, something about, you know, sexual orientation, no homosexual behavior, or something like that.

ECF 80-8 at 69-70.  Ms. Kearns explained that she and her team were "cast[ing] a very broad net" and "would include examples like that" and confer with counsel.  *Id.* at 70-71. Given this context, then, it is no wonder that MSDE had questions about the meaning of a handbook provision denying admission to students who engage "in sexual activity inconsistent with Scriptural teaching."  ECF 80-26 at 2.  Kearns sent an inquiry to the school in question, Arundel Christian School, *id.*, and ultimately, the school was found to be in compliance with the nondiscrimination requirement and was permitted to participate. ECF 75-23 at 2. Contrary to Bethel's assertion, ECF 80-1 at 26, the undisputed facts demonstrate that MSDE's methods were reasonable in light of the presenting problem— discriminatory policies expressed in religious terms—not "stem[ming] from animosity to religion or distrust of [religious] practices." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 547 (1993).

Bethel also cannot demonstrate that MSDE treated non-Christian schools more favorably than the Christian schools.  The examples Bethel cites do not support its assertion of disparate treatment.  Bethel complains that the handbook for Krieger Schecter Day

School includes "similar policies prohibiting public displays of affection and sexual contact" to Bethel's, but that Krieger Schecter was not flagged for further review. ECF 80-1 at 28. It asserts that the only difference is that Bethel's policy was inspired by its religious belief that all sexual intimacy should occur in marriage between a man and woman. *Id.* Not true. Bethel was not excluded from the BOOST program because of a policy prohibiting public displays of affection and sexual contact. It was excluded due to a discriminatory admissions policy. No such policy is included in the Krieger Schecter handbook. Indeed, the Krieger Schechter handbook upon which Bethel relies does not include an admissions policy at all and is from 2018-2019. ECF 80-68. Thus, it was not even part of 2017-2018 admissions policy review.[5] Moreover, Krieger Schecter's conduct policy unambiguously applies to both heterosexual and homosexual conduct and makes no distinction between the two. ECF 80-68 at 9; *see Bob Jones Univ. v. United States*, 461 U.S. 574, 604 n. 30 (1983) (observing that a regulation does not violate First Amendment "merely because it happens to coincide or harmonize with the tenets of some or all religions") internal citation and quotation marks omitted)). It is not an example of overlooked discrimination.

Similarly, contrary to Bethel's assertions, the policy of Talmudical Academy (ECF 80-60) is not an example of overlooked discrimination. It is a conduct policy, dated December 12, 2019, ECF 80-60 at 2, not an admissions policy that would have been part

---

[5] Furthermore, it appears that Krieger Schechter may not even be a BOOST-participating school. *See* 80-61 at 14-17; 80-62 at 14-19.

of the 2018 review that resulted in Bethel's exclusion from the program.  And the reference to "sodomy, unnatural or perverted sexual practices" is included in a list of examples of behavior that constitute sexual abuse.  *Id.* at 3.  The actual policy prohibits "any act that involves sexual molestation or exploitation" of a minor student.  *Id.*

Although Bethel complains that Yeshiva of Greater Washington's handbook does not include a nondiscrimination statement at all and mentions "Torah values" in its discipline section, ECF 80-1 at 26-27, that handbook is again from the 2019-2020 school year and was not a part of the admissions policy review that excluded Bethel. ECF 80-64 at 2.  Bethel notes that Yeshiva's nondiscrimination statement is included on its web page and, like Bethel's statement, includes only the Title VI nondiscrimination categories, not sexual orientation.  ECF 80-1 at 42.  But Bethel identifies no discriminatory language in Yeshiva's handbook or web page.  In any event, it was not Bethel's omission of sexual orientation from its nondiscrimination statement that resulted in its exclusion from the BOOST program.  It was Bethel's admissions policy that required student conduct to align with the "view of marriage defined as a covenant between one man and one woman, and that God immutably bestows gender upon each person at birth as male and female to reflect His image."  ECF 75-22 at 2.  That policy, on its face, singles out students based on sexual orientation and, therefore, is discriminatory.[6]   Consequently, Matthew Gallagher's

---

[6] As Bethel notes, it is "an elementary school where marriage is not applicable to underage children." ECF 80-1 at 30.  So including in the admissions policy an admonition that student conduct is expected to align with Bethel's view on marriage only makes sense as a signal that homosexuality will not be tolerated.

comments that the handbook language was problematic and that Bethel signed a nondiscrimination assurance illegally are nothing more than his assessment that Bethel was not in compliance with the BOOST requirements, not evidence of hostility.[7]

Faced with a dearth of evidence of hostility, Bethel contends that the Board went into closed session to "decide Bethel's fate" because the *Masterpiece Cakeshop* decision had just been issued by the Supreme Court. ECF 80-1 at 31. The implication seems to be that the Board expressed its hostility privately because Board members knew they could not express it publicly. But this is pure speculation and not supported by the evidence. In fact, the record shows that the Board had already extensively discussed Bethel's situation at the previous Board meeting on May 3, 2018, ECF 80-41 at 35-64, and three Board members were ready to vote to exclude Bethel at that time, but the Board agreed to table the vote because there were other Board members who wanted additional information, *id.* at 61-64. At the next meeting, in June, the Board went into closed session to receive legal advice, and then voted in open session with little additional discussion. *See* ECF 75-1 at 14 for full video citation. These facts do not support an inference of hostility. Consequently, the undisputed facts demonstrate that the defendants applied the nondiscrimination requirement in a neutral fashion.

---

[7] Bethel's claim that Mr. Gallagher was "sneering", ECF 80-1 at 30, is not supported by the cited video recording.

## B. The BOOST Nondiscrimination Provision Is Generally Applicable.

Contrary to Bethel's assertions, the BOOST nondiscrimination requirement does not allow for individualized exemptions and, therefore, is generally applicable.  To determine whether there is "a mechanism for individualized exemptions," courts look to whether the law "invite[s] the government to consider the particular reasons for a person's conduct." *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1877 (2021) (internal quotation marks omitted) (quoting *Employment Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 884 (1990)).  For example, in *Fulton*, the Supreme Court found that there was a system of individualized exemptions when the city's nondiscrimination provision expressly allowed for exceptions if granted at the Commissioner's discretion.  *Fulton*, 141 S. Ct. 1878.  In another example, *Sherbert v. Verner*, 374 U.S. 398, 401 (1963), the law provided that the State could deny unemployment benefits to applicants who "failed, without good cause . . . to accept available suitable work."  Since the discretionary "good cause" standard allowed the court to look at the reason underlying the applicant's conduct, the law provided for individualized exemptions.  *Fulton*, 141 S. Ct. at 1877 (describing *Sherbert* as an example of a law with individualized exemptions).

Here, defendants did not consider the reasons underlying schools' admissions policies, and the law does not allow for such considerations.  Unlike *Fulton* or *Sherbert*, the BOOST nondiscrimination requirement does not contain a discretionary standard or an exception to the policy.  While the nondiscrimination requirement provides that "[n]othing herein shall require any school or institution to adopt any rule, regulation, or policy that

8

conflicts with its religious or moral teachings," that language is immediately qualified by the confirmation that "*all* participating schools must agree that they will not discriminate in student admissions on the basis of . . . sexual orientation." 2016 Md. Laws ch. 143 at 132 (emphasis added). This language indicates that there can be no departures from the rule—all participating schools must comply. The BOOST Board and MSDE must "administer the grant program in accordance with [these] guidelines." *Id.* at 131. Therefore, despite Bethel's contention otherwise, defendants do not have the capacity to make exceptions to the nondiscrimination requirement for any reason.

Bethel equates MSDE's reasonable methods for reviewing handbooks with "'ad hoc discretionary decisions'" that amount to a system of individualized exemptions. ECF 80-1 at 33 (quoting *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1299 (10th Cir. 2004)). However, while it necessarily "takes some degree of individualized inquiry to determine whether a [school] is eligible," defendants' methods of enforcement do not amount to the "kind of case-by-case system envisioned by the [Supreme Court]" as a system of individualized exemptions. *Axson-Flynn*, 356 F.3d at 1298. The "distinctive feature" of a system of individualized exemptions, consideration of the underlying reason behind schools' conduct, is not present here. *Smith*, 494 U.S. at 884. It is undisputed that MSDE and the Board reviewed schools' handbooks on their face, without regard to the motivation behind schools' policies, and applied the same principles to all schools in making their decisions. ECF 75-15 at ¶¶ 12-15; ECF 75-19 at ¶ 20; ECF 80-8 at 44-47. To hold there is "a mechanism of individualized exemptions" here—where the law does not provide for any exceptions, and no exceptions have been granted—would essentially be holding that there

is "a mechanism for individualized exemptions" whenever eligibility is determined by an administrative board. This would substantially expand the rule beyond the circumstances in *Fulton* and *Sherbert*.

Bethel's claim that "many exemptions" have been granted is incorrect. ECF 80-1 at 32. To support its claim, Bethel notes that some schools retained in the BOOST program may share the same religious beliefs as Bethel, or may only include Title VI language in their nondiscrimination statements. *Id.* at 32-33. However, those facts do not demonstrate that the schools had discriminatory policies. Furthermore, Bethel was not excluded from BOOST based on its religious beliefs or because it included only Title VI language in its nondiscrimination statement. Rather, Bethel was excluded because it maintained a discriminatory policy that singled out students based on sexual orientation, one that "[a] non-heterosexual student may reasonably view . . . [as allowing] denial of admission or discipline or expulsion on the basis of his or her sexual orientation." ECF 75-19 at 4; ECF 75-22 at 2. As explained above, Bethel has not identified *any* school that maintains a discriminatory admissions policy and has been retained in the BOOST program. Bethel could not do so, because no exceptions have been granted, and no exceptions can be granted to the nondiscrimination requirement. Moreover, a religious exemption here would render the nondiscrimination requirement meaningless since the vast majority of schools in the BOOST program are religious and would be entitled to such an exemption. *See* ECF 80-61 at 14-17. The BOOST nondiscrimination requirement therefore does not have "a mechanism for individualized exemptions" and is generally applicable.

### C.    The Defendants Never Interfered With Bethel's Internal Affairs and Religious Autonomy.

As a condition of receiving BOOST scholarship funds, Bethel signed an assurance that it would not discriminate in student admissions based on sexual orientation.  ECF 75-6.  Bethel does not claim an exemption from this requirement on the basis of its religious beliefs.  Instead, it steadfastly claims it is complying with the requirement.  Nevertheless, Bethel now argues that, even if the nondiscrimination requirement is a valid, neutral law of general applicability, Bethel still may escape enforcement of the provision because the defendants' enforcement constitutes unwarranted interference in Bethel's internal church affairs.  ECF 80-1 at 34-35.  Bethel is plainly wrong.  Enforcement of the condition, to which Bethel agreed in order to participate in a scholarship program funded by taxpayer dollars, does not constitute unwarranted interference with internal church affairs.

Given that Bethel has not claimed a religious exemption, and has not argued entitlement to one, *Hosanna-Tabor* does not support its position.  The Supreme Court, in *Hosanna-Tabor*, held that there is a ministerial exception to employment discrimination laws that is grounded in the Religion Clauses.  *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 188 (2012).  The Supreme Court outlined the history that made it clear that the Religion Clauses of the First Amendment prohibit the government from interfering with a religious entity's selection of ecclesiastical staff.  *Id.* at 182-88.  Consequently, the E.E.O.C. could not seek an order reinstating a ministerial employee who had been terminated from employment, even if the termination was based on alleged discrimination.  *Id.* at 194.  "By requiring the Church to accept a minister it did

not want, such an order would have plainly violated the Church's freedom under the Religion Clauses to select its own ministers." *Id.* The exception "ensures that the authority to select and control who will minister to the faithful — a matter strictly ecclesiastical — is the church's alone." *Id.* at 194-95 (internal citation and quotation marks omitted). "[G]overnmental non-interference with the ministerial employment decisions of churches," *E.E.O.C. v. Roman Cath. Diocese of Raleigh*, 213 F.3d 795, 800 (4th Cir. 2000), is not what is at stake in this case. What is at stake is the authority of states to avoid spending taxpayer dollars on schools that maintain admissions policies that discriminate against gay and transgender students.

There is nothing akin to a ministerial exception in this case. Supreme Court precedent is clear that the government need not subsidize private educational institutions that discriminate. *See Bob Jones Univ.*, 461 U.S. at 602-04 (holding that Religion Clauses do not prohibit Internal Revenue Service from denying charitable organization status to religious schools that discriminate on basis of race). Bob Jones University, similar to Bethel in this case, argued that it was not engaging in race discrimination because it admitted all students, regardless of race. *Id.* at 605. It asserted that its conduct restrictions banning interracial dating and marriage were not discriminatory because they applied to all races. *Id.* As the Supreme Court noted, however, prohibitions "of racial affiliation and association is a form of racial discrimination." *Id.* The government's refusal to subsidize such discrimination, even if based on a school's sincerely held religious beliefs, does not violate the Establishment Clause. *Id.* at 604 n. 30 (observing that "'the uniform application of the rule to all religiously operated schools *avoids* the necessity for a potentially

entangling inquiry into whether a racially restrictive practice is the result of sincere religious belief'" (emphasis in original) (quoting *United States v. Bob Jones Univ.*, 639 F.2d 147, 155 (4th Cir. 1980))).  The undisputed facts do not demonstrate the defendants' enforcement of the BOOST provisions violated the Religion Clauses.

## II.   THE UNDISPUTED FACTS DEMONSTRATE THAT THE DEFENDANTS' ENFORCEMENT OF THE BOOST NONDISCRIMINATION REQUIREMENT DID NOT VIOLATE BETHEL'S FREE SPEECH RIGHTS.

### A.   There is No Evidence that the Defendants Engaged in Content-Based or Viewpoint-Based Discrimination.

Bethel does not contend that nondiscrimination requirements, generally, constitute content-based or viewpoint-based discrimination that is proscribed by the Free Speech Clause of the First Amendment.  Instead, it attempts to recast the defendants' enforcement of the BOOST nondiscrimination requirement as an effort to eliminate expressions of religious beliefs in school handbooks.  ECF 80-1 at 36.  The undisputed facts contradict this assertion.  Bethel was not excluded from BOOST for including a Statement of Faith in its handbook or for expressing religious beliefs on marriage.  It was excluded for a discriminatory admissions policy that referenced those beliefs.  ECF 75-22 at 2-3.  The reason for exclusion had nothing to do with the religious source of the policy and everything to do with the discriminatory effect of the policy.  *See* ECF 75-22 at 2 (explaining that a "non-heterosexual student may reasonably view the policy as one that allows denial of admission or discipline or expulsion on the basis of his or her sexual orientation").  Bethel has not identified any school with a discriminatory policy grounded in secular views or non-Christian views that was permitted to participate in BOOST.

Because the defendants sought to eliminate discriminatory policies, without regard to the reasons motivating such policies, their enforcement did not constitute content or viewpoint-based discrimination.  *See Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of L. v. Martinez*, 561 U.S. 661, 696 (2010) (holding that law school regulation of student organization's exclusionary membership policies was content-neutral where the law school "aim[ed] at the *act* of rejecting would-be group members without reference to the reasons motivating that behavior" (emphasis in original)).

### B.   There is No Evidence that the Defendants Imposed an Unconstitutional Condition on Bethel's Receipt of BOOST Funds.

Bethel signed an assurance that it would not discriminate in student admissions based on sexual orientation.  ECF 75-6.  Bethel did not claim an exemption from this requirement on the basis of its religious beliefs.  Having agreed not to discriminate as a condition to receiving taxpayer funds, Bethel was not in a position to then issue a discriminatory admissions policy because, as noted at pages 12-13 above, the First Amendment does not require Maryland to subsidize discrimination.

Bethel claims that it does not discriminate because it has an "all-comers policy." ECF 80-1 at 39.  But Bethel does not explain why its written admissions policy does not say this.   An unwritten "all-comers" policy is not consistent with Bethel's written admissions policy which requires student conduct to "align with [the] view" that marriage is "a covenant between one man and one woman, and that God immutably bestows gender upon each person at birth as male or female to reflect His image."  ECF 75-16 at 3.  Such

a policy can only reasonably be read as one that allows denial of admission and/or continued enrollment on the basis of sexual orientation. *See* ECF 75-22 at 2.

Further, Bethel's claims that it does not discriminate against transgender students is simply not plausible given its that its 2019-2020 handbook explicitly requires students to *identify with* and dress in accordance with their biological gender, *even off-campus*, or risk expulsion. ECF 75-30 at 7-8. Indeed, when asked in deposition whether Bethel would admit a prospective male student who informed the school that he wanted to dress like a girl, Bethel's Rule 30(b)(6) designee refused to answer. Defs.' Ex. 34, Bethel Deposition at 62:3-64:14. Bethel's written policy expressly excludes transgender students, an exclusion not permitted by Maryland's current nondiscrimination requirements. Of course, Bethel is free to maintain such policies, but Maryland is not required to subsidize them. *See Bob Jones Univ.*, 461 U.S. at 602-04.

## III. NEITHER THE TEXT OF THE BOOST NONDISCRIMINATION REQUIREMENT NOR THE DEFENDANTS' ENFORCEMENT OF THE REQUIREMENT VIOLATED ANY RIGHTS ARISING UNDER THE FOURTEENTH AMENDMENT.

### A. The Void-for-Vagueness Doctrine Does Not Provide a Basis for Bethel to Prevail in This Case.

Bethel has not responded to defendants' argument that the void-for-vagueness doctrine does not apply because the challenged law does not render Bethel's speech or conduct unlawful. *See* 75-1 at 37. Indeed, the single case Bethel discusses in this regard, ECF No. 80-1 at 40 (discussing *Grayned v. City of Rockford*), is a criminal case challenging a conviction under an anti-noise ordinance. 408 U.S. 104 (1972). Bethel's failure to respond to this argument constitutes a waiver, *Annan v. Capital One Bank*, No. CV TDC-

19-1329, 2020 WL 5407901, at *3 (D. Md. Sept. 9, 2020) (quoting *Satcher v. University of Ark. at Pine Bluff Bd. of Trs.*, 558 F.3d 731, 735 (8th Cir. 2009)), and a basis for granting summary judgment in favor of defendants on Bethel's void-for-vagueness claim, *Mentch v. Eastern Sav. Bank, FSB*, 949 F. Supp. 1236, 1247 (D. Md. 1997) (granting summary judgment to defendant over one of plaintiff's claims because plaintiff in her response brief "did not specifically address [defendant's] argument").[8]

In any event, *Grayned* illustrates that, contrary to Bethel's assertion, ECF No. 80-1 at 40-41, the lack of internal definitions in the BOOST law does not mean that the law is unconstitutionally vague. Although the noise ordinance in *Grayned* did not define the terms "adjacent" or "tends to disturb," the Court "extrapolate[d]" their meaning by looking at the "words of the ordinance itself," "the interpretations the court below has given to analogous statutes," and "perhaps to some degree, to the interpretation of the statute given by those charged with enforcing it." *Id.* at 109-10 (internal quotation marks and citations omitted). Similarly, as fully discussed in defendants' opening memorandum, the terms "sexual orientation" and "gender identity" can be extrapolated from other sources. ECF 75-1 at 37-38.

---

[8] Similarly, Bethel failed to respond to defendants' arguments that the enforcement of the nondiscrimination requirement did not violate the Due Process Clause of the Fourteenth Amendment because (1) BOOST scholarships are not a "'property' interest protected by procedural due process," *Board of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972), and (2) the specific rights asserted under the First Amendment are the appropriate constitutional framework to resolve Bethel's claims. ECF No. 75-1 at 36.

Bethel's contention that the defendants arbitrarily enforced the nondiscrimination provision, ECF No. 80-1 at 41, also does not support its void for vagueness claim because the undisputed facts show that defendants did not engage in arbitrary enforcement. Bethel relies on the handbooks from several non-Christian schools participating in BOOST to show arbitrariness. *Compare* ECF 80-1 at 41 *with* 80-1 at 30, 34. For the same reasons these examples do not show religious targeting, *see supra* section I.A, they do not show arbitrary enforcement.

Finally, contrary to Bethel's assertion, ECF 80-1 at 41, the mere fact that some of these schools are single-sex schools does not demonstrate arbitrary enforcement of the new gender identity and gender expression provisions. As MSDE's designee explained in deposition testimony, there is language in the Maryland General Assembly's Joint Chairman's Report[9] that allowed such schools to develop a policy regarding gender identity and expression if they did not already have one and to note such fact in their written assurances. ECF 80-53 at 53. Regardless of the complexity of applying the gender identity and expression requirements to single-sex schools, Bethel's policy on gender identity was neither nuanced nor complex. Its policy provides for expulsion of students who do not identify and dress in accordance with their biological gender, even off campus. ECF 75-30 at 7-8. It thereby expressly discriminates against transgender students. Bethel has

---

[9] *See* Defs.' Ex. 35, Joint Chairmen's Report, *Report on the Fiscal 2020 State Operating Budget (HB 100) and the State Capital Budget (HB 101) and Related Recommendations* 172 (Mar. 25, 2019), https://msa.maryland.gov/megafile/msa/speccol/sc5300/sc5339/000113/023900/023943/20190324e.pdf.

identified no other BOOST school whose written policies discriminate against transgender students.  For all of these reasons, Bethel's void-for-vagueness claim fails as a matter of law.

### B. Defendants' Enforcement of the Nondiscrimination Requirement Did Not Violate Parents' Fourteenth Amendment Due Process Rights.

Like Bethel, the parents of its students do not have a protected interest in the BOOST scholarships.  *See Roth*, 408 U.S. at 577.  The scholarships are not a protected interest because the State is not required to provide scholarships for nonpublic school students (Bethel has not argued to the contrary), and the BOOST law must be renewed annually. And at least one member of the General Assembly has stated that the legislature may not renew the BOOST law if the State cannot enforce the nondiscrimination provision.  ECF 22-2 at 7.  Because the BOOST scholarships are not guaranteed, Bethel cannot assert a parental-rights claim.

Bethel's argument that defendants "deprived parents of a choice for a Christian education" by deeming Bethel ineligible for BOOST is without merit.  ECF 80-1 at 43. The undisputed facts show that, in 2018, the BOOST program included more than 100 other Christian schools where Bethel students could use their scholarships instead.  ECF No. 80-61 at 14-17; *see supra* section I.A.  The availability of dozens of other BOOST-participating Christian schools refutes the argument that parents were somehow forced to send their children to public school, ECF No. 75-1 at 41-42, which is required to show a violation of the Fourteenth Amendment right to educate one's child.  *St. Joan Antida High Sch. Inc. v. Milwaukee Pub. Sch. Dist.*, 919 F.3d 1003, 1008 (7th Cir. 2019) (quoting *Pierce*

*v. Society of the Sisters*, 268 U.S. 510 (1925)).  The undisputed facts do not demonstrate any violation of parental rights.

Additionally, the case law that Bethel relies upon is inapposite.  The *Espinoza v. Montana Department of Revenue* decision held that a state could not prohibit students from using private scholarships to attend religious non-public schools "solely because of [the school's] religious character."  140 S. Ct. 2246, 2255 (2020) (internal quotation marks and citations omitted).  Here, dozens of religious schools benefit from the BOOST program, and Bethel was removed from BOOST because of its admissions policy, not its religious nature generally.  And *Wisconsin v. Yoder* was not about school choice at all but whether parents could decide *not* to educate their children after age 15 because of the parents' religious beliefs.  406 U.S. 205, 214-15 (1972).  Bethel's parental rights claim fails as a matter of law.

### C.    Defendants' Enforcement of the Nondiscrimination Requirement Did Not Violate Bethel's Right to Equal Protection of Laws.

Bethel's contention, that the defendants violated the Equal Protection Clause of the Fourteenth Amendment by treating it "worse" than other religious schools, ECF No. 80-1 at 44, is contradicted by the undisputed facts.

First, the evidence shows that another school that included language in its admissions policy almost identical to the language in Bethel's policy was also deemed ineligible for BOOST in 2018.  Like Bethel, Celebration Christian Academy's admissions policy stated that the school "supports the biblical view of marriage defined as a covenant between one man and one woman, and that God immutably bestows gender upon each person as male

or female to reflect His image.  Therefore, faculty, staff, and student conduct is expected to align with this view."  Defs.' Ex. 36, Letter from BOOST Chair to Celebration Christian Academy Letter 1 (Mar. 16, 2018).  Like Bethel, Celebration was declared ineligible for BOOST.  *Id*.  The notion that Bethel was somehow singled out for disfavored treatment by MSDE and the Board is simply not true.

Similarly groundless is Bethel's assertion that defendants shared with other BOOST schools a January 9, 2018 legal memorandum about how the Board was evaluating handbooks, but "never shared it with Bethel."  ECF 80-1 at 44; ECF 80-2 at ¶ 39.  The record shows that James Klarman, the Nonpublic Schools Program Coordinator at MSDE, sent a copy of the memorandum to Bethel principal Claire Dant on February 21, 2018.  Defs.' Ex. 37, Second Declaration of James Klarman ¶¶ 4-5.[10]

Bethel also complains that the "State never explained to Bethel why they believed our handbook did not comply with the law or how it should be changed" until after Bethel was declared ineligible.  ECF 80-2 at ¶ 40.  This statement is disingenuous because it ignores the fact that MSDE sent Bethel letters dated March 5, 2018 and May 25, 2018, highlighting the language in Bethel's admissions policy that the State believed was discriminatory and asking for an explanation.  ECF 75-17; ECF 75-20.  Bethel responded

---

[10] The incorrect date was used for the electronic file name of the January 9, 2018 legal memorandum and was saved as  "Enforcing Nondiscrimination and Reimbursement Memo 01-04-18."  Other BOOST schools who received the memorandum received the same file.  *See, e.g.*, Defs.' Ex. 38, Email from Klarman to Principal of Frederick Adventist Academy (Feb. 20, 2018).

to these letters in writing.  ECF 75-18; ECF 75-21.  Contrary to Bethel's assertions, Bethel knew exactly why it was excluded from BOOST.

Bethel also contends that it was treated it unequally because enforcement of the BOOST program was "uneven."  ECF No. 80-1 at 45.  Bethel complains that MSDE staff who conducted the review of school handbooks acted "without training."  ECF 80-1 at 45.  But the deposition testimony of Mr. Klarman, who personally worked on the handbook review, shows that MSDE staff received written legal guidance from the Office of the Attorney General in January, 2018 regarding how to determine if a BOOST school's admissions policy was discriminatory.  ECF 80-9 at 44-49; 89:21-90:6; *see also* ECF 80-53 at 37:5-12.  That guidance was shared with Bethel on February 21, 2018.  Defs.' Ex. 37 ¶¶ 4-5.  Further, MSDE staff gave Bethel written notice of their concerns and an opportunity to explain apparent inconsistencies between its handbook and the BOOST nondiscrimination requirement.  ECF 75-17, 75-18.  The record shows that MSDE staff only identified for further review handbooks that were unclear or appeared to be inconsistent with the BOOST law; they did not decide a school's BOOST eligibility themselves.  ECF 75-15 at ¶¶ 16-18.  MSDE staff referred these cases to the Board for decision.  *Id.* at ¶ 18.

The record shows that the Board's deliberations about Bethel's handbook were thorough.  The Board first considered Bethel's handbook during a May 3, 2018 meeting, which Bethel was invited to attend (but did not).  ECF 75-1 at 13.  Rather than decide at that time, the Board requested additional information from Bethel, and the Board again considered Bethel's eligibility during its next meeting on June 21, 2018.  *Id.* at 13-14.  Even

21

after the Board found Bethel ineligible for BOOST, ECF 75-22, the Board extended the same opportunity to Bethel that it did to other ineligible schools to revise its handbook, comply with the nondiscrimination requirement, and receive again BOOST scholarships. ECF 75-25.

Bethel unsuccessfully attempts to characterize the handbook-review process as one where the defendants had "unbounded discretion" to remove Bethel from BOOST, ECF No. 80-1 at 44, and relies on the decision in *Child Evangelism Fellowship of Md., Inc. v. Montgomery County. Pub. Sch.*, 457 F.3d 376 (4th Cir. 2006). But *Child Evangelism* is inapposite. That case dealt with free speech, not free exercise, and whether a school district's take-home flyer program "provide[d] safeguards sufficient to ensure viewpoint neutrality." *Id.* at 386. That is not the issue in this case. In addition, the evidence in this case does not show that MSDE and the Board possessed "unbounded discretion," which *Child Evangelism* described as the government's ability to deny speech "for any reason at all" and to "hid[e] the suppression from public scrutiny." *Id.* Here, the Board found Bethel ineligible for BOOST for not complying with the nondiscrimination requirement, not for any reason at all, and its decision was publicly available, including through the BOOST website. *See BOOST 2018 Meeting Dates and Materials*, Md. State Dept. of Educ., http://marylandpublicschools.org/Pages/boost/meetings2018.aspx (last visited July 20, 2021). The undisputed facts do not demonstrate any violation of the Equal Protection Clause.

**IV.    STRICT SCRUTINY DOES NOT APPLY IN THIS CASE, BUT IF IT DID, DEFENDANTS' ENFORCEMENT OF THE BOOST NONDISCRIMINATION REQUIREMENT SATISFIES STRICT SCRUTINY.**

Contrary to Bethel's contention, strict scrutiny does not apply in this case simply because Bethel has outlined creative arguments about "hybrid rights of Free Exercise, Free Speech, and parental rights." ECF 80-1 at 25 n. 7. Similar hybrid rights arguments were asserted and rejected in *Masterpiece Cakeshop*. 138 S. Ct. at 1723. Although the baker in that case had framed the Colorado Civil Rights Commission's actions as having violated both his freedom of speech and free exercise of religion, the Supreme Court analyzed the case under the rubric set forth in *Smith*, 494 U.S. 872. That rubric—which upholds enforcement of a valid, neutral, and generally applicable law even if it burdens a claimant's free exercise of religion—is also applicable here. Moreover, even if the Court were to find, for some reason, that *Smith* does not apply, it is not a given that strict scrutiny would apply. *See Fulton*, 141 S. Ct. at 1883 (2021) (Barrett, J., concurring) (expressing "skeptic[ism] about swapping *Smith*'s categorical antidiscrimination approach for an equally categorical strict scrutiny regime, particularly when this Court's resolution of conflicts between generally applicable laws and other First Amendment rights—like speech and assembly—has been much more nuanced"); *Yoder*, 406 U.S. at 221 ("By preserving doctrinal flexibility and recognizing the need for a sensible and realistic application of the Religion Clauses we have been able to chart a course that preserved the autonomy and freedom of religious bodies while avoiding any semblance of established religion. This is a tight rope and one we have successfully traversed." (internal citations and quotation marks omitted)); *see also Smith*, 494 U.S. at 882-83 (referring to the test in *Sherbert*, 374 U.S. 398, as a

"balancing test").  A true balancing test would weigh the State's admittedly weighty interest in not subsidizing discrimination against the extent to which enforcement has burdened Bethel and conclude in the defendants' favor.

In any event, if applied, the defendants' actions would withstand strict scrutiny because the interest in not subsidizing discrimination is a compelling one, and the State has sought to achieve its goals through the least restrictive means possible.  As an initial matter, the State required all participating schools to sign written assurances that they would not discriminate.  And when it was brought to the State's attention that, despite those assurances, some of the schools maintained discriminatory written policies in conflict with those assurances, the State engaged in a comprehensive review of the written policies and excluded only those schools whose written policies were discriminatory on their face.  Bethel has not identified less intrusive means available to the State that would have achieved its goals.  Defendants' actions withstand strict scrutiny.

## CONCLUSION

For all of the forgoing reasons, defendants' motion for summary judgment should be granted and Plaintiff's cross-motion for summary judgment should be denied.

Respectfully submitted,

BRIAN E. FROSH
Attorney General of Maryland

/s/ Robert A. Scott

_____
ROBERT A. SCOTT (NO. 24613)
ANN M. SHERIDAN (NO. 11137)
JUSTIN E. FINE (NO. 18731)
Assistant Attorneys General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
rscott@oag.state.md.us
(410) 576-7055
(410) 576-6955 (facsimile)

July 23, 2021                                  Attorneys for Defendants