# Exhibit 34

1            IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF MARYLAND

3                  NO. 1:19-CV-01853-SAG

4

5              BETHEL MINISTRIES, INC.,

6                      Plaintiff

7

8                          V.

9

10              DR. KAREN B. SALMON, ET AL.,

11                      Defendants

12

13

14

15

16

17

18

19

20   DEPONENT:  Claire Dant

21   DATE:      March 31, 2021

22   REPORTER:  Brooke Andrew

```
 1                      APPEARANCES

 2

 3    ON BEHALF OF THE PLAINTIFF, BETHEL MINISTRIES, INC.:

 4    Paul D. Schmitt

 5    Alliance Defending Freedom

 6    440 First Street Northwest

 7    Suite 600

 8    Washington, D.C. 20001

 9    Telephone No.: (202) 347-0406

10    E-mail: pschmitt@adflegal.org

11    (Appeared via Videoconference)

12

13    And

14

15    Ryan J. Tucker

16    Alliance Defending Freedom

17    15100 North 90th Street

18    Scottsdale, Arizona 85260

19    Telephone No.: (480) 444-0020

20    Facsimile No.: (480) 444-0025

21    E-mail: rtucker@adflegal.org

22
```

```
 1                  APPEARANCES (CONTINUED)

 2

 3   ON BEHALF OF THE DEFENDANTS, DR. KAREN B. SALMON, IN HER

 4   OFFICIAL CAPACITY AS STATE SUPERINTENDENT, MATTHEW

 5   GALLAGHER, IN HIS OFFICIAL CAPACITY AS CHAIR OF THE

 6   BOOST ADVISORY BOARD, MARVA JO CAMP, LINDA EBERHART,

 7   NANCY GRASMICH, ELIZABETH GREEN, BETH HARBINSON, A.

 8   SKIPP SANDERS, ALL IN THEIR OFFICIAL CAPACITITES AS

 9   MEMBERS OF THE BOOST ADVISORY BOARD:

10   Robert A. Scott

11   Justin E. Fine

12   Assistant Attorneys General

13   200 Saint Paul Place

14   20th Floor

15   Baltimore, Maryland 21202

16   Telephone No.: (410) 576-7055

17   E-mail: rscott@oag.state.md.us

18   jfine@oag.state.md.us

19   (Appeared via Videoconference)

20

21   Also Present: Adam Schuman, Planet Depos Remote

22   Technician
```

```
 1                       INDEX

 2                                          Page

 3   PROCEEDINGS                              8

 4   DIRECT EXAMINATION BY MR. SCOTT         10

 5   CROSS EXAMINATION BY MR. TUCKER        144

 6

 7                     EXHIBITS

 8   Exhibit                                Page

 9   1 - Notice of Deposition               13

10   2 - Bethel Christian Academy Handbook  24

11   3 - Bethel Christian Academy Brochure  37

12   4 - Bethel Christian Academy Pre-Enrollment  41

13        Parent Interview

14   5 - Bethel Christian Academy Admissions     46

15        Records

16   6 - Bethel Christian Academy Student        99

17        Disciplinary Records - January 2015 -

18        April 2018

19   6a - Bethel Christian Academy Behavior Report 102

20         - April 13, 2018

21   7 - Complaint                              123

22   8 - May 11, 2017 Email                      82
```

1                     EXHIBITS (CONTINUED)

2     Exhibit

3     9 - October 13, 2017 Letter from Matthew         85

4          Gallagher

5                                            Page

6     9a - Correspondence Re: Handbook Review         86

7     10 - March 5, 2018 Letter from Monica Kerns      88

8           to Claire Dant

9     11 - March 13, 2018 Email and Attachment         92

10          from Claire Dant To Monica Kearns

11    12 - April 26, 2018 Email Thread Between          94

12          Claire Dant And Monica Kearns

13    13 - May 2, 2018 Email from Claire Dant To        95

14          Monica Kearns

15    14 - Statement to The Boost Advisory Board        96

16          by Claire M. Dant On Behalf of

17          Bethel Christian Academy

18    15 - May 25, 2018 Letter from Monica Kearns       96

19          To Claire Dant

20    16 - May 29, 2018 Letter from Claire Dant to      96
            Monica Kearns and The Boost Board

21    17 - August 8, 2018 Letter from Matt             97

22          Gallagher to Claire Dant

1                      EXHIBITS (CONTINUED)

2     Exhibit

3     19 - May 24, 2019 Email Thread Between        110

4             Claire Dant And Donna Gunning

5     20a - February 28, 2019 Letter from Donna     106

6              Gunning to Claire Dant

7     21 - April 24, 2020 Letter from Donna         112

8             Gunning to Claire Dant

9     21a - Corrected April 24, 2020 Letter from    114

10             Donna Gunning to Claire Dant

11    22 - Aid to Non-Public Schools Program        118

12             FiscalYear 2020 Program Assurances

13    23 - Declaration of Claire Dent in Support    128

14             of Plaintiff's Motion for Preliminary

15             Injunction

16    26 - Claire Dant Letter to Washington Post    139

17    27 - Claire Dant Letter to Baltimore Sun      140

18    28 - September 24, 2019 Email Thread Claire   141

19             Dant And Bethel Christian Academy

20             Families

21

22

1                    STIPULATION

2

3    The deposition of CLAIRE DANT was taken via

4    videoconference in which all participants attended

5    remotely, on WEDNESDAY, the 31ST day of MARCH, 2021 at

6    approximately 9:57 a.m.; said deposition was taken

7    pursuant to RULES 30 AND 26 OF THE FEDERAL Rules of

8    Civil Procedure.  THE OATH IN THIS MATTER WAS

9    ADMINISTERED REMOTELY PURSUANT TO MD EXEC ORDER NO.

10   20-03-30-04.

11

12   It is agreed that BROOKE ANDREW, being a Notary Public

13   and Court Reporter, may swear the witness.

14

15

16

17

18

19

20

21

22

1          PROCEEDINGS

2

3      COURT REPORTER:  We're on the record.

4      VIDEOGRAPHER:  Okay.  Stand by.  Thank you to

5  everyone for attending this proceeding remotely,

6  which we anticipate will run smoothly.  Please

7  remember to speak slowly and do your best not to

8  talk over one another.  Please be aware that we are

9  recording this proceeding for backup purposes.  Any

10  off the record discussions should be had away from

11  the computer. Please remember to mute your mic for

12  those conversations.  Please have your video enabled

13  to help the reporter identify who is speaking.  If

14  you are unable to connect with video and are

15  connecting via phone, please identify yourself each

16  time before speaking.  We'll provide a complementary

17  unedited recording of this deposition with the

18  purchase of a transcript.  I apologize in advance

19  for any technical- related interruptions.  Thank

20  you.

21      COURT REPORTER:  Will all parties except for

22  the witness, please state your appearance, how you

1    are attending, and your location?

2         MR. SCOTT:  This is Robert Scott, I am

3    representing the defendants in this case.  I'm

4         appearing from my home in Catonsville, Maryland over

5         video.

6              MR. TUCKER:  Hello, this is Ryan Tucker, I'm

7         counsel for the plaintiff, the witness here today.

8              MR. SCHMITT:  I'm Paul Schmitt, I'm also here

9         representing the plaintiff.

10             MR. TUCKER:  And Paul and I are both in

11   Washington DC.

12             MR. FINE:  Justin Fine, attorney for the

13   defendants, appearing from Baltimore, Maryland.

14             COURT REPORTER:  Okay.  Ms. Dant, will you

15   please state your full name for the record?

16             THE WITNESS:  Claire Dant.

17             COURT REPORTER:  Now, Ms. Dant, can you please

18   hold up a photo ID to the camera?

19             THE WITNESS:  I don't have it with me, it's in

20   my purse in another room.  Do we need to go get it?

21             COURT REPORTER:  If I can get the attorneys to

22   agree that you are who you say you are, we can move

1    forward.

2              MR. SCOTT:  That's fine.

3              MR. TUCKER:  I affirmatively state that this is

4    Claire Dant.

5              COURT REPORTER:  Okay.

6              MR. SCOTT:  That's satisfactory to me.

7              COURT REPORTER:  All attorneys agree?  Thank

8    you.  Ms. Dant, will you please raise your right

9    hand? Okay.  Do you solemnly swear or affirm that

10   the testimony you're about to give will be the

11   truth, the whole truth, and nothing but the truth?

12             THE WITNESS:  Yes.  I do.

13             COURT REPORTER:  Thank you.  You may begin.

14                  DIRECT EXAMINATION

15   BY MR. SCOTT:

16     Q    Good morning, Ms. Dant.  My name is Robert

17   Scott, I'm an assistant attorney general for the State

18   of Maryland and I represent the defendants in a case

19   that we're here about today that's been brought by

20   Bethel Ministries, Inc. against several state officials,

21   including members of the BOOST Advisory Board.  We're

22   here today to take your deposition in that case.  We are

1    doing this over video link, which is less than ideal.

2    Usually these proceedings take place in a conference

3    room where we can all sit around a table and conduct the

4    deposition.  So to the extent this is a little awkward

5    and inconvenient, I apologize for that, but it's just

6    the way things are these days.  Have you ever been

7    deposed before?

8         A    No.

9         Q    Okay.  I'm sure your able attorneys have

10   explained the process to you, but I'm just going to give

11   you a few reminders about the process so that it can go

12   smoothly.  You've been placed under oath by the court

13   reporter.  I'm going to be asking you questions, you're

14   going to be answering those questions under oath. You're

15   under an obligation to give truthful answers to all of

16   my questions.  It's important since the court reporter

17   is taking down everything that I say and everything that

18   you say, that we try not to talk at the same time.

19   Frequently, in everyday conversation, you may --

20   somebody may start to ask you a question and you think

21   you know what they're going to ask, and then you start

22   to answer before the person finishes their question, and

1    we want to avoid that here because it's going to make it

2    very difficult for the court reporter to get down a

3    clear transcript of what everybody's saying.  So I'm

4    going to do my best to make sure you're completely

5    finished with your answer to my question before I start

6    to ask you another question.  And if you could be so

7    kind as to permit me to finish each question completely

8    to the end before you start to respond, it'll make it

9    easier for the court reporter to get everything down

10   correctly, okay?

11        A    Yes.

12        Q    Another one of the ground rules is you have to

13   give a verbal answer to the question.  You know, some

14   verbal statement shaking your head, or nodding your

15   head, or "uh-huh," or "uh-huh," or grunting are not

16   sufficient.  You have to give some affirmative

17   statement.  If I ask you a question that is not clear to

18   you or you don't understand, please let me know and I

19   will rephrase the question for you, okay?

20        A    Yes.  Thank you.

21        Q    If you need to do -- if you need to take a

22   break at any time, you know, let us know and we can

1    arrange to do that.  You're here today, I want -- let me

2    ask the court reporter to show you what will be marked

3    as deposition Exhibit 1.

4                (EXHIBIT 1 MARKED FOR IDENTIFICATION)

5                VIDEOGRAPHER:  Stand by, sharing now.

6        Q    So this is a copy of the notice for today's

7    deposition and you're here today initially in a -- in

8    capacity as an organizational dep -- organizational

9    designee, excuse me, for the Plaintiff in this case,

10   Bethel Ministries, Inc.  And the notice on page 4

11   includes, and which continues onto page 5, includes a

12   list of subject matters on which we'd asked Bethel to

13   provide a designee.  And I just want to confirm that

14   you're here today to testify as to all of the topics on

15   this notice; is that correct?

16       A    Yes.  It is.

17       Q    Okay.  Thank you.  What did you do to prepare

18   for today's deposition?

19       A    I read over documents and met with my

20   attorneys.

21       Q    What documents did you review?

22       A    Pretty much all of the documents that we had

1    produced in regard to the case.

2          Q     The documents that were produced in discovery

3    in the case, did you review anything else?

4          A     No, sir.

5          Q     And other than your attorneys, did you talk to

6    anyone about the dep in -- in preparing for your

7    deposition?

8          A     No, sir.

9          Q     And how long would you say you spent preparing

10   for today's deposition?

11         A     Several meetings.  Three or four.

12         Q     Would you say you spent more than five hours

13   preparing?

14         A     Probably.

15         Q     More than ten?

16         A     Probably not.

17         Q     So somewhere between five and ten hours?

18         A     Yes.

19         Q     Okay.  How long have you worked at Bethel

20   Christian Academy?

21         A     This is my 20th year.

22         Q     And you're the principal; is that correct?

1      A     Yes, sir.

2      Q     And have you been the principal the entire

3  time you've worked there?

4      A     No.

5      Q     What other positions have you held?

6      A     Assistant principal and teaching staff.

7      Q     Did you start as a teacher?

8      A     Yes.

9      Q     And then when did you become assistant

10  principal?

11      A     In 2003.

12      Q     And when did you become principal?

13      A     In 2016.

14      Q     And who do you report to?

15      A     Dr. John Green and the church board.

16      Q     And what is Mr. Green's position?

17      A     He is the lead pastor.

18      Q     Is there a distinction between Bethel

19  Ministries Inc and Bethel Christian Academy and if so

20  what is it?

21      A     I'm not sure I understand what you mean by

22  distinction.

1      Q      Well, there's a -- the Plaintiff in the case

2    is Bethel Ministries Inc; what is that?

3      A      That's the church ministry.

4      Q      And when we were -- and Bethel Christian

5    Academy than would be the school that's operated by the

6    ministry; is that correct?

7      A      Yes.

8      Q      And you said that you report to Mr. Green, the

9    lead pastor, and then also a board; is that right?

10     A      Yes, sir.

11     Q      And how many people are on that board?

12     A      Honestly, I don't know precisely, it's like

13   half a dozen.

14     Q      And how often do you deal with the board?

15     A      Not very frequently.

16     Q      Does Pastor Green have any role with respect

17   to the operation of the school?

18     A      No.

19     Q      What is your educational background?

20     A      You mean what is my highest level of degree?

21     Q      Sure.

22     A      I have a master's degree in Curriculum and

1    Instruction.

2          Q     From where?

3          A     The University of Scranton.

4          Q     And what year did you get that?

5          A     Oh my goodness.  I don't remember.  It's on a

6    certificate on my wall.

7          Q     Okay.  You have a bachelor's degree as well?

8          A     I do.

9          Q     From where?

10         A     It was called Columbia Union College, now

11   Adventist University.

12         Q     Where's that?

13         A     In Takoma Park, Maryland.

14         Q     And what year did you get your bachelor's

15   degree?

16         A     I also don't remember precisely, it was at

17   early 2000s.

18         Q     And what was your degree in your bachelor's?

19         A     Elementary Education.

20         Q     Do you have any other degrees?

21         A     I'm sorry, you broke up.

22         Q     I'm sorry.  Do you have any other degrees?

1       A     No, sir.

2       Q     And where -- have you held any other

3    professional positions other than working at Bethel?

4       A     I'm not sure what you mean by professional

5    positions, I have taught elsewhere.

6       Q     Okay.  Where?

7       A     A school called Providence Christian School.

8       Q     And how -- when did you teach there?

9       A     In the late 1990s.

10      Q     For how long?

11      A     One year.

12      Q     Have you had any other teaching positions?

13      A     No.

14      Q     How long has Bethel Christian Academy been in

15   operation?

16      A     Since 1984.

17      Q     And my understanding there's a kindergarten

18   through eighth grade; is that correct?

19      A     No.  Preschool through eighth grade.

20      Q     And what age does preschool begin?

21      A     Three.

22      Q     And how many students attend Bethel?

1      A      This year, approximately 160.

2      Q      And it's co-ed; is that correct?

3      A      Yes, sir.

4      Q      And how many teachers are employed by the

5    school?

6      A      20-some.

7      Q      And how many employees does the school have,

8    including teachers?

9      A      30-some.

10     Q      And where is the school located?

11     A      In Savage, Maryland.

12     Q      How many buildings does the school cons --

13    does the school operate?

14     A      Two.

15     Q      And does Bethel pay any property taxes on

16    either of those buildings?

17     A      I have no idea.

18     Q      Are the buildings owned by the ministry or by

19    the school?

20     A      By the ministry.

21     Q      Who is in charge of the finances for the

22    school?

1      A     That would be Dr. Green and the finance board.

2      Q     So I take it from your answer about the

3  property taxes that you don't have any role with respect

4  to the finances; is that correct?

5      A     That is correct.

6      Q     So you don't know what sources of funding the

7  school has; is that correct?

8            MR. TUCKER:  Objection to form.

9      Q     Let me rephrase that --

10     A     I'm not sure exactly what you're asking.

11     Q     Let me rephrase that question.  Do you know

12  what sources of funding the school has?

13     A     To some degree, yes.

14     Q     And can you ex -- tell me what it is -- what

15  they are?

16     A     Tuition, hot lunch, extended care fees.

17     Q     Does the school receive any subsidy from any

18  outside sources?

19     A     Such as what type of outside sources?

20     Q     Organizations, government organizations,

21  government agencies, non-governmental organizations,

22  religious organizations.

1      A      We do receive title funding -- title grant

2      funding from the Title I, II programs.

3      Q      Are those federal or state funds?

4      A      Those are federal.

5      Q      What about non-governmental sources?  Does it

6      receive any subsidies from non-governmental sources?

7      A      No.

8      Q      And do you know how much approximately the

9      school receives each year in the Title I and Title II

10     grants?

11          MR. TUCKER:  Hey Rob, is this part of the

12     corporate rep topics?

13          MR. SCOTT:  I believe that we included the

14     subject for all allegations in the complaint, but

15     I'm just trying -- I'm just trying to get some

16     background information about the school.

17          MR. TUCKER:  Yeah.  Yeah.  I mean, that's fine.

18     I just wanted to object to the scope on these

19     questions because it seems to me like it's a little

20     bit outside that.

21          MR. SCOTT:  Okay.

22     BY MR. SCOTT:

1    Q    Do you know the answer?

2    A    Not precisely, no.

3    Q    Do you know roughly?

4         MR. TUCKER:  Objection to form.

5    A    Yeah.  I'm not entirely sure.  Are you asking

6    about a particular title program?

7    Q    I'm just trying to get a sense of how much the

8    school receives on an annual basis for -- through these

9    government programs.

10   A    Less than $10,000.

11   Q    Who makes decisions about how the school is

12   operated?

13   A    In what respect?

14   Q    Well, how about -- let's start with policies

15   and procedures for operating the school.  Who decides

16   that?

17   A    Different people are involved in different

18   aspects of decision-making.

19   Q    Okay.  We -- the school has a handbook, right?

20   A    Yes, sir.

21   Q    Okay.  Who is responsible for the policies

22   that are in the handbook?  Who makes those policies?

1        A      Primarily me.

2        Q      Who else is involved in that?

3        A      I have an assistant principal who I discuss

4    things with at times.  And, Dr. Green may -- may also

5    enter into a discussion.

6        Q      And who is the assistant principal?

7        A      Brenonda Jackson-Gray.

8        Q      I didn't get the first name.  I'm sorry.

9        A      It's Brenonda.

10       Q      And how long has she worked as assistant

11   principal there?

12       A      She became assistant principal before I was

13   principal.  So probably a year longer than I've been

14   principal.

15       Q      Who at the school makes decisions about

16   student admissions?

17       A      Primarily me or Mrs. Gray may.

18       Q      Mrs. Gray May?  Who is that?

19       A      Yes.  Sorry.  Jackson-Gray.

20       Q      Oh, okay.  The assistant principal?

21       A      Yes.

22       Q      Let me -- let's move on to Exhibit 2, which is

1       the handbook.

2                       (EXHIBIT 2 MARKED FOR IDENTIFICATION)

3                       VIDEOGRAPHER:  Stand by.  Sharing now.

4               Q     Okay.  Thank you.  Ms. Dant, I have marked as

5       Exhibit 2 a copy of the handbook that was attached to

6       the lawsuit in this case.  This is dated 27, 2018.  I

7       understand from your testimony that you are the person

8       who is primarily responsible for creating this document;

9       is that correct?

10              A     That is correct.

11              Q     Okay.  And do you consult with anyone else

12      about the policies and procedures that are set forth in

13      this handbook when you want to, say, make changes to

14      them?

15              A     As stated, yes.

16              Q     And that would be Pastor Green; is that right?

17              A     Yes.

18              Q     And the assistant principal?

19              A     Yes.

20              Q     Anybody else?

21              A     No.

22              Q     So this isn't something that you would deal

1    with the board on?

2         A    No.

3         Q    When you took over as principal, was there a

4    version of this handbook already in effect?

5         A    Yes.

6         Q    And so that would have been in -- you said

7    2016 was when you took over as principal; is that

8    correct?

9         A    Yes.

10        Q    All right.  And do you know who prepared the

11   versions that were in effect before you became

12   principal?

13        A    That would be me.

14        Q    Okay.  And you did that in your role as

15   assistant principal; is that right?

16        A    Yes.

17        Q    Okay.  And was there a handbook in place

18   before you became assistant principal?

19        A    I'm sure there was.

20        Q    You're not -- did -- do you have any

21   recollection of that?

22        A    I've been do -- I've been doing it for a very

1    long time.

2         Q    I'm just trying to -- I'm just trying to

3    understand whether when you first started becoming

4    involved with this handbook, did you create -- was it

5    created from scratch by you or did you have something to

6    start with?

7         A    I'm sure I had something to start with, as I

8    recall.

9         Q    Okay.  And what's the purpose of this

10   document?

11        A    To provide clear information regarding our

12   policies and procedures.

13        Q    And how often is it revised?

14        A    Every year.

15        Q    And that would be a process that involves you,

16   Pastor Green, and the assistant principal; is that

17   right?

18        A    Yes.

19        Q    Who at the school makes decisions about

20   student discipline?

21        A    What type of decisions are you referring to?

22        Q    Well, let's start with the policy.  There are

1    some policies in this handbook about student discipline,

2    correct?

3         A    Yes.

4         Q    Those were developed by you in consultation

5    with Pastor Green and the assistant principal; is that

6    right?

7         A    Mostly with me and the assistant principal.

8    Pastor Green didn't really get too involved in that.

9         Q    Okay.  When it comes to making in -- decisions

10   about individuals students in particular circumstances,

11   who decides whether discipline is appropriate?

12        A    It depends on the behavioral circumstance, the

13   offense.

14        Q    Okay.  Can you explain that a little further?

15        A    If a student is being disciplined for being

16   disruptive in class, that doesn't require any

17   consultation.  If a student hits another student, that

18   may require some consultation.

19        Q    And when you say consultation, you mean

20   consultation by the staff member who witnessed the

21   incident with you or with somebody else?

22        A    Yes.

1      Q    And would you be primarily the person who they

2    would consult with about things like that?

3      A    Yes.  It could be Mrs. Jackson-Gray.

4      Q    Okay.  So if a staff member sees something

5    that he or she believes may require discipline and it's

6    a seri -- and they believe it's serious enough to

7    warrant it, they can consult with either you or the

8    assistant principal about what to do; is that fair?

9      A    Yes.

10     Q    So a teacher or another staff member, do they

11   have the authority to suspend a student without talking

12   to you or the assistant principal?

13         MR. TUCKER:  Objection to form.

14     A    I'm not sure what you mean.  Are you asking

15   about a blanket authority?

16     Q    I'm wondering if there is a level of sanction

17   that a teacher -- if there's a limit to what they can do

18   to discipline student without talking to you or the

19   assistant principal?

20     A    Yes.

21     Q    Okay.  And what is that limit?  What is the

22   limit of their authority, what they can do before they

1    need to come and talk to you or the assistant principal?

2         A    Probably remove a child from the classroom.

3         Q    They can do that without talking to you or the

4    assistant principal?

5         A    Except that they'd be sending them to us, so

6    they would be talking to us.

7         Q    Okay.  But again, a teacher wouldn't have the

8    authority to suspend a student as discipline without you

9    being involved; is that fair?

10        A    That would be correct.

11        Q    All right.  The same would be true for

12   expelling a student?

13        A    That would be correct.

14        Q    Going back to the handbook, does the school

15   have any other policy -- written policies or procedures

16   beyond what's in the handbook?

17        A    No.

18        Q    Okay.  So if anyone had a question about

19   student admissions standards or disciplinary standards,

20   a handbook would be the only place that they would look;

21   is that right?

22        A    That's correct.

1      Q      On page 2, the handbook is signed "the

2   administration."  Do you see that?

3      A      Yes.

4      Q      All right.  And who is that?  Who constitutes

5   the administration?

6      A      Me and Mrs. Jackson-Gray.

7      Q      On page 7 of the handbook, there is an

8   admissions policy and there's a reference here in the

9   third paragraph to a code of conduct.  It says, "middle

10  school students are required to sign a code of conduct";

11  is that correct?

12     A      That is correct.

13     Q      Okay.  And so students who are not in middle

14  school -- and what is middle school, that is six through

15  eight grades -- through six to eight; is that correct?

16     A      That is correct.

17     Q      So students who are in earlier grades than six

18  do not have to sign the code of conduct?

19     A      Correct.

20     Q      And so any student who's in middle school

21  would be presented with a written form that they have to

22  sign, that says they agree to the code of conduct; is

1    that correct?

2          A     Yes.

3          Q     On page 33 of the handbook, it says, at the

4    top, middle school code of conduct.  Is this the same as

5    the code of conduct that the students actually sign?

6          A     Yes.  It is.

7          Q     And what are the consequences if a student

8    fails to comply with the code of conduct?

9          A     It depends on what they did.

10          Q     Can a student be expelled for failing to

11   comply with the code of conduct?

12          A     It depends on what they did.

13          Q     Has any student ever been expelled from Bethel

14   for failing to comply with the code of conduct?

15          MR. TUCKER:  Objection to form.

16          A     That's a -- that's a very broad question.  The

17   code of conduct is connected to our discipline policies.

18          Q     Can you explain what you mean by that?

19          A     The code of conduct is not by itself the

20   discipline policy.

21          Q     But it says standards for behavior that need

22   to be compliant with, correct?

1       A    It's a general guideline for the intent that

2   we want from our middle school students, and being a

3   part of our community.

4       Q    And what is the purpose of having a middle

5   school students sign it?

6       A    Acknowledgment that they understand the

7   expectations.

8       Q    Let's talk a little bit about the application

9   process, when student is consi -- or family is

10  considering sending their child to Bethel.  How does the

11  application process work?

12      A    There is an application online that they can

13  access through our website.

14      Q    And what information is the student required

15  to provide in order to apply for that admission?

16      A    Their name, their age, their grade, those

17  various personal informations.

18      Q    Anything else?

19      A    No.  The application asks for parent contact

20  information and all those regular things.

21      Q    Are they required to take some sort of a test

22  in order to be admitted?

1      A    That's part of the process.

2           THE WITNESS:  Oops, my camera -- my monitor

3      just went blank.  I don't know if you can hear me or

4      not?  My monitor just went black.

5           VIDEOGRAPHER:  We can hear you perfectly.

6           MR. TUCKER:  Yeah.  Can you still see her, Rob?

7           MR. SCOTT:  I can see her, but she's frozen.

8           MR. TUCKER:  Okay.  They may have disconnected

9      connectivity on that computer.

10          THE WITNESS:  We're going to try to get me back

11     up.

12          MR. TUCKER:  There?

13          THE WITNESS:  It just turned off.  Yes.

14          MR. TUCKER:  It happens.

15          THE WITNESS:  Sure.  It's probably -- going to

16     timeout unaware.  After a certain amount of time, it

17     turns off.

18          MR. TUCKER:  Yeah.  Okay.

19          THE WITNESS:  Sorry about that.  Rebooting.

20          MR. TUCKER:  How about that?

21          THE WITNESS:  I can try to --

22          MR. TUCKER:  Rob, do you want to take a

1          two-minute break while we try to --

2                MR. SCOTT:  Yeah.  That's fine.

3                MR. TUCKER:  Okay.

4                COURT REPORTER:  We are off the record.

5                  (OFF THE RECORD)

6                THE WITNESS:  Okay.  We're almost -- okay.  I

7          think we're back.

8                MR. SCOTT:  Okay.  Are we all set?

9                THE WITNESS:  I believe so.

10               MR. TUCKER:  Yes -- yes.

11               MR. SCOTT:  Okay.  Madam Reporter, could you

12         read back the last question, please?

13               COURT REPORTER:  Yes.  Give me one moment. I'll

14         pull that up for you.

15                 (REPORTER PLAYS BACK REQUESTED TESTIMONY)

16    BY MR. SCOTT:

17         Q    Okay.  Thank you.  Ms. Dant, is there -- are

18    students who are seeking admission to Bethel required to

19    take a test in order to apply?

20         A    Yes.

21         Q    And what --

22         A    Depending on the grade.

1     Q    Okay.  What grades need to take a test?

2     A    Third grade and up.

3     Q    And can you tell me what the -- can you

4 describe the test for me?

5     A    It's the TerraNova 3 Standardized Achievement

6 Test.

7     Q    And does the school have minimum scores that

8 are required in order to be admitted?

9     A    Yes.

10    Q    So in order to be admitted, that the student

11 -- the prospective students need to submit an

12 application online, they need to -- if they're in third

13 grade or up, they need to take this standardized test

14 and achieve a certain score.  Is there anything else

15 that the applicants need to do to be admitted?

16    A    They must turn in all required medical

17 paperwork and go through a family interview.

18    Q    And who participates in the family interview

19 for the school?

20    A    Myself or Mrs. Gray, at least one parent,

21 sometimes the child.  It varies.

22    Q    And what happen -- what subject areas are

1   discussed during the interview?

2       A    A number of different things, primarily

3   procedural.

4       Q    What do you mean by procedural?

5       A    How the school functions.

6       Q    Does the school request any information from

7   the parents or the student during the interview?

8       A    Not that we don't already have through the

9   inter -- through the paperwork process.

10      Q    Does the school obtain any other information

11  other than what you've described so far about

12  prospective applicants as part of the admission process?

13      A    There may be academic records.

14      Q    When you say there may be, what do you mean?

15      A    Sometimes they're not available.

16      Q    So you get the records from the prior schools

17  that they have attended; is that correct?

18      A    Yes, sir.

19      Q    And what factors does the school -- you

20  mentioned the test, but beyond the test, what factors

21  does the school consider in deciding whether or not to

22  admit a student?

1        A      It is primarily academics.

2        Q      What -- anything else?

3        A      If they have been expelled from a previous

4     school, we would certainly consider that.

5        Q      So when you get their academic records from

6     other schools, you also are looking at their

7     disciplinary history; is that correct?

8        A      Yes.

9        Q      And that is something that's considered when

10    you're deciding whether to admit a student; is that

11    correct?

12       A      Yes.

13            MR. SCOTT:  All right.  Let's move on to

14       Exhibit 3, please.

15              (EXHIBIT 3 MARKED FOR IDENTIFICATION)

16            VIDEOGRAPHER:  Stand by.

17            MR. SCOTT:  Is there any way we can rotate

18       that?

19            VIDEOGRAPHER:  Yes.  Give me one second.

20            MR. SCOTT:  Thank you.

21    BY MR. SCOTT:

22       Q      Ms. Dant, I've had marked as Exhibit 3 to your

1    deposition a copy of document that was produced by your

2    attorneys in this case.  Can you tell me what this is?

3        A    It's a brochure that we hand out to people

4    interested in the school.

5        Q    All right.  I see there are three buildings

6    pictured on the first page of this document.  Are those

7    -- all three of those buildings still in use by the

8    school?

9        A    No.

10       Q    Okay.  Which one is no longer being used?

11       A    The one at the bottom.

12       Q    Sixth, seventh, and eighth grade.  So where do

13   those -- where did the students who used to go to school

14   there, where do they go to school now?

15       A    The building on Lincoln Street.

16       Q    Let me direct your attention to the fifth page

17   of this document.  Keep going, one more.

18       A    That's it.

19       Q    Yeah.  That's the one.  It's upside down.

20   Okay.  This is something that's referred to at the top

21   as a Statement of Cooperation and Agreement.  What is

22   this?

1      A     It's a statement of cooperation and agreement.

2      Q     And what's the purpose of it?

3      A     To discuss things that the parent is needing

4    to understand in enrolling their child.

5      Q     And I see that there's signature lines for the

6    father, mother, and guardian at the bottom.  Do you have

7    the parents sign this as part of the application

8    process?

9      A     Yes.

10     Q     Okay.  And I noticed that about, let's say,

11   two-thirds of the way down, there's a statement that the

12   parent is to initial that says, "As a BCA parent, I

13   commit to carefully read and support all school policies

14   as outlined in the Parent Student Handbook."  Do you see

15   that?

16     A     I do.

17     Q     Okay.  What does the school mean by "support

18   all school policies"?

19     A     It means not act in opposition to them.

20     Q     And does it mean that the parents have to

21   agree with the school policies?

22     A     No.

1     Q    So the school doesn't believe that a parent

2 who is seeking to have their student admitted needs to

3 agree with all the policies in the handbook.  Is that

4 your testimony?

5     A    It is.  Everyone is welcome.

6     Q    Even if they disagree with the policy?

7     A    Yes, sir.

8     Q    But they have to sign something that says that

9 they support the policy in order for their student --

10 for their child to be admitted, correct?

11     A    That is correct.

12     Q    And if a parent looked at the handbook and

13 determined that they disagreed with the policies and

14 then refused to sign this document, the statement of

15 cooperation and agreement, Bethel would not admit their

16 child as a student; is that correct?

17          MR. TUCKER:  Objection.  Speculation.

18     A    We've never had that situation, so I don't

19 know what would happen in that situation.

20     Q    But you do require parents to sign this

21 document as part of the application process, correct?

22     A    We do.

1      Q     And if the parents refused to sign it, then

2   the application would not be approved; is that right?

3      A     I can't speak to that.  I've never had that

4   circumstance occur.

5      Q     So you've never had a parent who's refused to

6   sign this?

7      A     That's correct.

8           MR. SCOTT:  Let's move on to Exhibit 4, please.

9           (EXHIBIT 4 MARKED FOR IDENTIFICATION)

10          VIDEOGRAPHER:  Stand by.  Sharing now.

11  BY MR. SCOTT:

12     Q     This is a doc -- another document that I

13  received in discovery in this case from your lawyers.

14  Can you tell me its -- it says Pre-Enrollment Parent

15  Interview.  Can you tell me the purpose of this form?

16     A     It's basically a guideline so that whoever

17  might be conducting an interview would not forget to

18  cover certain information.

19     Q     And does this accurately set forth the subject

20  matters that are discussed during the interview?

21     A     Yes.  It does.

22     Q     On page 2, it says, "BCA core values,

1    emphasize key points," do you see that?

2         A    I do.

3         Q    All right.  And then it says, "Have parent

4    sign statement," and that's underlined.  Is that the

5    statement that we just looked at earlier as part of

6    Exhibit 3, the statement of cooperation and agreement?

7         A    No.  We did not.

8         Q    So there's another form that the parents need

9    to sign?

10        A    Yes.  The BCA core values.

11        Q    And where's that document?  Is that in the

12   packet that they received as part of Exhibit 3 or is it

13   separate?

14        A    I did not see it there.  I'm sure we provided

15   it.

16        Q    But it is called BCA core values?

17        A    Yes.  They are also listed in the handbook.

18        Q    Okay.  So where -- let's go back to the

19   handbook, which is Exhibit 2.  Where are the core values

20   listed in the handbook?

21        A    At the very beginning.

22        Q    It looks like page 9?

1      A      Yep.  There they are.

2      Q      Okay.  And so in addition to the statement of

3  cooperation and agreement, the parents are also given a

4  form that says they agree with these core values that

5  they have to sign as part of the application process?

6      A      No.  That is not correct.

7      Q      Okay.  They sign it during the interview?

8      A      They do, but they're not signing that they

9  agree with them.

10     Q      Okay.  What's the purpose of having them sign

11 it?

12     A      That they acknowledge that this is what we

13 believe.

14     Q      And that's what the form says?

15     A      Yes.  It does.

16     Q      At the bottom -- we're going back to Exhibit

17 4, which is the interview form.  At the bottom of the

18 second page, it says there are a few additional things

19 for the parent to do for enrollment to be finalized. And

20 number 2 is signed education agreement.  What is that?

21     A      That's a statement explaining that we have a

22 continuous enrollment agreement regarding tuition.

1      Q    I'm not sure I understand.  Does that mean

2  you're -- they are agreeing to pay the tuition?

3      A    Yes.  But we don't have them re-enroll each

4  year.  So there is an explanation of a continuous nature

5  of our enrollment from year to year.

6      Q    And the parents are required to sign this?

7      A    Yes.

8      Q    Is there anything else the parents are

9  required to sign beyond the core values and cooperation

10  statement?

11      A    I -- I'm sorry.  I -- I cannot hear you.  That

12  whole part was garbled.

13      Q    Okay.  I'll start again.  Beyond the documents

14  that we've already talked about, the cooperation

15  statement, the core values statement, and this education

16  agreement, that's referenced in Exhibit 4, are there any

17  other documents that the parents are required to sign as

18  part of the admission or enrollment process?

19      A    There are a number of things the parents must

20  acknowledge with a signature in the application.

21      Q    And the application is completed online; is

22  that correct?

1        A     That is correct.

2             MR. SCOTT:  Let's go back to Exhibit 3, please.

3        Go up one page -- to the top.

4        Q     This document is include -- this is -- it says

5   application for admission.  This is included in the

6   brochure, that's Exhibit 3.  Does this reflect all of

7   the information that is required to fill out the

8   application online?

9        A     I'm not sure how to answer that because this

10  is the basic application, but then there are medical

11  forms and various other things that are required.

12       Q     All right.  So there is some difference

13  between the information that's requested on this page

14  and what's required online?

15            MR. TUCKER:  Objection to form.

16       Q     Is that correct?

17            MR. TUCKER:  Form.

18       A     I'm -- I'm not sure I understand what you're

19  asking.  The application is the same.  It asks the same

20  information.  The process involves other pieces.

21       Q     Right.  And the other pieces being medical

22  information and academic records.  Anything else?

1        A    No.

2             MR. SCOTT:  Let's move on to Exhibit 5, please.

3             VIDEOGRAPHER:  Stand by.

4        Q    Ms. Dant, Exhibit 5 are some documents that

5    were provided to us in discovery by your lawyers.  They

6    appear to be admission records; is that correct?

7             (EXHIBIT 5 MARKED FOR IDENTIFICATION)

8        A    Yes.

9        Q    Okay.  And what do these documents show?

10       A    They are database fields as a student walks

11   through the process.

12       Q    Walks through what process?

13       A    The enrollment process.

14       Q    Okay.  So let's look at the first page of

15   this.  This is a student admissions record for one

16   particular applicant; is that correct?

17       A    Yes.

18       Q    All right.  And is there a disposition

19   reflected on this page?

20       A    Do you mean a status?

21       Q    Well, was this student accepted?  Are you able

22   to tell from looking at this page whether or not this

1    student was accepted?

2         A    Yes, I am.

3         Q    And what is -- what was the outcome?

4         A    The student was not accepted.

5         Q    And where -- is that where it says status

6    rejected?

7         A    Yes, sir.

8         Q    Okay.  And are you able to tell why the

9    student was rejected?

10        A    This is very tiny.  So if they can be zoomed a

11   bit more and scrolled.  Yes.  If I looked through this,

12   I can see that a lot of things were not completed and

13   when the testing was conducted, the student did not pass

14   the test -- the exam.

15        Q    You're looking at the box that's checked

16   testing conducted.  And then in the box next says "did

17   not pass the exam."

18        A    Right.

19        Q    Okay.  Let's go to the next page 2.  Again,

20   this student appears to have been rejected, did not pass

21   the exam, correct?

22        A    Yes.

1        Q     Page 3, this student was rejected.  Can you

2   tell why?

3        A     There is no note there to indicate that

4   precisely.

5        Q     Would there be any other records at the school

6   to indicate why the student's application was rejected?

7        A     No.

8        Q     And you don't know why they were rejected?

9        A     I would have to conjecture.

10        Q     Well, I'm just asking whether you know, as the

11   designee of Bethel, whether or not -- why this students

12   application was rejected and your answers is --

13        A     I don't know -- I don't know.  There were

14   preschool students.  Often preschool students don't

15   proceed because they expected to be potty trained and

16   then were not.

17        Q     But you don't know whether that's what

18   happened in this instance?

19        A     No.  I don't.

20        Q     Okay.  Let's go to the next page.  This

21   application -- this student's application was rejected.

22   Are you able to tell why?

1       A     Again, it's rather small, but it looks like it

2    says "below grade level" in several areas.

3       Q     That's in the testing box?

4       A     Yes.

5       Q     Okay.  And you're interpreting that where

6    there's a little -- a symbol, it says GL, I guess below

7    -- you're interpreting that as below grade level in

8    several areas; is that right?

9       A     Yes.

10      Q     Is there any additional text in that box that

11   we can't see on this document?

12      A     I can't tell from that.  The M indicates --

13   the M indicates there is.

14      Q     And in order to find out what that says, you

15   have to go onto the database and look at it; is that

16   right?

17      A     I believe so.  This is how it prints out.

18      Q     Let's go to the next page which is Bates

19   stamped at the top, Plaintiff's production 0447.  Are

20   you able to tell why this student's application was

21   rejected?

22      A     If you scroll down a bit, it appears they also

1    were below grade level.

2         Q    And again, we can't see all the text in that

3    box, right?

4         A    Right.

5         Q    All right.  The next page, Plaintiff's

6    production 448.  Are you able to tell why this student

7    was rejected?

8         A    Because they didn't pass.

9         Q    Didn't pass the test?

10        A    It's in the testing box.  Yes.

11        Q    Did not pass the test, correct?

12        A    Right.

13        Q    All right.  The next page, 449, also rejected.

14   Are you able to tell why?

15        A    Below grade level.

16        Q    That's the testing box again?

17        A    Yes, sir.

18        Q    The next page, 450.  Are you able to tell why

19   this student was rejected?

20        A    Yes.

21        Q    And what was that?

22        A    They tested below grade level.

1        Q      Okay.  The next page, 451.  This student was

2    rejected.  And it looks like it was -- didn't pass the

3    test, correct?

4        A      Yes, sir.

5        Q      And the next page, 452, another student

6    rejected and it looks like because they didn't pass the

7    test, correct?

8        A      Correct.

9        Q      Next page, 453.  Appears to be the same.

10   Rejected, did not pass the test, correct?

11       A      Correct.

12       Q      Next page, 454, another student rejected and

13   it looks like did not -- or tested below grade level,

14   correct?

15       A      Correct.

16       Q      Next page, 455.  Are you able to tell why this

17   student was rejected?

18       A      No.  I cannot tell for sure.

19       Q      In the testing box, it says that the student

20   -- it says assessed June 19, 2017, and then it says AC.

21   Do you know what that means?

22       A      AC was the person who administered the test.

1     Q    But you're not able to tell why this student

2 was rejected?

3     A    No.  That data was apparently not entered.

4     Q    And there's no other record in schools

5 possession that reflects why that student was rejected;

6 is that right?

7     A    No there is not.  That is correct.

8     Q    Okay.  Let's go to the next page, 456.  Are

9 you able to tell why this student was rejected?

10    A    No.  That detail is not in that field.

11    Q    And there's no other document in the school's

12 possession that would show why that student was

13 rejected; is that right?

14    A    That's correct.

15    Q    The next page is 457.  It looks like this

16 student was rejected because they tested below grade

17 level; is that right?

18    A    Yes.

19    Q    So -- in looking again at the testing box, the

20 AC, you're saying that's the initials of a person who

21 the gave the test; is that right?

22    A    That's correct.

1     Q     And who is -- do you know who AC is?

2     A     Yes.  That's Amaris Carrington.

3     Q     And what is her job?

4     A     She's my administrative assistant.

5     Q     So the tests that the students take to -- when

6  they're applying, those tests are administered at

7  Bethel; is that right?

8     A     Yes.  Except that in a COVID world we have

9  done a couple of them via Zoom.

10    Q     Okay.  But it's not like the SAT where you go

11 to a big room to take it with 500 people in some

12 third-party location?

13    A     No.

14    Q     All right.  The next page, 458.  Are you able

15 to tell why this student's application was rejected?

16    A     No.  I'm not.

17    Q     And there is no other documents that the

18 school has in its possession that would show why this

19 student was rejected, right?

20    A     That's correct.

21    Q     And this student was applying for -- well, it

22 says grade 4.  Does that -- is that the grade that they

1  were in at the time of the application or the grade

2  they're seeking admission into?

3      A    That would be the grade they were seeking

4  admission into.

5      Q    Okay.  The next page, 459.  Do we know why

6  this students -- are you able to tell why this student's

7  application was rejected?

8      A    No.  I'm not.  But again, that's -- that's a

9  pre-K student, so there is no testing.

10      Q    And there's no document in the school's

11  possession that would show why this student was -- why

12  their application was rejected; is that correct?

13      A    That's correct.

14      Q    The next page, 460.  It looks like this

15  student was rejected because they didn't pass the test,

16  correct?

17      A    Correct.

18      Q    The next page, 461, this says the student was

19  rejected.  Are you able to tell why?

20      A    Yes.  Below grade level in all subjects.

21      Q    That's the testing box again?

22      A    Yes.

1        Q      The next document 462, are you able to tell

2   why this student was rejected?

3        A      No.  I cannot tell.

4        Q      And the school doesn't -- there is no

5   documents in the school's possession that would show why

6   this application was rejected; is that right?

7        A      That's right.

8        Q      And this student was seeking admission into

9   grade 7; is that right?

10        A      Correct.

11        Q      Next page, document 463.  Are you able to tell

12   why this student was rejected?

13        A      Yes.

14        Q      Why?

15        A      Seeking seventh grade, but scored a -- a third

16   grade level.

17        Q      So unsatisfactory test results, correct?

18        A      I'm sorry?

19        Q      So her test result -- this student's test

20   result were not sufficient; is that correct?

21        A      Correct.

22        Q      The next page, 464.  Are you able to tell why

1    this student's application was rejected?

2         A    No.  I'm not able to tell.

3         Q    And the school is not in possession of any

4    documents that would show why this student was not

5    accepted; is that right?

6         A    That is correct.

7         Q    The next page, 465.  Are you able to tell why

8    this student's application was rejected?

9         A    No.  It appears it was not completed.

10        Q    Okay.  What do you mean?  Why do you believe

11   that?

12        A    Because all the fields are virtually empty.

13        Q    And does the school know why the application

14   was not completed?

15        A    No.  We don't.

16        Q    Okay.  The next page, 466.  Looks like this

17   student was rejected for below grade level test; is that

18   correct?

19        A    That is correct.

20        Q    Any other reason?

21        A    No.

22        Q    The next page, 467.  Student was rejected.  It

1    says in the testing box that they were below grade level

2    in math; is that correct?

3         A    That is correct.

4         Q    Is that the reason why the student's

5    application was rejected?

6         A    Yes.

7         Q    The next page, 468, the student's application

8    was rejected.  And can -- are you able to tell why?

9         A    No.  I'm not.

10        Q    Okay.  And the school doesn't have any

11   documents in its possession that would show why this

12   student's application was rejected; is that correct?

13        A    That's correct.

14        Q    All right.  Let's go back to the handbook,

15   which is Exhibit 2, page 7.  About two-thirds of the way

16   down in bold, it says Statement of Non-Discrimination,

17   do you see that?

18        A    Yes.

19        Q    Okay.  When was that statement first added to

20   the admission's policy?

21             MR. TUCKER:  Objection to form.

22        A    I'm not sure exactly what you mean.  The

1    heading?  The precise wording?  It's been in our

2    handbook forever.

3        Q    The statement of non-discrimination.  I'm

4    asking whether -- when that was for -- when that first

5    became part of the Bethel's admissions policy?

6            MR. TUCKER:  Objection to form.

7        A    I'm not sure exactly what statement you're

8    talking about in regard to which paragraph.  And

9    20 years ago probably, a long time.

10       Q    Do you know when it was at -- when it was

11   first added?

12       A    I do not.

13       Q    Who drafted the language in the statement of

14   non-discrimination?

15       A    Me.

16       Q    Anybody -- did anybody else participate in

17   that process?

18       A    I'm sure Mrs. Gray and Dr. Green read it.

19       Q    Do you have a specific recollection of them

20   providing any input on this statement of non-

21   discrimination?

22       A    No.

1      Q    It says in the statement of non-discrimination

2   in the second -- at the first paragraph, second sentence

3   that "it," being Bethel "does not discriminate on the

4   basis of race, color, national and ethnic origin in the

5   administration of its educational policies, admissions

6   policies, et cetera."  I noticed that the statement of

7   non-discrimination does not include sexual preference. A

8   statement that the school does not discriminate based on

9   sexual preference.  Is there any particular reason why

10  that is not included?

11     A    Its language was the language that was

12  required for non-profits by the IRS.

13     Q    How do you know that?

14     A    Having been told that.

15     Q    And who told you that?

16     A    Don't remember precisely.

17     Q    Okay.  So some -- this is language that you

18  got --

19     A    That statement preexisted me.

20     Q    Okay.  That's what I was trying to find out.

21  So this statement was already in the handbook before you

22  ever started working on it; is that correct?

1       A    Yes, sir.

2       Q    Okay.  Do you know who originally put this

3  language in the handbook or when?

4       A    I do not.

5       Q    All right.  Has Bethel ever had any

6  prospective student apply for admission to Bethel

7  Christian Academy who is homosexual?

8            MR. TUCKER:  Objection to form.  Speculation.

9       Q    You can answer.

10      A    Not that I'm aware of.

11      Q    If a student applied to Bethel Christian

12  Academy and who was qualified for admission, but the

13  school learned was homosexual, would Bethel admit that

14  student?

15      A    That's a hypothetical situation.  All students

16  who apply and meet our academic requirements are welcome

17  to attend.

18      Q    Even if they're homosexual?

19      A    All students who apply and meet our academic

20  requirements are welcome.

21      Q    Even if they are homosexual, yes?

22      A    All students.

1      Q     Including homosexual students, correct?

2      A     Including any student.

3      Q     Including homosexual students, yes?

4      A     We don't disqualify any student that is

5   qualified to meet our academic requirements.  That would

6   include all students.

7      Q     Including homosexual students, correct?

8      A     Again, all students.

9      Q     Okay.  Including homosexual students, yes or

10  no?

11          MR. TUCKER:  Asked and answered.

12      A     We don't discriminate against any students.

13      Q     It's a very simple question.  If a student is

14  qualified for admission, and turns out to be homosexual

15  sexual would the school --

16          MR. TUCKER:  Objection.  Asked and answered.

17      She's already answered it.

18          MR. SCOTT:  Well, I don't agree -- I don't

19      agree, Counsel, but I'm going to ask one more time.

20          MR. TUCKER:  All would include every single

21      student of every orientation.

22  BY MR. SCOTT:

1       Q     Including homosexual students, yes or no?

2       A     All students.  Any student.

3       Q     What about students who don't dress or

4    identify with their biological gender?

5       A     Any student who meets our qualifications and

6    understands our conduct expectations would be admitted.

7       Q     What if the student says, "I don't want it.

8    I'm a boy and I don't want to dress like a boy, I want

9    to dress like a girl"?

10      A     That would be a hypothetical situation I have

11   never faced.

12      Q     So you don't know whether you would admit that

13   student or not?

14          MR. TUCKER:  Objection.  Speculation.  Asked

15       and answered.

16      A     I would have to speculate and I'm not wanting

17   to do that.

18      Q     But the school has a policy, doesn't it?

19   Against students not dressing or identifying with their

20   -- in accordance with their biological gender?

21          MR. TUCKER:  Objection to form.

22      A     We have a number of conduct policies --

1        Q      Including one that says --

2        A      -- it applies to all students.

3        Q      Okay.  My question is: the school has a policy

4   that prohibits students from not dressing in accordance

5   with their biological gender, isn't that correct?

6        A      We have a dress code policy.

7        Q      Right.  And what -- and it says that if you --

8   that you were required to dress in accordance with your

9   biological gender, correct?

10            MR. TUCKER:  Objection to form.

11       Q      You can answer.

12       A      I don't know precisely the wording in the

13   discipline policy in the handbook.

14       Q      All right.  Well --

15       A      We do require that -- we do require that all

16   students be in the proper uniform.

17       Q      Okay.  Well, it says right here at the

18   document -- in the document that we're looking at, which

19   is the handbook.  Which is Exhibit 1, to the complaint

20   that the file in this case and it says in the last -- in

21   the second-to-last, excuse me, the last sentence on page

22   7:  "Faculty, staff, and students are required to

1   identify with, dressing in accordance with, and use the

2   facilities associated with their biological gender."  Do

3   you see that?

4        A    Yes.  I do.

5        Q    Okay.  And so my question is if you have an

6   applicant -- student applicant who says, "I don't want

7   to comply with that policy."  Would you admit that?

8             MR. TUCKER:  Objection.  Speculation.

9        A    That's a hypothetical situation I've never had

10  to face.

11       Q    If you did face it, what would you do?

12            MR. TUCKER:  Objection.  Speculation.

13       A    I can't answer that question.  I don't want to

14  guess.

15       Q    What things would you consider in making that

16  kind of a decision?

17       A    I feel like that's still hypothetical.

18       Q    Well, I'm allowed to ask you hypothetical

19  questions, Ms. Dant.  If you don't -- if you refuse to

20  answer them, we'll deal with it.  But there's no

21  probation on me asking you a hypothetical questions

22  here.

1          MR. TUCKER:  And there is no prohibition to me

2       objecting to the form of the question.  She's

3       answered the question.

4          MR. SCOTT:  She hasn't answered the question.

5          THE WITNESS:  We don't discriminate -- we don't

6       discriminate against the students that apply and are

7       qualified to meet our academic requirements and who

8       want to be in our school.

9    BY MR. SCOTT:

10      Q    What about students who don't want to follow

11   this statement that I just read to you from the

12   handbook.  Do you admit them?

13         MR. TUCKER:  Speculation.  Objection.

14      Speculation.  Objection.  Asked and answered.

15      A    I think I've answered that question.  I don't

16   know what else to tell you.

17      Q    Okay.  It says in the first sentence about

18   what's -- let me ask you a different question.  Has

19   Bethel ever had any prospective student apply who did

20   not identify or dress in accordance with their

21   biological gender?

22      A    Not to my knowledge.

1      Q     Let me direct your attention to the last

2  sentence of the third paragraph on page 7 of Exhibit 1

3  -- no, I'm sorry, Exhibit 2.  I apologize.  Yes.  Thank

4  you.  It says, "Parents must understand that continued

5  enrollment of their children is dependent on their

6  support of the school."

7      A     My screen just went black again.  I'm so

8  sorry, my screen just went black again.

9      Q     All right.

10          MR. SCOTT:  Why don't we take a break?  Let's

11      take a ten-minute break.

12          COURT REPORTER:  Okay.  We are off the record.

13            (OFF THE RECORD)

14          COURT REPORTER:  We are back on the record.

15  BY MR. SCOTT:

16      Q     Okay.  Ms. Dant, let me refer you to the third

17  paragraph of page 7 of Exhibit 2, what we were talking

18  about before the break.  It says, "Parents must

19  understand that continued enrollment of their children

20  is dependent on their support of the school, its staff,

21  and its policy."  Do you see that?

22      A     Yes.

1      Q     Okay.  Does that mean a student who does not

2   comply with the policies in the handbook is no longer

3   entitled to be enrolled?

4      A     It has nothing to do with enrolling, it's once

5   they're in the school.

6      Q     "Continued enrollment" is what it says, right?

7      A     Yes.

8      Q     It says so.  Continued enrollment is dependent

9   on their support of the school, its staff, and its

10  policies, right?

11     A     Yes.

12     Q     So is continued -- does that mean a student

13  who does not support the school's policies can be

14  expelled?

15     A     It says a student who acts contrary to our

16  policies and in opposition to them may find themselves

17  in that situation.

18     Q     What situation?

19     A     Being asked to withdraw.

20     Q     I noticed that there's -- going down back to

21  the statement of non-discrimination in the second

22  paragraph, it states that, "Bethel Christian Academy

1   supports the biblical view of marriage, defined as a

2   covenant between one man and one woman."  Do you see

3   that?

4        A    Yes.

5        Q    Okay.  Why is that in the statement of

6   non-discrimination?

7        A    It was not my perception that it was in the

8   statement of non-discrimination.  It was a separate

9   statement having to do with conduct expectations.

10       Q    And -- well, why is it, you know, why does it

11  appear on this page?

12       A    Because we accept students from anywhere and

13  have open enrollment, it was our understanding that

14  clarity regarding who we are, and what we expect was a

15  good thing.

16       Q    Does it mean a student whose behavior does not

17  align with Bethel's view of marriage, i.e., that it's a

18  marriage that is a covenant between one man and one

19  woman you -- has to withdraw the from school?

20       A    Keep in mind that we have preschool through

21  eighth grade students, and so their actions have nothing

22  to do with marriage.

1      Q    Why do you say that?

2      A    Because they're too young.

3      Q    But then why does Bethel Christian Academy --

4  if this -- if it has no application to them because it's

5  beyond them, why is Bethel Christian Academy including a

6  statement about it's difficult view of marriage in its

7  admissions policy?

8           MR. TUCKER:  Objection to form.

9      A    As I stated, I don't believe that statement is

10 part of our admissions policy, as it refers also to

11 faculty and staff.  It's a statement of our belief.

12     Q    It's a statement of the school's belief about

13 marriage, right?

14     A    Yes.

15     Q    And Bethel is putting that statement on the

16 same page with -- I understand your view is it's not

17 part of admissions policy; is that right?

18     A    That's correct.

19     Q    But it's on the page with a heading at the

20 top, it says Admissions Policy, correct?

21     A    Yes.

22     Q    And I think you just testified a few minutes

1    ago that Bethel's view of marriage is irrelevant to

2    students because they're too young, correct?

3         MR. TUCKER:  Objection to form.

4       Mischaracterizes prior testimony.

5         A    No.  I stated that their actions as children

6    would not be relevant.

7         Q    Does Bethel Christian Academy teach or include

8    in its curriculum any teachings concerning marriage?

9         MR. TUCKER:  Rob, is this part of your

10       corporate depo or are we molding this into her

11       individual capacity?  I'm just trying to figure out

12       where we're at as to whether I need to object to the

13       scope or not.

14       MR. SCOTT:  I think it's fairly within the

15       subject areas.

16       MR. TUCKER:  Where would that be?  What topic?

17       MR. SCOTT:  Allegations in the complaint.

18       Factual basis for the allegations in the complaint.

19       MR. TUCKER:  What?  The sub -- the actual

20       subjects that are taught in each individual grade

21       level?

22       MR. SCOTT:  No.  I asked whether there were any

1      teachings concerning marriage.

2            MR. TUCKER:  Okay.  Go ahead.

3            THE WITNESS:  I don't believe that's part of

4      our curriculum.  We focus on biblical content.

5   BY MR. SCOTT:

6      Q    Has Bethel ever had a student after being

7   admitted disclose that he or she was homosexual to the

8   school?

9      A    I'm sorry.  I'm sorry.  You broke up a bit

10  there.

11     Q    I'm sorry.  It's -- I keep looking away when

12          I'm speaking.  That's my fault.  I'll try to

13  stop doing that.  My question is: Has Bethel ever had a

14  student after being admitted, disclose to the school if

15  he or she is homosexual?

16     A    I can't say definitively, no, not to me.  Not

17  to anyone I know.

18     Q    Okay.  But this question I'm asking you in

19  your capacity as designee for Bethel Christian -- for

20  the plaintiff in this case.

21     A    Then I would say no.

22     Q    Has Bethel ever had a student engage in

1    conduct at the -- that is inconsistent with Bethel's

2    view that marriage is defined as a covenant between one

3    man and one woman?

4         A    No.

5         Q    If that were to happen, what would Bethel do

6    under those circumstances?

7              MR. TUCKER:  Objection to speculation.  Form.

8         A    I would have to assume we would carry our

9    discipline policies as we do with all students.

10        Q    Has Bethel ever had a student that was

11   admitted who did not identify or dress in accordance

12   with their biological gender?

13        A    No.

14        Q    All right.  Well, you just referred to the

15   discipline policy.  Let's take a look at that.  I think

16   it's on page 34 -- 32.  Is this the discipline policy?

17        A    Part of it, yeah.

18        Q    Where does it start?  Do you know, Ms. Dant?

19        A    It just -- it just encompasses more than this

20   page.

21        Q    Okay.  Well, let's talk about this page first.

22   So it lists -- this page lists a number of offenses

1    which are described as of a more serious nature, right?

2        A    Yeah.

3        Q    And these offenses, according to this policy,

4    may result in suspension or expulsion from the school,

5    correct?

6        A    Correct.

7        Q    Okay.  And this is -- this -- and you -- if I

8    understand your earlier testimony, you are -- you

9    oversee the discipline of students at the school; is

10   that correct?

11       A    Yes.

12       Q    So if a student ought to be expelled or

13   suspended as a result of any offenses listed on this

14   page that we're looking at, page 34, Exhibit 2, it will

15   be your decision whether or not to suspend or expel that

16   student?

17       A    Yes.

18       Q    One of the listed offenses here is

19   inappropriate relationships.  Do you see that?

20       A    I do.

21       Q    Okay.  What does Bethel mean by inappropriate

22   relationships?

1       A     For children, it means romantic relationships

2    are inappropriate.

3       Q     When you say children, does that apply to all

4    students at the school?

5       A     We believe all of our students are children.

6       Q     Including the middle school students?

7       A     Yes.

8       Q     And when you say a romantic relationship, what

9    do you mean?

10      A     I don't know how else to describe romantic.

11   Crushes, I like you, you like me, we're in love, all of

12   that.

13      Q     So if a student is engaged in a relationship

14   like you just described, across the I like you, you like

15   me, that's potential grounds for suspension or expulsion

16   from the school; is that correct?

17      A     Any inappropriate relationships or

18   communication of that nature would be grounds for

19   discipline.

20      Q     And according to the page we're looking at,

21   possible suspension and expulsion, correct?

22      A     Possibly.

1      Q     Are there any other type of relationships that

2   the school believes are inappropriate other than

3   romantic?

4      A     I don't think so.

5      Q     So would two students who are holding hands,

6   would that be considered inappropriate relationship?

7            MR. TUCKER:   Objection to form.

8      A     Specific action would not necessarily be

9   interpreted as a particular thing.

10     Q     Okay.  Well, would holding hands be something

11  that might -- that the school might think is

12  inappropriate?

13     A     I think it would depend on how old these

14  children were and other types of judgment factors that I

15  can't really speak to in a general sense.

16     Q     And what about kissing?

17     A     No.  We told them nobody should be kissing

18  anybody.

19     Q     So if the -- if two students are kissing each

20  other, that's inappropriate relationship in the school's

21  view and they could potentially be disciplined?

22     A     I would not necessarily deem it as an

1  inappropriate relationship, but it would be an

2  inappropriate action.

3      Q    Right.  Well, I'm just -- I'm trying to

4  understand what the language in the book -- in the

5  handbook that says inappropriate relationships could be

6  potential grounds for suspension or expulsion.  I'm

7  trying to understand what that includes.  So that's why

8  I asked you whether it would include kissing, two

9  students were kissing each other.

10     A    Ongoing actions of physical contact and public

11 displays of affection would seem to be the definition

12 here of an inappropriate relationship.

13     Q    What about hugging?

14     A    I'm sorry.  I really -- I'm having difficulty

15 hearing you.

16     Q    Sorry.  What about hugging?

17     A    We tell all of our students to keep their

18 hands to themselves.

19     Q    Has any student ever been expelled from Bethel

20 for engaging in an inappropriate relationship?

21     A    No.

22     Q    Has ever -- has any student ever been

1   suspended from Bethel for engaging in inappropriate

2   relationship?

3       A    Yes.

4       Q    How many instances of that?  Either one.

5       A    One.

6       Q    And when was that?

7       A    I believe that's been provided to you.  I

8   don't remember the precise year.

9       Q    Other than that one instance, has any other

10  student ever been suspended from Bethel for an

11  inappropriate relationship?

12      A    No.

13      Q    The policy that we're looking at also states

14  that -- it covers offenses over the Internet, including

15  social media.  Do you see that?

16      A    I believe it says that.  Yes.  I see it.

17      Q    Does the school monitor students' social media

18  accounts?

19      A    No.

20      Q    Has any student ever been disciplined for

21  inappropriate social media posts?

22      A    No.

1      Q      The policy states that students may be

2    required to give the school access to the social media

3    accounts.  Do you see that?

4      A      Yes.

5      Q      Has this ever happened?

6      A      No.

7      Q      All right.  Let's talk about the BOOST

8    program.  When did Bethel first begin participating in

9    the BOOST program?

10     A      I think that was the '16-'17 school year.

11     Q      And how did that come about?

12     A      I don't remember precisely, but we had been

13   participating in the non-public textbook program for a

14   number of years, so I suspect it was through learning

15   about the BOOST program in that way.

16     Q      And who at the school is in charge of

17   administering the school's participation in BOOST?

18     A      Me.

19     Q      Is it fair to say that you were the primary

20   contact between the people who ran the BOOST program in

21   school?

22     A      Yes.

1        Q      And who did you deal with?  Who are the names

2    of the people that you dealt with at the stay with

3    respect to BOOST?

4        A      Throughout the entire program?

5        Q      Yeah.  Just like the names of the people that

6    you talked to or e-mailed with that program.

7        A      Prior to being expelled from the program, I

8    don't know that I had personal contact with anyone.  We

9    filled out the forms online, we submitted them.  We were

10   notified of our acceptance.  We followed through all the

11   various requirements.

12       Q      And that was -- you said you first -- the

13   schools first started participating, you know, 2016-'17

14   school year; is that right?

15       A      Yes, sir.

16       Q      And approximately how many students at that

17   all participate in that year?

18       A      I think about -- about 13.

19       Q      And then Bethel also participated the

20   following year, 2017 to 2018; is that right?

21       A      Yes, sir.

22       Q      And approximately how many students

1    participated that year?

2         A    Approximately 18.

3         Q    And what was Bethel's understanding of the

4    purpose of the BOOST program?

5         A    To provide the means by which low-income

6    families could attend private school.

7         Q    And you mentioned that you -- when you first

8    began participating, that you pulled out forms online,

9    notified the people accepted.  Were you the person who

10   completed the applications?

11        A    As best I recall, yes.

12        Q    And at that time, was Bethel aware that in

13   order to participate in the BOOST program that they had

14   to agree that would not discriminate against students in

15   admissions based on race, sex, national origin, or

16   sexual orientation, correct?

17        A    Correct.

18        Q    And Bethel, when you submitted the online

19   application you had to acknowledge or agreed to some

20   assurances to that effect, correct?

21        A    We did have to sign that statement.  Yes.

22        Q    And you were the person who would sign off on

1    them, right?

2        A    Yes.

3        Q    And Bethel also participated in a couple of

4    related programs, the agent schools program, and a

5    textbook and technology program; is that right?

6        A    That's correct.

7        Q    And that was the same timeframe, 2016, 2017,

8    2018, 2019; is that right?

9        A    We participated in the other two programs

10   prior to that as well.

11       Q    Okay.  And the other two programs also

12   required Bethel sign or prove assurances about not

13   having any discrimination admissions, correct?

14       A    I don't recall precisely what it involved

15   prior to my taking over on those programs since they

16   pre-existed me.

17       Q    Well, who was in charge before you taking

18   over?

19       A    The former principal.

20       Q    And who was that?

21       A    Alice Green.

22       Q    When did Ms. Green leave?

1    A    I'm sorry, could you repeat that?

2    Q    When did Ms. Green leave her position as

3  principal?

4    A    When I took over in 2016.

5    Q    Is Ms. Green related to Pastor Green?

6    A    Yes.

7    Q    Is it his wife?

8    A    Yes.

9    Q    Okay.  I want to show you some documents.  Can

10  we go to Exhibit 8, please?

11         (EXHIBIT 8 MARKED FOR IDENTIFICATION)

12         VIDEOGRAPHER:  Stand by.

13         COURT REPORTER:  And, Mr. Scott, I'm sorry to

14    interrupt.  This is the court reporter.  You are

15    trailing off a little bit during some of your

16    sentences.

17         THE WITNESS:  I'm still having -- I'm having

18    trouble hearing you.  I don't know if you can hear

19    me.

20         MR. SCOTT:  I can hear you fine.  I'll try to

21    do better job of speaking directly into the

22    computer.

1          VIDEOGRAPHER:  Sharing now.

2     BY MR. SCOTT:

3          Q    Okay.  I want to show you what's been marked

4     as Exhibit 8, this is the first two-and-a-half pages are

5     a series of e-mail addresses to whom this e-mail was

6     sent.  And then the text begins on page three.  And this

7     concerns the assurances and instructions for applying

8     for BOOST for 27, excuse me, for 2017-2018 school year.

9     Do you see that?

10         A    I do, but it's rather tiny.

11         Q    Can we make it bigger, please?  Thanks.  If

12    you go to -- go down two pages, please.  Then you'll

13    see, beginning on page 3155.001, you'll see the BOOST

14    assurances for the school year 2017, 2018.  Do you see

15    that?

16         A    Yes.

17         Q    All right.  And these were the assurances that

18    Bethel agreed to abide by participating in the BOOST

19    program, correct?

20         A    Yes.

21         Q    Can we go back to the first page, please?  The

22    first page of the Exhibit.  Yes.  Thank you.  If you

1    look about a third way down, there is an e-mail address

2    to somebody named, pattiwecker@teambethel.org.  Do you

3    see that?

4         A    No.  Yes.  I see it.

5         Q    Okay.  Who is Patti Wecker?

6         A    She was functioning as an assistant principal.

7         Q    Why, and how long was she in that -- strike

8    that.  When was she in that role?

9         A    That one year.

10        Q    What year?

11        A    I'm sorry, 2016, '17.

12        Q    And does she still work at the school?

13        A    No.  She does not.

14        Q    When did she leave?

15        A    The following year.

16        Q    2018?

17        A    '17, '18.

18        Q    Do you know why she left?

19        A    She retired.

20        Q    How long did she work at the school?  Just

21    that year?

22        A    20-some years.

1    Q    What was her job before she was starting as

2    acting principal?  Or -- excuse me, acting as assistant

3    principal?

4    A    She had a number of different roles over the

5    years, development -- development director, finance.

6    Q    And it's your understanding she's retired now?

7    A    Yes.

8    Q    So this e-mail looks like it went to her.  Was

9    she working on the BOOST application at that time?

10   A    She may have participated.

11   Q    Did you also receive this e-mail?

12   A    I don't recall.

13   Q    Let's go to Exhibit 9, please.

14        (EXHIBIT 9 MARKED FOR IDENTIFICATION)

15        VIDEOGRAPHER:  Stand by.

16   Q    Exhibit 9 is a letter dated October 13, 2017

17   from Matthew Gallagher to BOOST-eligible schools.  This

18   document was attached to the Plaintiff's Motion for

19   preliminary injunction filed in this case.  Have you

20   seen this letter before?

21   A    Yes.

22   Q    And the letter relates to the assurances that

1    the school needed to sign in order to participate in the

2    BOOST program, correct?

3         A    Correct.

4         Q    And Bethel agreed to those assurances in order

5    to participate in the program, correct?

6         A    Correct.

7         Q    Let's go to Exhibit 9A, please.

8              (EXHIBIT 9A MARKED FOR IDENTIFICATION)

9              VIDEOGRAPHER:  Stand by.

10        Q    Ms. Dant, Exhibit 9A is another e-mail that

11   went to, among other people, Patti Wecker.  Do you see

12   that?  pattiwecker@teambethel.org.  Quarter the way

13   down?

14        A    Yeah.  See it.

15        Q    Okay.  Do you know if you also received this

16   e-mail?

17        A    I don't know that I did.  My name is not

18   there.

19        Q    Let's go to the second-to-last page.  This is

20   a letter attached to e-mail dated December 19, 2017,

21   from Matthew Gallagher to BOOST schools.  Have you seen

22   this letter before?

1        A     I'm not sure.

2        Q     Do you remember being notified in 2017 that

3   the Boost program was going to review school handbooks

4   to determine compliance with the language in the non-

5   discrimination provision law?

6        A     Yes.  I'm just not sure I remember this

7   precise letter.

8        Q     So prior to December 17, 2017, when Bethel got

9   this letter from Mr. Gallagher regarding the handbooks,

10  had you had any communications with anybody at the State

11  Board of Education or BOOST about Bethel's compliance

12  with the non-discrimination version in the law?

13       A     It's hard to say precisely before this letter.

14  We were in the program in '17-'18.  And so whatever

15  communication was involved in ordering books from the

16  nonpublic school program or administering what paperwork

17  was required for the BOOST program, we engaged in that.

18       Q     Right.  But I'm specifically asking about

19  communications that relate to the nondiscrimination

20  provision in the law.  Do you recall any such

21  communications prior to December 19, 2017?

22       A     Are you referring to a particular document

1  that I could see because I can't remember the chronology

2  of that specifically?

3      Q    Right.  I'm not referring to any documents.

4  I'm asking you whether Bethel has any recollection of

5  any communications prior to the date of this exhibit

6  about complying with the nondiscrimination provisions?

7      A    I don't have any recollection other than what

8  was communicated via these letters.

9      Q    Okay.  So you don't have any recollection or

10  Bethel -- I'm asking you as a designee of Bethel,

11  whether Bethel has recollection of any verbal

12  communications about compliance with the

13  nondiscrimination provision prior to December 19, 2017?

14      A    No.  I do not.

15          MR. SCOTT:  Let's go over to Exhibit 10.

16          VIDEOGRAPHER:  Stand by.

17      Q    Ms. Dant, Exhibit 10 is a letter dated

18  March 5, 2018, to you from Monica Kearns at the Maryland

19  State Department of Education.  Have you seen this

20  before?

21          (EXHIBIT 10 MARKED FOR IDENTIFICATION)

22      A    Yes.

1      Q     Okay.  And was this your first notice that the

2    administrators of the BOOST program had a concern about

3    language in Bethel's handbook?

4      A     I don't know if it was the first notice or

5    not.

6      Q     Do you recall any verbal communications from

7    anyone at the state about Bethel's handbook in the

8    non-discrimination version prior to this letter?

9      A     Verbal communication?

10     Q     Yes.

11     A     Like -- like someone called me?

12     Q     Right.

13     A     No.  I don't recall anyone calling me about

14   that.

15     Q     Or you calling them or having a conversation

16   face to face?

17     A     I may have made a phone call inquiring about

18   the status of our BOOST application at some point in --

19   when this was all happening, but most things were

20   probably via e-mail.

21     Q     Okay.  And what can you tell me about that one

22   phone call that you just mentioned?

1        A     Well, like I say, I may have made a phone call

2   inquiring about the status of our application.  So I --

3        Q     So you --

4        A     -- would have said, "What's the status of our

5   application?"

6        Q     Okay.  But you don't have a specific

7   recollection of that conversation?

8        A     No.  No.

9        Q     And you don't -- and you don't know who it was

10  with?

11       A     It was probably with Monica Kearns.

12       Q     Are you sure of that?

13       A     Probably.

14       Q     You don't know for sure?

15       A     No.

16       Q     And you don't know --

17       A     I know I had not spoke -- I -- I did not speak

18  to anyone else.

19       Q     Okay.  You did speak to Monica Kearns at some

20  point?

21       A     I believe so.

22       Q     Okay.  But you don't know when?

1      A      I don't recall.

2      Q      And what, if anything, do you recall her

3   saying to you in this conversation?

4      A      That decisions were being made and that she

5   did not -- they did not have an answer yet for me as to

6   our status.

7      Q      Do you remember anything else that she said to

8   you in that conversation?

9      A      Not specifically, no.

10     Q      Okay.  And that was the only conversation you

11  can recall having with her; is that right?

12     A      That's correct.

13     Q      And do you have any recollection of speaking

14  to anybody else at the state about BOOST other than

15  Ms. Kearns?

16     A      No.

17     Q      Do you know if anybody else at Bethel ever

18  talked to anybody else at the state about BOOST?

19     A      No.

20     Q      Okay.  Going back to Exhibit 10, this letter

21  asked you to provide some additional information, in

22  fact, it requested a written response by March 14, 2018

1    on page 2, right?

2         MR. SCOTT:  Go to page 2, please.

3         THE WITNESS:  Can you make it a little larger?

4    Thank you.  Okay.  I'm sorry, what was your

5    question?

6  BY MR. SCOTT:

7    Q    Ms. Kearns is asking you to provide a res -- a

8  written response by March 14, 2018, correct?  First full

9  paragraph on page 2.

10   A    Yeah.  I have found it.  Yes.  I see that

11 request.

12   Q    Okay.  And did you personally prepare that

13 response?

14   A    I did.

15   Q    Did you consult with anybody in connection

16 with that response?

17   A    I may have discussed it with Dr. Green.

18   Q    Do you have a specific recollection of doing

19 that?

20   A    No.  I don't.

21        MR. SCOTT:  Let's go to Exhibit 11, please.

22        (EXHIBIT 11 MARKED FOR IDENTIFICATION)

1              VIDEOGRAPHER:  Stand by.

2    BY MR. SCOTT:

3         Q    Ms. Dant, Exhibit 11 is an e-mail and an

4    attachment from you to Monica Kearns, dated

5    March 13, 2018; is that right?

6         A    Yes.

7         Q    And the attachment, which is page 3, this is

8    your response to Ms. Kearns' request for a response,

9    correct?

10         A    Yes.

11         Q    And you drafted this and signed it on the next

12    page; is that correct?

13         A    I believe --

14              MR. SCOTT:  Go to ne --

15              THE WITNESS:  -- sir, you're not showing me the

16         -- you're not showing me the next page, so I can't

17         confirm that.  Yes.

18    BY MR. SCOTT:

19         Q    Okay.  You can now see the second page,

20    correct?

21         A    I see it now, yes.

22         Q    All right.  And that's your signature?

1          A    Yes.

2          Q    All right.

3               MR. SCOTT:  Let's go to Exhibit 12, please.

4                  (EXHIBIT 12 MARKED FOR IDENTIFICATION)

5               VIDEOGRAPHER:  Stand by.

6    BY MR. SCOTT:

7          Q    Okay.  Exhibit 12, Ms. Dant, is an e-mail

8    chain between you and Monica Kearns.  And on the first

9    page, about halfway down, you are ta -- you are asking

10   her about statements -- copies of statements that you

11   were planning to take to the board meeting -- the BOOST

12   board meeting.  Do you see that?

13         A    Yes.

14         Q    All right.  Did you attend that board meeting?

15         A    No.

16         Q    But at the time you wrote this -- these e-

17   mails, you were planning to go; is that right?

18         A    Correct.

19         Q    What -- is there -- was there a reason you

20   didn't go?

21         A    I don't recall.  Something must have come up.

22         Q    All right.  And again, the -- these e-mails

1   reflect, you know, you and Mo -- and Ms. Kearns

2   communicating back and forth about the BOOST program and

3   Bethel's application or desire to stay in the program,

4   but you don't recall any other -- you don't recall any

5   verbal communications you had with her other than what

6   you already described to me, correct?

7        A    Correct.

8             MR. SCOTT:  All right.  Let's go to Exhibit 13.

9             (EXHIBIT 13 MARKED FOR IDENTIFICATION)

10            VIDEOGRAPHER:  Stand by.

11  BY MR. SCOTT:

12       Q    All right.  So this Exhibit 13 is an e-mail

13  dated May 2, 2018, from you to Monica Kearns, correct?

14       A    Correct.

15       Q    And you're telling her that you're not going

16  to be able to make the meeting, correct?

17       A    Correct.

18       Q    And then you attach a copy of your statement

19  that you want the board to consider, correct?

20       A    Correct.

21       Q    Did you ever attend any BOOST board meetings?

22       A    No.  I did not.

1          MR. SCOTT:  Let's go to Exhibit 14, please.

2              (EXHIBIT 14 MARKED FOR IDENTIFICATION)

3          VIDEOGRAPHER:  Stand by.

4   BY MR. SCOTT:

5      Q    Exhibit 14, is this the statement that you

6   asked Monica Kearns to submit to the board in May of

7   2018?

8      A    Yes.  It is.

9          MR. SCOTT:  Let's go to Exhibit 15.

10             (EXHIBIT 15 MARKED FOR IDENTIFICATION)

11         VIDEOGRAPHER:  Stand by.

12  BY MR. SCOTT:

13     Q    Exhibit 15 is a letter to you from Monica

14  Kearns dated May 25, 2018 asking you to answer a couple

15  of questions from the BOOST board, correct?

16     A    Correct.

17     Q    You received this letter?

18     A    Yes.

19         MR. SCOTT:  Let's go to Exhibit 16.

20             (EXHIBIT 16 MARKED FOR IDENTIFICATION)

21         VIDEOGRAPHER:  Stand by.

22  BY MR. SCOTT:

1  Q  Okay. Exhibit 16 is a letter dated

2 May 29, 2018, from you to Monica Kearns and the BOOST

3 board; is that right?

4  A  Yes.

5  Q  And you wrote this letter?

6  A  Yes.

7  Q  And you sent it to Ms. Kearns, correct?

8  A  Correct.

9  Q  And this accurately describes Bethel's

10 position with respect to questions numb -- questions

11 numbers 1 and 2 that Ms. Kearns asked you in Exhibit 15,

12 correct?

13  A  Correct.

14   MR. SCOTT: Let's go to Exhibit 17.

15    (EXHIBIT 17 MARKED FOR IDENTIFICATION)

16   VIDEOGRAPHER: Stand by.

17 BY MR. SCOTT:

18  Q  This is a letter -- Exhibit 17 is a letter

19 dated August 8, 2018, from Matt Gallagher to you. Have

20 you seen this before?

21  A  Yes.

22  Q  Okay. And you received this letter?

```
1        A    Yes.

2        Q    Going back to Exhibit 16.  Did you draft this

3   letter yourself, Exhibit 16?

4        A    Yes.

5        Q    Did anybody else participate?

6        A    Not that I recall.

7             MR. SCOTT:  Let's go to Exhibit 20.

8             VIDEOGRAPHER:  Stand by.

9             MR. SCOTT:  That's not the right exhibit. Let's

10   try 19.  Let's try 18.  No.  Okay.

11             MR. TUCKER:  Rob, do you want to take a lunch

12   break?

13             MR. SCOTT:  Yeah.  Why don't we do that? Yeah.

14   I've got a issue with my exhibits, so yeah.  Why

15   don't we do that?  A half an hour?

16             MR. TUCKER:  Yeah.  That works.  How mu -- how

17   long do you think you've got?

18             MR. SCOTT:  I don't know.  Probably an hour.

19             MR. TUCKER:  Okay.  All right.  Well, we'll

20   come back about 30 minutes.

21             MR. SCOTT:  Okay.  Thanks.

22             MR. TUCKER:  Thank you, guys.
```

1          COURT REPORTER:  Thank you.

2          VIDEOGRAPHER:  If we're off the record.

3          COURT REPORTER:  We are off the record.

4           (OFF THE RECORD)

5          COURT REPORTER:  We're on the record.

6          MR. SCOTT:  Good afternoon.  We're back from

7     lunch break.  Can we call up Exhibit 6, please?

8           (EXHIBIT 6 MARKED FOR IDENTIFICATION)

9          VIDEOGRAPHER:  Stand by.

10   BY MR. SCOTT:

11       Q     Thank you.  Ms. Dant, I've had marked as

12   Exhibit 6 to your deposition a multi-page document that

13   I received from your attorneys related to discipline of

14   certain students.  Can you tell me what this is?

15       A     It's a printout of a report regarding student

16   behavior.

17       Q     Did you print this out?

18       A     My assistant did.

19       Q     And what parameters were used to print this

20   out?

21       A     She had date parameters.

22       Q     Any others?

1      A    No.

2      Q    So what does this reflect?

3      A    Students who had disciplinary action taken.

4      Q    From January 2015 until, looks like, 2018; is

5   that right?

6      A    I believe so.

7      Q    Have there been any additional disciplinary

8   actions taken against students since April of 2018?

9      A    I suppose that's possible.

10     Q    Do you know?

11     A    Not off the top of my head.  These were the

12  date parameters we were given.

13     Q    Okay.  What were the date parameters that you

14  were given?

15     A    I don't remember precisely other than what you

16  just said, 2015 to 2018.

17     Q    Okay.  And is this -- this is a computer

18  database -- this document was printed from a computer

19  database; is that right?

20     A    That's correct.

21     Q    And how is the information put into the

22  database, who does that?

1       A     It can be put in by an administrator.  If it's

2   simply classroom talking, it can be put in by a teacher.

3       Q     Okay.  And there's a column here where it

4   says, "Staff."  Or across the top, you'll see multiple

5   headings, there's one that says, "Staff," and then

6   there's names under there including your name for a

7   number of these.  Is that -- are those names under the

8   staff heading, the people who input the data into the

9   database?

10      A     Yes.

11      Q     And there's a column at the end called,

12  "Demerits."  Do you see that?

13      A     Yes.

14      Q     What is that?

15      A     It's just a database's designation of an

16  incident.

17      Q     What are the numbers mean?  De -- what do the

18  demerits mean?

19      A     It doesn't really mean anything.  It's the way

20  the database tracks when you input something.

21      Q     Okay.  Does this -- how far back does this

22  database go?

1      A    Oh, my.  I don't know that precisely either.

2  At some point, we switched from one school management

3  system to another, and I don't know the precise date

4  when that occurred.

5      Q    Does this document reflect every disciplinary

6  action that was taken between -- against a student

7  between January of 2015 and April 2018?

8      A    I believe so.  That were the parameters we

9  used to pull it.

10          MR. SCOTT:  Let me -- can you pull up Exhibit

11     6A, please?

12              (EXHIBIT 6A MARKED FOR IDENTIFICATION)

13          VIDEOGRAPHER:  Stand by.

14  BY MR. SCOTT:

15     Q    Exhibit 6A is a document that I received the

16  other day from your attorneys.  Can you tell me what

17  this is?

18     A    It is a behavior report.

19     Q    Dated April 13, 2018; is that correct?

20     A    Yes.

21     Q    Okay.  And where did this document come from?

22     A    It was pulled from the same database.

1          Q    So what's the difference between this document

2     and the document that we looked at just a few minutes

3     ago, Exhibit 6 which had multiple entries?

4          A    It only has one entry, so it looks different.

5          Q    Is -- the substance is also different though,

6     isn't it?

7          A    It's in a different format.  This -- the

8     content is the same information.

9          Q    Well, the description on Exhibit 6A of the

10    incident is different from the description on Exhibit 6.

11    It's more detailed, would you agree?

12         A    I would have to compare them.

13              MR. SCOTT:  Let's go back to Exhibit --

14              THE WITNESS:  Yeah.

15              MR. SCOTT:  Let's go back to Exhibit 6, please.

16       Last page.

17    BY MR. SCOTT:

18         Q    At the bottom, you'll see a description of the

19    April 13, 2018 incident.  Do you see that?

20         A    I do.

21         Q    Okay.  And then I'd ask you to now go back and

22    look at the description on 6A.  You would agree that it

1   has more detail, 6A, correct?

2        A    It's a different -- it's a different entry.

3   It's not the same entry with different information.

4        Q    Okay.  When you say it's -- I don't understand

5   what you mean.  Is it -- is Exhibit 6A and Exhibit 6,

6   does the -- did they -- were they printed from the same

7   database?

8        A    They were, but the incidences although at

9   first look, appear to be the same incident are the same

10  incident for two different students.

11       Q    Okay.  So there were two students involved in

12  this incident; is that correct?

13       A    Yes.

14       Q    Okay.  So why does the incident report on 6A

15  not appear on 6?

16       A    I'm not sure.  I could speculate that when it

17  was pulled, it was perceived to be the same thing twice.

18       Q    But it's not, it's actually description with

19  respect to two different students, is that what you're

20  saying?

21       A    Correct.

22       Q    And both of these students were suspended; is

1    that right?

2         A    Correct.

3         Q    And that was because they were engaging in

4    inappropriate behavior, correct?

5         A    Correct.

6         Q    Which was what?

7         A    Hugging in the stairwell.

8         Q    And that's prohibited by the --

9         A    Yes.

10        Q    -- handbook?

11        A    Yes.

12        Q    It's prohibited by the handbook, correct?

13        A    Correct.

14        Q    Okay.  Did you or anybody else at Bethel ever

15   speak to Matt Gallagher about whether Bethel's policies

16   violated the BOOST non-discrimination provisions?

17        A    No.

18        Q    Did you or anyone else at Bethel ever just

19   speak to Matt Gallagher about anything that you know of?

20        A    No.

21        Q    What about the other board members?  Did you

22   or anybody else at Bethel ever speak to any other

1    members of the BOOST Advisory Board?

2         A    No.  Unless Monica Kearns falls in that

3    number.

4         Q    She does not.

5         A    Then, no.

6         Q    Okay.  Does Bethel Christian Academy have

7    guidance counselors?

8         A    Have what?  I'm sorry.

9         Q    Guidance counselors.

10        A    No.  We do not.

11        Q    What about social workers?

12        A    No.

13        Q    If a student were having problems -- behavior

14   problems, or coping problems, is there anybody at the

15   school that would be available to help the student?

16        A    We would generally direct them to their

17   parents.

18        Q    Okay.  So there's nobody at the school who's

19   designated to provide counseling services to students;

20   is that right?

21        A    That's correct.

22             MR. SCOTT:  Can we call up Exhibit 20A, please?

1          (EXHIBIT 20A MARKED FOR IDENTIFICATION)

2          VIDEOGRAPHER:  Stand by.

3          MR. SCOTT:  Okay.

4          VIDEOGRAPHER:  Actually, it's right here.

5          MR. SCOTT:  Yes.  Success.

6    BY MR. SCOTT:

7          Q     Okay.  Exhibit 20A is a letter to you dated

8    February 28, 2019, from Donna Gunning at the Maryland

9    State Board of Educa -- Department of Education.  Have

10   you seen this before?

11         A     Can you scroll down?  It looks familiar.

12         Q     Okay.  In paragraph 2 on the first page,

13   Ms. Gunning is telling you that to the extent that

14   Christian Aca -- Bethel Christian Academy decides to

15   revise the language in its student handbook, that the

16   board has restored eligibility of some schools for the

17   BOOST program on that basis.  Did you ever revi -- or

18   did Bethel ever revise its handbook language in an

19   attempt to regain eligibility for BOOST?

20         A     No.

21         Q     Why not?

22         A     We were satisfied with our language,

1    expressing our beliefs.

2        Q    Were there any discussions that you had with

3    anybody about whether you should consider revising the

4    handbook in order to get back into the program?

5        A    Not that I recall.

6        Q    So it was your decision alone to not revise

7    the handbook in an attempt to try to get back into the

8    program; is that right?

9        A    There was no discussion regarding it.

10       Q    And you made that decision, right?

11       A    I suppose, since I'm responsible for the

12   handbook and I didn't revise it, yes.

13       Q    Did you have any communications with anybody

14   at the state about what type of revisions might be

15   necessary in order to come into compliance?

16       A    I did seek some information regarding what

17   this letter meant in regard to that.

18       Q    And did you receive that information?

19       A    I did.

20       Q    Okay.  And what did you do with it?

21       A    Put it in the file.

22       Q    Did you read it first?

1        A     I believe I may have scanned it.

2        Q     And this is information that you had requested

3   from the state?

4        A     Yes.

5        Q     And what was your conclusion upon scanning it,

6   if any?

7        A     I didn't know that I came up with a

8   conclusion.  It was just information gathering.

9        Q     And what was the purpose of the information

10  gathering?

11       A     Seeking to understand what was happening with

12  the requirements.

13       Q     And this was in 2019?

14       A     Apparently so.

15       Q     And this -- so this would have been after the

16  board had ruled that Bethel was no longer eligible to

17  participate in BOOST, right?

18       A     Correct.

19       Q     And so you were --

20           MR. SCOTT:  Well, let me -- let's call up

21       Exhibit 19, please.

22       Q     Okay.  This is an e-mail chain between you and

1  Donna Gunning at the Maryland State Board of Education,

2  and she's sending you information about revisions that

3  other schools have made to their handbooks in an attempt

4  to get back into BOOST, right?

5              (EXHIBIT 19 MARKED FOR IDENTIFICATION)

6       A    Correct.

7       Q    And you -- she sent that to you, and you

8  thanked her for that, correct?

9       A    Sure.  Yes.

10      Q    And you said you would review it right away,

11 right?

12      A    Yeah.

13      Q    Okay.  But you decided not to make any

14 revisions or -- to the handbook, correct?

15      A    Correct.

16      Q    Even though you knew that other schools had

17 revised their handbooks and had been re-admitted to the

18 program, correct?

19      A    Correct.

20      Q    And just to confirm, you don't have any

21 specific recollections of any verbal communications you

22 had with Donna Gunning; is that right?

1      A     I don't.

2      Q     There came a point when the State revi -- the

3   legislature, the Maryland legislature, revised the BOOST

4   law to change the language concerning discrimination in

5   2019.  Are you -- is -- was Bethel aware of that?

6      A     I was aware at some point.  I can't speak to

7   exactly when I became aware.

8      Q     And what was Bethel's understanding of what

9   the change was?

10     A     That they had added gender identity to the

11  statement.

12     Q     Anything else?

13     A     Not particularly.

14     Q     And then after that, in 2020, Bethel decided

15  to apply to this -- to the State for the Aid to

16  Non-Public Schools program, correct?

17     A     Correct.

18     Q     And that was -- and you -- and Bethel did that

19  even though it knew that the law now prohibited not only

20  discrimination based on sexual orientation but also

21  gender identity, correct?

22     A     Yes.

1      Q      Why did Bethel reapply in 2020?

2      A      Because we had been told that we were not

3    qualified for the previous two years, and so that time

4    was up, and so we went ahead and reapplied.

5      Q      And it was ultimately determined that your

6    application was not timely, correct?

7      A      Was not what?

8      Q      Timely.  It was late?

9      A      Yes.  They had stated that because we were not

10   being notified anymore regarding when the deadlines were

11   or any of that, and so I was not completely sure when

12   the deadline was.

13     Q      Prior to submitting this new application in

14   2020, did Bethel make any revisions to its handbook?

15     A      We make revisions every year, so yes.

16          MR. SCOTT:  Let's take a look at Exhibit 21,

17      please.

18             (EXHIBIT 21 MARKED FOR IDENTIFICATION)

19          VIDEOGRAPHER:  Stand by.

20          MR. SCOTT:  All right.  Go to the second page,

21      please.

22   BY MR. SCOTT:

```
1        Q    So this is a letter -- I'm on page 2 of

2   Exhibit 21 to your deposition, Ms. Dant.  This is a

3   letter dated April 24, 2020 to you from Donna Gunning

4   advising that Bethel's application had been denied.

5   Attached to it, or as Appendix A, or a copy of the law,

6   and then Appendix B, Bethel's handbook for 2019, 2020.

7            MR. SCOTT:  If we could go to page -- looks

8        like it's about page 10.  Wait.  Up -- up -- up --

9        up. Yeah.  Right here.

10  BY MR. SCOTT:

11       Q    So Ms. Gunning -- or excuse me, Ms. Dant, this

12  is a copy of Bethel's handbook from 2019, 2020, right?

13       A    Correct.

14           MR. SCOTT:  Okay.  And let's go to page 7 of

15       that.  No.  Of the handbook.  Keep going -- no, this

16       handbook.  Just keep going.  Page 7.  Yeah.  Keep

17       going. Four more pages.

18           VIDEOGRAPHER:  That's it.  That's the whole

19       document.

20           MR. SCOTT:  That's it?

21           VIDEOGRAPHER:  Yeah.

22           MR. SCOTT:  Okay.  We'll have to fix that. Hold
```

1       on.  Why don't we take a two-minute break while I

2       call my office?  I'll have them resend it.

3              COURT REPORTER:  We are off the record.

4                (OFF THE RECORD)

5              COURT REPORTER:  We're back on the record.

6   BY MR. SCOTT:

7       Q    Okay.  Ms. Dant, we're getting a corrected

8   copy of the exhibit which will be designated as Exhibit

9   21A, in which hopefully will include all the pages of

10  the 2019-2020 handbook.

11             (EXHIBIT 21A MARKED FOR IDENTIFICATION)

12             VIDEOGRAPHER:  Sharing now.

13      Q    So if we could go down to page 7 of the

14  handbook.  Keep going.  Keep going.  There we go, 7 up.

15  Up one page.  There we go.  Okay.  Ms. Dant, this is the

16  -- this is page 7 of the 2019-2020 Bethel handbook.  And

17  I will direct your attention to the text that appears

18  under Statement of Nondiscrimination.  Do you see that?

19      A    Yes.

20      Q    Okay.  So I notice that there is no statement

21  here, unlike the earlier handbook that we looked at,

22  Exhibit 2 with respect to Bethel's view of marriage, in

1   between a cove -- being a covenant between one man and

2   one woman, correct?

3        A    Correct.

4        Q    Okay.  Why was that language removed?

5        A    It was relocated to another place, in the

6   handbook.

7        Q    Why?

8        A    We often relocate things and move them around

9   for greater clarity.  It was --

10       Q    I understand --

11       A    -- never part of -- it was never part of the

12  admissions policy to begin with.

13       Q    Okay.  So you're saying it shouldn't have --

14  it shouldn't have been there in the first place?

15       A    I'm saying, as I stated to you earlier, that

16  paragraph was not perceived by me to be part of the

17  admissions policy with a piece of conduct information.

18       Q    Okay.  And where was it moved to?

19       A    The discipline conduct area.

20       Q    Okay.  Can you tell me -- can you show me

21  where that is?

22       A    I was not looking at it to know what page is

1    stack in that discipline area where the --

2         Q    It was --

3         A    -- list of behavioral offenses maybe.

4         Q    Page 35 of the handbook, perhaps.  Is that

5    what you mean, that section?

6         A    Yes.  This area.  Yeah.

7         Q    And where is the language about the marriage?

8         A    The marriage may not be there.  It may have

9    just been -- it may have been separated out and put in

10   with the statement of faith.  The expectation of student

11   conduct is below.

12        Q    Right.  So where is the statement of faith?

13        A    At the front of the handbook.

14        Q    Page 8.  Is this what you mean?  Page 8?

15        A    Yes.  Yes.

16        Q    Okay.  And where does the language about the

17   marriage appear in this section?

18        A    It may not be exactly the same -- the same

19   wording.  The statement was not just taken as a whole

20   and stuck somewhere else.

21        Q    Okay.

22        A    You'll notice if you look at number 5 in the

1    statement of faith.

2         Q    Okay.

3         A    That's a script of foundation for that.

4         Q    Okay.  And it also has language about

5    condemning a homosexual lifestyle, correct?

6              MR. TUCKER:  Objection.  Form.

7         A    It states the scripture reference.

8         Q    About condemning a homosexual lifestyle,

9    correct?

10             MR. TUCKER:  Objection.  Form.

11        A    The statement in the handbook reads that way.

12        Q    Okay.  So let's go back to 35 -- page 35,

13   which is the conduct policy.  And at the bottom, you

14   pointed out that there were some new language here.  It

15   looks like -- it says that, "Any conduct that is in

16   violation of the school statement of faith will be

17   considered grounds for disciplinary action, including

18   the expectation that BCA students identify with, dress

19   in accordance with, and use facilities associated with

20   their biological gender," right?

21        A    Yes.

22        Q    Okay.  And why was that added to the

1   disciplinary section of the handbook?

2        A    Because it was a conduct statement, it was

3   simply moved from one place to the other.

4             MR. SCOTT:  Let's look at Exhibit 22, please.

5             (EXHIBIT 22 MARKED FOR IDENTIFICATION)

6             VIDEOGRAPHER:  Stand by.

7   BY MR. SCOTT:

8        Q    Ms. Dant, Exhibit 22 is a document I received

9   from your attorney.  It is a two-page document entitled

10  "Aid to Non-Public Schools Program Fiscal Year 2019 to

11  2020, Program Assurances."  And then about appears to be

12  your signature on the second page; is that right?

13       A    That's correct.

14       Q    Okay.  So this would have been something that

15  you signed and submitted in support of your -- of the

16  school's application in 20 -- for the 2019-2020 program,

17  correct?

18       A    I always get confused with fiscal years and

19  school years.

20       Q    I think this --

21       A    It's for year 2020?

22       Q    Yeah.  And then in parenthesis it says "SY

1    2019-2020."  Do you see that?

2         A    Yes.

3         Q    So I think that means school year.  So --

4         A    I think it -- I think it does.

5         Q    Yes.  So this was something that you signed

6    and submitted in support of Bethel's application for the

7    program for the 2019-2020 school year, correct?

8         A    Yes.

9         Q    All right.  And item number 4 on the first

10   page says "the school does not discriminate in student

11   admissions, retention, or expulsion or otherwise

12   discriminate against any student on the basis of race,

13   color, national origin, sexual orientation, or gender

14   identity or expression," right?

15        A    Right.  It does say that.

16        Q    Okay.  And you signed it certifying that the

17   school complied with that, correct?

18        A    Correct.

19        Q    Okay.  But that's not true, is it?

20             MR. TUCKER:  Objection to form.

21        A    What's not true?

22        Q    That the school does not discriminate based on

1    gender identity or expression.

2         A    That absolutely is true that we do not

3    discriminate.

4         Q    Okay.  But your handbook says that students

5    have to dress in accordance with and identify with their

6    biological gender.  We just looked at --

7         A    That one will apply to all students.

8         Q    And if they don't, they can face discipline

9    including expulsion, correct?

10        A    Any student that does not comply with our

11   behavioral expectations may be subject to school

12   discipline.

13        Q    Well, let me ask you this.  If a student

14   applied to Bethel for admission and met all the

15   requirements and was qualified, but said, "I don't

16   identify with my biological gender."  Bethel wouldn't

17   admit that student, would they?

18             MR. TUCKER:  Objection.  Form.

19        A    We would not have asked that question.

20        Q    What if the student --

21        A    That would not -- that does not matter to us,

22   as long as they met our academic requirements.

1      Q     So even if they tell you, "I'm not -- I don't

2   identify with my biological gender," you would admit

3   that student, if they met all other qualifications.  Is

4   that your testimony?

5      A     It's not in part of our enrollment policy to

6   ask.  If they meet our requirements, we would accept

7   them.

8      Q     Even if they voluntarily tell you that they

9   don't identify with their biological gender?

10     A     It would not matter to us.  If they meet our

11  requirements they are welcome to come.

12     Q     What if they -- what if the students say that,

13  "when I get there, I'm not going to dress in accordance

14  with my biological gender"?

15     A     We've never had that situation.

16     Q     What if you did?

17     A     I will question why they would want to come to

18  our school if they've already determined they're not

19  going to.

20     Q     Would you admit them?

21        MR. TUCKER:  Objection.  Form.  Asked and

22     answered.  Speculation.

1      Q    You can answer.

2      A    When we're talking to students, we are looking

3   to make sure that there is clear understanding of what

4   we are requiring in regards to our students.

5   Behaviorally and academically.  That would be made clear

6   to the student.

7      Q    Yeah.  I appreciate what you're saying,

8   Ms. Dant, but that's not what I asked you.  And I mean,

9   this case is about a law that says, "If you're going to

10  participate in this program, you can't discriminate

11  against people based on gender, identity, or

12  expression."  And I'm asking you, as the lawyer who is

13  defending a lawsuit brought by Bethel, whether or not

14  Bethel would admit a student who said, "I'm otherwise

15  qualified, I meet all your qualifications.  But I do not

16  plan to dress in accordance with my biological gender

17  when I attend your school."  And my question to you, and

18  I think the Court would want to know the answer to this

19  is, is would you admit that student or not?

20         MR. TUCKER:  Objection.  Form.  Asked and

21     answered.  Mischaracterization.  Speculation.

22      A    And I'm saying we would have a conversation.

1    We would make our expectations clear and we would accept

2    a student who is qualified and desires to come to our

3    school.  They would be welcome.

4         Q    Even if they tell you they're not going to je

5    -- dress in accordance with the biological gender?

6              MR. TUCKER:  Objection.  Form.  Same -- we've

7         asked the same question about ten different times,

8         Rob. She's already answered the question.

9              MR. SCOTT:  I disagree, Counsel, and I think

10        the court would disagree as well.  All right.  We'll

11        move on to another subject.  Let's talk about the

12        complaint, which is Exhibit 7.

13              (EXHIBIT 7 MARKED FOR IDENTIFICATION)

14              VIDEOGRAPHER:  Stand by.

15   BY MR. SCOTT:

16        Q    All right.  Exhibit 7, Ms. Dant is a copy of

17   the complaint that was filed in this case.  And I want

18   to direct your attention to paragraph 189, which is on

19   page 23.  Did you see that?  You can blow it up a bit so

20   she can read it.

21        A    Blow it up a tiny bit, please.  Thank you.

22        Q    All right.  It says -- it alleges in paragraph

1  189 that "Defendants' made statements disparaging the --

2  that Bethel's religious beliefs regarding marriage and

3  biological sex."  My question to you is, which of the

4  defendants made those statements?

5      A    I did not personally hear those statements

6  made.

7      Q    Okay.  Well, I'm asking you as the designee of

8  Bethel Chris -- the plaintiff in this case.  So I'm

9  asking you what information Bethel has concerning these

10 alleged statements that the complaint says "The

11 Defendants' made disparaging Bethel's religious

12 beliefs."

13     A    I believe that you have provided to my

14 attorney statements made by the defendants upon which

15 these things are -- these allegation of disparaging

16 statements is based.

17     Q    And what are those statements and who made

18 them?

19     A    I believe they may have been made by

20 Mr. Gallagher.

21     Q    Okay.  What did he say --

22     A    I don't know -- I don't know precisely what

1    the statements may have been.

2        Q    Okay.  So you believe Mr. Gallagher made

3    statements, but you don't know what they were; is that

4    right?

5        A    I believe that your def -- your client gave us

6    documentation indicating these things.

7        Q    Okay.  Well, I'm asking you what doc -- what

8    statements were made and I'm asking you what Bethel

9    knows about that, not what documents we gave you?

10            MR. TUCKER:  Objection.  Form.

11       A    As I said, I did not hear the statements made.

12   The documents that were provided to us by the Defendants

13   indicate that Mr. Gallagher had statements that he made

14   regarding Bethel and our beliefs.  I don't know the

15   precise statement.

16       Q    So you don't know what he said; is that right?

17            MR. TUCKER:  Objection.  Form.

18       A    I don't -- I don't have a quote of what he

19   exactly said, no.

20       Q    Okay.  Did any of the other defendants make

21   any statements disparaging Bethel's religious --

22       A    I'm not sure.

1          MR. TUCKER:  Objection.  Again, calls for legal

2     conclusion.

3          MR. SCOTT:  It's an allegation in the

4     complaint.  I'm asking which defendants --

5      A     Documentation -- supported by documentation

6  provided by the defendant.

7  BY MR. SCOTT:

8      Q     What documentation are you referring to?

9      A     I don't know the precise name of which

10 document.

11     Q     Okay.  Well, my question --

12     A     I believe there were a number of documents

13 provided to us, as we provided a number of documents.

14     Q     My question is what -- other than -- you

15 mentioned, Mr. Gallagher.  My question is, what other

16 defendants, if any, did -- does Bethel claim made

17 disparaging statements about Bethel's religious beliefs?

18     A     I do not know.

19     Q     Okay.  Did any state employee that you were

20 aware of ever make any statements disparaging Bethel's

21 religious beliefs?

22     A     Not to me.

1          Q     To Bethel?

2          A     Not to Bethel.

3          Q     To anyone that Bethel was aware of?

4          A     Not that I'm aware of.

5          Q     And just speak -- just so the record is clear,

6     I'm asking you as the designee of Bethel.

7          A     I understand.

8          Q     Okay.  Does Bethel believe that it meets all

9     of the eligibility requirements for the BOOST program?

10         A     Yes.

11         Q     Let me ask you to look at paragraph 158 of the

12    complaint.  It says, "Aside from the gender identity

13    nondiscrimination provision, Bethel meets the

14    eligibility requirements for reinstatement in BOOST."  Do

15    you see that?

16         A     Yes.

17         Q     Okay.  Why does it say "aside from the gender

18    identity nondiscrimination provision"?

19              MR. TUCKER:  Objection.  Form.

20         Q     Doesn't that mean that Bethel doesn't meet --

21    doesn't meet the gender identity nondiscrimination

22    requirement?

1      A     No idea --

2            MR. TUCKER:  Objection.  Form.

3      A     I think it means that's what being determined

4   at this time, that's what's in contention.

5      Q     So its Bethel's position that it meets the

6   gender identity nondiscrimination provision?

7      A     Yes.

8            MR. SCOTT:  Okay.  Let's go to Exhibit 23.

9            (EXHIBIT 23 MARKED FOR IDENTIFICATION)

10            VIDEOGRAPHER:  Stand by.

11   BY MR. SCOTT:

12      Q     Ms. Dant, I've had it marked as Exhibit 23

13   copy of a declaration that you signed in this case back

14   in October of 2019.  Did you sign this document?  Can

15   you go to the last page, please?

16      A     Yes, sir.

17      Q     Okay.  Let me direct your attention to page 3,

18   paragraph 15.  It says here, "Based on its religious

19   beliefs, Bethel also requires all students to identify

20   with their biological sex, adhere to the dress code of

21   their biological sex, and use the private facilities of

22   their biological sex."  Do you see that?

1      A     I do.

2      Q     Okay.  And that was true when you signed this

3   declaration back in 2019, right?

4      A     That's true.

5      Q     And it's true today, right?

6      A     Yes.

7      Q     Other than the decision of the BOOST Advisory

8   Board to disqualify -- well -- strike that.  Let me ask

9   you this.  What evidence does Bethel have to support its

10  allegation that the defendants in this case are hostile

11  towards the beliefs -- the religious beliefs of Bethel?

12           MR. TUCKER:  Objection to form.

13     A     The fact that that's the only reason that they

14  stated for removing us from the program.

15     Q     Okay.  Anything else?  Is there any other --

16  are there any other statements that anybody made that

17  support Bethel's assertion that the board was hostile

18  towards Bethel's religious beliefs?

19     A     Could you restate that question, please?

20     Q     Yeah.  The complaint alleges that Maryland

21  officials, including the defendants, allowed their

22  hostility towards Bethel's religious beliefs to override

1  the program's own requirements.  And my question to you

2  is, what's your basis for -- what's Bethel's basis for

3  that assertion?

4       A    Okay.

5            MR. TUCKER:  Objection.  Form.

6       A    And as I stated, the fact that they removed us

7  from the program because of the language in our handbook

8  is the basis for that.

9       Q    Is there anything else, any other statements

10 or evidence or documents or anything else that supports

11 that assertion?

12           MR. TUCKER:  Objection.  Form.  Asked and

13       answered.

14      A    Other than what you already mentioned

15 regarding Mr. Gallagher's statements about our school,

16 no.

17      Q    Okay.  And again, you don't remember -- you

18 don't know what exactly -- you don't know what Mr.

19 Gallagher said?

20      A    I was not there.

21      Q    Okay.  Does Bethel have any evidence that any

22 members of the BOOST board had any ill will or animus

1    toward Bethel based on Bethel's religious beliefs?

2              MR. TUCKER:  Objection.  Form.

3        A    Other than removing us from the program

4    because of our beliefs?  No.

5        Q    Does evidence -- does Bethel have any evidence

6    that anybody with the Maryland State Government has any

7    ill will or animus toward Bethel based on Bethel's

8    religious beliefs?

9              MR. TUCKER:  Objection to form.

10       A    Other than that decision that they made

11   against us, no.

12       Q    And by decision they made against us, you mean

13   to disqualify Bethel from the BOOST program, correct?

14       A    Correct.

15       Q    Does Bethel believe that the BOOST board

16   treated Bethel differently than other schools that had

17   their handbooks reviewed for compliance with the

18   non-discrimination provision in the BOOST board?

19       A    Yes.

20       Q    Okay.  And what's the basis for that belief?

21       A    The fact that it was communicated that other

22   schools had been accepted into the program who have

1    similar beliefs -- similar beliefs that we have, and yet

2    we were not accepted into the program.

3        Q    Okay.  And what other schools are you

4    referring to?

5        A    I can't remember a long list of them.  I

6    believe that they were also listed somewhere in all of

7    this documentation.  I can't remember which ones were in

8    or out.  Broadfording Academy.  I don't remember if

9    they're in or out, but there were a number of schools

10   mentioned that were in and we were out.

11       Q    Okay.  But you can't identify any of those

12   schools right now?

13       A    I would have to see a list of them.

14       Q    Do you believe such a list exists?

15       A    I do.

16       Q    Okay.  And have you seen it?

17       A    Yes.

18       Q    Okay.  And --

19       A    It's in -- it's in this massive amount of

20   documentation.

21       Q    And what does it say?

22       A    It basically says that Bethel Christian

1    Academy was deemed to be ineligible, and then it lists

2    other schools that were deemed to be eligible.

3        Q    Okay.  But you don't know what those other

4    schools are?

5        A    Not off the top of my head.

6        Q    Do you know what their handbooks say or said

7    at the time that they were considered?

8        A    No.  Not precisely.  In fact that I probably

9    had not read them.

10       Q    Okay.  So you don't know what other schools

11   were allowed to continue to participate in what other

12   students -- what other schools were declared ineligible

13   and you don't know what their handbooks said, correct?

14            MR. TUCKER:  Objection to form --

15       A    I cannot give you a list of them.  No.

16       Q    And you don't know what their handbooks say,

17   correct?

18       A    I do not.  I believe it is in the

19   documentation.

20       Q    So then why do you believe Bethel was treated

21   differently than these other schools?

22       A    I don't know.

1      Q   Does Bethel have any evidence that the BOOST

2   board applied different standards to Bethel and applied

3   to other religious schools when the board was deciding

4   whether schools policies were in compliance with the

5   BOOST's non-laws, non-discrimination provision?

6         MR. TUCKER:  Objection.  Form.  Compound.

7    Vague.  Calls for legal conclusion.

8     A   I don't know the - I, personally, doesn't have

9   any evidence other than the fact that some schools were

10   in and my school was out.

11     Q   Anything else?

12         MR. TUCKER:  Same objection.

13     A   No.

14         MR. SCOTT:  All right.  Why don't we just take

15    a short break.  I think I'm almost finished.  I just

16    want to go over my notes here and clean up any last

17    minute things.  So lets take a five-minute break,

18    please.

19         MR. TUCKER:  Okay.

20         COURT REPORTER:  We are off the record.

21      (OFF THE RECORD)

22         COURT REPORTER:  We are back on the record.

1    BY MR. SCOTT:

2         Q    Okay.  Thanks.  So Ms. Dant, let's go back to

3    your declaration, which was Exhibit 23.  I want to ask

4    you about paragraph 41.  It says here that "An

5    additional 20 prospective students inquired about

6    attending Bethel and the financial aid available, but

7    were unable to join Bethel for the 2019-2020 school year

8    due to lack of student financial aid, including BOOST

9    funding."  Do you see that?

10        A    I do.

11        Q    Okay.  Do you know who -- do you know who

12   those students are, those prospective students?

13        A    I could not list their names to you.  We did

14   look -- we did look up how many inquiry had mentioned

15   financial aid as a concern.

16        Q    And where did you look for that information?

17        A    It's in the part of the online application

18   includes an online inquiry.

19        Q    Okay.  So somebody can go online and make an

20   inquiry, is that what you're saying?

21        A    Yes.

22        Q    And so you looked for those that checked --

1   that asked for information about financial aid; is that

2   right?

3       A    Yes.

4       Q    And so if a prospective student made an

5   inquiry, and included a request for information about

6   financial aid, you included them in this number of 20

7   prospective students?

8       A    Yes.

9       Q    Okay.  Did you ever talk to any of these

10  prospective students about what type of financial aid

11  they were interested in?

12      A    Yes.  Certainly.

13      Q    Okay.  And did any of them mention BOOST?

14      A    Yes.

15      Q    Okay.  How many?

16      A    At least two.

17      Q    Two of the 20?

18      A    At least.

19      Q    Okay.  Do you know the -- do you remember

20  their names?

21      A    They are in some of the documentation we

22  provided to you.  I believe (confidential) and

1    (confidential).

2         Q    Okay.  Any other?

3         MR. TUCKER:  Robert, I know we've got to -- I

4    know we've got to enter into the protective order,

5    which will -- we can talk about later but just for

6    purposes of clarity, we probably want to mark those

7    two names confidential to protect their disclosure.

8         MR. SCOTT:  I don't have any problem with that.

9    I do think we should get the order filed.

10        MR. TUCKER:  Yeah.

11   BY MR. SCOTT:

12        Q    Ms. Dant, you so you said at least two.  Can

13   you recall any other names?

14        A    No.  I cannot.

15        Q    And then the next paragraph says, this is 42,

16   "At least one other Bethel student will be forced to

17   leave our school next year unless Bethel is it

18   readmitted to BOOST."  Do you see that?

19        A    Yes.

20        Q    Okay.  Do you know who that student is?

21        A    I do.

22        Q    Who is it?

1          A     I believe I do.

2          Q     Who is it?

3          A     That -- that name has not been provided to

4     you.  I'm not sure how to handle that.

5          Q     Okay.  Well, I think the information is

6     relevant and I'm asking for it now.

7               MR. TUCKER:  I'll just say is -- Robert, if you

8          don't mind, is this a current student?

9               THE WITNESS:  She's is no longer a current

10         student.

11              MR. TUCKER:  She's no longer at Bethel?

12              THE WITNESS:  Right.

13              MR. TUCKER:  Robert, as long as we can agree to

14         protect subject again to a confidentiality order,

15         which I'm sure we're going to be agreeing to, I'm

16         okay with her answering that question.

17              MR. SCOTT:  Okay.  Thank you.

18              THE WITNESS:  Okay.  (confidential).

19    BY MR. SCOTT:

20         Q     Can you spell that?

21         A     (Confidential).

22         Q     Okay.  Okay.  And you're saying she's no

1    longer a student at Bethel?

2         A    Correct.

3         Q    And I take it from this statement in the

4    affidavit that she told you, or her parents told you,

5    that she wouldn't be able to -- the reason she couldn't

6    stay was because BOOST -- because Bethel was no longer

7    participating in brute -- BOOST?

8         A    Correct.

9         Q    Okay.  Did her parents tell you that?

10        A    Yes.

11        Q    Okay.  And what were her parents -- what are

12   her parents' names?

13        A    Diana Turner.  She only has a mom.

14        Q    Okay.  Thanks.  So I have a couple of

15   questions now that I'm going to ask you.  Not in your

16   capacity as a designee.  So I know, we had agreed that

17   we are going to do this both on the same day, so I just

18   want to make clear that what I'm asking you about now is

19   not your capacity as designee.

20             MR. SCOTT:  Exhibit 26.  Can we put that up?

21             (EXHIBIT 26 MARKED FOR IDENTIFICATION)

22             VIDEOGRAPHER:  Stand by.

1           MR. TUCKER:  Just for clarity.  I think some

2      were probably asked earlier in her individual

3      capacity, but it may not make a difference.  We can

4      talk about that later if we need to.

5  BY MR. SCOTT:

6      Q    Exhibit 26.  Yes.  Okay.  So this is a

7  document that was produced by your attorneys in this

8  case and it appears to be a letter that you wrote to the

9  Washington Post; is that right?

10     A    Yes.

11     Q    Okay.  And you wrote this and submitted for

12  publication in the Post?

13     A    Yes.

14          MR. SCOTT:  Okay.  Exhibit 27.

15          (EXHIBIT 27 MARKED FOR IDENTIFICATION)

16          VIDEOGRAPHER:  Stand by.

17  BY MR. SCOTT:

18     Q    This is another document that was produced in

19  discovery in this case, although it doesn't look like I

20  got this one from your attorneys.  This appears to be a

21  letter that you wrote to the Baltimore Sun; is that

22  right?

1        A    Can you scroll up?

2        Q    If you go to the first page.

3        A    Yes.  I believe so.

4        Q    It says Baltimore Sun, when you look at the

5   web address.  It says Baltimore Sun there.

6        A    Yes.  I believe I wrote a letter to the

7   editor.

8            MR. SCOTT:  Okay.  Exhibit 28.

9            (EXHIBIT 28 MARKED FOR IDENTIFICATION)

10           VIDEOGRAPHER:  Stand by.

11  BY MR. SCOTT:

12       Q    This is an e-mail that you sent to somebody

13  whose name is blacked out.  Actually, I'm sorry,

14  somebody sent this e-mail to you; is that right?

15       A    Yes.  It appears that it was sent to me.

16       Q    Okay.  And then below the -- that, there is an

17  e-mail that you sent looks like to a group of people,

18  BCA Families, about the lawsuit, right?

19       A    Yes.

20       Q    Okay.  And then the last page of this is, it

21  looks like a press release from the Alliance Defending

22  Freedom?

1        A      Yes.

2        Q      To the family's students at the school.

3             MR. TUCKER:  Rob -- Rob we just -- Rob, I'm

4        sorry, we lost you.

5             MR. SCOTT:  Okay.  Like how far back?

6             MR. TUCKER:  Find out about -- we pro -- I

7        would just restart this last question.  We didn't

8        pick it up.

9   BY MR. SCOTT:

10       Q      So my question is, is that the last page of

11  this -- well, the question was this female that she sent

12  to the BCA Families forwarded the press release from the

13  Alliance Defending Freedom, which is the last page of

14  this exhibit; is that correct?

15       A      Yes.

16       Q      Okay.  And we -- this asserts -- this press

17  release asserts that Bethel fully complied with the

18  voucher programs requirement that Maryland targeted it

19  because of its religious views.  And I asked you earlier

20  about what evidence Bethel had to support its assertion

21  that Maryland had targeted it, or was hostile towards it

22  based on its religious views.  And you testified that

1    you were relying only on the decision that was made to

2    disqualify Bethel from the program, correct?

3         MR. TUCKER:  Objection to form.

4      Mischaracterizes the evidence.

5      A    Yes.  I testified that I was relying on the

6    fact that we were excluded from the program because of

7    our handbook language stating our religious beliefs.

8         Q    Right.  Is there any other evidence that you

9    are aware of that Maryland state officials targeted

10   Bethel because of its religious views other than what

11   you just said?

12        A    And the fact that other schools were accepted

13   into the program --

14        Q    Right.  But you don't know --

15        A    -- having changed -- having changed their

16   language.

17        Q    Right.  But you don't know what those schools

18   are or what their handbooks said, right?

19        A    It's in the documentation, but no, I don't

20   know them.

21        MR. SCOTT:  Okay.  All right.  I don't have any

22     other questions at this time.  Thank you for your

1        time today, Ms. Dant and --

2              THE WITNESS:  You're welcome.

3              MR. SCOTT:  -- have a good day.

4              MR. TUCKER:  I --

5              MR. SCOTT:  Go ahead.

6              MR. TUCKER:  I just had -- I just had a few

7        questions, Rob.

8              MR. SCOTT:  Okay.

9              MR. TUCKER:  For the witness.  And Adam, I

10       don't know if you can bring it up, but I think it

11       was Exhibit 5.  I'm trying to look at my notes here.

12             VIDEOGRAPHER:  Stand by.

13             MR. TUCKER:  Is it possible to bring up Exhibit

14       5?

15             VIDEOGRAPHER:  Yeah.  Give me one second.

16             MR. TUCKER:  Yes.  That's it.

17                   CROSS EXAMINATION

18   BY MR. TUCKER:

19       Q    Ms. Dant, looking at Exhibit 5, do you see on

20   the left side there where it says "status"?

21       A    Yes.

22       Q    And then it says "rejected" in the column, I

1    guess right next to it?

2        A    Yes.

3        Q    What does rejected mean?

4        A    Rejected could mean that a student did not --

5    their application did not meet our requirements or that

6    the application was incomplete.

7        Q    Okay.  That's all I have for that particular

8    exhibit.  I do have a few more questions.  Ms. Dant, you

9    said that all students who pass the entrance exam are

10   welcome at Bethel; is that correct?

11       A    Yes.

12       Q    Mr. Scott asked you about whether Bethel would

13   admit homosexual children.  Do you remember that

14   discussion?

15       A    I do.

16       Q    And I believe you emphasize that you admit any

17   and all qualified students; is that correct?

18       A    That is correct.

19       Q    Is that without respect to sexual attractions,

20   orientation, or gender identity?

21       A    Without respect to those things, yes.

22       Q    Does Bethel ask about sexual orientation

1  during its admissions process?

2      A    No.  We do not.

3      Q    Does Bethel ask about student generated --

4  gender identity during its admissions process?

5      A    No.  We do not.

6      Q    Do students' sexual orientation or gender

7  identity relevant to Bethel's admissions process?

8      A    No.  It is not relevant.

9      Q    Has Bethel ever asked about a student's sexual

10 orientation or gender identity in the admissions process

11 or at any point at all?

12     A    No.

13          MR. TUCKER:  That's all I have.

14          THE WITNESS:  Okay.

15          MR. TUCKER:  I don't have anything.

16          MR. SCOTT:  I don't have anything further, so I

17     believe we're finished.

18          COURT REPORTER:  We are off the record.

19          (DEPOSITION CONCLUDED AT 2:44 P.M.)

20

21

22

```
1                    CERTIFICATE OF REPORTER

2

3

4    I do hereby certify that the witness in the foregoing

5    transcript was taken on the date, and at the time and

6    place set out on the Stipulation page hereof, by me

7    after first being duly sworn to testify the truth, the

8    whole truth, and nothing but the truth; and that the

9    said matter was recorded by me and then reduced to

10   typewritten form under my direction, and constitutes a

11   true record of the transcript as taken, all to the best

12   of my skill and ability. I certify that I am not a

13   relative or employee of either counsel and that I am in

14   no way interested financially, directly or indirectly,

15   in this action.

16

17

18   _____

19   BROOKE ANDREW

20   COURT REPORTER/NOTARY

21   MY COMMISSION EXPIRES: 11/27/2021

22   SUBMITTED ON: 04/19/2021
```