**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION**

|  |  |  |
|---|---|---|
| BETHEL MINISTRIES, INC., | ) | |
| | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | Case No. 1:19-cv-01853-SAG |
| v. | ) | |
| | ) | |
| MOHAMMED CHOUDURY, et al. | ) | |
| | ) | |
| | ) | |
| *Defendants.* | | |

**PLAINTIFF'S REPLY IN SUPPORT OF ITS
CROSS-MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Introduction ..................................................................................................... 1

Argument ......................................................................................................... 2

    I.    Defendants Target Bethel's Beliefs, Not Its Admissions Policy. ................ 2

    II.    Defendants Violated Bethel's Free Exercise Rights.................................... 4

        A.    The BOOST law is not generally applicable by its plain language, in practice, and because of its system of individualized assessments. ................................................................................... 4

        B.    Defendants failed to neutrally enforce the BOOST law....................... 7

            1.    Defendants targeted Christian schools and their beliefs............ 7

            2.    Defendants showed impermissible hostility to Christian beliefs. ..................................................................................... 8

            3.    Defendants kicked Bethel out in violation of the law. .............. 12

            4.    Defendants excluded Bethel because of its religious character. .................................................................................. 12

        C.    Defendants interfere with Bethel's internal affairs and autonomy. .. 13

    III.    Defendants violated Bethel's Free Speech Rights.................................... 13

    IV.    The BOOST Law Is Unconstitutionally Vague. ...................................... 16

    V.    Defendants Harm Parents' Due Process Rights....................................... 16

    VI.    Defendants Violated Bethel's Equal Protection Rights. ........................... 17

    VII.    Defendants' religious favoritism violates the Establishment Clause. ...... 19

    VIII.    Defendants' Enforcement Fails Strict Scrutiny. ...................................... 20

        A.    Defendants have no compelling interest in excluding Bethel............ 20

        B.    Expelling Bethel was not Defendants' least restrictive means. ......... 22

Conclusion...................................................................................................... 22

Certificate of Service...................................................................................... 24

**INTRODUCTION**

Bethel Christian Academy has an all-comers admissions policy. They accept all academically qualified students, regardless of their religion, sexual orientation, or gender identity. As an elementary school, Bethel does not ask prospective students about their sexual orientation and gender identity because it is not relevant: they are children. Bethel never violated the BOOST law's nondiscrimination requirement, and no student has ever alleged discrimination at Bethel or any BOOST school.

Defendants nonetheless expelled Bethel from the programs. Bethel's parent-student handbook contains numerous citations to and explanations of the school's religious beliefs, including its religious beliefs about marriage and human sexuality. According to the Supreme Court, these are "decent and honorable" religious beliefs. *Obergefell v. Hodges*, 576 U.S. 644, 672 (2015). But according to Defendants, saying that faculty, staff, and student conduct is expected to align with those religious beliefs is a "discriminatory policy" against children who are prospective students.

Defendants made this conclusion after launching an inquisition that treated Christian schools that expressed their religious beliefs about marriage and human sexuality worse than other private schools. "After receiving a complaint about a different [school]," Maryland officials "launched an inquiry." *Fulton v. City of Phila., Pa.*, 141 S. Ct. 1868, 1875 (2021). Untrained state officials searched schools' handbooks for disfavored beliefs about marriage and human sexuality. Their scrutiny proceeded in three phases.

First, two MSDE staff reviewed school handbooks, looking for certain "trigger" terms, like "Biblical values," "Christian principles," "Christ-centered approach," and "traditional family marriage." When they found "triggers," they "flagged" the handbook for further scrutiny. Defendants specifically flagged Bethel's handbook because it "is talking about a covenant between one man and one woman."

The consequence of searching for "triggers" that related to Christian teachings on marriage and human sexuality was that they only flagged Christian schools. Defendants never flagged a single Jewish, Muslim, or secular private school even though some had similar language. Unflagged schools were allowed to continue participating in the program.

Second, MSDE staff sent flagged handbooks to the Maryland Attorney General's office for further review. If they approved the handbook language the school could participate. If not, Defendants required more information from schools. They explicitly highlighted religious beliefs and schools had to attempt to justify their handbooks' religious and moral beliefs.

Third, if state lawyers were unsatisfied, they referred handbooks to the BOOST Advisory Board for further scrutiny, which made final determinations for the schools that made it this far in the process. Of the approximately 180 BOOST participating schools, the government only subjected 22 (all Christian) to the second step of scrutiny and only a handful made it to the final step.

This process targeted Christian schools, persecuted expressions of religious beliefs about marriage and human sexuality, and forced schools to choose between public benefits or their religious expression. Bethel declined to hide its beliefs and Defendants punished them. They violated Bethel's constitutional rights.

## ARGUMENT

### I.  Defendants Target Bethel's Beliefs, Not Its Admissions Policy.

To justify their religious targeting, Defendants misconstrue Bethel's handbook. Defendants kicked Bethel out of the programs because of its biblical

marriage statement and accompanying conduct language.[1] But those provisions are separate from its admissions policy. ECF 80-37 at 7; ECF 80-4 at 68:5–22.

Defendants argue that Bethel's handbook language "can only be read as one that allows denial of admission and/or continued enrollment on the basis of sexual orientation." ECF 83 at 15. But Defendants classified Bethel as a "Category 3" school. *See* ECF 80-27 (Bethel listed as Category 3 in April 2018); ECF 80-34 (same in March 2018). And according to their own legal interpretation of the BOOST law, "if [a Category 3 school] wishes to participate in BOOST, [it] must sign the assurance that it does not discriminate in admissions." ECF 80-32 at 2. Bethel did so. Even Defendants did not believe Bethel's handbook language was in clear violation of the BOOST law: it took them half a year and multiple meetings to determine Bethel's fate. ECF 75-14 (requesting handbooks in 2017); ECF 80-45 (expelling Bethel at the end of June 2018). *See also* ECF 80-53, Gunning Depo. at 32:11–17 (government official in charge of programs does not see anything "overtly discriminatory" in Bethel's current admissions policy.).

Bethel—like any school—has conduct expectations for its students. Bethel applies the same standards to every student, regardless of their sexual orientation or gender identity or expression. Bethel has a dress code, school uniforms,[2] and facilities particular to a student's biological sex. ECF 80-2 ¶¶ 35–38. Regardless of a student's sexual orientation, gender identity, or expression, Bethel expects all students to meet

---

[1] Bethel's conduct expectation applies to faculty, staff, and enrolled students—all current members of the Bethel community. It does not address applicants or potential applicants. ECF 80-37 at 7. And despite their insistence to the contrary, Defendants relied on schools' conduct policies before the BOOST law was expanded to cover conduct: if they had not, their "sham admission" theory (that schools could discriminate in admissions by later dismissing students because of their behavior) would not make any sense. *See* ECF 80-47 (expulsion letter from Gallagher to Dant). *See also* ECF 80-8, Kearns Depo at 50:19–21 (MSDE looked at conduct).

[2] One of Bethel's uniform options can be worn by either boys or girls.

the standards appropriate to their biological sex. *Id*. at ¶ 31. But Defendants falsely claim that Bethel discriminates against transgender students. ECF 83 at 15.

As Bethel's principal explained, if a prospective student indicated they wanted to dress as the opposite sex, "[w]e would make our expectations clear and we would accept a student who is qualified and desires to come to our school. They would be welcome." ECF 80-4 at 121:15*, 122:22–123:3.* If a prospective student voluntarily told Bethel that he or she did not identify with his or her biological sex, "[i]t would not matter to us. If they meet our requirements they are welcome to come." In other words, everyone is welcome, but once admitted, the same rules apply to all. *See id*. at 120:2–12. ECF 80-2 at ¶ 31.

## II.   Defendants Violated Bethel's Free Exercise Rights

Defendants violated Bethel's Free Exercise rights because the BOOST law is not generally applicable, because they failed to apply the BOOST law in a neutral way, and because Defendant's enforcement interferes with Bethel's internal affairs.

### A. The BOOST law is not generally applicable by its plain language, in practice, and because of its system of individualized assessments.

Defendants claim that the BOOST law is generally applicable because it requires all schools not to discriminate in admissions. ECF 83 at 8. But Defendants went beyond the law's plain-language requirement and made schools conform their handbooks or policies to the State's approval. ECF 75-14. And they did so even though there is no evidence that Bethel (or any school) discriminated in admissions. ECF 80-14, Defs' Admis. Nos. 10, 17, 18, 19, 20, 21. What's more, the law exempts religious schools from "adopt[ing] any rule, regulation, or policy that conflicts with its religious or moral teachings." *See* 2021 Md. Laws ch. 357 at 160, 162[3]; *see also* ECF 80-7 & 80-10. That's a "formal system of entirely discretionary exceptions" that "renders the [handbook requirement] not generally applicable." *Fulton*, 141 S. Ct. at 1878. But

---

[3] http://mgaleg.maryland.gov/2021RS/chapters_noln/Ch_357_hb0588E.pdf.

Defendants nevertheless required some schools to change their handbooks and written policies. *See* ECF 80-28 (examples of state-approved handbook revisions). And since Bethel's expulsion, the Maryland legislature codified the handbook submission, review, and approval as a participation requirement for the programs. ECF 80-53, Gunning Depo. at 111:16–112:9; 2021 Md. Laws ch. 357 at 158 (requiring schools to "[s]ubmit its student handbook or other written policy related to student admissions to the Maryland State Department of Education for review to ensure compliance with program eligibility requirements.").

In *Fulton*, the City of Philadelphia terminated a contract with Catholic Social Services (CSS) because CSS would not certify same-sex couples for foster placements or place foster children with same-sex couples. The Court observed that it was "plain that the city's actions have burdened CSS's religious exercise." 141 S. Ct. at 1876. Like Defendants, Philadelphia argued that the contract's nondiscrimination agreement was neutral and generally applicable under *Employment Division v. Smith*, 494 U.S. 872 (1981). But the Supreme Court disagreed, holding that the contract was "not generally applicable as required by *Smith*" because it allowed the City's program director to grant an "exception." *Fulton*, 141 S. Ct. at 1878. That one clause, said the Court, was a "system of individual exemptions" or assessments. *Id*. Where such a system of individual exemptions exists, Maryland "may not refuse to extend that exemption system to cases of religious hardship without a compelling reason." *Id*. (cleaned up). The same is true for the religious freedom exception in the BOOST law. ECF 80-7 & 80-10; 2021 Md. Laws ch. 357 at 160, 162.

And Defendants' administration of the BOOST law reflects a system of individualized assessments. In *Smith*, the Supreme Court explained that the *Sherbert v. Verner* compelling interest test "was developed in a context that lent itself to individualized governmental assessment of the reasons for the relevant conduct." 494 U.S. at 884. And in *Sherbert*, a "good cause" exemption in an unemployment

benefits program allowed government officials to determine the reasons why applicants sought exemptions from work requirements. This invited government officials to investigate the reasons behind an exemption-seeker's conduct. *Id.*

The same thing happened here. To determine compliance with Defendants' handbook requirement, untrained MSDE officials, government lawyers, and Board members scrutinized religious schools' handbooks to identify the schools' religious language and the religious reasons justifying their policies. ECF 80-26 (letters identifying problematic language); ECF 80-53, Gunning Depo. 35:6–12, 71:4–14 (MSDE officials still make ad hoc compliance determinations). Defendants did not require all schools to submit handbooks; some could just write up an admissions policy. ECF 80-12, Eberhart Depo. 44:13–17, 66:4-8; ECF 75-14 (Gallagher's December 2017 letter to BOOST schools). And schools only had to amend or change their handbooks if the State did not like their language. ECF 80-28. But even then, Defendants granted reconsideration to some schools after finding their religious belief language discriminatory. ECF 80-45 (June 21, 2018, meeting summary detailing grant of reconsideration).

Here, Defendants do not object to Bethel's admissions policy—it's an all-comers policy. ECF 80-2 ¶¶ 7, 29, 30; ECF 80-4 at 120:2–12. And in a vacuum, Defendants would not object to Bethel's conduct policies: that all children at an elementary school may not date, engage in public displays of affection, and are expected to keep their hands to themselves. ECF 80-4, Dant Depo. 73:21–74:5, 76:10–18; ECF 80-5, Wecker Depo. 98:4–5; ECF 80-37 at 34. Nor do they have a problem with Bethel's sex-specific dress, uniform, and facility-use policies—plenty of BOOST schools (including single-sex schools) have those. Ex. 67 at 5, 7–5 (separate boys and girls dress and uniform standards, public displays of affection banned); ECF 80-64 (separate boys and girls divisions with sex-specific dress and uniform policies); ECF 80-68 (including sex-specific dress codes and prohibiting public displays of affection and "Sexual

interactions of any kind"). Instead, they object to Bethel's written expectation that faculty, staff, and student behavior should align with Bethel's biblical beliefs that marriage is a covenant between one man and one woman and that all people are created in the image and likeness of God as male or female. ECF 80-26 at 4–5 (MSDE's letter highlighting these beliefs as problematic). If Bethel's marriage beliefs were not in its handbook, Bethel would be in the programs.

### B. Defendants failed to neutrally enforce the BOOST law.

Defendants violated the Free Exercise clause when they failed to meet "the minimum requirement of neutrality to religion." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 66 (2020) (quotation and citation omitted). They targeted Bethel and other Christian schools' religious beliefs, showed hostility toward those beliefs, and discriminated against its religious character. *See Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993); *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719 (2018); *Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246 (2020).

### 1. Defendants targeted Christian schools and their beliefs.

"The Court must survey meticulously the circumstances of governmental categories to eliminate. . . religious gerrymanders." *Lukumi,* 508 U.S. at 534. And in this case, the Court does not have to look very hard. Defendants searched schools' handbooks for "triggers"—terms that subjected some schools to heightened scrutiny. Those "triggers" only included terms that implicated Christian schools[4]—"Christian principles," "biblical values," "Christ-centered environment," and "Christ-centered approach." ECF 80-26; ECF 80-22, Wise Depo. at 38:17, 39:2–10, 98:17–20; ECF 80-9, Klarman Depo. 56:17–19, 57:7–9, 59:7, 85:20–21. Searching for these "triggers"

---

[4] The fact that Defendants searched every handbook does not demonstrate that the acted neutrally—they scrutinized handbooks in a non-neutral way.

exposes their "distrust" of Christian schools' "religion [and] its practices." *Lukumi*, 508 U.S. at 547.

Defendants have no explanation for this behavior. They say that there was no targeting because Christian schools participate in BOOST. ECF 83 at 2–3.[5] But Defendants targeted Christian schools who expressed their religious beliefs about marriage and sexuality. ECF 80-28; ECF 80-22, Wise Depo. at 38:17, 39:2–10, 98:20; ECF 80-9, Klarman Depo. 56:17–19, 57:7–9, 59:7, 85:20–21.

Defendants then say their "methods" of targeting religious schools are excusable because they "were reasonable in light of the presenting problem." ECF 83 at 4. Yet, they admit there's no evidence that any BOOST school discriminated against a student. ECF 80-14, Defs.' Admis. Nos. 10, 17, 18, 19, 20, 21. In reality, they were not reacting to discrimination, but to a politically motivated complaint by a BOOST program opponent who did not like a different school's policies. *See* ECF 80-17, 80-18 (Maryland PTA opposes scholarship programs used at religious schools).

## 2. Defendants showed impermissible hostility to Christian beliefs.

"The Free Exercise Clause bars even 'subtle departures from neutrality' on matters of religion." *Masterpiece*, 138 S. Ct. at 1731 (quoting *Lukumi*, 508 U.S. at 534). Government officials offend the Free Exercise clause's neutrality requirement when they show hostility toward religious beliefs. *Masterpiece*, 138 S. Ct. at 1729–31. If there's even a "*slight suspicion*" that enforcement and intervention "stem[s] from animosity of religion or distrust of its practices," government officials must conform to the Constitution. *Masterpiece*, 138 S. Ct. at 1731 (quoting *Lukumi*, 508 U.S. at 547)

---

[5] Defendants try to claim that only religious schools participated in BOOST during the 2017–18 school year, but that is false. *See* ECF 80-61 (listing schools receiving 2017–18 BOOST awards). A cursory review shows that at least several non-religious schools received BOOST money in 2017–18, including Unselds School - Baltimore (*id*. at 25), Baltimore School of Independent Learners (*id*.), Montessori School of Westminster (*id*. at 26), Tome School (*id*.), and Lucy School (*id*.).

(emphasis added). Government officials can show hostility both through a "disparity in treatment" or through their comments. *Id.* at 1730–31. Both are present here.

### a. Defendants' hostility is shown by disparate treatment.

MSDE staff only flagged Christian schools' handbooks for further scrutiny. ECF 80-14, Defs.' Admis. No. 2. No Jewish, Muslim, or secular private schools faced that examination. *Id.,* Defs.' Admis. Nos. 5, 6, 7. Instead, Defendants relied on those schools' assurances (but not Bethel's) and allowed them to participate in BOOST. *Id.* Despite the fact that "religious and philosophical objections to gay marriage are protected views," Defendants treated Christian schools that mentioned religious beliefs about marriage and human sexuality worse than other schools. *Masterpiece*, 138 S. Ct. at 1727. Government officials flagged "Christian Principles" as a proxy for discrimination even though "[t]he First Amendment ensures that religious organizations and persons are given proper protection as they seek to teach the principles that are so fulfilling and so central to their lives and faiths." *Obergefell*, 576 U.S. at 679–80. Simply put, Christian schools were forced to hide their beliefs to participate. ECF 80-28.

Defendants try to dodge the comparisons Bethel made to the Jewish day schools by saying they didn't participate in the program. But Krieger Schechter's students received BOOST awards in 2018–19 and 2019–20 (the same school year Defendants rejected Bethel's reapplication). ECF 80-62 at 28.[6]  Defendants then suggest their handbook would not have been reviewed, but Defendants produced this example in response to Bethel's discovery request for the school handbooks reviewed by Defendants. ECF 83 at 5, ECF 80-68. Similarly, Talmudical Academy's handbook prohibits <u>students</u> from engaging in "sodomy, unnatural or perverted practices," which it labels as "abuse." ECF 80-60 at 2 (§ II(A)(1), (vi)). Just as Bethel expects its

---

[6] Page 19 of the 2019–20 BOOST legislative report shows Krieger Schechter's awards for that year. https://bit.ly/3j8Jso8.

faculty, staff, and students to conform their conduct with Bethel's beliefs about human sexuality, Talmudical Academy expects it faculty and students not to engage in abusive sexual behavior. *Id*.

Defendants also suggest that the Jewish day schools' handbooks were reviewed in later years (2018–19 and 2019–20), under a different process than Bethel in 2018. ECF 83 5, 6. But they have admitted that the same MSDE staff use the same January 2018 legal guidance even today, and that they only rely on their "professional judgment" for gender identity and expression compliance. ECF 80-53, Gunning Depo. at 35:5–12. Those same staff rejected Bethel's 2019–20 school year reapplication. ECF 80-59, 80-58 (review flagged Bethel's religious beliefs).

### b. Defendants made statements hostile to Bethel's beliefs.

In *Masterpiece*, the Supreme Court explained that government officials can violate the Constitution's neutrality requirement by showing hostility toward religious believers and their beliefs. 138 S. Ct. at 1729. Defendants continue to make disparaging comments about Bethel's beliefs and practices, both in briefing and in evidence. *See* Defs.' Response, ECF 83 at 12–13 (comparing Bethel's position that elementary school children should not be sexually active to Bob Jones University's racist anti-miscegenation policies).

First, Defendants' reliance on *Bob Jones University* is not only insulting, it's wrong.[7] "[L]umping those who hold traditional beliefs about marriage together with racial bigots is insulting to those who retain such beliefs." *Fulton*, 141 S. Ct. at 1925

---

[7] *Bob Jones* involved racism, the "familiar and recurring evil" that "implicates unique historical, constitutional, and institutional concerns." *Pena-Rodriguez v. Colo.*, 137 S. Ct. 855, 868 (2017). The comparison is not fair or relevant because Bethel's students are children. No student may engage in any kind of dating or public displays of affection—and Bethel enforces this policy evenly, regardless of sexual orientation. ECF 80-43; ECF 80-6, Pl.'s Interrog. Ans. 7.

(Alito, J., concurring). And this is particularly true when your students are overwhelmingly racial and ethnic minorities. ECF 80-2 ¶ 13.

Second, the record shows Defendants do not like Bethel's religious views. *See* ECF 80-1 at 22–25. Defendants identified Bethel's biblical marriage statement as the problematic language that led to its expulsion from BOOST. *See* ECF 80-25, Gallagher Depo. 98:3–12 ("The biblical view of marriage is defined as a covenant between one man and one woman"); ECF 80-52, Grasmick Depo. 40:19–41:6 (Bethel's marriage statement of concern); ECF 80-42, Camp Depo. 80:11–13 (problem language "marital or non-marital something"); ECF 80-31, Sanders Depo. 50:6–51:2 (identifying marriage provision as problem); ECF 80-13, Harbinson Depo. 60:7–13, 64:16–65:3 (marriage statement was the reason for expulsion); ECF 80-12, Eberhart Depo. 62:2–63:2 (same); ECF 80-8, Kearns Depo. at 67:5–6 (Bethel's handbook "is talking about a covenant between one man and one woman.").

The BOOST chair also showed his disdain for these commonly held views and he openly criticized the Catholic Church for declining to bless same-sex unions. ECF 80-41, May 3, 2018 Transcript at 57:12–14, 16:4–5; ECF 80-63*; Fulton*, 141 S. Ct. at 1920 (Alito, J., concurring) ("commissioner of the Department of Human Services . . . disparaged CSS's policy as out of date and out of touch with Pope Francis's teachings."). What's more, other Board members refused to believe that Christian schools would enforce their policies evenly for both opposite-sex and same-sex conduct. ECF 80-41 at 51:5–12, 53:5–16. In fact, one member testified that although Bethel shares the same beliefs as the Catholic Church, he doesn't think Catholic schools discriminate because Catholic teaching "does" and "can change . . . particularly through Pope Francis." ECF 80-31 at 84:9–17, 83:15–19. Such evidence is more than a "slight suspicion." *Masterpiece*, 138 S. Ct. at 1731.

### 3. Defendants kicked Bethel out in violation of the law.

The Maryland legislature made clear that schools need not adopt policies contrary to their religious beliefs to participate in BOOST. ECF 80-7; ECF 80-10. But Defendants ignored this provision. ECF 80-11 (Gallagher email noting conflict). Instead, they forced religious schools to change their internal policies to become state-approved. ECF 80-28 (examples of state-approved handbook changes). Additionally, at the time Defendants expelled Bethel from BOOST, the law only addressed discrimination in student admissions. ECF 80-7. Yet Defendants looked beyond schools' admissions policies and applied the law as if it covered student conduct. ECF 80-47.

What's more, Defendants' decided Bethel's fate in an unprecedented, closed session, contrary to Maryland's open meetings law. MD GEN PROVIS § 3-301 (all non-excepted actions of a public body must occur in open meeting). A Board member admits they determined Bethel's fate in a closed session on June 21, 2018. ECF 80-13, Harbinson Depo. at 111:14–16.

This further demonstrates the targeting and hostility in violation of Bethel's free exercise rights.

### 4. Defendants excluded Bethel because of its religious character.

"Disqualifying otherwise eligible recipients from a public benefit solely because of their religious character imposes a penalty on the free exercise of religion that triggers the most exacting scrutiny." *Espinoza*, 140 S. Ct. at 2255 (cleaned up).

Defendants only scrutinized Bethel's handbook because of its religious character as a Christian school. Defendants did not scrutinize Jewish, Muslim, or secular private schools. ECF 80-14, Defs.' Admis. Nos. 5, 6, 7. MSDE officials scrutinized school handbooks in search for phrases that implicated religious schools, and in particular Christian schools. *See supra* at 7–9. Bethel's Christian status and character drew the government's scrutiny. But the Free Exercise clause "'protects

12

religious observers against unequal treatment' and against 'laws that impose special disabilities on the basis of religious status.'" *Espinoza*, 140 S. Ct. at 2254 (quoting *Trinity Lutheran*, 137 S. Ct. at 2021).

### C. Defendants interfere with Bethel's internal affairs and autonomy.

Defendants' targeting, hostility, and religious character discrimination faces strict scrutiny. But *Employment Division v. Smith* does not apply here for another reason: Defendants' scouring religious schools' religious beliefs and meddling with their handbooks "interfere[s] with an internal church decision that affects the faith and mission of the church itself." *Hosanna–Tabor Evangelical Lutheran Church and Sch. v. E.E.O.C.*, 565 U.S. 171, 190 (2012). The First Amendment limits civil authority to "ensure[ ] that no branch of secular government trespasses on the most spiritually intimate grounds of a religious community's existence." *E.E.O.C. v. Roman Cath. Diocese of Raleigh, N.C.*, 213 F.3d 795, 800 (4th Cir. 2000) (declining to apply *Smith*). Like Bethel, most religious schools exist for the "religious education and formation of students." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2055 (2020).

Defendants argue that these principles do not apply because Bethel does not bring ministerial exception claims. ECF 83 at 12. But the Fourth Circuit has explained that "religious freedom" protects "the power of religious bodies to decide for themselves, free from state interference, matters . . . of faith and doctrine." *Diocese of Raleigh*, 213 F.3d at 800 (cleaned up). Defendants deprived Bethel and other schools of that by interfering with internal documents explaining their religious beliefs.

## III.  Defendants violated Bethel's Free Speech Rights.

Defendants violated Bethel's First Amendment free speech rights by engaging in content and viewpoint-based discrimination in their BOOST enforcement and by imposing an unconstitutional condition on Bethel's receipt of a public benefit. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (content-based restrictions on speech are

"presumptively unconstitutional"); *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995) (same for viewpoint-based restrictions); *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 213 (2013) ("*AOSI*") (denying benefit on a basis violating free speech prohibited, even if not entitled to benefit).

Defendants justify punishing Bethel's religious speech by claiming that they were regulating conduct. ECF 83 at 13–14. But there's no evidence of discriminatory conduct by any school. Ex. 80-14, Defs' Admis. Nos. 10, 17, 18, 19, 20, 21. *Cf. Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 799 (2011) (government restrictions on speech must be "actually necessary" to solve an "actual problem"). And further, the cases they rely on are inapplicable. ECF 80-1 at 32–34.

*AOSI* is instructive to this analysis. In that case, Congress passed a law seeking, among other things, to stop the spread of HIV/AIDS. 570 U.S. at 208. Because prostitution severely undermined the government's interest, the Act required recipient organizations to adopt a policy expressly opposing prostitution. *Id.* at 209. When an organization challenged this provision of the law on free speech grounds, the Court distinguished "between conditions that define the limits of the Government spending program—those that specify the activities [Maryland] wants to subsidize—and conditions that seek to leverage funding to regulate speech outside the contours of the [State] program itself." *Id.* at 214–15. The Court explained that the policy requirement was "not about the Government's ability to enlist the assistance of those with whom it already agrees" but "about compelling a grant recipient to adopt a particular belief as a condition of funding." *Id.* at 218.

Here, the BOOST program is not an anti-discrimination statute. It does not define discrimination or any protected classes. ECF 80-1 at 4, 15–16. Instead, the BOOST program provides scholarships for parents to use at a school of their choice. *Espinoza*, 140 S. Ct. at 2254. The government is not funding schools—it's funding students and their families, who choose where to spend their benefit. *See Zelman v.*

*Simmons-Harris*, 536 U.S. 639, 649–53 (2002) (families' choice breaks funding link, even if government directly pays the school). By conditioning schools' eligibility on adopting approved handbook language, Defendants do not pursue their interest in providing low-income students with tuition to attend private schools of their choice.

*Legal Services Corporation v. Velazquez* is also illustrative. 531 U.S. 533, 547 (2001). In that case, the government funded Legal Services Corporation, whose grants funded legal services for indigent individuals. *Id.* at 536. Congress tried to restrict the funding's use, prohibiting recipient organizations from seeking to amend or challenge existing welfare law. *Id.* at 536–37. The Court explained that because "Congress funded LSC grantees to provide attorneys to represent the interests of indigent clients," the "program was designed to facilitate private speech, not to promote a governmental message." *Id.* at 542. Likewise, BOOST exists to give low-income families private educational choices. Families choose which educational messages to expose their children to. Defendants' handbook language regulation promotes State views and messages but does not further the interest in school choice.

To be clear, Defendants went after Bethel's religious speech. It was Bethel's statement about biblical marriage that drew the BOOST Board's ire in 2018. *See supra* at 11. And Defendants specifically flagged the scripture references and the Assemblies of God Statement of Faith's beliefs about marriage as "Statements of Concern" to reject Bethel's 2020 reapplication.[8] ECF 80-58. Punishing Bethel's religious speech violates its free speech rights.[9]

---

[8] Bethel Ministries is an Assemblies of God church and the school's handbook includes an Assemblies of God Statement of Faith. *See* ECF 80-5 at 61:7–18.

[9] Defendants try to shrug off Bethel's argument that they violated its hybrid rights under the First Amendment by calling it "creative." But any credit for creativity goes to the Supreme Court, which recognized hybrid rights as triggering strict scrutiny in *Smith*, 494 U.S. at 881–884. *See also Archdiocese of Wash. v. W.M.A.T.A.*, 897 F.3d 314, 331 (D.C. Cir. 2018); *Gary S. v. Manchester Sch. Dist.*,

## IV.  The BOOST Law Is Unconstitutionally Vague.

Laws must be clear about what conduct is allowed and prohibited. *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972); ECF 80-1 at 34–36.

Defendants argue that there is no Fourteenth Amendment Due Process issue because the BOOST law does not "render Bethel's speech or conduct unlawful." ECF 83 at 15. They cite no case to support their contention that vagueness doctrine only applies if there are criminal penalties. And that's not surprising. Their position is legally incorrect. The Supreme Court has explained that ordinances which "impose[] only civil penalties" that have a "prohibitory and stigmatizing effect" may warrant a strict test. *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982) (applying *Grayned*).

The BOOST law imposes (and Defendants pursue) a civil penalty and financial harm through the $102,600 clawback and exclusion from public benefits. ECF 80-48. And Defendants expelling Bethel from BOOST and branding the school as discriminatory caused stigmatic harm to Bethel's reputation. ECF 80-2 ¶ 26.

## V.  Defendants Harm Parents' Due Process Rights.

The Constitution protects parents' right to "direct 'the religious upbringing' of their children," and they may "exercise that right by sending their children to religious schools." *Espinoza*, 140 S. Ct. at 2255, 2261 (citation omitted).

Defendants deprived low-income parents of the right to use their public benefit to send their children to a school that shares and expresses their religious beliefs. These families may have no right to a scholarship, but that is beside the point. The scholarship program in *Espinoza* was not an entitlement program either. *Id.* at 2251–

---

374 F.3d 15, 19 (1st Cir. 2004); *Cornerstone Christian Schs. v. Univ. Interscholastic League*, 563 F.3d 127, 136, n. 8 (5th Cir. 2009); *San Jose Christian Coll. v. Morgan Hill*, 360 F.3d 1024, 1032–1033 (9th Cir. 2004); *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1295–97 (10th Cir. 2004); *Hicks ex rel. Hicks v. Halifax Cty. Bd. of Educ.*, 93 F. Supp. 2d 649, 663 (E.D.N.C. 1999) (recognizing free exercise and parental rights hybrid rights claim).

52. Like BOOST, it also involved student applications to determine awards and favored some students over others. *Id*. And like Bethel parents, the plaintiff parents in *Espinoza* "chose the school in large part because it 'teaches the same Christian values that [they] teach at home,'" but Montana blocked them from using their scholarships at their chosen school. *Id*. at 2252 (citation omitted); ECF 80-2, Dant Decl. at ¶ 6.

The fact that *Espinoza*'s scholarship award was not an entitlement did not stop the Court from concluding that "the prohibition . . . burdens not only religious schools but also the families whose children attend or hope to attend them." 140 S. Ct. at 2261. Defendants burden BOOST parents who want to send their children to Bethel. Their enforcement "bars parents who wish to send their children to a religious school from those same benefits, again solely because of the religious character of the school." *Id*. at 2255. "[D]isqualifying otherwise eligible recipients from a public benefit solely because of their religious character imposes a penalty on the free exercise of religion that triggers the most exacting scrutiny." *Id*. at 2255 (quotation omitted).

## VI.  Defendants Violated Bethel's Equal Protection Rights.

The Fourteenth Amendment's Equal Protection Clause commands states to give all persons the equal protection of laws, treating all similarly situated persons alike. *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Laws are not presumed to be valid when they classify by suspect classes, including religion. *Id*. at 440; *Roller v. Gunn*, 107 F.3d 227, 233 (4th Cir.1997).

Defendants claim they satisfied the Equal Protection Clause because they also kicked out another school that expressed similar religious beliefs. ECF 83-19 & 83-20. But Defendants make Bethel's point: they treated schools that expressed their religious beliefs about marriage and human sexuality worse than other schools. Their enforcement treated one type of religious school—Christian academies—worse than other religious schools. A Board member even recognized this during a meeting: "is

17

the intent to—at what point are we excluding a certain category of religious institution, period, no matter what, no matter how they try to abide by the rules because we're projecting certain things?" ECF 80-41 at 56:13–16.

And the record shows Defendants treated Bethel worse. For example, they freely shared the legal memorandum that guided determinations for most flagged BOOST schools. According to that memo, Bethel's handbook complied with the BOOST law—Category 3 schools only had to sign the assurances to participate in BOOST. *See* ECF 80-32 (legal memo); ECF 80-27 (identifying Bethel as a Category 3 school); ECF 80-34 (same). Yet, Defendants specifically instructed MSDE staff not to share the updated memo used to determine the fate of Bethel and other Category 3 schools. *See* ECF 80-40 (Kearns instructing staff not to share May 1, 2018 legal memo)[10]; ECF 80-22, Wise Depo. 110:5–111:21. Bethel asked for an explanation of why their handbook language did not satisfy Defendants. Ex. 66 at 2–5. (Dant emails asking why Bethel's assurance was insufficient given legal memo). But Defendants expelled Bethel anyway. ECF 80-47.

Defendants also deprived Bethel of the equal protection of the laws by creating a system of ad hoc enforcements that gave government officials unbridled discretion. *Vill. of Willowbrook v. Olech*, 528 U.S. 562 (2000) (plaintiff alleging it was treated differently from others has equal protection claim). When the government "gives a public official unbounded discretion to decide which speakers may access a traditional public forum," it violates the First Amendment. *Child Evangelism Fellowship of Md., Inc. v. Montgomery Cty. Pub. Sch.*, 457 F.3d 376, 386 (4th Cir. 2006). This applies even in limited public and nonpublic forums. *Id*. "The dangers posed by unbridled

---

[10] In their July 23 brief, Defendants provide a February 2018 email from Jamie Klarman to Claire Dant transmitting the January 2018 memo. Initially withheld as privileged, this contentless email was overlooked in the 50,000+ pages in Defendants' production. On July 26, Defendants made a post-discovery production of documents related to Defendants' review of Bethel's handbook. *See* Ex. 66.

discretion—particularly the ability to hide unconstitutional viewpoint discrimination—are just as present" in limited public and nonpublic forums. *Id*.

Defendants suggest that *Child Evangelism Fellowship* does not apply here because "that case dealt with free speech, not free exercise." ECF 83 at 22. But Defendants violated Bethel's free exercise *and* free speech rights. *See supra* at 4–15. And like in *Child Evangelism Fellowship*, Defendants had unbridled discretion to engage in viewpoint discrimination against schools that expressed disfavored religious beliefs about marriage and human sexuality.

Reviewing handbooks, MSDE officials made ad hoc decisions granting eligibility for most schools, while singling out schools like Bethel for scrutiny. ECF 80-53, Gunning Depo. 35:6–12. Those problems continue today because MSDE officials who make the vast majority of eligibility determinations are not trained for this task and they rely on their "professional judgment." *See also id*. at 71:4–14 (explaining that citations to Bible verses in Bethel's handbook were flagged because, "whoever reviewed this felt that that was questionable.").

## VII. Defendants' religious favoritism violates the Establishment Clause.

The Establishment Clause of the First Amendment "forbids an official purpose to disapprove of a particular religion or of religion in general" or favoring particular denominations. *Lukumi*, 508 U.S. at 532; *Larson v. Valente*, 456 U.S. 228 (1982). Defendants treated Christian schools less favorably than Jewish, Muslim, or secular schools, giving their beliefs unique scrutiny. ECF 80-14, Defs.' Admis. Nos. 2, 5, 6, 7.

And Defendants played favorites between Christian schools, punishing those who did not keep their religious beliefs about marriage and sexuality to themselves. ECF 80-28 (examples of government-approved revisions to religious school handbooks). When asked what differentiated Bethel's biblical marriage beliefs from the Catholic Church's, Board member Sanders explained that Catholic schools (which share Bethel's religious beliefs on marriage and sexuality) "do not ask questions"

about prospective students' sexual orientation, and that Catholic teaching "does" and "can change . . . particularly through Pope Francis." ECF 80-31 at 84:9–17, 83:15–19.

## VIII.   Defendants' Enforcement Fails Strict Scrutiny.

Defendants' unconstitutional behavior "must satisfy strict scrutiny, and this means that [their actions] must be narrowly tailored to serve a compelling state interest." *Roman Cath. Diocese of Brooklyn*, 141 S. Ct. at 67 (quotation omitted)[11]; *Reed*, 576 U.S. 155. Defendants cannot shoulder this burden.

### A. Defendants have no compelling interest in excluding Bethel.

Defendants must proffer a compelling interest in putting Bethel to a choice between expressing its religious beliefs about marriage and receiving public benefits. When strict scrutiny applies, "courts should strike sensible balances, pursuant to a compelling interest test that requires the Government to address the particular practice at issue." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 439 (2006). This Court must "'scrutinize[ ] the asserted harm of granting specific exemptions to particular religious claimants,'" not "rely on 'broadly formulated'" governmental interests. *Fulton*, 141 S. Ct. at 1881 (quoting *O Centro*, 546 U.S. at 431). Additionally, when they seek to restrict speech, Defendants "must specifically identify an 'actual problem' in need of solving." *Ent. Merchs. Ass'n*, 564 U.S. at 799 (quoting *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 822–23 (2000)). "[A]nd the curtailment of free speech must be actually necessary to the solution." *Id.* (citing *R.A.V. v. City of St. Paul*, 505 U.S. 377, 395 (1992)). The Supreme Court has explained that this "is a demanding standard" because "[i]t is rare that a

---

[11] Defendants argue that they do not necessarily face strict scrutiny. ECF 83 at 23. That's wrong because they engaged in religious targeting, demonstrated religious hostility, discriminated on status, and because the law is not generally applicable. "The compelling interest standard that we apply once a law fails to meet the *Smith* requirements is not "watered down but really means what it says." *Lukumi*, 508 U.S. at 546 (cleaned up).

regulation restricting speech because of its content will ever be permissible." *Id.* at 799 (quoting *Playboy*, 529 U.S. at 818).

Defendants fail to explain why they have a compelling interest in refusing to allow Bethel to participate in the programs. ECF 83 at 23–24. Instead, they assert a generalized interest in not funding discrimination, which is insufficient to exclude Bethel. *Fulton,* 141 S. Ct. at 1881 (interest must be particular to excluding Bethel). But discrimination has never occurred at any BOOST school, and certainly not at Bethel. ECF 80-14, Defs.' Admis. Nos. 10, 17, 18, 19, 20, 21. Bethel welcomes all academically qualified students and it has never denied a student admission based on sexual orientation, gender identity, or gender expression. ECF 80-2 ¶¶ 7, 30. And further, LGBTQ individuals have been part of the Bethel community. ECF 80-5, Wecker Depo. at 93:2–9; 93:14–20; 96:20–97:2.

BOOST's religious exemption language undermines Defendants' claim that they have a compelling interest. "The creation of a system of exceptions under the [handbook review] undermines [Maryland's] contention that its non-discrimination policies can brook no departures." *Fulton*, 141 S. Ct. at 1882. Defendants put Bethel to a choice between participating and expressing their religious beliefs in their handbook—all while allowing schools without handbooks or who have similar policies to Bethel in the program. Defendants "offer[] no compelling reason why it has a particular interest in denying an exception to [Bethel] while making them available to others." *Id.*

Additionally, Defendants' uneven and underinclusive enforcement undermines their alleged interest. "[A] law cannot be regarded as protecting an interest of the highest order when it leaves appreciable damage to that supposedly vital interest unprohibited." *Lukumi*, 508 U.S. at 547 (cleaned up). Defendants did nothing besides handbook reviews. ECF 80-8, Kearns Depo. 112:20–24.; ECF 80-53, Gunning Depo at 52:14–18. But not every school had a handbook. ECF 80-12, Eberhart Depo. 66:7–8.

And Defendants allowed schools without them to write up admissions policy statements. *Id*. at 44:13–17. Some handbooks do not include conduct expectations, so those schools' policies do not face scrutiny. ECF 83 at 5 (Claiming Krieger Schechter's conduct policy was not likely reviewed).

### B. Expelling Bethel was not Defendants' least restrictive means.

If "the government can achieve its interests in a manner that does not burden religion, it must do so." *Fulton*, 141 S. Ct. at 1881. Defendants have not pursued their stated interest in the least restrictive means or a means narrowly tailored to fit their purpose. There's no evidence any BOOST school discriminated against a student. *see* Ex. 80-14, Defs' Admis. Nos. 10, 17, 18, 19, 20, 21. Defendants took the vast majority of BOOST schools—those without flagged handbooks—at their word, relying on signed assurances. ECF 80-8, Kearns Depo. 64:2–4; ECF 80-12, Eberhart Depo. 45:10–17; ECF 80-9, Klarman Depo. 65:18–66:1. Defendants could similarly rely on Bethel's assurance. Rejecting schools whose religious beliefs they found suspect was not the least restrictive means.

### CONCLUSION

Bethel is entitled to judgment as a matter of law. Bethel respectfully requests that the Court grant this motion, deny Defendants' motion, and provide Bethel with its requested relief and any other remedies the Court deems fit.[12]

---

[12] *See In re A.H.*, 999 F.3d 98, 107 (2d Cir. 2021) ("Having concluded that the petitioners suffered status-based discrimination when the school districts denied their TTP funding requests, the district court was required to provide a remedy that would restore the victims of discriminatory conduct to the position they would have occupied in the absence of such conduct.") (cleaned up).

Respectfully submitted this 6th day of August, 2021.

By: /s/ *John R. Garza*

John R. Garza (No. 01921)
Garza Law Firm, P.A.
17 W. Jefferson Street
Rockville, Maryland 20850
Telephone: (301) 340-8200
Fax: (301) 761-4309
Email: JGarza@garzanet.com

David A. Cortman*
Alliance Defending Freedom
1000 Hurricane Shoals Road
Suite D-1100
Lawrenceville, Georgia 30043
Telephone: (770) 339-0774
Fax: (770) 339-6744
Email: DCortman@ADFlegal.org

Paul Daniel Schmitt*
Alliance Defending Freedom
440 First Street NW, Suite 600
Washington, D.C. 20001
Telephone: (480) 444-0020
Fax: (480) 444-0028
Email: PSchmitt@ADFlegal.org

Ryan J. Tucker*
Alliance Defending Freedom
15100 N 90th Street
Scottsdale, AZ 85260
Telephone: (480) 444-0020
Fax: (480) 444-0028
Email: RTucker@ADFlegal.org

*Attorneys for Plaintiff*
***Admitted Pro Hac Vice***

23

**CERTIFICATE OF SERVICE**

I certify that on this 6th day of August, 2021, the foregoing was served in compliance with the Federal Rules of Civil Procedure to the following:

Robert A. Scott
Ann Sheridan
Justin E. Fine
Assistant Attorneys General
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
rscott@aog.state.md.us
asheridan@oag.state.md.us
jfine@oag.state.md.us

/s/ John R. Garza
John R. Garza
*Attorney for Plaintiff*