**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| **BETHEL MINISTRIES, INC.,** | * | |
| | * | |
| | * | |
| **Plaintiff,** | * | |
| **v.** | * | **Civil Case No.: SAG-19-1853** |
| | * | |
| **DR. KAREN B. SALMON,** *et al.***,** | * | |
| | * | |
| **Defendants.** | * | |
| | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## AMENDED MEMORANDUM OPINION

Bethel Ministries, Inc. ("Plaintiff" or "Bethel") sued Maryland State Superintendent Dr. Karen B. Salmon and all seven members of the advisory board for the Broadening Options and Opportunities for Students Today ("BOOST") program (collectively, "Defendants"). Bethel claims that Defendants violated its rights under the First and Fourteenth Amendments to the United States Constitution when they excluded Bethel from participating in the BOOST program because Bethel was allegedly violating the program's nondiscrimination requirements. ECF 1. Discovery is closed, and both parties have filed motions for summary judgment. ECF 75 (Defendants' motion); ECF 80 (Bethel's motion). Those motions are now fully briefed. ECF 83, 86. The Court has reviewed the motions, both oppositions, and both replies, along with the accompanying exhibits. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2021). For the reasons that follow, the Court finds that Defendants' application of the nondiscrimination provision to exclude Bethel from the BOOST program for the 2018-2019 and 2019-2020 school years violated Bethel's First Amendment rights. Accordingly, Bethel's motion will be granted as to Count II, and Defendants' motion will be denied as to Count II. Defendants will, therefore, be enjoined from clawing back the $102,600 Bethel received in BOOST funding. Because the Court will afford Bethel the

declaratory and retrospective injunctive relief it seeks, the Court will decline to exercise its discretionary authority under 28 U.S.C. § 2201 to adjudicate Count I and Counts III-VI. Those claims will, therefore, be dismissed.

## I.    FACTUAL BACKGROUND

### a.  Bethel Christian Academy

Bethel is a Pentecostal Christian Church located in Savage, Maryland. ECF 1 ¶ 26. As part of the Church's mission, it operates Bethel Christian Academy, a private school for students in preschool through eighth grade.[1] *Id.* ¶ 28. Bethel is "unabashedly Christian," and outwardly shares its Christian beliefs with prospective applicants. ECF 19-1 at 18.

For example, Bethel summarizes its religious beliefs and related practices in its Parent/Student Handbook. The handbook contains a "statement of nondiscrimination" on its "Admissions Policy" page, which states, in relevant part, that Bethel "does not discriminate on the basis of race, color, national and ethnic origin in administration of its educational policies, admissions policies, scholarship and loan programs, and athletic and other school-administered programs." ECF 1-4 at 7. Bethel does not include sexual orientation or gender identity in its statement of nondiscrimination. *See id.* In the next paragraph, the handbook says,

> It should be noted, however, that Bethel Christian Academy supports the biblical view of marriage defined as a covenant between one man and one woman, and that God immutably bestows gender upon each person at birth as male or female to reflect his image. (Gen. 1:27, Gen. 2:23-24). Therefore, faculty, staff, and student conduct is expected to align with this view. Faculty, staff, and students are required to identify with, dress in accordance with, and use the facilities associated with their biological gender.

*Id.*

---

[1] For purposes of this Motion, Bethel Ministries, Inc. and Bethel Christian Academy are jointly referred to as "Bethel."

Admissions at Bethel is a competitive process, based on a formal entrance exam, an evaluation of previous grades, and a pre-enrollment interview.  ECF 1 ¶ 41.  Bethel contends that it does not consider sexual orientation in the admissions process.  According to Bethel, once students are admitted, the school's policies apply equally, regardless of a student's sexual orientation or sexual attraction.  *See* ECF 1 ¶ 54.  For example, the student conduct policy prohibits any communication of a sexual nature, and any harassment, physical contact, or public displays of affection.  *See* ECF 1 ¶¶ 52–53.

Bethel made several relevant changes to its handbook for the 2019-2020 school year.  Primarily, the statement about Bethel's biblical view of marriage is no longer in the "student admissions" section.  *Compare* ECF 19-13 at 7 (2019-2020 Statement of Nondiscrimination on "Admissions Policy" page), *with* ECF 1-4 at 7 (2017-2018 Statement of Nondiscrimination on "Admissions Policy" page).  However, sexual orientation and gender identity remain omitted from the Statement of Nondiscrimination in the 2019-2020 handbook.  ECF 19-13 at 7.

### b.  BOOST Program

Maryland's legislature established the BOOST program in 2016, and it has re-authorized funding in each subsequent fiscal year.  ECF 1 ¶ 60–61.  The program is administered jointly by the Maryland State Department of Education ("MSDE") and a seven-person BOOST advisory board (the "Advisory Board").  *Id.* ¶ 63.  BOOST provides scholarships for students to attend nonpublic schools in Maryland.  *Id.* ¶ 62.  However, only students who are eligible for the free or reduced-price lunch program may receive scholarships.  *Id.*  Additionally, scholarships can only be used at schools that meet certain eligibility requirements.  First, to be eligible for BOOST, schools must also participate in a second program operated by MSDE, known as Aid to Non-Public Schools (the "Aid Program").  ECF 19-1 at 8.  The Aid Program provides nonpublic schools with

textbooks and computer hardware.  ECF 19-6 at 0059.[2]  Second, to participate in BOOST, schools must sign an assurance stating that they "will not discriminate in student admissions on the basis of race, color, national origin, or sexual orientation."  ECF 1-5 at 4.  The nondiscrimination requirement has a pertinent qualification, indicating that schools are not required "to adopt any rule, regulation, or policy that conflicts with its religious or moral teachings."  ECF 1 ¶ 68.  Bethel signed the assurance and started participating in BOOST during the program's inaugural year.  *Id.* ¶ 72–73.  Ultimately, seventeen Bethel students received BOOST scholarships for the 2016-2017 academic year, and the number increased to eighteen students for the 2017-2018 academic year. *Id.* ¶ 75–76.

In the fall of 2017, MSDE began investigating BOOST schools to verify their compliance with the nondiscrimination requirement.  ECF 1 ¶ 92.  The Advisory Board received a complaint from the Maryland Parent Teacher Association ("MPTA") on October 11, 2017, suggesting that written policies in the handbook of a different school, Trinity Lutheran Christian School ("Trinity"), signaled a practice of discrimination in admissions. *See* Affidavit of Donna Gunning, ECF 22-1, Attachment B.  Two days later, the Advisory Board sent a letter to all BOOST-eligible schools, reminding them of the assurances that schools had signed, and asking them to "review [their] school's moral and religious position on non-discrimination, particularly on sexual orientation."  ECF 19-14.  The letter was sent to schools of various religious and non-religious affiliations. *See* ECF 22-1 ¶ 6 (referring to the list of schools to which the letter was sent).

---

[2] MSDE operates a third program called the "Nonpublic Aging Schools Program," which provides funding to renovate aging buildings.  Participation in the Aid Program is also a prerequisite for the Aging Schools Program. Bethel participated in all three programs for the 2016-2017 and 2017-2018 school years.  ECF 19-1 at 10.

### c.  Enforcement of Nondiscrimination Provision

A couple of months later, in December, 2017, MSDE specifically requested that BOOST schools provide their respective student handbooks.  Declaration of Principal Claire Dant, ECF 19-3 ¶ 21.  Bethel complied by sending its Parent/Student handbook for the 2017-2018 academic year.  ECF 1 ¶ 95–96.  Throughout the first half of 2018, Bethel corresponded with MSDE about its handbook and its related admissions practices.  For example, on March 5, 2018, MSDE asked Bethel how its handbook was consistent with the school's assurance that it does not discriminate in admissions based on an applicant's sexual orientation.  *Id.* ¶ 102, ECF 19-15.  Bethel responded with a letter, on March 13, 2018, explaining that the school does not consider sexual orientation in admissions, and that all students at its preschool through eighth grade school are forbidden from engaging in any sexual conduct.  ECF 1 ¶ 103, ECF 19-7.  Bethel has reiterated to MSDE and to the Advisory Board that it complies with BOOST's nondiscrimination provision.  *See, e.g.*, ECF 19-8 (explaining that Bethel's statement on marriage and biological sex is consistent with BOOST's nondiscrimination requirement).

The Advisory Board met on May 3, 2018, to discuss Bethel's eligibility for BOOST.  ECF 19-16 (transcript of meeting).  At this meeting, Board Member Matthew Gallagher ("Defendant Gallagher") made comments about Bethel.  Bethel and the Defendants disagree vehemently about the import of these comments, and whether his statements had anything to do with Bethel's religious beliefs.  *Compare* ECF 80-1 at 24, *with* ECF 83 at 7.  In response to another Board member, Defendant Gallagher stated that Bethel had "signed an assurance illegally[.]"[3]  ECF 80-

---

[3]  May 3, 2018 BOOST Advisory Board Meeting Video, at 17:19-17:26, available at https://vimeo.com/368387715/85b45d8b3b.

1 at 24.[4]  Defendant Gallagher also referred to language on Bethel's "Admissions Policy" page as "extraordinarily problematic," and stated that certain language "leaves the door wide open to discrimination."  *Id.*  Defendant Gallagher elaborated, adding that the handbook "becomes problematic" when it states that "faculty, staff, and student conduct is expected to align with this view."[5]  On May 25, 2018, Assistant State Superintendent Monica Kearns ("Assistant Superintendent Kearns") wrote to Bethel's Principal, Claire Dant, with additional questions.  In the section immediately preceding her questions, Assistant Superintendent Kearns explained that, since "[t]he law prohibits discrimination in student admissions," "it can be argued that it is problematic if a school admits a student and then summarily expels the student based on sexual orientation."  ECF 80-43.  In response, Bethel stated that any student who can meet its academic standards is welcome to join the community, regardless of religious beliefs, same-sex attraction, beliefs about marriage, or beliefs about sexual morality.  ECF 80-44.

On June 21, 2018, the Advisory Board met again to consider Bethel's eligibility for BOOST.  ECF 19-18 (transcript of meeting).  The Advisory Board members went into closed session for this meeting.  *Id.* at 0296–98.  The Board members voted to enter closed session to receive legal advice from the Maryland Attorney General's Office.  *See id.*[6]  Following the closed session, the Advisory Board members returned to open session, deliberated further, and ultimately voted to exclude Bethel from BOOST.  *See id.* at 0301–02.  On the same day, they voted to deem Broadfording Christian Academy and Grace Academy eligible for BOOST.  *Id.* at 0299–300.

---

[4] Defendants and Bethel disagree about whether this statement implicated Bethel at all.  The Court has not yet made a factual finding on this issue.

[5] *See supra* n.3 at 1:18:28 – 1:19:25.

[6] June 21, 2018 BOOST Advisory Board Meeting, at 1:07:30–1:09:09, available at https://vimeo.com/368402663/ff91451a6c.

According to Bethel, both schools share Bethel's beliefs and policies on marriage and sexual conduct.  ECF 1 ¶ 133.  On August 8, 2018, MSDE sent a letter to Bethel memorializing Defendants' decision at the June 21 Advisory Board meeting.  ECF 80-47.  On December 12, 2018, MSDE sent another letter seeking repayment of $102,600 for the years Bethel had participated in the program.  ECF 80-48.  Due to its disqualification, and the resulting lack of funding, at least six students were forced to leave Bethel in the 2018-2019 academic year, and three additional students left during the 2019-2020 academic year.  ECF 19-3 ¶¶ 38, 40.

In 2019, the General Assembly expanded BOOST's nondiscrimination requirement to cover schools' activities beyond their admissions decisions, and to include gender identity/expression as a protected class.  ECF 22 at 22.  The new requirement mandates that schools will not "discriminate in student admissions, retention, or expulsion or otherwise discriminate against any student on the basis of race, color, national origin, sexual orientation, or gender identity or expression."  2019 Md. Laws Ch. 565 at 151.  Bethel reapplied for the BOOST program in 2020, and its application was denied because its handbook was found to violate this nondiscrimination requirement.  ECF 75-29 at 3.  Defendants, however, stated that if Bethel "revise[d] the language in its student handbook," its eligibility could be restored.  *Id.*  To that end, Defendants sent Bethel examples of changes that other BOOST-participating schools made to their handbooks in order to regain BOOST eligibility.  ECF 80-28.  Bethel declined that invitation.  ECF 80-1 at 25.

## II.     LEGAL STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The moving party bears the burden of

showing that there is no genuine dispute of material facts. *See Casey v. Geek Squad Subsidiary Best Buy Stores, L.P.*, 823 F. Supp. 2d 334, 348 (D. Md. 2011) (citing *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987)). If the moving party establishes that there is no evidence to support the non-moving party's case, the burden then shifts to the non-moving party to proffer specific facts to show a genuine issue exists for trial. *Id.* The non-moving party must provide enough admissible evidence to "carry the burden of proof in [its] claim at trial." *Id.* at 349 (quoting *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315-16 (4th Cir. 1993)). The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient; there must be evidence on which the jury could reasonably find in its favor. *Id.* at 348 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)). Moreover, a genuine issue of material fact cannot rest on "mere speculation, or building one inference upon another." *Id.* at 349 (quoting *Miskin v. Baxter Healthcare Corp.*, 107 F. Supp. 2d 669, 671 (D. Md. 1999)).

Additionally, summary judgment shall be warranted if the non-moving party fails to provide evidence that establishes an essential element of the case. *Id.* at 352. The non-moving party "must produce competent evidence on each element of [its] claim." *Id.* at 348-49 (quoting *Miskin*, 107 F. Supp. 2d at 671). If the non-moving party fails to do so, "there can be no genuine issue as to any material fact," because the failure to prove an essential element of the case "necessarily renders all other facts immaterial." *Id.* at 352 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Coleman v. United States*, 369 F. App'x 459, 461 (4th Cir. 2010) (unpublished)). In ruling on a motion for summary judgment, a court must view all of the facts, including reasonable inferences to be drawn from them, "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

## III.    ANALYSIS

For the reasons explained below the Court finds that the Defendants violated Bethel's free speech rights under the First Amendment.  As is also explained in more detail below, this Court will award Bethel the only injunctive relief it believes Bethel would be entitled to on any of its claims.  Accordingly, this Court declines to exercise its discretionary authority to adjudicate Bethel's other claims and will dismiss them.

### a.  Defendants Excluded Bethel from the BOOST Program Because of Its Speech, Not Its Conduct

As a threshold matter, Defendants argue that their enforcement of the nondiscrimination requirement against Bethel did not implicate Bethel's First Amendment rights at all because they were regulating conduct rather than speech.  ECF 75-1 at 30.  Defendants' argument is plausible in theory, but the record here conclusively refutes it.  While the Court does not question Defendants' desire to prevent BOOST-participating schools from engaging in discriminatory conduct, they only attempted to accomplish that goal by regulating speech.  For example, Bethel was *not* excluded from the BOOST program because it rejected any applicant on the basis of sexual orientation; or because it disciplined or expelled any student on that basis; or because it engaged in any other discriminatory conduct or behaved any differently than any other BOOST-participating school.  Instead, Bethel was expelled from the program because it refused to change the admissions policy section of its handbook to reflect the views that the government wanted it to express.  Put simply, Defendants did not demand that Bethel *act* differently to remain BOOST-eligible, they demanded that Bethel *speak* differently.

The Defendants virtually admit as much.  They argue that the nondiscrimination provision "does not require [schools] to say anything if their admissions policy, including in its written form, conforms to the requirement."  *Id.*  That argument is self-defeating.  It boils down to an assertion

that Bethel can say whatever it wants as long as it says *what the Defendants want it to say* in its admissions policy.  The fact that Bethel may have been free to express its views in other ways, or in other sections of its handbook, does not make it any less true that Defendants demanded that Bethel speak in certain ways, and express certain views, in the admissions policy section of its handbook.  Defendants even suggested that if only Bethel would agree to "revise" the language in its admissions policy (not any of its conduct), it could regain BOOST eligibility.  ECF 75-29.

Throughout Defendants' briefing, they also suggest that they were regulating conduct rather than speech because, by virtue of its admissions policy, Bethel *is* discriminating in admissions on the basis of sexual orientation.  According to Defendants, Bethel discriminates because its policy would allow it to reject an applicant, or to discipline a student, on the basis of sexual orientation, and because the policy creates a discriminatory chilling effect akin to a "White Applicants Only" disclaimer.  ECF 75-1 at 27 (citing *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 62 (2006) ("*FAIR*")).

But the Defendants have failed to put forth any evidence that Bethel's policy has deterred a single prospective applicant from applying for admission at Bethel, let alone any evidence that Bethel has ever denied admission, expelled, or disciplined a student on the basis of sexual orientation.  In the absence of any such evidence whatsoever, the Court cannot simply infer—from the text of Bethel's admissions policy alone—that Bethel has discriminated against anyone or even that its policy has deterred anyone from applying.  If Defendants had uncovered this sort of evidence—or even if their investigation into Bethel's eligibility had *attempted* to uncover such evidence—Defendants might have a stronger argument that they were concerned about Bethel's conduct rather than its speech.  Instead, though, the record reflects that Defendants focused exclusively on the text of Bethel's handbook.

In this way, the case is distinct from the facts in both *FAIR*[7] and *Christian Legal Society*,[8] on which Defendants rely.  In both of those cases, the challenged policies were facially exclusionary.  There was no question in *FAIR* that certain schools issued blanket bans on military recruiters from recruiting on their campuses, and there was no question in *Christian Legal Society* that entire groups of people were excluded from membership in the plaintiff's student group.  Here, however, Bethel's admissions policy does not *foreclose* the possibility that it will discriminate on the basis of sexual orientation, but it also does not guarantee it.  ECF 1-4 at 7.  Bethel has consistently represented before this Court, and before the Defendants, that it has never discriminated in admissions on the basis of sexual orientation.  *See, e.g.*, ECF 80-1 at 3.  This Court does not expect Defendants to take Bethel's word for it, but even with the benefit of full discovery, Defendants have not provided this Court any basis on which to find otherwise.

To be clear, the Court does not take lightly Defendants' argument that Bethel's admissions policy could deter potential applicants from applying due to the views Bethel expresses in that policy.  It is certainly possible that an admissions policy could deter members of certain groups from submitting an application.  It is also possible that such a policy could be proven to cause discrimination—by showing, for example, that the school took discriminatory actions in furtherance of the policy, or by showing that the policy created a discriminatory chilling effect

---

[7] In *FAIR,* the Supreme Court upheld a law requiring the Department of Defense to deny federal funding to higher education institutions that prohibited military recruiters from on-campus recruiting.  *FAIR*, 547 U.S. at 59.

[8] In *Christian Legal Society,*  the Supreme Court upheld a law school's nondiscrimination policy after it excluded a student group from its "Registered Student Organization" program (which made groups eligible for funding) because the group excluded any members who did not conduct their lives in accordance with its "Statement of Faith," including anyone who engaged in "unrepentant homosexual conduct."  *Christian Legal Soc'y Chapter of the Univ. of Cal. Hastings Coll. Of the Law v. Martinez*, 561 U.S. 661, 672 (2010).

(like a "White Applicants Only" disclaimer).  *See R.A.V. v. St. Paul*, 505 U.S. 377, 389 (1992) ("[W]ords can in some circumstances violate laws directed not against speech but against conduct.").  Here, though, no such evidence exists.  The text of Bethel's policy alone is not evidence of discriminatory *conduct*; the text of the policy is speech.  It follows, then, that excluding Bethel from the BOOST program based on the text of its admissions policy alone—without any evidence that the policy caused discriminatory actions or effects—is a regulation of speech, not a regulation of conduct.  Again, Defendants were not focused on what Bethel was *doing*, they were focused on what it was *saying*.

### b. Defendants Excluded Bethel from the BOOST Program Because of the Specific Viewpoints It Expressed in Its Admissions Policy

Not only was Defendants' decision to exclude Bethel from BOOST eligibility based on Bethel's speech, but it was based on the specific viewpoints Bethel chose to express in its admissions policy.  The First Amendment, which is applicable to the states via the Fourteenth Amendment, bars laws that restrict the freedom of speech.  *National Institute of Family and Life Advocates v. Becerra*, 138 S. Ct. 2361, 2371 (2018).  "In the realm of private speech or expression, government regulation may not favor one speaker over another[, and] [d]iscrimination against speech because of its message is presumed to be unconstitutional."  *Rosenberger v. Rector and Visitors of University of Virginia*, 515 U.S. 819, 828 (1995).  Therefore, "the government offends the First Amendment when it imposes financial burdens on certain speakers based on the content of their expression."  *Id.*  The government must also be particularly vigilant to "abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction."  *Id.*

The BOOST law's nondiscrimination provision itself is content and viewpoint neutral, but Defendants' enforcement of it was focused entirely on the content and viewpoint of Bethel's

speech.  As explained above, Defendants may have been motivated by an effort to prevent discriminatory conduct among BOOST-participating schools, but their process involved telling schools what they could and could not say on the issues of marriage and gender if they wanted to remain BOOST-eligible.  *See* ECF 80-28 (examples of handbook changes).  Schools that expressed views on those topics in a way Defendants deemed acceptable remained eligible, whereas schools like Bethel that refused did not.  *See id.*; ECF 75-25 ("To the extent Bethel Christian Academy decides to revise the language in its student handbook, please know that the BOOST Advisory Board has restored the eligibility of schools for the BOOST Program on that basis.").

For example, Trinity's handbook was initially flagged as problematic because it said, "the school reserves the right, within its sole discretion, to refuse admission of an applicant or to discontinue enrollment of a student [who is] . . . living in, condoning, or practicing homosexual lifestyle or alternative gender identity[.]"  ECF 80-28 at 1.  But Trinity remained eligible for BOOST by revising its handbook to say, "We hold to the Biblical standard, believing the Biblical role is to work in conjunction with students and their families to be Christ-like."  *Id.*  Similarly, Grace Academy was told its handbook violated the nondiscrimination provision because it "reserve[d] the right to refuse admission of an applicant or discontinue enrollment of a student" on the basis of their "[s]exual immorality" or "homosexual orientation."  *Id.*  But when Grace revised its handbook by eliminating the reference to "homosexual orientation," Defendants restored its eligibility.  *Id.*  These examples demonstrate the Defendants' effort to tell schools which expressions of viewpoints were acceptable, and which were unacceptable, on the issues of marriage, sexual orientation, and gender identity.

The irony of these examples is that many of the State-approved revisions have no impact on the schools' discretion to discriminate.  For example, whereas Trinity's old handbook explicitly

allowed it to reject applicants on the basis of their "homosexual lifestyle[s]," its revised handbook presumably would have allowed it to reject applicants it disfavored for not being "Christ-like." Of course, Trinity, like other BOOST schools, pledged that it would not discriminate in the admissions process on the basis of sexual orientation, so it would still have been a violation of that certification to reject a homosexual applicant for that reason. However, Defendants did not change the implications or potential effects of the schools' admissions policies, but instead required schools to tweak their language to be less explicit about the views they espoused, making those written policies more palatable to Defendants.

This Court does not question Defendants' ultimate motivation to prevent discrimination, but their method of accomplishing that goal involved drawing lines between acceptable and unacceptable speech on specific topics. They advised BOOST-participating schools on what their admissions policies could and could not say on those topics in order to remain BOOST-eligible. The First Amendment is designed to prevent the government from acting as the arbiter of acceptable and unacceptable speech. Whether or not they intended to, Defendants assumed that role of arbiter here.

### c. Defendants Conditioned Bethel's BOOST Eligibility on Its Adoption of a State-Approved Admissions Policy

As described above, Defendants rescinded Bethel's BOOST eligibility because of the particular views it expressed in its admissions policy. But the Defendants did not directly regulate Bethel's speech. Instead, they imposed a viewpoint-based condition on Bethel's ability to receive government funding. This Court will, therefore, address whether such a condition violates the unconstitutional conditions doctrine.

14

### i. The Unconstitutional Conditions Doctrine

It is "a basic First Amendment principle that 'freedom of speech prohibits the government from telling people what they must say.'" *Agency for Int'l Dev. v. Alliance for Open Society Int'l, Inc.*, 570 U.S. 205, 213 (2013) ("*AOSI*") (quoting *FAIR*, 547 U.S. at 61). The First Amendment protects each person's ability to "decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence." *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 641 (1994). Accordingly, "[t]he government may not prohibit the dissemination of ideas that it disfavors, nor compel the endorsement of ideas that it approves." *Knox v. Service Employees*, 567 U.S. 298, 309 (2012) (collecting cases).

Similarly, the First Amendment places "a limit on [the government's] ability to place conditions on the receipt of funds." *FAIR*, 547 U.S at 59. "As a general matter, if a party objects to a condition on the receipt of [government] funding, its recourse is to decline the funds. This remains true when the objection is that a condition may affect the recipient's exercise of its First Amendment rights." *AOSI*, 570 U.S. at 214. In some cases, however, the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech even if he has no entitlement to that benefit." *Id.* (quoting *United States v. American Library Association, Inc.*, 539 U.S. 194, 210 (2003)).

The Supreme Court has indicated that the line between permissible conditions on the receipt of government funds and unconstitutional conditions is "hardly clear," but that it depends on the relationship between the government program and the conditions imposed under it. *AOSI*, 570 U.S. at 215. "The relevant distinction that has emerged . . . is between conditions that define the limits of the government spending program—those that specify the activities Congress wants to subsidize—and conditions that seek to leverage funding to regulate speech outside the contours

of the program itself." *Id.* at 214-15.  The former are generally permissible, while the latter are generally impermissible.

In *AOSI*, the Supreme Court compared several of its previous cases that, according to the Court, highlight this distinction.  In *Regan v. Taxation With Representation of Washington*, the Supreme Court upheld a law requiring nonprofits seeking tax-exempt status under 26 U.S.C. § 501(c)(3) to refrain from engaging in substantial lobbying efforts.  461 U.S. 540 (1983).  There was no question that the restriction on lobbying affected the nonprofits' protected First Amendment rights in exchange for a tax benefit.  However, the Supreme Court upheld the restriction because:

> the condition did not prohibit [nonprofits seeking tax-exempt status] from lobbying Congress altogether.  By returning to a 'dual structure' it had used in the past— separately incorporating as a § 501(c)(3) organization and a § 501(c)(4) organization—the nonprofit could continue to claim § 501(c)(3) status for its nonlobbying activities, while attempting to influence legislation in its § 501(c)(4) capacity with separate funds.

*AOSI*, 570 U.S. at 215.  Critically, then, "[t]he condition . . . did not deny the organization a government benefit '*on account of its intention to lobby*.'"  *Id.* (quoting *Regan*, 461 U.S. at 545) (emphasis added).  In other words, the Court viewed the restriction on lobbying as merely a limit on the government program (*i.e.* the tax benefit could not be used to subsidize lobbying efforts), rather than an effort to force the nonprofits to relinquish a protected right as a condition for claiming the tax exemption (because, in practice, the nonprofits were not being forced to give up lobbying efforts in exchange for the exemption).

By contrast, in *FCC v. League of Women Voters of California*, 468 U.S. 364, 399-401 (1984), "the Court struck down a condition on federal financial assistance to noncommercial broadcast television and radio stations that prohibited all editorializing, including with private

funds." *AOSI*, 570 U.S. at 215-16.  As the *AOSI* Court explained, "[u]nlike the situation in *Regan*, the law provided no way for a station to limit its use of federal funds to noneditorializing activities, while using private funds 'to make known its views on matters of public importance.'"  *Id.* at 216 (quoting *League of Women Voters of California*, 468 U.S. at 400).  Accordingly, the condition on receiving government funds "went beyond ensuring that federal funds not be used to subsidize 'public broadcasting station editorials,' and instead leveraged the federal funding to regulate the stations' speech outside the scope of the program."  *Id.* (quoting *League of Women Voters of California*, 468 U.S. at 399).

In *Rust v. Sullivan*, the Court rejected a challenge to Title X of the Public Health Service Act, which funded nonprofit health-care organizations' family planning projects and services but prohibited those funds from being "used in programs where abortion is a method of family planning."  500 U.S. 173, 178 (1991).  The Court in *Rust* held it was permissible for Congress to "selectively fund certain programs to address an issue of public concern, without funding alternative ways of addressing the same problem."  *AOSI*, 570 U.S. at 217.  As in *Regan*, the government spending program in *Rust* was "designed to ensure that the limits of the federal program are observed," and "that public funds [are] spent for the purposes for which they were authorized."  *Rust*, 500 U.S. at 193.  And critically, the Supreme Court recognized that "Title X expressly distinguishes between a Title X *grantee* and a Title X *project*."  *Id.* at 196 (emphasis in original).  The Court held, therefore, that "[t]he Title X *grantee* can continue to . . . engage in abortion advocacy; it simply is required to conduct those activities through programs that are separate and independent from the project that receives Title X funds."  *Id.* (emphasis in original).  Accordingly, "[b]ecause the regulations did not 'prohibit the recipient from engaging in the

protected conduct outside the scope of the federally funded program,' they did not run afoul of the First Amendment." *AOSI*, 570 U.S. at 217 (quoting *Rust*, 500 U.S. at 197) (alteration omitted).

Then, in *AOSI* itself, the Court considered a challenge to a law that authorized the "appropriation of billions of dollars to fund efforts by nongovernmental organizations to assist in the fight" against HIV/AIDS. *Id.* at 208. One condition on a nonprofit's receipt of funds under the law, however, was that "no funds may be used by an organization 'that does not have a policy explicitly opposing prostitution and sex trafficking.'" *Id.* (quoting 22 U.S.C. § 7631(f)). The Court found that this requirement imposed an unconstitutional condition in violation of the First Amendment because it "mandates that recipients of Leadership Act funds explicitly agree with the Government's policy to oppose prostitution and sex trafficking." *Id.* at 213. The Court held that:

> By demanding that funding recipients adopt—as their own—the Government's view on an issue of public concern, the condition by its very nature affects "protected conduct outside the scope of the federally funded program." *Rust*, 500 U.S.[] at 197[.] A recipient cannot avow the belief dictated by the Policy Requirement when spending Leadership Act funds, and then turn around and assert a contrary belief, or claim neutrality, when participating in activities on its own time and dime. By requiring recipients to profess a specific belief, the Policy Requirement goes beyond defining the limits of the federally funded program to defining the recipient.

*Id.* at 218. Because the law required grantees to "pledge allegiance to the Government's policy of eradicating prostitution[,]" the condition ran afoul of the First Amendment. *Id.* at 220.

As these cases demonstrate, while the government may constrain the uses of funding to define the scope of a government program, it may not condition that funding on acquiescence with, or expression of, its views. Admittedly, that line is not always clear, but the *AOSI* case establishes that the government violates the First Amendment if it conditions funding on a requirement that recipients conform their speech to the government's preferred views. *Id.*

**ii. Defendants' Attempt to Regulate Bethel's Speech Violated the Unconstitutional Conditions Doctrine**

There is no dispute that Defendants excluded Bethel from BOOST eligibility because its admissions policy expressed its views on marriage and gender in a way Defendants found objectionable.  ECF 80-47.  Defendants also made clear to Bethel that if it changed its policy, its eligibility would be reconsidered, and that, in fact, several BOOST-participating schools had changed their policies and Defendants restored their eligibility.  ECF 75-25 ("To the extent Bethel Christian Academy decides to revise the language in its student handbook, please know that the BOOST Advisory Board has restored the eligibility of schools for the BOOST Program on that basis.").  Bethel's BOOST eligibility, therefore, was conditioned on the use of an admissions policy that either expressed State-approved views on marriage and gender or remained silent on those topics.

Arguably this case is distinct from *AOSI* insofar as the law in that case mandated adoption of a certain view, whereas here the condition *prevented* Bethel from expressing certain views. While that is a legitimate distinction, Defendants were still drawing lines between acceptable and unacceptable speech.  In order to remain BOOST-eligible, schools were forced to adopt language Defendants approved (*e.g.* reserving the right to deny an applicant for not being "Christ-like") and forego language Defendants found objectionable.  Thus, while Defendants were not enlisting BOOST participants to express particular government views in the same way the government was in *AOSI*, the Defendants were requiring Bethel to use State-approved speech or to forego BOOST funding.

Defendants argue that their enforcement of the nondiscrimination requirement is merely a condition that defines the contours of the BOOST program, rather than one that reaches outside of the program to regulate speech.  ECF 75-1 at 30 ("The BOOST Program nondiscrimination

requirements are 'conditions that define' the program as one that provides funds to students to attend nonpublic schools that do not discriminate on the basis of sexual orientation, and now gender identity."). This Court disagrees. As noted above, the line between permissible conditions that "define the limits of a government spending program" and impermissible conditions that "seek to leverage funding to regulate speech outside the contours of the program itself" is "hardly clear, in part because the definition of a particular program can always be manipulated to subsume the challenged condition." *AOSI*, 570 U.S. at 214-15. Here, however, the condition falls on the impermissible side of that line.

First, like in *AOSI* and *League of Women Voters of California*, and unlike in *Regan* and *Rust*, there is no way for Bethel to avoid the condition the Defendants imposed. In *Regan*, the funding condition left non-profits free to lobby, just not in their Section 501(c)(3) capacities. *Regan*, 461 U.S. at 545. And in *Rust*, Title X grantees could continue to engage in abortion advocacy, just not with Title X funds. *Rust*, 500 U.S. at 196. Here, though, there is no way for Bethel to receive BOOST funding *and* employ an admissions policy that expresses its views on marriage and gender. To be sure, Defendants did not attempt to prevent Bethel from expressing its views on marriage and gender in any place other than the text of its admissions policy. But Bethel has a protected right to express those views *in its admissions policy* if it so chooses. Moreover, the First Amendment prevents Defendants from attempting to use BOOST funding as leverage to compel recipients to express views that Defendants find more palatable. *AOSI*, 570 U.S. at 214-15. Thus, fact that Bethel remained free to express its views in other ways does not mitigate the fact that Defendants conditioned BOOST funding on Bethel's agreement to conform its admissions policy to align with Defendants' preferred views. In that sense, this case is closer to *AOSI* and *League of Women Voters of California*, where the conditions significantly burdened

recipients' ability to express their views, than it is to *Regan* and *Rust*, where the conditions limited recipients' ability to use government funds and benefits to express their views but did not otherwise impede their ability to express those views in whatever ways, and with whatever language, they wished.

Second, Defendants' enforcement of BOOST's nondiscrimination provision against Bethel was not an effort to enforce a limitation that defines the contours of the BOOST program. As an initial matter, the BOOST program is not a legislative effort to address discrimination in schools—it is an effort to provide financial assistance to families in need to allow them to send their children to nonpublic schools. *See* ECF 1-5 ("this appropriation shall be for a [BOOST] Program that provides scholarships for students . . . to attend eligible nonpublic schools."). While the nondiscrimination provision clearly demonstrates the Legislature's preference that BOOST funding is not used to subsidize families who choose to send their children to discriminatory schools, Defendants' enforcement of that provision reached far beyond an effort to carry out that programmatic limitation. As explained above, Defendants' condition was not limited to verifying that Bethel was abiding by the nondiscrimination provision. Instead, Defendants exceeded that programmatic limitation and attempted to use BOOST funding as leverage to compel Bethel to speak in a different way on specific topics. *AOSI*, 570 U.S. at 218 (the government may not leverage funding to regulate "protected conduct outside the scope" of the program itself) (quoting *Rust*, 500 U.S. at 197).

### d.  Defendants' Actions Cannot Withstand Heightened Scrutiny

The Supreme Court has not been clear on how lower courts should decide what level of scrutiny applies in unconstitutional conditions cases. In some sense, the unconstitutional conditions doctrine is, itself, a form of scrutiny insofar as it asks whether a funding condition—

even one that discriminates on the basis of content or viewpoint—is necessary to define the parameters of the government program.  Regardless, "[w]hat can be gleaned from a careful parsing of the case law is that the level of scrutiny applied to Government subsidies under the unconstitutional conditions doctrine turns on the type and scope of speech required or restricted, the speaker, whether the condition is viewpoint-discriminatory, its relationship to the Government program at issue, and other fact-specific inquiries." *Alliance for Open Society Int'l, Inc. v. Agency for Int'l Dev.*, 678 F.3d 127, 132 (2d Cir. 2012) (Pooler, J., concurring in denial of reh'g en banc) (collecting cases).

Defendants' actions conditioned government funding on a viewpoint-based restriction of speech.  When faced with similar cases, the Supreme Court has (though not explicitly) applied a heightened level of scrutiny, rather than simply asking whether the government had any conceivable rational basis for the challenged condition.  *See e.g.*, *AOSI*, 570 U.S. 214-20 (applying heightened scrutiny); *Legal Services Corp. v. Velazquez*, 531 U.S. 533, 547 (2001) (same).

As explained above, the condition—Defendants' demand that Bethel revise its handbook to express views that were more palatable to the Defendants—was not necessary to define the scope or priorities of the funding program, or even to carry out its nondiscrimination provision. Instead, Defendants reached beyond the definitional contours of the program in a way that impeded Bethel's First Amendment rights.  Moreover, Defendants' enforcement of the nondiscrimination provision was only, at best, loosely tailored to the goal of preventing discrimination by BOOST-participating schools.  Defendants reviewed language used in schools' handbooks but made no effort to determine whether that language caused any discriminatory effects.  Accordingly, no matter how compelling Defendants' interest in preventing discrimination, their actions cannot withstand heightened scrutiny.

### e. Remedy

This Court finds that Defendants' application of the BOOST nondiscrimination provision, in December, 2018, to exclude Bethel from BOOST eligibility for the 2018-2019 and 2019-2020 school years, violated Bethel's rights under the First Amendment.  Accordingly, for the reasons explained above, this Court will grant Bethel's motion for summary judgment as to Count II and deny Defendants' motion for summary judgment as to Count II.  This Court will, therefore, enjoin Defendants from clawing back the $102,600 that Bethel previously received in BOOST funding.

In this Court's view, that is the only relief available to Bethel on any of its claims in this case.  To the extent Bethel claims it is entitled to prospective injunctive relief (aside from an injunction prohibiting Defendants from clawing back previously awarded funding), this Court disagrees.  The record in this case concerns conduct that took place before the Complaint was filed and the Complaint has never been amended to incorporate any subsequent developments.  Since the Complaint was filed, BOOST's nondiscrimination provision has been amended, and the record does not reflect whether Bethel has made any additional changes to its handbook that could impact the State's review of any future reapplication.  Any forward-looking injunction would inappropriately govern Bethel's hypothetical future application to the BOOST program and the Defendants' hypothetical enforcement of a new, amended version, of the law that is at issue in this case.  It would thus be improper for this Court to award any prospective injunctive relief relating to Bethel's future BOOST eligibility or the Defendants' future enforcement of the current nondiscrimination provision.

Because this Court is awarding the only relief it thinks is appropriate on any of Bethel's claims, it will decline to exercise its discretionary authority under 28 U.S.C. § 2201 to adjudicate Bethel's other claims.  Those claims will, therefore, be dismissed.

Accordingly, nothing in this opinion addresses the constitutionality of the BOOST program or its nondiscrimination provision.  Nor does this opinion address Bethel's future eligibility for BOOST funding.  Defendants may, of course, continue to enforce the nondiscrimination provision against Bethel and any other BOOST-participating schools.  This Court's ruling is a narrow one: on the record developed *in this case*, Defendants' enforcement of the 2018 iteration of the nondiscrimination provision to exclude Bethel from the BOOST program for the 2018-2019 and 2019-2020 school years violated the First Amendment.

This Court appreciates the Legislature's interest in ensuring that BOOST funding does not subsidize discrimination by participating schools.  And the Court recognizes that Defendants have a very difficult task in carrying out that goal by enforcing the nondiscrimination provision, particularly as it applies to religious schools like Bethel with whose views the State may vehemently disagree.  But the State acts at its own peril when it attempts to draw lines between acceptable speech and unacceptable speech on specific topics.  Because that is what Defendants did here, they violated Bethel's First Amendment rights.

## IV.    CONCLUSION

For the reasons set forth above, Bethel's motion for summary judgment, ECF 80, will be GRANTED as to Count II, and Defendants' motion for summary judgment, ECF 75, will be DENIED as to Count II.  A declaratory judgment will issue in Bethel's favor, and against the Defendants, declaring that Defendants' application of the 2018 iteration of the BOOST nondiscrimination provision to exclude Bethel from the BOOST program for the 2018-2019 and 2019-2020 school years violated Bethel's First Amendment rights.  Defendants also will be enjoined from clawing back the $102,600 Bethel previously received in BOOST funding.  Count I and Counts III-VI will be dismissed.  A separate order follows.

24

Dated: January 12, 2022                                 /s/

                                              Stephanie A. Gallagher
                                              United States District Judge